## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492, LLC, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| *Plaintiffs,* | )<br>) |
| v. | )<br>) |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | )<br>)<br>) |
| *Defendant.* | )<br>)<br>) |

Civil Action No.

## <u>VERIFIED COMPLAINT</u>

Plaintiffs, the Association to Preserve and Protect Local Livelihoods ("APPLL"), B.H. Piers, L.L.C. ("BH Piers"), Golden Anchor, L.C., doing business as Harborside Hotel ("Harborside"), B.H.W.W., L.L.C. ("BHWW"), Delray Explorer Hull 495 LLC ("495"), Delray Explorer Hull 493 LLC ("493"), and Acadia Explorer 492, LLC ("492") (and together with APPLL, BH Piers, Harborside, BHWW, 495, and 493, "Plaintiffs"), through their attorneys, complain against Defendant the Town of Bar Harbor, ("Defendant" or "the Town"), as follows:

### SUMMARY

1.     This Complaint challenges, under the Constitution and the laws of the United States, the legality of efforts to all but close the port of Bar Harbor to cruise ships engaged in the interstate and foreign commerce of the United States through that certain Citizen Petition for Land Use Ordinance Amendment passed by the Town on November 8, 2022, as Article 3 of the Special Town Meeting Warrant and became an ordinance (the "Initiated Ordinance") of the Town,

1

pursuant to the Town Charter, effective as of December 8, 2022, which, by its terms, prohibits the disembarkation of more than one thousand (1,000) persons, including passengers and crew, cumulatively from cruise ships per day into the Town of Bar Harbor. Plaintiffs seek a declaration that the Initiated Ordinance is unconstitutional and otherwise unlawful and a permanent injunction against the implementation and enforcement of the Initiated Ordinance. Plaintiffs seek no monetary damages.

2.      The 1,000-person disembarkation limit, which covers passengers and crew, is antithetical to the Supremacy and Commerce clauses of the US Constitution and the resultant comprehensive federal regulatory scheme that governs the operations of cruise ships and maritime facilities. Federal regulations prescribe the operating standards and conditions of cruise ships, their crews, and maritime facilities with preemptive effect and provide implicit, if not explicit, authority for these ships and facilities to engage in the operations for which they have been federally approved. By imposing a draconian and arbitrary limitation on passenger and crew disembarkations from cruise ships, the Initiated Ordinance impermissibly bars cruise ships and maritime facilities from engaging in their federally approved operations in the port of Bar Harbor that passenger and cruise ships have safely engaged in at that port for decades.

3.      The Initiated Ordinance will exclude cruise ship visitors, but not visitors arriving by any other conveyance, from the Town, purportedly to conserve Town resources and enhance the lives and safeguard the health, safety, and welfare of the Town's residents. The Initiated Ordinance discriminates against interstate and foreign commerce, and its application of the 1,000-person limit only to cruise ships and cruise ship visitors is not the least discriminatory means available to achieve the purported purpose of the Town Council of Bar Harbor (the "Initiative"). The Initiated Ordinance will also have impacts outside of the Town and the State of Maine. It will

also cause disruption of cruise ship commerce up and down the Eastern Seaboard that greatly outweighs any asserted conservation of Town resources that is purported to result from the unlawful exclusion of less than ten percent of all visitors to the Town.

4.    The Initiated Ordinance is not rationally related to its purpose and objectives in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

5.    Plaintiffs allege that the Initiated Ordinance is invalid under United States Constitution and federal statutory protections. Plaintiffs seek declaratory and injunctive relief barring the enforcement of the Initiated Ordinance.

## PARTIES

6.    Plaintiff APPLL is a not-for-profit 501(c)(6) organization, duly organized under the laws of the State of Maine, with a principal place of business in the Town of Bar Harbor, County of Hancock, State of Maine. Plaintiff APPLL is comprised of members ("APPLL Members") that own and/or operate businesses in Bar Harbor and have combined their resources to advocate for the preservation and protection of local businesses and livelihoods. APPLL Members include owners and employees of restaurants, retail stores and tour-related businesses, among others. Consistent with its articles of incorporation, APPLL's purposes include, but are not limited to, empowering and supporting local business owners and employees and protecting their way of life, advocating for businesses in and around the Mount Desert region, and resisting measures that would impinge on business conditions or the local economy. APPLL exists so that its members can work together to protect tourism from inequitable treatment and legislation that discriminates against maritime tourism. APPLL Members are bringing this case because they recognize the

economic benefits that result from maritime visitor spending. The Board of APPLL has specifically authorized its president to review and verify the allegations of this Complaint.

7.     Plaintiff BH Piers is a limited liability company, duly organized under the laws of the State of Maine, with a principal place of business in the Town.

8.     Plaintiff BH Piers operates a pier located at 1 West Street, commonly known as Harbor Place in Bar Harbor, Maine. One of the pier's uses is landing passengers and crew from cruise ships anchored in Frenchman Bay. BH Piers' operation is in full compliance with United States Coast Guard rules and regulations, pursuant to 33 C.F.R. § 105.200. A true and accurate copy of BH Piers' Federal Overlay Plan ("Approval") is attached hereto as Exhibit A.

9.     Plaintiff Golden Anchor (herein "Golden Anchor" and "Harborside") is a limited liability company, duly organized under the laws of the State of Florida, with a principal place of business in Delray Beach, County of Palm Beach, State of Florida, authorized to transact business in the State of Maine.

10.    Harborside operates a pier at 55 West Street in the Town. One of the uses of the pier is landing passengers and crew from cruise ships anchored in Frenchman Bay. Harborside's operation is in full compliance with United States Coast Guard rules and regulations, pursuant to 33 C.F.R. § 105.200. A true and accurate copy of Harborside's Approval, is attached hereto as Exhibit A.

11.    Plaintiff BHWW is a limited liability company, duly organized under the laws of the State of Maine, with a principal place of business in the Town, doing business as Bar Harbor Whale Watch Company.

12.    Plaintiff 495 is a Florida limited liability company. 495 owns and operates a 149-passenger custom built cruise ship tender vessel that is used to ferry cruise ship passengers and

crew to and from the landings of BH Piers and Harborside for their disembarkations and visits to the Town.

