# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, a Maine corporation, | ) ) ) | |
| *Plaintiff-Intervenor*, | ) ) | Case No. 1:22-cv-416 |
| v. | ) ) | **INJUNCTIVE RELIEF SOUGHT** |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | ) ) ) | |
| *Defendant*. | ) ) ) | |

## COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff-Intervenor Penobscot Bay and River Pilots Association (the "Penobscot Pilots Association"), through its attorneys, complains against Defendant Town of Bar Harbor (the "Town") as follows:

## INTRODUCTION

1.       This complaint in intervention seeks declaratory and injunctive relief against recent municipal activity in the Town of Bar Harbor that severely and arbitrarily restricts the operations of cruise vessels into the Town of Bar Harbor in violation of the United States Constitution and the Maine Constitution. This protectionist municipal action – specifically, a citizens' group petition (the "Initiative") amending the Bar Harbor Code, Chapter 125, Article VII, by adding Section 125-177(H), which became an ordinance of the Town effective December

8, 2022 (the "Challenged Ordinance")[1] – purports to control cruise vessels that anchor in federally designated anchorages outside the municipal jurisdiction of the Town and private property owners who operate piers used for landing passengers from cruise ships anchored in Frenchman Bay. The Challenged Ordinance directly and immediately harms local businesses of all types, including the business of the Penobscot Pilots Association. Because of its damaging impacts on the provision of pilotage services, it threatens the safety and security of Maine's coastal waters.

2.      The Challenged Ordinance unlawfully interferes with the comprehensive federal system regulating the operation of cruise ships and maritime commerce. Cruise vessels are federally certified and authorized to engage in the operations for which they have been certified. The Challenged Ordinance imposes an unreasonable and arbitrary limitation on the number of persons that can disembark from federally certified cruise vessels anchored at federally designated anchorages, effectively barring the cruise vessels from engaging in their federally certified operations in navigable waters of the United States.

3.      Federal law and federal regulations govern the system of commerce within the U.S. and between the U.S. and foreign countries. In this arena of federal primacy, the need for uniformity far outweighs any benefits that the Town, or citizen supporters of the Challenged Ordinance, may claim in defense of this attempt to erect a barrier to maritime commerce at its shoreline.

4.      The Challenged Ordinance imposes impermissible burdens on the interstate and foreign commerce of the United States. It penalizes the disembarkation of more than one

---

[1] Plaintiff-Intervenor Penobscot Pilots Association will refer to the municipal action as the Challenged Ordinance throughout this Complaint, except where it is necessary to distinguish the citizen's petition from the resulting ordinance.

thousand (1,000) persons from cruise ships per day into the Town for the purported purpose of conserving municipal resources and enhancing the lives and safeguarding the health, safety, and welfare of municipal residents. The Challenged Ordinance discriminates against interstate and maritime commerce by limiting disembarkations from cruise ships only and not restricting visitors arriving by any other form of transportation. The Challenged Ordinance discriminates against foreign commerce by favoring domestic vessels and disadvantaging foreign vessels. Draconian restrictions on admission to the Town from persons using one method of transportation (ships) or from ships engaged in international itineraries, but not domestic itineraries, is not the least discriminatory means available to achieve the Challenged Ordinance's purported purpose. Disruption of maritime commerce on the Eastern Seaboard greatly outweighs any asserted need of the Town to conserve municipal resources by excluding a relatively small component of tourists and visitors to Bar Harbor.

5.      While the Challenged Ordinance does not directly speak to pilotage, its effect is to eliminate the vast majority of vessels requiring pilotage in Frenchman Bay, and through its collateral impacts on other Maine ports, elsewhere in Maine. In so doing, the Challenged Ordinance upsets the balance of pilotage resources in the State and frustrates the purposes of Maine's pilotage system – to provide maximum safety for vessels entering and leaving Maine's coastal waters, to support the operations of pilotage groups with the highest standard of efficiency, and to ensure that well-qualified pilots are available for the discharge of their duties in aid of commerce and navigation.

6.      The Challenged Ordinance prevents the efficient accomplishment of the purposes of state pilotage laws and frustrates the very purposes of Maine's pilotage system – to provide maximum safety for vessels entering and leaving Maine's coastal waters, to support the

operations of pilotage groups with the highest standard of efficiency, and to ensure that well-qualifies pilots are available for the discharge of their duties in aid of commerce and navigation. The Town's severe restrictions on cruise ship disembarkations effectively close the port of Bar Harbor to maritime cruise commerce, thereby disrupting the careful balance of pilotage resources in the State.

7.      The Challenged Ordinance specifically threatens the ability of the Penobscot Pilots Association to provide for the safe passage of vessels entering or leaving its designated pilotage area; undermines the Penobscot Pilots Association's ability to maintain the system of pilotage in its designated area for the public purposes of preserving and protecting lives, property, the environment, and transient vessels; and places in doubt the availability of qualified pilots to discharge pilotage duties in Penobscot and Frenchman Bays.

8.      The Challenged Ordinance frustrates Maine's ability to support and grow tourism and tourism-based revenues in the State and ensure consistency of municipal and regional tourism efforts with the State's economic development strategy. The Challenged Ordinance harms the State's ability to promote the cruise tourism industry in Maine and rely on the cruise tourism industry as a segment of the State's overall tourism economy, which is essential to the State's economic stability and growth.

9.      The Challenged Ordinance harms the Penobscot Pilots Association. The Challenged Ordinance is designed to suppress the overwhelming majority of cruise vessel traffic in Bar Harbor and Frenchman Bay, traffic which currently accounts for nearly 50 percent of the Penobscot Pilots Association's annual revenues. Without these revenues, the Penobscot Pilots Association will be unable to support the human and capital resources necessary to maintain efficient and high-quality pilotage services in the Penobscot Pilots Association's designated

pilotage area and to recruit and train pilots for the future, as is necessary for the safe navigation of vessels in Frenchman Bay.

10.    The Challenged Ordinance violates the United States Constitution and the Maine Constitution. The Penobscot Pilots Association requests that this Court (1) enjoin the Challenged Ordinance from going into effect; (2) declare that the Challenged Ordinance is invalid under the Supremacy and Commerce Clauses of the U.S. Constitution; and (3) declare that the Challenged Ordinance is invalid under the Maine Constitution.

## PARTIES

11.    Plaintiff-Intervenor Penobscot Pilots Association is a corporation duly organized under the laws of the State of Maine, with a principal place of business in Searsport, Maine.

12.    The Penobscot Pilots Association is the single designated pilotage association providing pilotage services on seven of the ten regulated pilotage routes in Maine, covering Penobscot and Frenchman Bay and the Penobscot River. The Penobscot Pilots Association's owners are four of only nine active licensed pilots in Maine serving the waters under the jurisdiction of the Maine Pilotage Commission. The Penobscot Pilots Association's pilotage operations are regulated by the Maine Pilotage Commission.

13.    Defendant Town of Bar Harbor is a municipal corporation, duly organized under the laws of the State of Maine, and its principal place of business is in the County of Hancock, State of Maine.

## JURISDICTION AND VENUE

14.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts over actions arising under the Constitution or laws of the United States. The Penobscot Pilots Association brings claims arising under the

Supremacy Clause, Article VI of the United States Constitution, the Commerce Clause, Article I, Section 8 of the United States Constitution, and for vindication of rights pursuant to 42 U.S.C. § 1983.[2]

15.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1367, which confers supplemental jurisdiction on federal district courts over all other claims that are so related to claims in the action within the court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. The Penobscot Pilots Association brings claims arising under the Maine Constitution, which arise out of a common nucleus of operative facts with the Penobscot Pilots Association's substantive federal claims.