13.     Plaintiff 493 is a Florida limited liability company. 493 owns and operates a 149-passenger custom built cruise ship tender vessel that is used to ferry cruise ship passengers and crew to and from the landings of BH Piers and Harborside for their disembarkations and visits to the Town.

14.     Plaintiff 492 is a Florida limited liability company. 492 owns and operates a 149-passenger custom built cruise ship tender vessel that is used to ferry cruise ship passengers and crew to and from the landings of BH Piers and Harborside for their disembarkations and visits to the Town.

15.     BHWW, Golden Anchor, BH Piers, 495, 493 and 492 are affiliated entities. 495, 493 and 492 are sometimes referred to, collectively, in this Complaint as the "Tender Owners."

16.     Defendant Town is a municipal corporation, duly organized under the laws of the State of Maine, and its principal place of business is in the County of Hancock, State of Maine.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts over actions arising under the Constitution or laws of the United States. This case arises under the Commerce Clause of the Constitution, Article I, Section 8, the Treaty Clause of the United States Constitution, Article II, Clause 2, the federal authority over maritime and navigable waters, certain statutes and regulations of the United States, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, all of which, pursuant to the Supremacy Clause, Article VI of the United States Constitution, are the supreme law of the land and this case is brought pursuant to 42 U.S.C. § 1983.

18.     This suit is brought pursuant to 42 U.S.C. § 1983, which provides, in part, as follows: "Every person who under color of any statute, ordinance, regulation, custom, usage of any state or territory subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to a deprivation of any rights, privileges, immunity secured by the Constitution shall be liable to the party injured in an action at law or in equity or other proper proceedings for redress."

19.     Venue is proper in the District of Maine pursuant to 28 U.S.C. § 1391 because Defendant is located in this District. In addition, a substantial part of the events or omissions giving rise to the claims, specifically, the passage of the Initiated Ordinance, occurred in this District.

20.     The Court has authority to enjoin enforcement of the Initiated Ordinance under 42 U.S.C. § 1983 and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTUAL BACKGROUND

### *The Cruise Industry in Bar Harbor*

21.     Bar Harbor serves as a popular access point for both Acadia National Park, which experienced approximately four million visitors in 2021, and cruises to the Canadian Maritimes. Both overnight and daytime visitors are drawn to Bar Harbor because of its proximity to the Maine coast and Acadia National Park. The Town has also been a sought after tourist destination since the 1880's with its cottages, hotels and shops set in a pastoral and waterfront setting.

22.     In 1998, Bar Harbor developed and adopted a plan called the "Bar Harbor Waterfront Master Plan." The plan (the "Master Plan") identified several infrastructure improvements the Town should consider to facilitate the increase in cruise ship visitation and the Town went ahead actively developing a plan to attract cruise ship visitation with the goal of

developing, growing, and supporting the cruise ship economy in coordination with Maine Department of Transportation and the Maine Port Authority.

23.     The Master Plan was embraced by the Town, the State of Maine, the cruise industry, and the owners of privately-owned key waterfront parcels, all of which worked together for years to develop Bar Harbor as the arrival gateway for visitors. In furtherance of that objective, millions of dollars were spent on the infrastructure required to enable Bar Harbor to welcome large cruise ship and to safely tender their passengers and crew aboard custom-made cruise ship tender vessels.

24.     In furtherance of the Master Plan and in reliance on the Town and the State of Maine's commitment to cruise ship tourism in Bar Harbor, the Tender Owners collectively expended $17,800,000 on their tender boats. BH Piers and Harborside each went through a lengthy and expensive process to acquire and renovate their respective piers to accommodate cruise passenger tourism. As explained in more detail below, these funds were expended by BH Piers, Harborside, BHWW, and the Tender Owners in reliance on the Town and the State of Maine's commitment to cruise ship tourism in Bar Harbor. At all relevant times hereto, the anticipated volume of this cruise ship tourism involved disembarkation of anticipated 2,000 to 4,500 cruise ship tourists (average daily) on cruise ships that call on the port of Bar Harbor.

25.     Bar Harbor has the distinction of being one of the most convenient and practical customs point of entry capable of accommodating the large number of cruise ships that re-enter the United States from foreign waters each season. Those cruise ships anchor outside the town's municipal jurisdiction at the two separate federally-designated anchorages in Frenchman Bay up to two miles away from the passenger landing areas in Bar Harbor.

26.     Once anchored, BHWW custom barges are ferried to the cruise ship where the barges are safely secured to the ship so the tender boats can have a stable docking area to accept

passengers. The tender boats owned by the Tender Owners (and at times boats owned by entities related to the Tender Owners) ferry passengers and crew between the custom barges secured to the cruise ships and the two Coast Guard approved private piers in Bar Harbor at Harbor Place and Harborside Docks, owned and operated by BH Piers and Harborside.  These two private piers are the only cruise ship tender landing facilities in the Town.

27.    The private piers are specifically designed and designated as secure facilities for the purpose of receiving cruise ship passengers and crew. These operations are duly and properly approved by the United States Coast Guard. *See* ¶¶ 8, 10 *supra*. BH Piers and Harborside each went through an exacting, rigorous, and costly process in order to gain their U.S. Coast Guard Approvals. BH Piers and Harborside incurred the expense of acquiring the property and underwent the federal process for obtaining their Coast Guard Approvals for the express purpose of engaging in the business of disembarking cruise ship passengers and crew at their respective piers.

28.    On a daily basis, when cruise ships call at Bar Harbor, they typically arrive in the morning and depart later the same day. Once on land, typically for no more than six (6) hours, passengers and crew cross a private landing site and proceed into Bar Harbor, patronizing shops, museums, restaurants, tour services, and other hospitality-related services in the Town or in the surrounding areas, including Acadia National Park.

29.    Prior to the COVID-19 pandemic, approximately 158 cruise ships, carrying a potential 249,080 passengers, were scheduled to call at Bar Harbor in 2019.

30.    Cruise ship visitation has a positive, outsized economic impact in Bar Harbor. A peer-reviewed twenty-year study of monthly taxable Bar Harbor restaurant sales, including data from January of 2000 to December of 2019, using a time-series regression model, reveals much about the beneficial economic impact of cruise ship visitations during that time period. This

lengthy study of the cruise industry in Bar Harbor encompasses a sufficient time frame for determining how restaurant sales are related to the presence of overnight visitations, the impact of Acadia National Park visitors, the number of cruise ship passengers that disembark, and the general variation in restaurant sales nationally.