16.     Venue is proper in the District of Maine pursuant to 28 U.S.C. § 1391. The Defendant resides in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

17.     The Court has authority to issue the requested relief under 42 U.S.C. § 1983 and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

18.     The Penobscot Pilots Association satisfies the standard for intervention as a matter of right under Rule 24(a) of the Federal Rules of Civil Procedure. The Penobscot Pilots Association claims a significant protectable interest relating to the property or transaction which is the subject of the action and is so situated that disposition of the action may as a practical matter impair or impede the Penobscot Pilots Association's ability to protect its interest. The

---

[2] Section 1983 provides: "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress[.]"

Penobscot Pilots Association's interests are not adequately represented by the parties to the action.

19.     Alternatively, the Penobscot Pilots Association satisfies the standard for permissive intervention under Rule 24(b) of the Federal Rules of Civil Procedure.

20.     In either case, the Penobscot Pilots Association's request for intervention is timely.

## BACKGROUND

### *Maine State Pilotage System*

21.     Maritime pilotage in the United States is subject to an accumulation of regulatory requirements that, depending on the location of the pilot and the nationality or citizenship of the vessel, include both federal and state regulation of rates and qualifications. The First Congress of the United States, confronting a welter of pilotage practices from the former colonies, determined that pilotage ". . . in the bays, inlets, rivers, harbors and ports of the United States [should] continue to be regulated in conformity with the existing laws of the States, respectively . . . until further legislative provision shall be made by Congress."[3] Act of August 7, 1789, ch. 9, 1 Stat. 53 (1789) (the "Lighthouse Act"). Despite its power to regulate commerce and navigation, Congress elected to forego assertion of exclusive federal authority over pilotage in favor of permitting states to devise varying regulatory structures focusing on state regulation that permitted consideration of the peculiarities of particular ports and localities.

22.     Thus, since the earliest days of our Nation, and with certain exceptions not relevant here, pilotage of foreign vessels in United States waters has been governed by the twenty-four coastal states, including Maine, through comprehensive pilotage systems designed to

---

[3] The relevant Lighthouse Act provisions are now codified at 46 U.S.C. § 8501(a) and now reads, in relevant part, "Except as otherwise provided in this subtitle, pilots in the bays, rivers, harbors, and ports of the United States shall be regulated only in conformity with the laws of the States."

meet the particular needs and circumstances of the state's waters and ensure that "well-trained independent pilots are always available, without discrimination, to any vessel required to use a state pilot." Paul G. Kirchner & Clayton L. Diamond, *Unique Institutions, Indispensable Cogs, and Hoary Figures: Understanding Pilotage Regulations in the United States*, 23 U.S.F. Mar. L.J. 168, 170 (2011) [hereinafter *Understanding Pilotage Regulations*]; *see* 46 U.S.C. § 8501.

23.      Every state pilotage statute compels pilotage, meaning that the state "requires . . . vessels to take [on] a state-licensed pilot[,]" "identifies the vessels to which the requirement applies[,]" and in so doing, "assumes the responsibility to ensure that the vessel receives good service and fair treatment." *Understanding Pilotage Regulations*, 23 U.S.F. Mar. L.J. at 189-90. Thus, the states regulate pilotage comprehensively, typically through state-recognized commissions, in order to "implement and support the pilotage requirement." *See id*.

24.      For safety and efficiency reasons, there is no competition among state pilots. States set and regulate the rates that pilots may charge for their services. *Id*. at 191. They also limit the number of pilot licenses issued to a number required to maintain a safe and efficient pilotage service. *Id*. These economic regulations have laudable goals. Under such a structure, states can ensure that pilots have the "right" amount of work – enough to "earn sufficient revenues to pay the substantial infrastructure costs of a modern pilotage operation and [remain] current in [their] experience over a broad range of vessel types and geographic locations" but not so much work as to cause fatigue. *Id*.

25.      Maritime pilots offer an essential and unique service to the maritime commerce industry. They provide critical independent local knowledge and navigational information to vessels and bring the highest level of ship-handling skills to maneuver vessels within their

pilotage area. Safety is the primary objective of pilotage. State-licensed pilots are among the most highly trained mariners in the world.

26.     Pilotage is an "indispensable [element] in the transportation system of every maritime economy. [The pilots'] work prevents traffic congestion and accidents which would impair navigation in and to the ports. It affects the safety of lives and cargo, the cost and time expended in port calls, and in some measure, the competitive attractiveness of particular ports." *Kotch v. Bd. of River Port Pilot Comm'rs for Port of New Orleans*, 330 U.S. 552, 558 (1947).

27.     A modern, dependable piloting operation is an extensive system that requires great effort and resources to maintain. Pilotage associations or other groups of pilots must make large capital investments in pilot boats, office facilities and equipment, dispatch systems, communication equipment and other facilities, and equipment and support services. They also must invest in training and retaining capable crew for pilot boat operations and maintenance.

28.     Maine's system of state pilotage, established by state law at 38 M.R.S. §§ 85, *et seq.,* follows this time-tested design. The system is intended to "provide maximum safety from the dangers of navigation for vessels entering or leaving [Maine coastal and navigable waters], to maintain a state pilotage system devoted to the preservation and protection of lives, property, the environment and vessels entering or leaving these waters at the highest standard of efficiency and to insure the availability of pilots well qualified for the discharge of their duties in aid of commerce and navigation." 38 M.R.S. § 85. Pilotage is compulsory for "[e]very foreign vessel and every American vessel under register, with a draft of 9 feet or more, entering or departing from any port or harbor[.]" 38 M.R.S. § 86.

29.     The Maine Pilotage Commission oversees and administers the state-mandated system of pilotage covering ten pilotage routes in the three coastal zones of Maine's coastal

waters. *See* 38 M.R.S. § 86-A. The Commission controls the assignment of pilotage areas, the licensing of pilots, and the rates that may be charged for pilotage service within its jurisdiction. 38 M.R.S. § 90.

30.     Under the jurisdiction and oversight of the Maine Pilotage Commission, the Penobscot Pilots Association maintains the state-mandated system of pilotage for the Penobscot and Frenchman Bays and the Penobscot River, which includes the ports of Searsport, Bucksport, Bangor/Brewer, Bar Harbor, and Rockland. The Penobscot Pilots Association's pilotage region extends 75 miles across from Boothbay Harbor to Frenchman Bay and 75 miles from the west pilot station on Penobscot Bay to the Penobscot River Port of Brewer.

31.     The Penobscot Pilots Association's pilots are responsible for guiding any vessel required to take a pilot within the Penobscot Pilots Association's designated area in accordance with state law. The pilots board vessels at offshore pilot stations 24 hours a day, 365 days a year (weather permitting) and navigate them safely to their destination. Once a vessel's port visit is complete, the pilots reverse the process and direct the navigation of the vessels until they are safely clear of state waters.