31.     In 2019, each cruise ship passenger spent an average of $21.83 on food and drink while in port. Based on the estimated number of cruise ship passengers that disembarked each month in 2019 and the estimated restaurant spending of $21.83 per passenger, cruise ship passengers had their greatest relative impacts in September (10% of restaurant sales) and October (12% of restaurant sales). These figures are not surprising because, the Town, by its own design, has the highest number of cruise ship passengers in September and October, while overnight tourism slows down in the fall. In 2019, the overall economic impact of cruise ship passengers, which included spending at restaurants and other purchases prior to COVID-19, was $23.5 to $31.5 million.

32.     This economic activity is essential to many businesses that have grown to support the cruise industry in Bar Harbor, including restaurants, retail, and tour-based businesses.  When the COVID-19 pandemic forced the shutdown of cruise travel in 2020, and no cruise ships came to Bar Harbor, Bar Harbor businesses immediately felt the impact.  For example, Bar Harbor restaurant sales in October 2020 decreased by 47 percent as compared to that same month in 2019. *Id*.

33.     For many years, the Town (fully considering any impact on the Town and its facilities and services) has managed cruise ship visitation. Since 2008, the Town has established voluntary and variable cruise ship "daily caps" of 5,500 passengers per day for the months of May, June, September and October, and 3,500 passengers per day for the months of July and August.

34.     For more than 15 years, the Town and its Cruise Ship Committee and Town Staff have negotiated voluntary caps and have again entered into voluntary caps with the cruise industry for a modified cruise schedule for 2023 and beyond.

35.     On February 15, 2022, the Town Council approved the formation and membership of a working group to negotiate with the cruise industry for a voluntarily-modified cruise schedule for 2023 and beyond.

36.     On August 16, 2022, as a result of the efforts of the Town's working group, the Town Council adopted the cruise ship scheduling plan, which included a shortened cruise ship season and passenger caps that, in some cases, would voluntarily reduce the number of daily cruise visitors disembarking at Bar Harbor.

37.     In September and October 2022, the Town entered into Memoranda of Agreement ("MOA") with each of various cruise lines,[1] whereby the cruise lines voluntarily agreed that, in the months of May, June, September and October, they would limit aggregate daily passenger disembarkations to 3,800 passengers, and in the months of July and August would limit daily passenger disembarkations to 3,500 passengers.

### *The Citizens' Initiative*

38.     On March 16, 2022, a citizens' group submitted a petition to the Town Council of Bar Harbor (the "Initiative").

---

[1] The cruise lines signing the MOA include American Cruise Lines, Disney Cruise Lines, Holland America Line, Hurtigruten Expeditions, Norwegian Cruise Line, Pearl Seas Cruises, Princess Cruises, Royal Caribbean Cruises, Ltd., Seabourn Cruise Line, Viking Cruises, and Windstar Cruises Marshall Islands.

39.     The Initiative amends the Bar Harbor Code ("Town Code"), Chapter 125, Article VII, by adding Section 125-177(H). A true and accurate copy of the Initiative is attached hereto as Exhibit B.

40.     Substantively, as to the daily limit for persons disembarking from a cruise ship, the Initiative proposed an amendment to the land use ordinance of the Town Code prohibiting the disembarkation of more than 1,000 "passengers" from cruise ships per day on, over, or across any property located within the Town.

41.     The Initiative provided that, "no more than 1,000 *passengers*, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor." *Id.* at § 125-77(H)(2) (emphasis added).

42.     The Initiative also charged the Town's Harbormaster with duties that include but are not limited to "determin[ing]" whether and when the 1,000-passenger limit has been exceeded in each calendar day. *Id*. It also charged the Harbormaster with devising "a reservation system for cruise ships that transport persons by watercraft for disembarkation in the Town of Bar Harbor"; a "mechanism for counting and tracking the number of persons disembarking each day"; a "mandatory procedure for reporting violations to the Code Enforcement Officer." *Id.*

43.     The Initiative provided further that "[a]ny property owner issued a permit under this § 125-77(H) shall comply with all rules and regulations promulgated by the Harbormaster [pursuant to the Initiative]." *Id*.

44.     The Initiative empowered the Code Enforcement Officer to impose "fines, penalties, actions" with the specific provision that "each disembarking person exceeding the permitted daily limit" could result in a $100 fine "per excess unauthorized person" to be imposed on property owners to whom permits have been issued. *Id*. at § 125-77(H)(4). The only property

owners susceptible to fines under the Initiative are BH Piers and Harborside, because these entities are the only owners of property on which cruise ship disembarkations occur.

45.     The Initiative was to be expressly retroactive to March 16, 2022, but included a provision that it will not apply to "any cruise ship reservations that have been accepted by the Harbormaster prior to March 16, 2022" and provided further that "the Town will not take any enforcement action . . . with regard to any cruise ship visits occurring prior to the date of adoption at Town Meeting, [November 8, 2022]." *Id.* § 125-77(H)(5).

46.     The Initiative is accompanied by a "Purpose" section, which was not enacted into law. The Purpose section broadly asserts that "large numbers of [cruise ship] passengers" entering into the limits of the Town of Bar Harbor "have overwhelmed the downtown area, resulting in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other spaces, and inundating local amenities and attractions, all of which results in a diminished quality of life for Town residents." *Id.* Purpose, ¶ 1.

47.     The Purpose section of the Initiative asserted further that:

> the presence of disembarking cruise ship passengers in the downtown area jeopardizes the Town's ability to deliver municipal services to Town residents and visitors (for example, cruise ship passengers), including the provision of public safety services (police and fire), emergency medical services (EMS), in-patient and out-patient services at local hospitals, pandemic control measures, and public sanitation services, and also impacts the ability of local shops, restaurants, and other businesses to attract and serve customers.

*Id.*

48.     The Purpose section identified only passengers arriving by cruise ship as the cause of the alleged burdens on the Town's public services, businesses, and healthcare providers.

49.     The stated Purpose of the Initiative is mere pretense and was unsupported by relevant facts or data. Although not expressly stated, the Initiative's purpose—and actual

effect—is to bar virtually all cruise ships that have safely visited Bar Harbor for decades and to bar the passengers who patronize those cruise ships from entering the Town.