32.     The Penobscot Pilots Association facilitates year-round commercial traffic in Penobscot Bay and River ports of Searsport and Bucksport. These ports receive commercial traffic supporting trade in petroleum products and other liquid bulk cargos. In addition, Searsport regularly receives bulk, breakbulk, and specialty cargo and has carved out a niche serving the wind energy industry with the import of blades, towers, and nacelles for land-based wind turbine installation. Further up the Penobscot River, the port of Brewer receives sporadic vessel traffic in the form of tugs and barges calling on the Cianbro modular fabrication facility.

33.     The Penobscot Pilots Association navigates large yachts (over 275') into Boothbay Harbor, Blue Hill Bay, and Somes Sound, as well as on the major waterways of Penobscot Bay and Frenchman Bay. Since 2016, the fastest growing segment of its pilotage operations has been the increase in cruise ship traffic visiting the port of Bar Harbor. In a six-month tourist season, the Penobscot Pilots Association will move more ships in Bar Harbor than in the entire year in Penobscot Bay and River. The region covered by the Pilots extends 75 miles across from Boothbay Harbor to Frenchman Bay, and 75 miles from the west pilot station on Penobscot Bay to the Penobscot River Port of Brewer.

34.     The Penobscot Pilots Association covers its region with four individual state-licensed pilots, two pilot boats, and a host of support staff in the form of contract pilots, pilot boat captains, deckhands, boat maintenance staff, and drivers for shoreside transportation. In addition to piloting vessels, the pilots are responsible for coordinating shoreside and pilot boat transportation arrangements for their respective jobs, planning transit times for deep-draft vessels based on the local 10-13' tides and daylight restrictions, and communicating these transit "windows" to attending ship agents and local terminal operators. The pilots also provide their own "back office" support, including dispatching, billing, accounting of invoices, and correspondence with agents and interested shippers regarding potential ship movements.

### *Maine's Tourism Industry*

35.     Tourism is a vital economic driver for Maine. The State invests considerable energy and money to support and expand the tourism industry in Maine and promote the state as a tourist destination. The day-to-day work is coordinated through the Maine Office of Tourism ("MOT"), which is charged with developing and implementing a "marketing and development strategy for state tourism growth that maximizes the effectiveness of state and private sector

contributions in attracting visitors to the State and increasing tourism-based revenues." 5 M.S.A. § 13090-E; *see* 5 M.S.A. § 13090-C (legislative purpose of MOT).

36.     One of the focuses of the MOT is cruise tourism in Maine. To that end, MOT works with CruiseMaine to encourage and oversee cruise ship tourism in the state. State funding supports CruiseMaine for the purpose of promoting Maine as a cruise ship destination.

### Cruise Tourism in Bar Harbor

37.     Bar Harbor is a marquee cruise destination and popular port-of-call on a wide variety of cruise ship itineraries. Among other things, it serves as a popular access point for both Acadia National Park and cruises to Canadian ports along the Atlantic Coast and the St. Lawrence River.

38.     Bar Harbor is a destination port (not a turnaround port) for the cruise industry. Cruise itineraries do not begin or end at Bar Harbor.

39.     Bar Harbor also has the distinction of being one of the most convenient and practical customs ports of entry capable of accommodating the large number of cruise ships that re-enter the United States from foreign waters each season. Bar Harbor is one of only three such ports (termed Class A ports) in Maine.

40.     Bar Harbor is a tender port, meaning that cruise ships do not dock at the waters' edge. Cruise ships calling at Bar Harbor typically arrive in the morning and anchor offshore in federally designated anchorages outside the Town's municipal jurisdiction. The Penobscot Pilots Association's licensed pilots provide pilotage to the anchorages for all foreign-flagged vessels, as required by law, and for any U.S.-flagged vessels required to take a pilot.

41.     Once anchored, smaller launches or tenders ferry passengers between the cruise vessels and two private piers in Bar Harbor. The pilots sometimes ride these tenders to and from the private piers.

42.     Passengers typically head back to the ships in the early afternoon, again via tenders. Once the ship is ready to depart, the pilots provide pilotage for the outbound transit of the cruise vessel to open water.

43.     For nearly 20 years, Bar Harbor has worked cooperatively with stakeholders, residents, cruise industry partners, and state agencies to develop cruise tourism in a manner beneficial to the Town and the cruise industry. As part of these efforts, in 2008, the Town accepted a recommendation from the Town's Cruise Ship Study Task Force (now the Cruise Ship Committee), which consists of representatives from the Town, businesses, tender operations, and the cruise industry, to adopt daily cruise passenger caps (based on a ship's lower berth capacity[4]) of 5,500 passengers per day for the months of May, June, September and October, and 3,500 passengers per day for the months of July and August.

44.     In early 2022, the Town formed a working group to explore with the cruise industry a modified cruise schedule for 2023 and beyond.

45.     Thereafter, the Town and various cruise lines entered into a Memorandum of Agreement ("MOA"), whereby the cruise lines voluntarily agreed that, in the months of May, June, September, and October, they would limit aggregate daily passenger disembarkations to 3,800 passengers, and in the months of July and August would limit daily passenger disembarkations to 3,500 passengers.

---

[4] "Lower berth capacity" generally refers to the capacity of the vessel and is calculated based on the number of "lower berths" or beds on the vessel. The term does not account for other persons on the vessel who may disembark at a port, such as crew.

### *The Initiative*

46.     On March 16, 2022, a citizens' group submitted the Initiative to the Town Council of Bar Harbor. A true and accurate copy of the Initiative dated March 16, 2022 is attached hereto as Exhibit A.[5]

47.     Substantively, the Initiative proposed an amendment to the land use ordinance of the Town Code prohibiting the disembarkation of "more than 1,000 *passengers*, in the aggregate, … on a single calendar day from any cruise ship(s) [to] come to shore on, over, or across any property located within the Town of Bar Harbor[.]" Ex. A (emphasis added).

48.     The Initiative contained no plan for implementation. Instead, it required the Harbormaster to devise "a reservation system for cruise ships that transport passengers by watercraft for disembarkation in the Town of Bar Harbor"; a "mechanism for counting and tracking the number of passengers disembarking each day"; and a "mandatory procedure for reporting violations to the Code Enforcement Officer[.]" *Id.*

49.     The Initiative required compliance by "[a]ny property owner issued a permit under this § 125-77(H) … with all rules and regulations promulgated by the Harbor Master [pursuant to the Initiative]." *Id.*

50.     The Initiative empowered the Town's Code Enforcement Officer to impose fines and/or penalties of at least $100 for each "disembarking passenger exceeding the daily passenger limit" upon permit-holding property owners. *Id.*

51.     The Initiative was expressly retroactive to March 16, 2022, but proposed to exempt from its application "any cruise ship reservations that have been accepted by the Harbor

---

[5] A substantially similar version of the Initiative dated March 17, 2022 discusses "persons," not "passengers" and is expressly retroactive to March 17, 2022.  A true and accurate copy of the March 17, 2022 Initiative is attached hereto as Exhibit A-1.

Master prior to March 16, 2022" and protect from enforcement action "any cruise ship visits occurring prior to the date of adoption by voters at [the] Town Meeting." *Id*.

52.     The Initiative's "purpose" section contains the purported rationale for the restrictive disembarkation limits of the Initiative's proponents. It complains that the "large numbers of [cruise ship] passengers" entering into the limits of the Town of Bar Harbor "have overwhelmed the downtown area, resulting in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other public spaces, and inundating local amenities and attractions, all of which result in a diminished quality of life for Town residents." *Id.*

53.     The Initiative's purpose section asserts further that the presence of "disembarking cruise ship passengers in the downtown area jeopardizes the Town's ability to deliver municipal services to Town residents and visitors (for example, cruise ship passengers), including the provision of public safety services (police and fire), emergency medical services (EMS), in-patient and out-patient services at local hospitals, pandemic control measures, and public sanitation services, and also impacts the ability of local shops, restaurants, and other businesses to attract and serve customers." *Id*.