50.    On August 2, 2022, the Town Council voted to place the Initiative on the warrant articles calling the November town meeting warrant. A true and accurate copy of the Order placing the Initiative on the warrant articles is attached hereto as Exhibit C.

51.    The Initiative was listed as Article 3 on the Warrant for the November 8, 2022, Special Town Meeting. A true and accurate copy of the Special Town Meeting Warrant, which includes Article 3, is attached hereto as Exhibit D.   On August 2, 2022, when the Council adopted Warrant Article 3 to advance the form of the initiative ordinance to the voters at Town Meeting on November 8, 2022, the approved text in the Council's Warrant used a form of Ordinance that used the term "persons" throughout the Initiated Ordinance. As a result, the 1000 *passenger* per day cap on disembarkations is now a 1000-*person* cap, clearly encompassing all types of travelers on cruise ships (passengers and crew). In all staff memoranda to the Council subsequent to November 8, 2022, Town officials acknowledge that the term "persons" in the Initiated Ordinance includes both passengers and crew.

52.    On November 8, 2022, the Initiative was passed by the Bar Harbor Town Meeting as Article 3 of the Special Town Meeting Warrant and became an ordinance (the "Initiated Ordinance") of the Town, pursuant to the Town Charter, effective as of December 8, 2022.

53.    By its terms, the Initiated Ordinance applies to "persons" (both crew and passengers) and it also exclusively applies to "cruise ships" as defined in Section 153-22(B) in the Town Code. Under the Town Code, "[C]ruise ship" means a watercraft carrying passengers for hire which is capable of providing overnight accommodations for 49 or more passengers." It does not apply to any other vessel of any type or size.

54.     The State of Maine, the Town and private businesses have for decades solicited the cruise lines to include Bar Harbor as a port-of-call on cruise itineraries, and cruise lines have done so because it is popular with cruise passengers. Cruise passengers want to visit Bar Harbor and Acadia National Park. They want to get off the ship, visit the Town, and tour the surrounding area. A cruise itinerary with a stop at Bar Harbor loses its appeal if passengers cannot get off the ship. Cruise vessels simply will not call at Bar Harbor if, by law or by the happenstance of timing, all passengers cannot choose to disembark and enjoy shore-side activities.

55.     The terms of the Initiated Ordinance effectively prohibit most cruise ships from otherwise being able to book calls at the port of Bar Harbor as cruise lines do not book ports where the local town does not allow all persons on the ship the option to disembark.

56.     Most cruise lines schedule vessels in excess of 1,000-passenger lower berth capacity for calls at Bar Harbor. The Initiated Ordinance prohibits these vessels from disembarking their full complement of potential passengers.

57.     The terms of the Initiated Ordinance would prohibit even a vessel with a lower berth capacity of fewer than 1,000 passengers from disembarking its full complement of potential passengers (or crew) if one or more other cruise vessels already has disembarked passengers (or crew) that day.

58.     The Initiated Ordinance immediately renders the Town an unviable destination port-of-call. This is because cruise line itineraries are planned years in advance, and if forced to now meet the 1,000-person requirement, it effectively makes the port not viable for the cruise lines which have historically used the port of Bar Harbor to disembark all of their passengers. And, once cruise lines schedule their vessels to visit other ports, it could take years to reestablish cruise line confidence in calling at the port of Bar Harbor.

14

59.     The reduction in the number of disembarking persons caused by the Initiated Ordinance impacts the economic viability of Tender Owners having and maintaining infrastructure and staff to the point that Tender Owners will be forced to close.

60.     Without historical cruise ship passenger traffic, the tendering operations of the Tender Owners and the private pier facility operations of BH Piers and Harborside are effectively obsolete.

61.     The Initiated Ordinance eliminates the good will that the Tender Owners have developed over decades with its customers, as well as the customer contacts and referral sources of the cruise lines that frequent the Town.

62.     The Initiated Ordinance will have these further impacts: (a) it will render the property interests of BH Piers and Harborside in their U.S. Coast Guard Approvals essentially valueless, (b) it will substantially reduce the value of the disembarkation points owned by Golden Anchor (Harborside Docks) and BH Piers (Harborplace) that are the subject of the U.S. Coast Guard Approvals, (c) it will cause the loss of the vast majority of the tendering business of BHWW and its affiliates, (d) it will render the tender vessels obsolete for their designed purpose and will cause the Tender Owners to lose the revenue necessary to sustain their respective businesses and be forced to close, and (e) it will dramatically reduce the revenue previously generated along the Bar Harbor waterfront through the operation of whale watch boats, lighthouse tours and nature cruises as well as revenue previously generated by the operators of the shops and restaurants that rely on the business provided by cruise ship passengers, some of whom may be forced out of business.

63.     The custom-built barges owned by BHWW utilized to assist in safely disembarking and embarking cruise ship passengers from the ships to and from tender vessels, will be obsolete and they will be unable to generate enough revenue to sustain their use for their intended purpose.

64.     APPLL Members' businesses and the other Plaintiffs' businesses, which include barge work, tendering, restaurants, tour businesses, retail businesses, and Coast Guard-approved related facilities, will be severely damaged by the Initiated Ordinance and its implementation will harm the ability of their employees to earn a living.

65.     Plaintiffs have been damaged and continue to be damaged by the unconstitutional Initiated Ordinance.

66.     All conditions precedent to the relief requested in this Complaint have been performed or have occurred.

## CLAIMS FOR RELIEF

### COUNT I
*(Violation of the Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution)*

67.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 6 through 66 as if fully set forth herein.

68.     The Supremacy Clause ensures that the "[U.S.] Constitution, and the Laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." U.S. Const., art. VI, cl. 2.

69.     Pursuant to this mandate, state law yields to federal law in three instances: when Congress states its intention to displace state law in a federal statute (express preemption), where the federal interest is so dominant that the federal system will preclude enforcement of state laws on the same subject (field preemption), and where the state or local law "stands as an obstacle to

16

the accomplishment and execution of the full purpose and objectives of Congress" or compliance

with both state and federal law is impossible (conflict preemption). *Young v. Coloma-Agaran*, No.