54.     The Initiative blames only passengers arriving by cruise ship for the alleged burdens on the Town's public services, businesses, and healthcare providers. It makes no reference to visitors or tourists arriving by other means of transport.

55.     The Initiative's broad claims of harm allegedly caused by disembarking cruise passengers are not supported by studies or other evidence. For example, the Initiative does not cite traffic studies or accident statistics that show any deleterious effects of cruise passenger crowding of downtown areas. Nor does the Initiative reference statements or other evidence from

Town officials indicating that the presence of more than 1,000 cruise passengers per day jeopardizes the Town's ability to offer police, fire, EMS, and hospital services.

56.     Although not expressly stated, the Initiative's purpose—and actual effect—is to bar almost all cruise ships from visiting Bar Harbor and for the ships that do call on Bar Harbor, bar their passengers from entering the Town.

57.     On August 2, 2022, the Town Council voted to place the Initiative on the warrant articles calling the November town meeting warrant. A true and accurate copy of the Order placing the Initiative on the warrant articles is attached hereto as Exhibit B.

58.     The Initiative was listed as Article 3 on the Warrant for the November 8, 2022, Special Town Meeting. A true and accurate copy of the Special Town Meeting Warrant, which includes Article 3, is attached hereto as Exhibit C.

59.     On November 8, 2022, the Bar Harbor Town Meeting passed Article 3. Pursuant to the Town Charter, Article 3 became the Challenged Ordinance, effective December 8, 2022.

60.     As presented and passed, the Challenged Ordinance uses the term "persons" rather than "passengers." Ex. B; Ex. C. As a result, the Challenged Ordinance imposes a 1,000-*person* cap that encompasses all forms of travelers (not just passengers) seeking to disembark from cruise ships.

***Impacts of the Challenged Ordinance***

61.     The Challenged Ordinance, if implemented and enforced, will have swift and immediate impacts.

62.     The Challenged Ordinance will drastically reduce, and very likely eliminate the overwhelming majority of, cruise ship calls at the port of Bar Harbor. It will effectively prohibit cruise vessels with a certain lower berth capacity (those with a lower berth capacity in excess

1,000, which account for approximately 95 percent of the cruise industry operating fleet capacity) from calling at Bar Harbor for the purpose of disembarking passengers and crew.

63.     Under the Challenged Ordinance, at a minimum, vessels with a lower berth capacity in excess of 1,000 passengers will be prohibited from disembarking their potential full complement of passengers (not to mention any crew). Even vessels with a lower berth capacity under 1,000 passengers will be discouraged from calling at Bar Harbor and, if they do call, will face the real possibility that, through the happenstance of timing, they will be prohibited from disembarking their potential full complement of passengers (or any combination of passengers and crew).

64.     Cruise lines include Bar Harbor as a port-of-call on cruise itineraries because it is popular with cruise passengers. Cruise passengers want to visit Bar Harbor and Acadia National Park. They want to get off the ship, visit the Town, and tour the surrounding area. A cruise itinerary with a stop at Bar Harbor loses its appeal if passengers cannot get off the ship. Cruise vessels simply will not call at Bar Harbor if, by law or the happenstance of timing, all passengers cannot choose to disembark and enjoy shoreside activities.

65.     The Challenged Initiative offers cruise lines a Hobson's choice – anchor at Bar Harbor as planned and somehow decide who can (and cannot) get off the ship, replace the Bar Harbor call with a call at Portland or Eastport (Maine's two remaining Class A ports), if capacity to accommodate the vessel even exists, or scrap the stop (or stops) in Maine altogether. The Challenged Ordinance renders Bar Harbor an unreliable destination port-of-call.

66.     The Challenged Ordinance will impact the 2023 and 2024 cruise seasons. The Challenged Ordinance, by its terms, makes the 1,000-person limit applicable to any cruise vessel booking confirmed on or after March 17, 2022.

67.     The Challenged Ordinance will impact the 2025 cruise season. Cruise itineraries are planned years in advance, and many cruise lines are planning their itineraries and booking ports of call for 2025. Cruise lines are deciding now whether to include Bar Harbor on future itineraries. The Challenged Ordinance's disembarkation limits make it extremely difficult for any cruise line to project with certainty the availability of Bar Harbor as a port of call. And once cruise lines schedule their vessels to visit other ports, it could take years to reestablish cruise line confidence in calling at the port of Bar Harbor.

68.     The Challenged Ordinance will place unwarranted stress on the operations and capacity of other Maine ports. The Challenged Ordinance effectively eliminates Bar Harbor's capacity to process through U.S. Customs cruise vessels re-entering the United States. Instead, re-entering cruise vessels will need to call at one of Maine's two remaining Class A ports (Portland and Eastport). It is unlikely that Portland and Eastport will be able to fully absorb Bar Harbor's capacity, and ships that are excluded from Bar Harbor may have nowhere else to go, in Maine at least.[6]

69.     Maritime commerce requires and benefits from a robust and resilient system of pilotage. Pilotage is a time-proven service that provides great benefits to the State, residents, and visitors (human, vessel, and cargo). A strong system of pilotage preserves and protects lives, property, the environment, and vessels in Maine's coastal waters.

70.     Pilotage is an extensive system that requires great effort and resources to maintain. Pilotage groups face high fixed operating costs. They must acquire, maintain, and insure purpose-built pilot boats that are specifically designed to operate under challenging

---

[6] In this regard, the Challenged Ordinance likely will have impacts outside Maine as well.  If ships re-entering the United States cannot clear customs in Bar Harbor, Eastport, or Portland, they will need to clear customs at a port outside Maine, such as MassPort.

conditions. They must employ and retain qualified mariners in sufficient numbers to operate

reliable, efficient service 24 hours a day, 7 days a week, 365 days a year.

71.     Pilotage is a regulated industry. Its various aspects (participants, rates, territories)

are carefully balanced to provide sufficient revenues to each pilotage group so that each group

can cover its fixed costs, maintain the skills of the group's pilots, and attract future pilots to the

profession. This regulation helps ensure that essential pilotage services are available to all

vessels required to take on a pilot without discrimination. It also ensures that pilots who provide

these necessary services are well-qualified, skilled and experienced in the waters of their

designated area, and adequately compensated to support the human and capital costs of their

endeavors.

72.     Pilotage is an essential public service in aid of interstate and foreign commerce. It

is designed to weather fluctuations in vessel traffic resulting from customary market forces,

economic and business changes, and the ebb and flow of supply and demand. But it cannot be

maintained in an environment where commerce is allowed or denied by local fiat.

73.     The Challenged Ordinance arbitrarily excludes a whole category of commerce

from Frenchman Bay by local fiat. In so doing, the Challenged Ordinance threatens the

efficiency and viability of the Penobscot Pilots Association. Approximately 50 percent of the

Penobscot Pilots Association's annual revenues come from pilotage services provided to cruise

vessels anchoring in Frenchman Bay. The Challenged Ordinance aims to reduce that cruise

traffic drastically, thereby cutting the Penobscot Pilots Association's revenues nearly in half.