00-00774, 2001 WL 1677259 (D. Hawaii Dec. 27, 2001), *aff'd*, 340 F.3d 1053 (9th Cir. 2003).

70. The Constitution and a wide array of federal statutes recognize the primacy and

virtual exclusivity of federal authority over maritime activities. *See United States v. Locke*, 529

U.S. 89, 108 (2000) ("Congress has legislated in the field from the earliest days of the Republic,

creating an extensive federal statutory and regulatory scheme."). Because only confusion and

difficulty would result if "vessels were compelled to comply with the local statutes at every port[,]"

local interests "yield" to the Constitution in the field of maritime commerce. *State of Washington*

*v. W.C. Dawson & Co.,* 264 U.S. 219 (1924); *see Foremost Ins. Co. v. Richardson,* 457 U.S. 668,

674-75 (1982) (federal interest in maritime commerce can only "be fully vindicated if all operators

of vessels on navigable waters are subject to uniform rules of conduct.").

71. Establishing and maintaining ports of call is essential to the health and stability of

the cruise line industry.  The Eleventh Circuit Court of Appeals observed that:

> Ports-of-call not only add to the enjoyment of a cruise but form an
> essential function of the cruise experience…[p]lainly, individuals
> choose cruise ship vacations because they want to visit unfamiliar
> places ashore. Cruises . . . offer fundamentally different experiences,
> not generally because of any material difference between ships, but
> often because of where the ships elect to *stop. See Isham v. Pacific*
> *Far East Line, Inc.,* 476 F.2d 835, 837 (9th Cir.1973) ("Where a
> passenger or cruise vessel puts into numerous ports in the course of
> a cruise, these stopovers are the sine qua non of the cruise."). When
> a passenger selects a particular cruise, ports-of-call or stopovers
> provide those passengers with the "cruise experience" for which
> they are paying. Simply put, the destinations or ports-of-call are
> frequently the main attraction.

*Doe v. Celebrity Cruises, Inc*., 394 F.3d 891, 901 (11th Cir. 2004) (emphasis in original).

72.     A substantial body of federal law controls and regulates the operations of cruise vessels serving the interstate and foreign maritime commerce of the United States. Cruise vessels are subject to federal inspection and supervision in a variety of areas, including construction standards, environmental protection requirements, operational procedures, customs and immigration compliance, security measures, and health and safety requirements.

73.     The United States Coast Guard and other federal agencies, such as the Centers for Disease Control and Prevention ("CDC"), Environmental Protection Agency ("EPA"), and Federal Maritime Commission ("FMC"), routinely prescribe practices, procedures, and standards for vessel operations and, in the interests of safety, environmental protection, and maritime and national security, direct where vessels may (and may not) operate or anchor. *See*, *e.g.*, 46 C.F.R. Subchapter H; 33 U.S.C. §1322. The Coast Guard's Title 46 regulations "have the force of law" and "preemptive effect over State or local regulations in the same field." 46 C.F.R. § 70.01-1.

74.     Under this comprehensive federal statutory and regulatory regime, it is clear that granting (or revoking) permission for a carrier to enter a U.S. port, disembark, and begin operation, lies solely with the federal government.[2] State or local laws that ban federally licensed vessels from calling at a port violate the Supremacy Clause. *See Young v. Coloma-Agaran*, 340 F.3d 1053, 1057 (9th Cir. 2003).

---

[2] For example, the CDC made clear in its directives to the maritime industry responding to the global COVID-19 pandemic that the federal government alone grants (or denies) permission for a carrier to enter a U.S. port, disembark, and begin operation in international, interstate, or intrastate waterways subject to the jurisdiction of the United States. CDC, *Second Modification and Extension of No Sail Order and Other Measures Related to Operations* (July 16, 2020); *see also* 42 C.F.R. § 71.1(b) (defining "controlled free pratique" as "permission for a carrier to enter a U.S. port, disembark, and begin operation under certain stipulated conditions.").

75.     Cruise ships calling at the port of Bar Harbor and their operations, including accepting disembarking cruise ship passengers, are regulated by the federal government and such cruise ships operate under valid Coast Guard Certificates of Inspection issued pursuant to regulations at Title 46, Chapter 1, Subchapter H.[3]  Having satisfied all federal requirements for their operations, these cruise ships are authorized to engage in the activities for which they have been certified.

76.     The Town cannot exclude federally regulated and federally certified cruise ships from its port through the Initiated Ordinance. *See Young v. Coloma-Agaran*, 340 F.3d 1053, 1057 (9th Cir. 2003) (state or local laws that ban federally licensed vessels from calling at a port violate the Supremacy Clause).

77.     The proposed 1,000-person daily disembarkation limit will effectively prohibit the cruise fleet that has for decades been solicited by the State of Maine and the Town from calling at Bar Harbor, despite these vessels being physically able to operate safely in the navigable waters surrounding the Town and despite these vessels meeting all applicable federal (and international) standards. The 1,000-person limit in the Initiated Ordinance on all persons on cruise ships disembarking each day will effectively prohibit most every cruise line from booking calls at the Port of Bar Harbor. That impact will result in a consequent reduction of more than ninety percent (90%) of cruise ship visitors into the Port of Bar Harbor.

78.     The federal government, through the United States Coast Guard, also regulates maritime facilities that receive vessels certified to carry more than 150 passengers. *See* 33 C.F.R. § 105.105(a)(2).

---

[3] As noted above, these regulations "have preemptive effect over State or local regulations in the same field." 46 C.F.R. § 70.01-1.

79.     Like the Title 46 regulations, the regulations at Title 33, Chapter 1, Subchapter H, Part 105 "have preemptive effect over State or local regulations insofar as a State or local law or regulation applicable to the [federally regulated] facilities … would conflict with the regulations in part 105, either by actually conflicting or by frustrating an overriding Federal need for uniformity." 33 C.F.R. § 101.112(b).

80.     Among other things, the Part 105 regulations require that the owner or operator of a covered maritime facility ensure shore access to individuals who work on the vessels ("seafarers", *i.e.*, the crew) and those who provide services to seafarers. 33 C.F.R. § 105.237. A maritime facility operating pursuant to Part 105 cannot provide timely access to some seafarers and not others.