These revenues cannot be replaced.

74.     The large and immediate loss of revenue for the Penobscot Pilots Association as a

result of the Challenged Ordinance will negatively impact the Penobscot Pilots Association's

ability to cover its fixed costs, attract and retain well-qualified mariners to the profession and in service of the Penobscot Pilots Association's designated area, and otherwise maintain the system of pilotage in its designated area.

75.     The immediate disruption of the Penobscot Pilots Association's resources, and the consequent inability of the Penobscot Pilots Association to perform its vital role, will compromise the safety, environmental resources, and security of traffic in the Penobscot Pilot Association's pilotage area to the detriment of all persons, property, and vessels that rely on its pilotage services for safe navigation.

76.     The Challenged Ordinance, by local fiat, categorizes a whole segment of commerce as locally undesirable, and therefore excludable. In so doing, the Challenged Ordinance upsets the natural balance of maritime commerce and threatens the efficiency and viability of the Maine pilotage system as an essential element of maritime commerce. Its protectionist effects will impact maritime commerce up and down the coast of Maine.

## FIRST CAUSE OF ACTION
### *Violation of the Supremacy Clause*

77.     The Penobscot Pilots Association repeats and incorporates by reference the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

78.     The Supremacy Clause provides that the United States "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.

79.     State and local law is superseded by federal law in three instances: (1) when Congress states its intention to displace state law in a federal statute (express or explicit preemption), (2) where the federal interest is so dominant that the federal system will prevent

enforcement of state laws on the same subject (field or implicit preemption), and (3) where the state or local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or compliance with both state and federal law is impossible (conflict preemption). *Young v. Coloma-Agaran*, No. 00-00774, 2001 WL 1677259 (D. Haw. Dec. 27, 2001) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941)), *aff'd*, 340 F.3d 1053 (9th Cir. 2003).

80.     The Constitution and numerous federal statutes recognize the primacy and virtual exclusivity of federal authority over maritime activities. *See United States v. Locke*, 529 U.S. 89, 108 (2000). The "manifest purpose" of committing maritime law to the federal government was to avoid the "confusion and difficulty" that would come if "vessels were compelled to comply with the local statutes at every port[.]" *State of Washington v. W.C. Dawson & Co.,* 264 U.S. 219 (1924). Therefore, local interests must "yield" to the Constitution in the field of maritime commerce. *Id.*; *see Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 674-75 (1982).

81.     The federal interest in uniformity in the maritime arena is reflected in the substantial body of federal law that governs and regulates the operations of cruise vessels serving the interstate and foreign maritime commerce of the United States. For instance, cruise vessels are subject to federal inspection and supervision in a variety of areas, including construction standards, environmental protection requirements, operational procedures, customs and immigration compliance, security measures, and health and safety requirements.

82.     The federal government routinely prescribes practices, procedures, and standards for maritime vessel operations and, in the interests of safety, environmental protection, and maritime and national security, directs where vessels may (and may not) operate or anchor. *See*,

*e.g.*, 46 C.F.R. Subchapter H. The Coast Guard's Title 46 regulations "have the force of law" and "preemptive effect over State or local regulations in the same field." 46 C.F.R. § 70.01-1.

83.     Under this comprehensive federal statutory and regulatory regime, granting (or revoking) permission for a ship to enter a U.S. port, disembark, and begin operation, lies solely with the federal government.[7] Therefore, state or local laws that ban federally-licensed vessels from calling at a port violate the Supremacy Clause. *See Young v. Coloma-Agaran*, 340 F.3d 1053, 1057 (9th Cir. 2003).

84.     Cruise ships calling at the port of Bar Harbor are regulated by the federal government and operate under valid Coast Guard Certificates of Inspection issued pursuant to regulations at Title 46, Chapter 1, Subchapter H.[8]  Having satisfied all federal requirements for their operations, these cruise ships are authorized to engage in the activities for which they have been certified.

85.     The Town cannot exclude federally regulated and federally certified cruise ships from the port. *See Young*, 340 F.3d at 1057 (state or local laws that ban federally-licensed vessels from calling at a port violate the Supremacy Clause).

86.     Yet, near-complete exclusion of federally certified cruise ships from the port of Bar Harbor is exactly the result of the Challenged Ordinance. The 1,000-person daily disembarkation limit will effectively prohibit the cruise fleet that has historically visited the Town (*i.e.*, cruise ships carrying 1,000 or more passengers) from calling at Bar Harbor, despite

---

[7] *See, e.g.*, CTRS. FOR DISEASE CONTROL AND PREVENTION, SECOND MODIFICATION AND EXTENSION OF NO SAIL ORDER AND OTHER MEASURES RELATED TO OPERATIONS (July 16, 2020) (making clear that the federal government alone grants (or denies) permission for a carrier to enter a U.S. port, disembark, and begin operation in "international, interstate, or intrastate waterways subject to the jurisdiction of the United States"); *see also* 42 C.F.R. § 71.1(b) (defining "controlled free pratique).

[8] As noted above, these regulations "have preemptive effect over State or local regulations in the same field." 46 C.F.R. § 70.01-1.

these vessels being physically able to operate safely in the navigable waters surrounding Bar Harbor and despite these vessels meeting all applicable federal (and international) standards. No cruise vessel will call at a port where all passengers and crew, whether by law or by the happenstance of timing, cannot disembark.

87.     The federal government, through the United States Coast Guard, also regulates the maritime facilities that embark or disembark persons traveling on vessels certified to carry more than 150 passengers. *See* 33 C.F.R. § 105.105(a)(2).

88.     Like the Title 46 regulations, the regulations at Title 33, Chapter 1, Subchapter H, Part 105 "have preemptive effect over State or local regulations insofar as a State or local law or regulation applicable to the [federally-regulated] facilities … would conflict with the regulations in part 105, either by actually conflicting or by frustrating an overriding Federal need for uniformity." 33 C.F.R. § 101.112(b).

89.     Among other things, the Part 105 regulations require that the owner or operator of a covered maritime facility ensure shore access to seafarers, which include vessel crew and pilots. 33 C.F.R. § 105.237. A maritime facility operating pursuant to Part 105 cannot provide timely access to some seafarers and not others.

90.     The Challenged Ordinance applies to all persons seeking to disembark from cruise vessels. Its 1,000-person daily cap directly conflicts with, and is expressly preempted by, federal law and regulations requiring that maritime facilities provide timely access to all seafarers (including pilots) seeking to disembark at the facility.

91.     The Challenged Ordinance interferes with the right of the Penobscot Pilots Association's pilots to disembark from a cruise vessel at the Part 105 maritime facilities operated by Plaintiffs BH Piers, L.L.C. and Golden Anchor, L.C.

92.     A disparate state law also "must yield when it is inconsistent with or impairs the policy or provisions of a treaty or of an international compact or agreement." *United States v. Pink*, 315 U.S. 203, 231 (1942).

93.     The cruise industry is inherently international. A "significant and intricate complex of international treaties and maritime agreements[,]" in addition to the above-mentioned federal regulations, "bear[ ] upon the licensing and operation of vessels." *Locke*, 529 U.S. at 102. The United States is a party to, among other treaties and agreements, the *International Convention for the Safety of Life at Sea*, 1974, 32 U.S.T. 47, T.I.A.S, No. 9700, the *International Convention for Prevention of Pollution from Ships*, 1973, S. Exec. Doc. C, 93-1, 12 I.L.M. 1319, as amended by 1978 Protocol, S. Exec. Doc. C., 96-1, 17 I.L.M. 546, and the *International Convention of Standards of Training, Certification and Watchkeeping for Seafarers*, With Annex, 978 (STCW), S. Exec. Doc. EE 96-1, C.T.I.A. No. 7624. *See id.* at 102-03.