81.     BH Piers and Harborside administer maritime facilities regulated by the federal government, specifically the United States Coast Guard. Each has approvals pursuant to 33 C.F.R. Part 105 from the Coast Guard to operate their facilities. *See* Exhibit A.

82.     The Initiated Ordinance applies to all persons (passengers and crew) seeking to disembark from cruise vessels.  In addition to unlawfully limiting passengers' disembarkations, the 1,000-*person* daily cap directly conflicts with, and is expressly preempted by, federal law and regulations requiring that maritime facilities, like those operated by Plaintiffs BH Piers and Harborside, provide timely access to all seafarers (*i.e.*, crew) seeking to disembark at the facility.

83.     Under federal law, Plaintiffs BH Piers and Harborside cannot provide access to some seafarers and not others. Yet access for some, not all, seafarers is exactly the effect of the Initiated Ordinance.  Plaintiffs BH Piers and Harborside cannot comply with both federal law and the Initiated Ordinance. The Initiated Ordinance's draconian and arbitrary limitations on the number of persons allowed to disembark at and through BH Piers' and Harborside's maritime

facilities hinder and frustrate BH Piers' and Harborside's ability to conduct their operations in accordance with federal requirements.

84. A disparate state law also "must yield when it is inconsistent with, or impairs the policy or provisions of, a treaty or of an international compact or agreement." *United States v. Pink*, 315 U.S. 203, 231 (1942).

85. The cruise industry is inherently international. A "significant and intricate complex of international treaties and maritime agreements[,]" in addition to the above-mentioned federal regulations, "bear[ ] upon the licensing and operation of vessels." *Locke*, 529 U.S. at 102. The United States is a party to, among other treaties and agreements, the *International Convention for the Safety of Life at Sea*, 1974, 32 U.S.T. 47, T.I.A.S, No. 9700, the *International Convention for Prevention of Pollution from Ships*, 1973, S. Exec. Doc. C, 93-1, 12 I.L.M. 1319, as amended by 1978 Protocol, S. Exec. Doc. C., 96-1, 17 I.L.M. 546, and the *International Convention of Standards of Training, Certification and Watchkeeping for Seafarers*, With Annex, 978 (STCW), S. Exec. Doc. EE-96-1, C.T.I.A. No. 7624. *See id.*

86. These conventions, established under the auspices of the International Maritime Organization (IMO) and, by extension, the United Nations, bind signatory maritime nations to minimum standards for vessels flying their own flag and establish mutual cooperation among Port States to ensure uniformity of enforceable standards that each party imposes on vessels of other nations and impose the sole enforceable standards that each party may impose on the vessels of other signatory nations' flags.

87. A key structural component of the network of maritime treaties and conventions to which the United States is a party is the notion of reciprocity—signatory nations, including the United States, accept compliance by another nation as satisfying conditions for port entry. When

the national government has exercised its indisputable foreign affairs powers to commit the Nation to vessel standards agreed to by various maritime countries, it is clear that a municipality cannot restrict the operation of a vessel that the federal government has pledged to accept in U.S. ports.

88.     The Initiated Ordinance through its 1,000-person limit (a) violates the Supremacy Clause because it impermissibly circumvents federal maritime laws and regulations and imposes local regulation upon navigable waters of the United States, (b) violates the explicit language of, and conflicts with, multiple federal laws, including regulations that expressly preempt state and local laws, (c) violates the comprehensive federal regulatory scheme by purporting to control ship design, construction, the ability to make a port of call, the operations and the overall passenger capacity, and the general operation of cruise ship vessels, and (d) moreover, it impermissibly frustrates the overriding need for federal supremacy and uniformity in the field of maritime commerce.

89.     As a result of the Initiated Ordinance, Plaintiffs are suffering and will suffer actual, immediate, and irreparable injury. Cruise vessels otherwise certified to conduct their operations will be excluded from the port of Bar Harbor, and the cruise industry will lose confidence in the availability and viability of the port of Bar Harbor as a valuable and marketable destination port-of-call and will now remove the Town from the future itineraries of the cruise lines which will eliminate the good will built up as a result of decades of work with the cruise lines. Plaintiffs BH Piers and Harborside will be prevented from conducting their federally approved operations and will be penalized for doing so and such operations will cease. The Tender Owners will have to close their businesses. The exclusion of cruise vessels from the port of Bar Harbor will also cause immediate, substantial, and deleterious economic disruption to the businesses of APPLL's members. Similar to the losses sustained during the cruise industry shutdown in 2020, as a result

of the COVID-19 pandemic, Plaintiffs will experience a substantial loss of restaurant sales, retail sales, and tour-related income from the application of the Initiated Ordinance during the pendency of this lawsuit and some may be forced to close.

90.     An actual justiciable controversy exists among the parties regarding whether the Initiated Ordinance is preempted by federal law and thus is unconstitutional and in violation of the Supremacy Clause.

## COUNT II
*(Violation of the Commerce Clause of the United States Constitution)*

91.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 6 through 66 as if fully set forth herein.

92.     The Commerce Clause of the U.S. Constitution, Art. I, § 8, Clause 3, confers upon Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." The Commerce Clause's express grant of power carries with it "a further, negative command, known as the dormant Commerce Clause," *Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 179 (1995), which limits the power of local governments to enact laws affecting interstate commerce, *Hughes v. Oklahoma,* 441 U.S. 322, 326 (1979); *see South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984). Even in the absence of congressional legislation, the Commerce Clause restricts "the powers of the States to interfere with or impose burdens on interstate commerce." *Arkansas Electric Cooperative Corporation v. Arkansas Public Service Commission*, 461 U.S. 375, 390 (1983).

93.     With regard to foreign commerce, the federal government's power is "exclusive and absolute[,]" *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904), and "may not be limited, qualified, or impeded to any extent by state action[,]" *Bd. of Trustees,* 289 U.S. at 56-57.

23

94.     Local measures violate the Commerce Clause if they: A) attempt to regulate beyond the boundaries of the enacting state; B) if they discriminate against interstate commerce on their face, in purpose, or in effect; C) if they are an excessive burden on interstate commerce in relation to the putative local benefits; or D) if they interfere with the federal government's ability to speak with one voice when regulating commerce with foreign nations.