94.     These conventions, established under the auspices of the International Maritime Organization (IMO) and, by extension, the United Nations, bind signatory maritime nations to minimum standards for vessels flying their own flag, establish mutual cooperation among Port States to ensure uniformity of enforceable standards that each party imposes on vessels of other nations, and impose the sole enforceable standards that each party may impose on the vessels of other signatory nations' flags.

95.     A key structural component of the network of maritime treaties and conventions to which the United States is a party is the notion of reciprocity—signatory nations, including the United States, accept compliance by another nation as satisfying conditions for port entry. When the national government has exercised its indisputable foreign affairs powers to commit the United States to vessel standards agreed to by various maritime countries, it is clear that a

municipality cannot restrict the operation of a vessel that the federal government has pledged to accept in U.S. ports.

96.     The Challenged Ordinance violates the Supremacy Clause. It impermissibly aims to circumvent federal maritime laws and regulations and impose local regulation upon navigable waters of the United States. It violates the explicit language of, and conflicts with, multiple federal laws, including regulations that expressly preempt state and local laws. It violates the comprehensive federal regulatory scheme by purporting to control ship design, construction, ability to call at a U.S. port, operations and passengers, and operation of vessels through its 1,000-person limit. Moreover, it impermissibly frustrates the overriding need for federal supremacy and uniformity in the field of maritime commerce.

97.     The Challenged Ordinance harms the Penobscot Pilots Association.

98.     An actual justiciable controversy exists among the parties regarding whether the Challenged Ordinance is preempted by federal law and thus unconstitutional and in violation of the Supremacy Clause.

## SECOND CAUSE OF ACTION
### *Violation of the Commerce Clause*

99.     The Penobscot Pilots Association repeats and incorporates by reference the allegations contained in paragraphs 1 through 76 and 78 through 97 as if fully set forth herein.

100.     The Commerce Clause of the U.S. Constitution, Art. I, § 8, Clause 3, provides Congress with the power "[t]o regulate Commerce with foreign Nations, and among the several States." The Commerce Clause's express grant of power carries with it "a further, negative command, known as the dormant Commerce Clause," *Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 179 (1995), which limits the power of local governments to enact laws affecting interstate commerce. *Hughes v. Oklahoma,* 441 U.S. 322, 326 (1979); *see S.-Cent.*

*Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984). Even in the absence of congressional legislation, the Commerce Clause restricts "the power of the States to interfere with or impose burdens on interstate commerce." *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 389 (1983) (quoting *Western & Southern Life Insurance Co. v. Board of Equalization*, 451 U.S. 648, 652 (1981)).

101.    For matters affecting foreign commerce, the federal government's power is "exclusive and absolute," *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904), and "may not be limited, qualified, or impeded to any extent by state action[,]" *Bd. of Trustees of Univ. of Illinois v. United States*, 289 U.S. 48, 56-57 (1933)..

102.    Local measures violate the Commerce Clause if they: (1) attempt to regulate beyond the boundaries of the enacting state; (2) discriminate against interstate commerce on their face, in purpose, or in effect; (3) create an excessive burden on interstate commerce in relation to any putative local benefits; or (4) interfere with the federal government's ability to speak with one voice when regulating commerce with foreign nations.

103.    Local laws that discriminate against interstate commerce are *per se* invalid under the Commerce Clause, subject only to a government's defensive demonstration that the law has a non-protectionist purpose and employs the least discriminatory means for achieving that purpose. A law must have more than a non-protectionist *stated* purpose because the "evil of protectionism can reside in legislative means as well as legislative ends." *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 504 U.S. 353, 360 (1992) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 626-27 (1978)). A legitimate state goal may not be "achieved by the illegitimate means of isolating the State from the national economy." *Id.*

104.    The Challenged Ordinance is a regulation of commerce. It regulates the transport of persons by water and prescribes the terms and conditions for the discharge of passengers. When applied to vessels and passengers arriving from foreign ports, it regulates foreign commerce as well. *See Henderson v. Mayor of City of New York*, 92 U.S. 259, 271 (1875) (describing conditions placed on the discharge of passengers as regulation of interstate and foreign commerce); *see also Chy v. Freeman*, 92 U.S. 275 (1875)*; Gibbons v. Ogden*, 22 U.S. 1, 9 (1824).

105.    The Challenged Ordinance discriminates against interstate commerce. The transport of persons by water to Bar Harbor is an inherently "out-of-state" activity. Almost exclusively, cruise vessels call at the port of Bar Harbor on itineraries that include one or more calls at ports in other states.

106.    Transport by water, however, is not the only (or even the primary) way that persons enter Bar Harbor.

107.    The Challenged Ordinance seeks only to restrict the number of persons who visit Bar Harbor by cruise ship. Persons gaining access to Bar Harbor by any other means of conveyance (such as land-based conveyance) are unaffected.

108.    The Initiative (on which the Challenged Ordinance is based) asserts, though does not demonstrate, that the "large numbers" of persons coming to the Town via cruise ships jeopardizes the Town's ability to deliver municipal services to Town residents and visitors (including those visitors that the Initiative seeks to exclude) and "diminish[es]" the "quality of life for Town residents." Ex. A; Ex. A-1.

109.    The Initiative (on which the Challenged Ordinance is based) asserts that the disembarkation limit is necessary to "protect, preserve and promote the general health, safety,

welfare and peace of the community." *Id.* But the Initiative does not provide evidence to support its claims that the presence of more than 1,000 cruise passengers per day impedes the Town's ability to maintain the health, safety, or welfare of the community.

110.    The Initiative (on which the Challenged Ordinance is based) does not assert that the alleged impacts on the Town and its residents caused by persons coming via cruise ship, either individually or collectively, are any different from impacts caused by persons arriving in Bar Harbor by other means of conveyance. Indeed, the Initiative does not even refer to the impact of non-cruise visitors in Bar Harbor.

111.    The Challenged Ordinance essentially erects a wall around the port of Bar Harbor—halting commerce from a large percentage of cruise ships active in interstate and foreign commerce. This is exactly the kind of local obstruction of commerce that the Commerce Clause is designed to avoid. *See S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 92 (1984). Eliminating or reducing the presence of out-of-state cruise tourists is not a proper reason for a ban and contradicts the very purpose of the Commerce Clause.

112.    Even if the Challenged Ordinance had a non-protectionist purpose, which it does not, a disembarkation limit applied only to persons arriving by one type of conveyance is not the least discriminatory means for achieving that purpose.

113.    A local law also violates the Commerce Clause if the burdens it creates on interstate commerce clearly exceed the law's putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

114.    The Challenged Ordinance imposes burdens on interstate commerce that are clearly excessive in relation to any of the Challenged Ordinance's putative local benefits.

115.    The Challenged Ordinance does little, if anything, to further any putative public health or safety purpose. Rather, its narrow, protectionist focus on cruise ship visitors purposefully ignores the reality that the "evils" allegedly suffered by the Town's residents will not be solved by imposing draconian limits on one small segment of visitors only.