### The Initiated Ordinance Discriminates Against Interstate Commerce

95.     Local laws that discriminate against interstate commerce are *per se* invalid under the Commerce Clause, subject only to a government's defensive demonstration that the law has a non-protectionist purpose and employs the least discriminatory means for achieving that purpose. It is not enough that a law's *stated* purpose is non-protectionist because the "evils of protectionism can reside in legislative means as well as legislative ends." *Fort Gratiot Sanitary Landfill v. Michigan Department of Natural Resources*, 504 U.S. 353, 360 (1992). A legitimate state goal may not be "achieved by the illegitimate means of isolating the State from the national economy." *Id*.

96.     The Initiated Ordinance discriminates against interstate commerce.  The Initiated Ordinance seeks to regulate the transport of persons by water. The transport of persons by water is part of interstate and foreign commerce. *Chy Lung v. Freeman*, 92 U.S. 278 (1879)*; Gibbons v. Ogden*, 22 U.S. 1, 9 (1824).

97.     The transport of persons by water to Bar Harbor is an inherently "out-of-state" activity.  Almost exclusively, cruise ships call at the port of Bar Harbor following one or more calls at ports in other states and often ports in other countries (i.e., Canada, Bermuda).

98.     Transport by water, however, is not the only (or even the primary) way that persons enter Bar Harbor.  Less than 10 percent of visitors come to Bar Harbor by cruise ship. The

remaining visitors reach Bar Harbor by land-based means of transportation (e.g., automobile, bus, or bicycle).

99.     The Initiated Ordinance seeks only to restrict the number of persons who enter Bar Harbor by cruise ship.  Persons gaining access to Bar Harbor by any other means of conveyance (such as land-based conveyance) are unaffected.

100.     The Initiated Ordinance asserts, though does not demonstrate, that the "large numbers" of persons coming to the Town via cruise ships jeopardize the Town's ability to deliver municipal services to Town residents and visitors (including those visitors that the Initiative seeks to exclude) and "diminish[es]" the "quality of life for Town residents." *Initiative,* § 125-77(H), *Purpose* ¶ 1.

101.     The Initiated Ordinance asserts that the disembarkation limit is necessary to "protect, preserve and promote the general health, safety, welfare and peace of the community." *Initiative,* § 125-77(H), *Purpose* ¶ 1.

102.     While the stated "Purpose" for the Initiative is mere pretense and lacked any factual basis, the Initiated Ordinance does not and could not assert that the alleged impacts on the Town and its residents caused by persons coming via cruise ship, either individually or collectively, is any different from those impacts caused by persons arriving in Bar Harbor by other means of conveyance. Indeed, the Initiative does not even refer to the impact of non-cruise visitors in Bar Harbor.

103.     Cruise ship passengers make up *less than 10 percent* of the visitors to Bar Harbor each year. Their impact on congestion of local sidewalks or ability to walk through the Town is marginal at best.  According to a 2021 study, cruise ship passengers marginally impact congestion beyond 100 feet from the point of disembarkation and have zero effect on congestion at 2,000 feet

beyond the point of disembarkation. Further, minimizing any impact, most cruise visitors come in September and October, when the volume of land-based travelers and overnight guests is at its lowest and is roughly equivalent or less than the tourists on Town streets in June and July.

104.    The Initiated Ordinance erects a wall around the port of Bar Harbor—halting commerce from a large percentage of cruise ships active in interstate and foreign commerce. This is exactly the kind of local obstruction of commerce that the Commerce Clause is designed to avoid. *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 92 (1984) ("The Commerce Clause was designed 'to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.") Eliminating or reducing the presence of out-of-state cruise tourists is not a proper reason for a ban and contradicts the very purpose of the Commerce Clause.

105.    Even if the Initiated Ordinance had a non-protectionist purpose, which it does not, a disembarkation limit applied only to persons arriving by one type of conveyance is not the least discriminatory means for achieving that purpose.

**The Initiated Ordinance Is an Excessive Burden on Interstate Commerce**

106.    A non-discriminatory local law violates the Commerce Clause if it burdens interstate commerce in a way that is clearly excessive in relation to the law's putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

107.    The Initiated Ordinance imposes burdens on interstate commerce that are clearly excessive in relation to any of the Initiated Ordinance's putative local benefits.

108.    The Initiated Ordinance does not advance any public health or safety purpose and erects substantial barriers to the free flow of commerce.  It will force cruise lines to "route around" the disembarkation limits by calling at other ports, use only the smallest of vessels to call at Bar

26

Harbor (an irrational notion given that vessels with lower berth capacity in excess of 1,000 account for nearly all of the cruise industry capacity), or remove Bar Harbor completely from cruise itineraries.

109.   In this way, the Initiated Ordinance more than burdens interstate commerce. It essentially prohibits cruise lines from bringing cruise tourists to Bar Harbor via the port of Bar Harbor and in so doing renders substantially all cruise ship industry operations in the Town, including the private tendering and support service businesses required for cruise ship operations, obsolete and the operations are not sustainable given the limited business the Initiated Ordinance allows.

110.   The Initiated Ordinance was not supported by any formal findings about the asserted putative benefits of restricting the number of individuals visiting Bar Harbor via cruise ship.

111.   Far from conferring local benefits, the Initiated Ordinance withholds from Bar Harbor and its citizens, substantial economic benefits that the cruise ship industry would otherwise provide.

**The Initiated Ordinance Unduly Restricts Foreign Commerce**

112.   In matters pertaining to foreign commerce, the federal government's power is "exclusive and absolute." *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904). Discordant state and local restrictions must give way before the imperative that the national government "speak[] with one voice." *Japan Line Ltd. v. County of Los Angeles*, 441 U.S. 434, 452 (1979).

113.   Federal supremacy over maritime commerce and the nation's relationships with foreign countries leaves little room for state or local action. *See e.g.*, *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000); *Locke*, 529 U.S. at 108 (recognizing a need for "uniformity

of regulation for maritime commerce"); *Kraft Gen. Foods, Inc. v. Iowa Dept. of Revenue and Fin.*, 505 U.S. 71, 79 (1992) ("the Foreign Commerce Clause recognizes that discriminatory treatment of foreign commerce may create problems, such as the potential for international retaliation, that concern the Nation as a whole.").