116.    The Challenged Ordinance creates substantial barriers to the free flow of commerce. It forces cruise lines to "route around" the disembarkation limits by calling at other ports, use only the smallest of vessels to call at Bar Harbor, or remove Bar Harbor (and possibly other ports in Maine) completely from cruise itineraries.

117.    The Challenged Ordinance disrupts the free flow of interstate commerce by imposing a burdensome and almost impossible condition on cruise vessels that seek to call and disembark passengers at Bar Harbor. *See Henderson*, 92 U.S. at 271. In this way, the Challenged Ordinance more than burdens interstate commerce. It essentially halts interstate (and foreign) cruise commerce at the port of Bar Harbor.

118.    In matters pertaining to foreign commerce, the federal government's power is "exclusive and absolute." *Buttfield*, 192 U.S. at 493. Discordant state and local restrictions must give way before the imperative that the national government "speak[] with one voice." *Japan Line Ltd. v. Los Angeles County*, 441 U.S. 434, 452 (1979).

119.    Federal supremacy over maritime commerce and the Nation's relationships with foreign countries leaves little room for state or local action. *See, e.g., Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000); *Locke*, 529 U.S. at 108 (recognizing a need for "uniformity of regulation for maritime commerce"); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 79 (1992) ("the Foreign Commerce Clause recognizes that discriminatory treatment

of foreign commerce may create problems, such as the potential for international retaliation, that concern the Nation as a whole.").

120.    The Challenged Ordinance discriminates against foreign commerce. Foreign-flagged cruise vessels make up the overwhelming majority of cruise vessels that call at the port of Bar Harbor. All of these vessels are engaged in itineraries that include one or more calls at ports in other countries (*i.e.*, Canada, Bermuda),[9] and the majority of these vessels have lower berth capacities in excess of 1,000 passengers. These vessels facilitate the international transportation of passengers, and they will bear the burden of the Challenged Ordinance's limitations. The Challenged Ordinance thus favors domestic vessels over foreign competitors and ships engaged in domestic itineraries over ships engaged in international itineraries. The Town is without authority to make such impositions on foreign commerce.

121.    The Challenged Ordinance impermissibly regulates in an area where national uniformity is essential. Every cruise ship journey involves advanced planning for complex vessel itineraries, the interstate and foreign travel of passengers not only aboard the vessel but, upon reaching a particular port of call, may also, as in true for Bar Harbor, involve providing for pilotage to ensure the safe and efficient navigation of vessels from and to open water and to assist in the maneuvering of vessels while anchoring. This advanced planning for both international and interstate commerce requires uniformity in regulation.

122.    The Challenged Ordinance imposes rules for landing persons in Bar Harbor that are different than the rules of other U.S. ports, in violation of the Commerce Clause. *Henderson*, 92 U.S. at 273 ("The laws which govern the right to land passengers in the United States from other countries ought to be the same in New York, Boston, New Orleans, and San Francisco.").

---

[9] Foreign-flagged cruise ships must call at a foreign port in order not to run afoul of U.S. cabotage laws. *See* 46 U.S.C. § 55103.

In so doing, the Challenged Ordinance threatens the Nation's ability to maintain an integrated maritime transportation system.

123.     The Challenged Ordinance harms the Penobscot Pilots Association. Among other things, it will severely diminish the Penobscot Pilots Association's ability to provide valuable services to instrumentalities of interstate and foreign commerce.

124.     The Challenged Ordinance deprives the Penobscot Pilots Association of rights secured by the U.S. Constitution, under color of state law, thereby violating 42 U.S.C. § 1983.

125.     An actual justiciable controversy exists among the parties regarding whether the Challenged Ordinance violates the Commerce Clause.

126.     The Penobscot Pilots Association is entitled to declaratory and injunctive relief against the Town.

## COUNT III
### *Violation of the Maine Constitution*
### *Preemption by 38 M.R.S. §§ 85, et seq.*

127.     The Penobscot Pilots Association repeat and incorporate by reference the allegations contained in paragraphs 1 through 76, 78 through 97, and 100 through 123 as if fully set forth herein.

128.     Home rule is granted to municipalities by the Maine Constitution and Maine's home rule statute. Me. Const. art. VIII, Pt. 2, § 1; 30-A M.R.S. § 3001.[10]

129.     Home rule, while broad, does not authorize all municipal action. To be sure, municipal action is invalid "when the Legislature has expressly prohibited local regulation, or

---

[10] The Maine Constitution provides municipalities the "power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in nature." Me. Const. art. VIII, pt. 2, § 1. Section 3001 provides municipalities the authority to "exercise any power or function . . . which is not denied either expressly or by clear implication." 30-A M.R.S. § 3001 (municipal action can be preempted expressly or by implication); *see State v. Brown*, 95 A.3d 82, 90–91 (Me. 2014) (citing cases).

when the Legislature has intended to occupy the field and the municipal legislation would frustrate the purpose of state law." *State v. Brown*, 95 A.3d 82, 90-91 (Me. 2014) (quoting *Perkins v. Town of Ogunquit*, 709 A.2d 106 (Me. 1998)).

130.    In the absence of an express prohibition, a local ordinance is preempted where state law creates "a comprehensive and exclusive regulatory scheme inconsistent with the local action" or the local ordinance "prevents the efficient accomplishment of a defined state purpose[.]" *E. Perry Iron & Metal Co. v. City of Portland*, 941 A.2d 457, 462 (Me. 2008).

131.    The pertinent inquiry is "whether the local action would frustrate the purpose of any state law[,]" *Sawyer Env't Recovery Facilities, Inc. v. Town of Hampden*, 760 A.2d 257, 263-64 (Me. 2000), or ""prevent[ ] [its] efficient accomplishment[,]" *Smith v. Town of Pittston*, 820 A.2d 1200 (Me. 2003).

132.    Maine has enacted a comprehensive system to regulate pilotage. The statute's broad legislative purpose includes "provid[ing] maximum safety from the dangers of navigation for vessels entering or leaving the waters[,]" "maintain[ing] a state pilotage system devoted to the preservation and protection of lives, property, the environment and vessels entering or leaving these waters at the highest standard of efficiency[,]" and "insur[ing] the availability of pilots well qualified for the discharge of their duties in aid of commerce and navigation." 38 M.R.S. § 85.

133.    The Challenged Ordinance is inconsistent with Maine's comprehensive scheme for the provision and regulation of pilotage services along Maine's coastal waters.

134.    The Challenged Ordinance, by local fiat, categorizes a whole segment of commerce as locally undesirable, and therefore excludable. Its effect is to eliminate a whole

category of vessels from Frenchman Bay, and through its collateral impacts on other Maine ports, elsewhere in Maine.

135.    The Challenged Ordinance destroys the natural balance of maritime commerce. Its protectionist effects will impact maritime commerce up and down the coast of Maine.

136.    The Challenged Ordinance threatens the efficiency and viability of the Maine pilotage system as an essential element of maritime commerce and, in so doing, frustrates the public interest purposes of Maine's pilotage system – to provide maximum safety for vessels entering and leaving Maine's coastal waters, to support the operations of pilotage groups with the highest standard of efficiency, and to ensure that well-qualified pilots are available for the discharge of their duties in aid of commerce and navigation.