114.    The Initiated Ordinance discriminates against foreign commerce. The majority of cruise ships that call at Bar Harbor operate itineraries that include foreign ports of call. These cruise ships facilitate the international transportation of passengers.

115.    The Initiated Ordinance disrupts the free flow of interstate commerce as most cruise ship itineraries, for ships calling on Bar Harbor, involve ports in other states and many itineraries include ports in Canada. The Initiated Ordinance adversely impacts foreign commerce by imposing draconian and arbitrary disembarkation limitations that render the Town an unsuitable destination port-of-call.

116.    The Initiated Ordinance will disrupt the operations of domestic and foreign corporations doing business in Bar Harbor, prevent foreign (and out-of-state) travelers on international vessels from disembarking at Bar Harbor, and severely diminish the ability of Plaintiffs in Bar Harbor to provide valuable services to instrumentalities of interstate and foreign commerce. *See, e.g., Henderson v. Mayor of City of New York*, 92 U.S. 259 (1875) (held invalid state law that impinged on the U.S. and foreign flagged vessels from transporting passengers, foreign commerce that was committed to Congress). The Initiated Ordinance is without authority to make such impositions on foreign commerce.

117.    The Initiated Ordinance is not based on any condition "arising from the peculiarities of local waters that call for special precautionary measures." *Ray v. Atlantic Richfield,* 435 U.S 151, 171 (1978); *Cooley*, 53 U.S. at 19. Nothing in the Initiated Ordinance suggests that the 1,000-

person limitation on the number of passengers and crew is based on any peculiar conditions of the local waters. Rather, it is based solely on the claimed effect of cruise ship passengers and crew once they "come to shore on, over, or across any property located within the Town of Bar Harbor." *Initiative,* at § 125-77(H)(2). Thus, the local waters exception to preemptive federal regulatory authority cannot apply to the Initiated Ordinance.

118.    The Initiated Ordinance impermissibly regulates in an area where national uniformity is essential. Every cruise ship journey involves advanced planning for complex vessel itineraries, the interstate and foreign travel of passengers not only aboard the vessel but, upon reaching a particular port of call, may also, as in true for Bar Harbor, involve providing water-borne conveyances on which the cruise ship passengers and crew can travel to and from the ship. Such advanced planning also includes long-term coordination for the availability of Coast Guard-approved cruise ship terminal facilities and barge services, procuring and tendering provisions and supplies, all of which move in the interstate and foreign commerce of the United States. This advanced planning for both international and interstate commerce requires uniformity in regulation.

119.    The Initiated Ordinance would impose a regime for landing passengers and crew in Bar Harbor that is different than those in other ports in the United States, in violation of the Foreign Commerce Clause. *Henderson*, 92 U.S. at 273 ("The laws which govern the right to land passengers in the United States from other countries ought to be the same in New York, Boston, New Orleans, and San Francisco.").

120.    The Initiated Ordinance threatens the nation's ability to maintain an integrated maritime transportation system, and its aims cannot be validated by resorting to the "apologetics

of the police power." *See Southern Pac. Co. v. State of Ariz. ex rel Sullivan*, 325 U.S. 761, 779-80 (1945).

121.    The Initiated Ordinance deprives Plaintiffs of rights secured by the United States Constitution, as set forth above, under color of state law, thereby violating 42 U.S.C. § 1983.

122.    An actual justiciable controversy exists among the parties regarding whether the Initiated Ordinance violates the Commerce Clause.

123.    Plaintiffs are suffering and will suffer irreparable harm as a result of being deprived of their constitutional rights.

124.    Plaintiffs are entitled to declaratory and injunctive relief against the Town.

## COUNT III
*(Initiated Ordinance Inconsistent with Substantive Due Process)*

125.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 6 through 66 as if fully set forth herein.

126.    The Initiated Ordinance confiscates Plaintiffs property interests in their U.S. Coast Guard approvals without due process of law because it constitutes economic regulation, which is arbitrary, discriminatory, and/or demonstrably irrelevant to the intentions and policy goals of the Initiated Ordinance, *supra* paragraph 89, by making such property interests worthless.

127.    Said Initiated Ordinance is arbitrary, discriminatory and irrelevant to any legitimate legislative goal. The Purpose section of the Initiative, *supra* paragraph 47, identified only passengers arriving by cruise ship as the cause of the alleged burdens on the Town's public services, businesses, and healthcare providers. Yet, cruise ship passengers only constitute a small percentage of visitors to Bar Harbor. Mandatory disembarkation caps unreasonably deprive Plaintiffs of their property interests.

128.    The Initiated Ordinance is unreasonable, arbitrary, inadequate, discriminatory and wholly disconnected from any valid legislative goal. The Initiated Ordinance fails to meet the requirements of the Due Process Clause, and Plaintiffs ask this Court so declare.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendant as follows:

1.  A declaration, pursuant to 28 U.S.C. § 2201, that the Initiated Ordinance violates federal laws and regulations that govern and subordinate the authority of the Town under the Supremacy Clause of the Constitution.

2.  A declaration, pursuant to 28 U.S.C. § 2201, that the Initiated Ordinance violates the Commerce Clause of the U.S. Constitution.

3.  A declaration, pursuant to 28 U.S.C. § 2201, that the Initiated Ordinance violates the Due Process Clause of Fourteenth Amendment to the U.S. Constitution.

4.  A preliminary and permanent injunction against implementation and enforcement of the Initiated Ordinance.

5.  An award to Plaintiffs of all costs, attorneys' fees, and expenses, pursuant to 42 U.S.C. § 1988.

6.  Such other and further relief as this Court deems just and proper.

ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492, LLC

By their attorneys,

DATED: December 29, 2022                  /s/ *Timothy C. Woodcock*
                                          Timothy C. Woodcock, Bar #1663
                                          P. Andrew Hamilton, Bar #2933
                                          Patrick W. Lyons, Bar #5600
                                          *Counsel for Plaintiffs*

EATON PEABODY
80 Exchange Street
Bangor, Maine 04401
(207) 992-0111
twoodcock@eatonpeabody.com
ahamilton@eatonpeabody.com
plyons@eatonpeabody.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 29, 2022, the foregoing Verified Complaint was electronically filed with the Clerk of this Court using the CM/ECF system.

Dated: December 29, 2022                    /s/ *Timothy C. Woodcock*