137.    The Challenged Ordinance prevents the efficient accomplishment of the public interest purposes of the State's pilotage law. In particular, it frustrates the ability of the Penobscot Pilots Association and the State to "insure the availability of pilots" for its designated pilotage area, as the current pilotage system does. Efficient, reliable, and available pilotage operations cannot be maintained in an environment where municipalities are permitted to close their shores to whole segments of commerce.

138.    The Challenged Ordinance will cut off an entire segment of vessel traffic into Frenchman Bay instantaneously. The immediate loss of this traffic and its corresponding revenue will frustrate the ability of the Penobscot Pilots Association to maintain the system of state pilotage in its designated area. The Penobscot Pilots Association likely will need to reduce the number of pilots it employs while still covering its entire pilotage area, from Boothbay Harbor to Frenchman Bay. Other vessels will bear the consequences (*i.e.*, traffic delays) of the Penobscot Pilots Association's reduced capacity to provide pilotage. Over time, the loss of revenue will

discourage experienced mariners from undertaking the years of training required to become a state pilot, thereby preventing the Penobscot Pilots Association from being able to fulfill its mandate to the State to insure the availability of pilots well qualified for the discharge of their duties in aid of commerce and navigation.

139.    The Challenged Ordinance harms the Penobscot Pilots Association.

140.    An actual justiciable controversy exists among the parties regarding whether the Challenged Ordinance frustrates or otherwise prevents the efficient accomplishment of the purposes of the Maine state pilotage laws.

141.    The Penobscot Pilots Association is entitled to declaratory and injunctive relief against the Town.

### COUNT IV
### *Violation of the Maine Constitution*
### *Preemption by 5 M.R.S. §§ 13052, et seq.*

142.    The Penobscot Pilots Association repeat and incorporate by reference the allegations contained in paragraphs 1 through 76, 78 through 97, 100 through 123, and 128 through 139 as if fully set forth herein.

143.    Local action is preempted when it "would frustrate the purpose of any state law[,]" *Sawyer Env't Recovery Facilities, Inc. v. Town of Hampden*, 760 A.2d 257, 263-64 (Me. 2000), or "prevent[ ] [its] efficient accomplishment[,]" *Smith v. Town of Pittston*, 820 A.2d 1200 (Me. 2003) (quoting *School Comm. of Town of York v. Town of York,* 626 A.2d 935, 938 n.8 (Me. 1993)).

144.    Tourism is a vital economic driver for Maine, and the State relies heavily on tourism for economic stability and growth. Maine statutes establish the importance of state-level coordination of economic development policies and programs and consistency of municipal and

regional economic efforts with the economic development strategy for the State. 5 M.R.S. § 13052. Maine statutes further direct the MOT, as an organization within the Maine Department of Economic and Community Development, to fulfill the State's economic growth and development purposes and mission consistent with the State's economic development strategy. 5 M.R.S. § 13055.

145.    The State invests considerable energy and money to support and grow the tourism industry in Maine, promote the state as a tourist destination, maximize the effectiveness of state and private sector contributions in attracting visitors to the State, and increase tourism-based revenues. 5 M.S.A. § 13090-E; *see* 5 M.S.A. § 13090-C (legislative purpose of MOT).

146.    The Challenged Ordinance is inconsistent with Maine's goals of tourism and tourism-based revenue growth. It is inconsistent with Maine's efforts to promote the cruise industry in Maine. The Challenged Ordinance frustrates the purposes of Maine's efforts to maintain state-level coordination of economic development policies and programs, which support growth of the cruise tourism industry in Maine.

147.    The Challenged Ordinance, again by local fiat, egoistically seeks to reduce, almost to a trickle, cruise tourism in Bar Harbor.

148.    The Challenged Ordinance will have outsized, negative impacts on cruise tourism throughout Maine. Ships that previously would have visited two or even three ports in Maine will stop at fewer ports (because Bar Harbor is not an option) or will skip Maine ports altogether. The State's tourism industry and other municipalities who benefit economically from the tourism industry will bear the consequences of the Town's protectionist attempt to ban cruise tourism.

149.    The Challenged Ordinance harms the Penobscot Pilots Association.

150.    An actual justiciable controversy exists among the parties regarding whether the Challenged Ordinance frustrates or otherwise prevents the efficient accomplishment of the purposes of the Maine economic development and tourism laws.

151.    The Penobscot Pilots Association is entitled to declaratory and injunctive relief against the Town.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Intervenor Penobscot Bay and River Pilots Association respectfully prays for judgment against Defendant Town of Bar Harbor as follows:

1. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that the Challenged Ordinance is preempted by federal law and violates the Supremacy Clause of the United States Constitution.

2. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that the Challenged Ordinance violates the Commerce Clause of the United States Constitution.

3. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that the Challenged Ordinance frustrates the purpose of Maine state laws establishing and regulating a statewide system of pilotage and therefore is preempted under the Maine Constitution and 30-A M.R.S. § 3001.

4. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association,

declaring that the Challenged Ordinance frustrates or otherwise prevents the efficient accomplishment of the purposes of the Maine economic development and tourism laws and therefore is preempted under the Maine Constitution and 30-A M.R.S. § 3001.

5. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that any local, involuntary imposition of limitation(s) on the disembarkation of passengers, crew, and other persons from federally certified vessels violates the Supremacy Clause of the United States Constitution.

6. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that any local, involuntary imposition of limitation(s) on the disembarkation of passengers, crew, and other persons from vessels operating in the interstate and foreign commerce of the United States violates the Commerce Clause of the United States Constitution.

7. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that any local, involuntary imposition of limitation(s) on the disembarkation of passengers, crew, and other persons from maritime vessels frustrates the purpose of Maine state laws establishing and regulating a statewide system of pilotage and therefore is preempted under the Maine Constitution and 30-A M.R.S. § 3001.

8. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association,

declaring that any local, involuntary imposition of limitation(s) on the disembarkation

of passengers, crew, and other persons from maritime vessels frustrates or otherwise

prevents the efficient accomplishment of the purposes of the Maine economic

development and tourism laws and therefore is preempted under the Maine

Constitution and 30-A M.R.S. § 3001.

9.  A permanent injunction against Defendant Town of Bar Harbor, and such other

preliminary injunctive or other relief as may be appropriate to prevent injury pending

review (as requested in Plaintiffs' pending motion for preliminary injunction, ECF

No. 12), prohibiting Defendant Town of Bar Harbor from (i) implementing and/or

enforcing the Challenged Ordinance and (ii) failing to accept, enter, take, and honor

cruise vessel reservations for calls at the port of Bar Harbor on the basis of the

Challenged Ordinance.

10. An award to Plaintiff-Intervenor Penobscot Bay and River Pilots Association of all

costs, attorneys' fees, and expenses, pursuant to 42 U.S.C. § 1988.

11. Such other and further relief as this Court deems just and proper.

                                    Respectfully submitted,

C. Jonathan Benner (*pro hac vice* pending)        _____
Kathleen E. Kraft (*pro hac vice* pending)         Twain Braden, Esq.
Thompson Coburn LLP                                Thompson Bowie & Hatch LLC
1909 K Street N.W., Suite 600                      415 Congress Street
Washington, D.C. 20006                             P.O. Box 4630
(202) 585-6900 (main)                              Portland, ME 04112-4630
(202) 585-6969 (fax)                               (207) 774-2500
                                                   tbraden@thompsonbowie.com

*Attorneys for Plaintiff-Intervenor Penobscot Bay*
*and River Pilots Association*

Date: January __, 2023