# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, | ) ) ) | |
| *Plaintiff-Intervenor*, | ) ) | |
| v. | ) ) | Case No. 1:22-cv-416-LEW |
| TOWN OF BAR HARBOR, | ) ) | |
| *Defendant*, | ) ) | |
| CHARLES SIDMAN, | ) ) | |
| *Defendant-Intervenor.* | ) ) | |

## PLAINTIFF-INTERVENOR
## PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S
## POST-TRIAL BRIEF

## TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Standing ................................................................................................................. 3

Argument ............................................................................................................... 8

I.   The Ordinance Violates the Supremacy Clause ........................................... 8

    A.   The Extensive Federal Presence in All Aspects of Cruise Vessel Regulation Creates a Complex Regulatory Network That Cannot Function Effectively if Ocean-Going Vessels Can be Excluded by Local Action at Individual Ports .......... 9

    B.   The Ordinance Irremediably Conflicts with Federal Requirements ....................... 12

        1.   The Ordinance Conflicts with Regulations Implementing Federal Maritime Transportation Security Act Requirements ...................................... 12

        2.   The Ordinance Conflicts with and Obstructs Customs and Immigration Screening of Entrants to the United States ...................................................... 14

        3.   The Ordinance Conflicts with the U.S. Coast Guard's Designation of Federal Anchorages in Frenchman Bay ......................................................... 16

II.   The Ordinance Violates the Commerce Clause .......................................... 18

    A.   The Ordinance Discriminates Against Interstate Commerce .................................. 22

        1.   The Ordinance Impedes the Free Flow of Interstate Commerce Across State and International Lines .............................................................................. 23

            (a)   The Ordinance is a Protectionist Measure Designed to Benefit Bar Harbor Interests at the Expense of Interstate Commerce ......................... 23

            (b)   The Ordinance Burdens Instrumentalities of Interstate Transportation ................................................................................................ 27

        2.   The Ordinance Excludes Out-of-State Cruise Lines and the Majority of Foreign-Flag Cruise Vessels from the Local Market ...................................... 34

        3.   The Town Cannot Show that the Ordinance is the Least Discriminatory Means of Achieving Legitimate Local Interests ............................................. 37

    B.   The Ordinance Unduly and Unjustifiably Burdens Interstate Commerce .............. 38

        1.   The Ordinance's Impositions on Interstate Commerce Are Substantial .......... 38

        2.   The Town's Purported Local Justifications for the Ordinance Do Not Outweigh Its Substantial Burdens on Interstate Commerce ........................... 40

    C.   The Ordinance Violates the Foreign Commerce Clause ......................................... 43

III.   The Ordinance Violates the Maine Constitution ......................................... 44

    A.   The Ordinance Interferes with the Maine Legislature's Comprehensive and Exclusive Regulatory Scheme for State Pilotage .................................................. 45

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- i -

B.    The Ordinance Frustrates the Purpose of Maine's Economic and Community Development Statutes ............................................................................................ 48

Relief Requested ...................................................................................................... 49

Conclusion ............................................................................................................... 50

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- ii -

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Watson*, 10 F.3d 915 (1st Cir. 1993) ...............................................................5

*Air Transp. Ass'n of Am., Inc. v. Healey*, No. 18-CV-10651-ADB, 2021 WL
2256289 (D. Mass. June 3, 2021) ...........................................................................38

*Am. Dredging Co. v. Miller,* 510 U.S. 443 (1994)........................................................11

*Antilles Cement Corp. v. Acevedo Vila*, 408 F.3d 41 (1st Cir. 2005) ...........................43

*Arizona v. United States*, 567 U.S. 387 (2012)................................................................8

*Barber v. State of Hawaii*, 42 F.3d 1185 (9th Cir. 1994) ..............................................17

*Barclays Bank v. Franchise Tax Bd.*, 512 U.S. 298 (1994).............................................21

*Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25 (1996)..................................9

*Bayley's Campground, Inc. v. Mills*, No. 20-1559, 2021 WL 164973 (1st Cir. Jan.
19, 2021) ..................................................................................................................25

*Beveridge v. Lewis*, 939 F.2d 859 (9th Cir. 1991) ........................................................17

*Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959) ...........................................28, 29, 30

*Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318 (1977) ...............................6

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573
(1986)........................................................................................................................38

*C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994) ...................18, 34, 42

*Cachia v. Islamorada, Vill. of Islands*, 542 F.3d 839 (11th Cir. 2008) ........................35

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997)................7, 25

*Chan v. Society Expeditions, Inc.*, 123 F.3d 1287 (9th Cir. 1997) ...............................10

*Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334 (1992) ..........................................27, 37

*Cincinnati, P., B.S. & P. Packet Co. v. Catlettsburg*, 105 U.S. 559 (1881)
......................................................................................................................20, 27, 28, 31

*City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978) ............................................21, 23, 24, 27

*Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542 (2015)..................................19

*CSX Transp., Inc. v. Williams*, No. CIV.A. 05-338EGS, 2005 WL 902130
  (D.D.C. Apr. 18, 2005), *rev'd*, 406 F.3d 667 (D.C. Cir. 2005)........................................24, 33

*Dennis v. Higgins*, 498 U.S. 439 (1991) ........................................................................6

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) ......................................22, 36, 38

*E. Perry Iron & Metal Co. v. City of Portland*, 941 A.2d 457 (Me. 2008) ................................44

*Edwards v. California*, 314 U.S. 160 (1941) ........................................................ *passim*

*Fireside Nissan, Inc. v. Fanning*, 30 F.3d 206 (1st Cir. 1994) ......................................50

*Fla. Transp. Serv., Inc. v. Miami-Dade Cnty.*, 757 F. Supp. 2d 1260 (S.D. Fla.
  2010), *aff'd*, 703 F.3d 1230 (11th Cir. 2012) ..................................................27, 39

*Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 504 U.S. 353
  (1992) ..................................................................................................27

*Garrity v. New Jersey*, 385 U.S. 493 (1967)..................................................................6

*General Motors Corp. v. Tracy*, 519 U.S. 278 (1997)........................................6, 34, 36

*Gibbons v. Ogden*, 22 U.S. 1 (1824).........................................................6, 7, 19, 23

*Gloucester Ferry Co. v. Com. of Pennsylvania*, 114 U.S. 196 (1885) ...........................32

*Gonzales v. Raich*, 545 U.S. 1 (2005)..........................................................................20

*Graham v. Richardson,* 403 U.S. 365 (1971) ............................................................15

*H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525 (1949).............................................19

*Hall v. De Cuir*, 95 U.S. 485 (1877)........................................................20, 28, 33

*Hannibal & St. J.R. Co. v. Husen*, 95 U.S. 465 (1877)..................................................24

*Healy v. Beer Inst.*, 491 U.S. 324 (1989) ..................................................................39

*Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241 (1964)..............................25

*Henderson v. Mayor of City of New York*, 92 U.S. 259 (1875) ......................................7

<u>*Hignell-Stark v. City of New Orleans*, 46 F.4th 317 (5th Cir. 2022)</u>........................36, 37

*Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) ................................8

*Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178 (1st Cir. 1999) ....................................6

*Hughes v. Oklahoma*, 441 U.S. 322 (1979) ........................................................................21, 34, 35

*Huish Detergents, Inc. v. Warren County, Kentucky,* 214 F.3d 707 (6th Cir. 2000)......................7

*Illinois Cent. R. Co. v. State of Illinois ex rel. Butler*, 163 U.S. 142 (1896)....................20, 28, 31

*Industria y Distribution de Alimentos v. Trailer Bridge*, 797 F.3d 141 (1st Cir. 2015) ................................................................................................................38

*Isham v. Pac. Far E. Line, Inc.*, 476 F.2d 835 (9th Cir. 1973) ......................................................36

*Island Silver & Spice, Inc. v. Islamorada, Vill. of Islands*, 475 F. Supp. 2d 1281 (S.D. Fla. 2007), *aff'd*, 542 F.2d 844 (11th Cir. 2008) ....................................34, 35

*Jones v. City of Memphis*, 868 F. Supp. 2d 710 (W.D. Tenn. 2012), *aff'd*, 531 F. Appx. 709 (6th Cir. 2013)........................................................................................4

*Kansas City Southern Ry. v. Kaw Valley Drainage District*, 233 U.S. 75 (1914)........................28

*Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662 (1981)....................23, 41

*Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71 (1992) ............................43

*Levin Richmond Terminal Corp. v. City of Richmond*, 482 F. Supp. 3d 944 (N.D. Cal. 2020)........................................................................................................31

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) .....................................................................6

*Maine Forest Prod. Council v. Cormier*, 51 F.4th 1 (1st Cir. 2022) .........................................9, 16

*Maine Forest Products Council v. Cormier*, 586 F. Supp. 3d 22 (D. Me. 2022) ...............9, 14, 16

*Midcoast Disposal, Inc. v. Town of Union*, 537 A.2d 1149 (Me. 1988).......................................44

*Morgan v. Com. of Va.*, 328 U.S. 373 (1946) ...........................................................20, 23, 28, 32

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018) ...............................................9

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012).......................................................19

*Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)..................................21, 43

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- v -

*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 143 S. Ct. 1142 (2023)................18, 22, 27

*New Energy Co. of Indiana v. Limbach*, 486 U.S. 269 (1988) ......................................23

*Northeast Patients Group v. United Cannabis Patients and Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022)...............................................................21

*Ouellette v. Mills*, 22 F. Supp. 3d 36 (D. Me. 2014).......................................................8

*Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66 (1st Cir. 2001), *aff'd sub nom. Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003) ..........................................4

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ..............................................38, 42

*Pittston Warehouse Corp. v. City of Rochester*, 528 F. Supp. 653 (W.D.N.Y. 1981) .......................................................................26, 28, 31

*Portland Pipe Line Corp. v. City of S. Portland*, 332 F. Supp. 3d 264 (D. Me. 2018) ............................................................................ *passim*

*Proctor v. Cnty. of Penobscot*, 651 A.2d 355 (Me. 1994) ............................................8

*Puerto Rico Ass'n of Mayors v. Velez-Martinez*, 482 F. Supp. 3d 1 (D.P.R. 2020) .....................49

*Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978)........................................................9

*Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429 (1978) ............................................ *passim*

*Rental Hous. Ass'n of Greater Lynn v. Hills*, 548 F.2d 388 (1st Cir. 1977).....................................5

*S. Covington & C. St. R. Co. v. City of Covington*, 235 U.S. 537 (1915) ...................................................................20, 28, 32, 33

*S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761 (1945) ..............................................................................3, 21, 28, 29

*Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320 (9th Cir. 2015) ........................................18

*Savage v. Mills*, 478 F. Supp. 3d 16 (D. Me. 2020).............................................3, 4, 5, 18

*Sawyer Env't Recovery Facilities, Inc. v. Town of Hampden*, 760 A.2d 257 (Me. 2000) ....................................................................44, 46, 49

*Selevan v. New York Thruway Auth.*, 584 F.3d 82 (2d Cir. 2009)...................................................3

*Serv. Mach. & Shipbuilding Corp. v. Edwards*, 617 F.2d 70 (5th Cir.), *aff'd*, 449 U.S. 913 (1980)..........................................................................24, 25

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- vi -

*Sherlock v. Alling*, 93 U.S. 99 (1876) .................................................................22, 27

*Smith v. Town of Pittston*, 820 A.2d 1200 (Me. 2003) ...............................................44

*Smith v. Turner*, 48 U.S. 283 (1849)..........................................................................22

*Snead v. Cent. of Georgia Ry. Co.*, 151 F. 608 (C.C.S.D. Ga. 1907) ........................6, 7

*South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018) ..........................................21, 38

*St. Thomas-St. John Hotel & Tourism Ass'n v. Virgin Islands,* 218 F.3d 232 (3d
    Cir. 2000) ................................................................................................................4

*Takahashi v. Fish & Game Comm'n,* 334 U.S. 410 (1948)..........................................12

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019) ......19, 22

*Town of Southold v. Town of E. Hampton*, 477 F.3d 38 (2d Cir. 2007) .......................37

*U & I Sanitation v. City of Columbus,* 205 F.3d 1063 (8th Cir. 2000)
    .....................................................................................................39, 40, 41, 42

*Vavoules v. Kloster Cruise Ltd.*, 822 F. Supp. 979 (E.D.N.Y. 1993) ...........................35

*W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994)...............................................22

*Walgreen Co. v. Rullan*, 405 F.3d 50 (1st Cir. 2005) ..................................................34

*Wyandotte Transp. Co. v. United States*, 389 U.S. 191 (1958) .....................................3

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) .....................................................2, 23, 24

*Young v. Coloma-Agaran. Young v. Coloma-Agaran*, No. CIV.00-00774HG-
    BMK, 2001 WL 1677259 (D. Haw. Dec. 27, 2001), *aff'd*, 340 F.3d 1053 (9th
    Cir. 2003) ................................................................................38, 39, 40, 41

## Statutes and Constitutional Provisions

33 U.S.C. § 471 ...........................................................................................................16

46 U.S.C. § 55103 ........................................................................................................31

Me. Const. Art. VIII, pt. 2, § 1....................................................................................44

Me. Rev. Stat. tit. 5, § 13052 .......................................................................................48

Me. Rev. Stat. tit. 5, § 13090 .......................................................................................48

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- vii -

Me. Rev. Stat. tit. 30-A, § 3001 ...................................................................44

Me. Rev. Stat. tit. 38, § 85, et seq. .....................................................45, 46, 47

Me. Rev. Stat. tit. 38, § 86 ........................................................................45

ch. 9, 1 Stat. 53, 54 (1789) .......................................................................45

U.S. Const. art. I, § 8...........................................................................1, 18

U.S. Const. art. III, § 2 .....................................................................3, 5, 6

U.S. Const. art. VI, cl. 2..........................................................................8

**Rules & Regulations**

33 C.F.R. § 101.112 ...........................................................................12, 13

33 C.F.R. § 104 .................................................................................12, 13

33 C.F.R. § 105 .................................................................................12, 13

33 C.F.R. § 110 .................................................................................12, 17

*Seafarers' Access to Maritime Facilities*, 84 Fed. Reg. 12102 (Apr. 1, 2019).......................12, 13

**Other Authorities**

23 U.S.F. Maritime L.J. 168 (2010).............................................................45

M. Farrand, *The Framing of the Constitution of the United States* 7 (1913).................................19

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- viii -

## Introduction

On November 8, 2022, a majority of the voting residents of the Town of Bar Harbor approved the enactment of a citizen's initiative to impose daily limits on cruise ship disembarkations ("Initiative"). The Initiative became a Town ordinance ("Ordinance") on December 8, 2022. The Ordinance restricts the disembarkation of persons from cruise vessels lying in federal anchorages to 1,000 per day in the aggregate. Each daily disembarkation over 1,000 persons carries a minimum $100 per person penalty, assessed against the private pier owners who receive visitors ashore via tender vessels providing transport from the anchorages. *See* Joint Proposed Findings of Fact ("PFF") ¶¶ 241-244, 251.

Bar Harbor is a popular tourist destination and a marquee port of call for cruise itineraries in the New England/Canada trade. Cruise vessels anchor in federal anchorages in Frenchman Bay. In recent years, the port of Bar Harbor has welcomed, on average, more than 140 cruise vessel calls during the cruise season (April to November). The majority of these vessels each carry more than 1,000 cruise passengers and hundreds of crew. *See* PFF ¶¶ 52, 57, 86-90, 264-269. The Ordinance will effectively prohibit those visits.

The Penobscot Bay and River Pilots Association ("Pilots" or "Pilots Association") intervened in this action to enjoin enforcement of the Ordinance on the grounds that the Ordinance (1) is preempted by federal law; (2) violates Article 1, section 8 of the United States Constitution by erecting a barrier around Bar Harbor to the detriment of interstate commerce, discriminating in favor of local competitors in the Bar Harbor/Acadia National Park vacation market, and substantially burdening interstate and foreign commerce and instrumentalities of interstate transportation; and (3) is preempted by the Maine Constitution by frustrating the State's objectives with respect to pilotage and tourism.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 1 -

The Ordinance places the Town squarely athwart the movement of the interstate and international maritime commerce of the United States. The Town's limitation on disembarkations is arbitrarily set so low that it is an effective prohibition on cruise vessel calls for a substantial majority of vessels now calling Bar Harbor. Both in anticipation and once effective, it disrupts interstate and international maritime trading patterns, impedes the travel of American citizens and lawfully admitted foreign nationals, and restricts at the municipal level the interstate and international operations of vessels subject to a technically complex, multi-layered federal regulatory regime governing the vessels themselves, their access to U.S. ports, and the entry into the United States of their passengers and crews, despite compliance with multiple federal requirements governing these subjects. The Ordinance launches the Town far beyond the boundaries of lawful non-federal actions that might incidentally affect maritime commerce.

Residents of attractive tourist destinations do not universally perceive every aspect of a strong tourist economy as a positive. This is true in Bar Harbor. Some local residents, most notably Mr. Sidman, feel inconvenienced or annoyed by the influx of large numbers of visitors, arriving by various modes of transportation, into the Town. The Town has tools to address its residents' concerns. It can exercise its police power in a host of constitutionally appropriate ways to manage sidewalk congestion and crowds. It can, as it has for many years, work cooperatively with the cruise industry to mitigate the adverse effects of Bar Harbor's popularity with tourists.

What the Town cannot do, however – whether by purpose, intent, or effect – is isolate itself from the national marketplace or wall off the Town from vessels, passengers, and crew traveling in interstate and foreign commerce, even if in reaction to vocal local interests. *See Wyoming v. Oklahoma*, 502 U.S. 437, 456-57 (1992) ("We have often examined a presumably legitimate goal, only to find that the State attempted to achieve it by the illegitimate means of

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 2 -

isolating the State from the national economy." (internal citations and quotations omitted)). It cannot invoke the "convenient apologetics of the police power"[1] to exclude the vast bulk of modern cruise vessels from its port, including vessels that have called at Bar Harbor for years. And it cannot justify through police power local restrictions that impact core functions of vessels lying at anchor in federal anchorages and operating in the navigable waters of the United States. *See Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1958) (navigable waters are "public property of the nation, and subject to all the requisite legislation by Congress.") (internal citation, quotations omitted).

## **Standing**

Article III of the Constitution limits federal courts' jurisdiction to the resolution of "cases" and "controversies." U.S. Const. art. III, § 2. Courts ensure this condition is satisfied by "requir[ing] that plaintiffs establish their standing as the proper parties to bring suit." *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 89 (2d Cir. 2009) (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP,* 549 F.3d 100, 106 (2d Cir. 2008)). Prospective plaintiffs must show that they have suffered an injury-in-fact that is fairly traceable to the defendant's actions and can be remedied by the requested relief. *Id.*; *see also Savage v. Mills*, 478 F. Supp. 3d 16, 24-25 (D. Me. 2020) (addressing Article III standing for dormant Commerce Clause claim).

Beyond the Article III requirements, "prudential concerns ordinarily require a plaintiff to show that his claim is premised on his own legal rights …, that his claim is not merely a

---

[1] *S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 779 (1945). "The principle that, without controlling Congressional action, a state may not regulate interstate commerce so as substantially to affect its flow or deprive it of needed uniformity in its regulation is not to be avoided by "'simply invoking the convenient apologetics of the police power.'" *Id.* at 779-80 (quoting *Kansas City Southern Ry. v. Kaw Valley Drainage District*, 233 U.S. 75, 79 (1914); *Buck v. Kuykendall*, 267 U.S. 307, 315 (1925)).

generalized grievance, and that it falls within the zone of interests protected by the law invoked." *Id.* at 24 (quoting *Pagán v. Calderón*, 448 F.3d 16, 27 (1st Cir. 2006)) (internal quotations omitted). In the dormant Commerce Clause context, a plaintiff's injury must "result from economic protectionism or the impaired movement of goods between state borders." *Jones v. City of Memphis*, 868 F. Supp. 2d 710, 728 (W.D. Tenn. 2012), *aff'd*, 531 F. Appx. 709 (6th Cir. 2013). But a plaintiff is not required to demonstrate prudential standing to bring a preemption-based challenge under the Supremacy Clause. *Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001), *aff'd sub nom. Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003) (plaintiff could bring Supremacy Clause challenge regardless of whether federal statute's relevant provisions were designed to benefit plaintiff); *St. Thomas-St. John Hotel & Tourism Ass'n v. Virgin Islands,* 218 F.3d 232, 241 (3d Cir. 2000) ("[A] state or territorial law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption.").

The Pilots meet these requirements. The Pilots Association is the only pilotage group providing pilotage services on routes covering Penobscot and Frenchman Bays and the Penobscot River. The Pilots provide pilotage services to all vessels requiring pilotage in their pilotage area. Nearly fifty percent of the Pilots' annual revenues are derived from pilotage services rendered to cruise vessels entering and exiting Frenchman Bay. The Ordinance will prohibit the majority of cruise vessels from calling at the port of Bar Harbor. By the Town's own estimate, the Ordinance will reduce cruise passenger visitation by ninety-five percent. If cruise vessels do not come to Bar Harbor, they will not anchor in Frenchman Bay and will not require pilotage services in the Pilots' designated pilotage area. The Pilots stand to lose nearly fifty percent of their annual revenues because of the Ordinance's direct impact on cruise vessel traffic

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 4 -

in Frenchman Bay. *See* PFF ¶¶ 274-275, 278-284, 290, 318-319, 321-322, 372-376. The Pilots'

injury is the "prototypical concrete harm" sufficient to establish Article III standing.[2] *Savage*,

478 F. Supp. 3d at 25 ("As the First Circuit has made clear, wallet injury or 'actual economic

loss … is the prototypical concrete harm.'") (quoting *Gustavsen v. Alcon Labs., Inc*., 903 F.3d 1,

8 (1st Cir. 2018)). This injury is a direct result of the Ordinance's disembarkation limit. Only a

permanent injunction can remedy the Pilots' injury.

  In addition to economic harm, enforcement of the Ordinance will also degrade the Pilots'

ability to fulfill their statutory obligation to maintain the system of pilotage in their designated

pilotage area. The inevitable loss of revenue caused by greatly-reduced cruise traffic in

Frenchman Bay due to the Ordinance will negatively impact the Pilots' ability to cover their

fixed costs and to attract and retain well-qualified mariners to serve in the Pilots' pilotage area.

The Pilots cannot provide their essential services to all traffic (cargo and passenger) in Bar

Harbor and Frenchman Bay without revenues sufficient to support their operations. Disruption of

the Pilots' resources and the consequent inability of the Pilots to perform their vital role in

interstate commerce will compromise the safety, environmental resources, and security of traffic

in the Pilots' designated pilotage area. It will decrease their efficiency and render them unable to

ensure the timely availability of pilots well qualified for the discharge of their duties in aid of

commerce and navigation. *See* PFF ¶¶ 306-312, 314, 375-376.

  That the Pilots' injury arises out of the Town's unlawful regulation of cruise vessel

operations instead of direct regulation of the Pilots is of no consequence. The Commerce Clause

---

[2] If a plaintiff has not actually realized the economic loss upon complaint filing, "competitive injury" – a particularized future economic injury which, though latent, is imminent --will support standing. *Adams v. Watson*, 10 F.3d 915, 920-21 (1st Cir. 1993); *see Rental Hous. Ass'n of Greater Lynn v. Hills*, 548 F.2d 388 (1st Cir. 1977).

bestows "a 'right' to engage in interstate trade free from restrictive state regulation," and is enforceable by persons injured, directly or indirectly,[3] by such state action. *Dennis v. Higgins*, 498 U.S. 439, 447-48 (1991) (injured party may sue and obtain injunctive relief); *see, e.g., Garrity v. New Jersey*, 385 U.S. 493, 500 (1967) (engaging in interstate commerce is a "righ[t] of constitutional stature"). "[C]ognizable injury from unconstitutional discrimination against interstate commerce does not stop at members of the class against whom a State ultimately discriminates." *General Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997) (discussing Article III standing); *see also Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 183 (1st Cir. 1999) ("an in-state business which meets constitutional and prudential requirements due to the direct or indirect effects of a law purported to violate the dormant Commerce Clause has standing to challenge that law") (internal citations omitted); *see generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Commerce undoubtedly includes "traffic," "buying and selling," and "the interchange of commodities." *Gibbons v. Ogden*, 22 U.S. 1, 189 (1824). "[B]ut it is something more: it is [commercial] intercourse … between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." *Id.*; *see also Snead v. Cent. of Georgia Ry. Co.*, 151 F. 608, 614 (C.C.S.D. Ga. 1907) ("'[C]ommerce … embraces ships and vessels as the instruments of intercourse and trade, as well as the officers and seamen employed in their navigation.'") (quoting *State Tonnage Tax Cases*, 12 Wall. 216, 20 L.Ed. 370). The

---

[3] Local action can infringe upon the right to engage in interstate commerce directly or indirectly. *See Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977) (stock exchanges had standing to challenge tax on securities transactions because, *e.g.*, they were "asserting their right under the Commerce Clause to engage in interstate commerce free of discriminatory taxes on their business and they allege[d] that the transfer tax indirectly infringes on that right").

transportation of persons is commerce. *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 584 (1997) (quoting *Edwards v. California*, 314 U.S. 160, 172-73 (1941) (internal quotations omitted); *see also Gibbons*, 22 U.S. at 215-16 ("no clear distinction is perceived between the power to regulate vessels employed in transporting men for hire, and property for hire"). When the instrumentality of transportation is a cruise vessel, the transport of passengers on the water cannot be separated from the disembarkation of those passengers at scheduled ports of call – both are commerce. *See Henderson v. Mayor of City of New York*, 92 U.S. 259, 271 (1875) ("The transportation of a passenger from Liverpool to the city of New York is one voyage. It is not completed until the passenger is disembarked at the pier in the latter city. A law or a rule emanating from any lawful authority, which prescribes terms or conditions on which alone the vessel can discharge its passengers, is a regulation of commerce; and, in case of vessels and passengers coming from foreign ports, in a regulation of commerce with foreign nations.").

Each year, the Pilots facilitate the movement of hundreds of cargo- and passenger-carrying vessels in interstate commerce. *See* PFF ¶¶ 341-343. The Pilots themselves are thus instrumentalities of interstate commerce. *Snead*, 151 F at 613 ("persons who are concerned or affected by commerce [include] … persons who are the instrumentalities of commerce, such as pilots"). The Pilots engage in interstate commerce and their ability to do so will be greatly restricted if the Ordinance is enforced. The Ordinance will injure the Pilots by restricting their access to the majority of cruise vessels that would have called at Bar Harbor absent the Ordinance. *See, e.g., Huish Detergents, Inc. v. Warren County, Kentucky,* 214 F.3d 707, 710-11 (6th Cir. 2000) (waste generator subject to local regulation requiring it to send all of its waste to designated facility for processing had standing under the dormant Commerce Clause because it

sought "to protect its right to contract with a company that can transport its waste for out-of-state processing and/or disposal"). It is not seriously disputed that the cruise lines will not bring vessels to Bar Harbor that would violate the disembarkation limit, and most cruise lines will simply remove Bar Harbor from their New England/Canada itineraries if the Ordinance is enforced. *See* PFF ¶¶ 274-275, 278-82. And if vessels do not call at Bar Harbor, they will not require the services of the Pilots. *Ouellette v. Mills*, 22 F. Supp. 3d 36, 44 (D. Me. 2014) (quoting *Lujan*, 504 U.S. at 562) (when a plaintiff's injury arises out of the "'allegedly unlawful regulation … of *someone else*," plaintiff has standing if court can be reasonably assured of "the response of the regulated … third party to the government action") (emphasis in original). Thus, the Pilots have standing to bring this lawsuit.[4]

**Argument**

### I.   The Ordinance Violates the Supremacy Clause

The Supremacy Clause states that the laws of the United States "shall be supreme Law of the Land." U.S. Const., art. VI, cl. 2. Under the Supremacy Clause, state laws that "interfere with, or are contrary to, federal laws" are invalid. *Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons*, 22 U.S. at 9).

Whether state action is found incompatible with federal law depends on the particularities of the federal and state or local laws at issue. In some cases, preemption is mandated because the federal law or regulation at play includes language explicitly preempting state action in a given area. *Arizona v. United States*, 567 U.S. 387, 399 (2012). In others, preemption is required

---

4 The standing analysis under Maine law provides the same result. *See Proctor v. Cnty. of Penobscot*, 651 A.2d 355 (Me. 1994) (finding standing to challenge ordinance where plaintiff "faced with penalties if she disobey[ed] the County ordinance and with economic injury if she complie[d] with the ordinance").

because Congress has manifested its preemptive intent by enacting a pervasive scheme of federal regulation or legislating on a field dominated by a federal interest. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157 (1978); *see also Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) ("A federal statute, for example, may create a scheme of federal regulation 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'") (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)). Finally, state law is preempted because it imposes a duty inconsistent (in conflict) with federal law, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018), or "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Maine Forest Prod. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022) (quoting *Arizona*, 567 U.S. at 399). *See also Barnett Bank*, 517 U.S. at 31 (state or local law preempted where it stands in direct "irreconcilable conflict" with federal law); *Maine Forest Products Council v. Cormier*, 586 F. Supp. 3d 22, 37 (D. Me. 2022). The Ordinance, in design and effect, presents an irreconcilable conflict with federal law and an obstacle to the execution of Congress's objectives.

### A. The Extensive Federal Presence in All Aspects of Cruise Vessel Regulation Creates a Complex Regulatory Network That Cannot Function Effectively if Ocean-Going Vessels Can be Excluded by Local Action at Individual Ports

The federal presence in the area of navigation, safety, and environmental protection is extensive, pervasive, demanding, and complex. It follows a vessel from its design phase through its ultimate scrapping. It is linked to a series of international agreements dependent upon predictability of access to ports and reciprocity of treatment of foreign vessels and foreign nationals aboard those vessels. *See* PFF ¶¶ 295-303. An array of federal agencies, including the United States Coast Guard ("Coast Guard"), the Bureau of Customs and Border Protection ("CBP") (both subdivisions of the U.S. Department of Homeland Security), the Centers for

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 9 -

Disease Control and Prevention, the Environmental Protection Agency, and the Federal Maritime Commission, administer this pervasive regulatory system.

Local restrictions on vessel operations, particularly when imposed without consultation, cooperation, or reconciliation with federal permissions, inspections, certifications, and requirements, pose a direct threat to the necessary uniformity of federal oversight and the efficient operations of cruise and other types of vessels.

Cruise vessels are designed and have as their primary purpose the safe embarkation, carriage, and disembarkation of paying passengers. It is why they exist. This function dictates their design, their operations, and their geographic deployment. *See Chan v. Society Expeditions, Inc.*, 123 F.3d 1287, 1292 (9th Cir. 1997). Cruise vessels commonly calling Bar Harbor have passenger capacities well in excess of 1,000. Crew count sometimes can equal half the number of passengers. *See* PFF ¶¶ 274-275, 278-281. The Ordinance excludes these vessels despite these vessels meeting all applicable federal (and international) standards.

A limitation on size or capacity imposed by one port along an itinerary is disruptive of all arrangements along the route.[5] The Ordinance's disembarkation limit is unique to Bar Harbor and severely restricts cruise lines' operational choices. A vessel that might be employed on an itinerary calling at Bar Harbor would have to have a maximum combined capacity of passengers and crew of no more than 1,000. The limitation would apply to the vessel's operations in all ports on the itinerary. The Ordinance becomes the "lowest common denominator" for the entire itinerary. Moreover, even if the cruise lines could align their capacities to the Ordinance,

---

[5] Itineraries are designed months and years in advance, involve the coordination of many variables, reflect commitments to a number of non-cruise vessel entities, such as providers of land-based accommodations, fuel, waste disposal, shoreside excursion operators, food suppliers. *See* PFF ¶¶ 157-160, 299-301.

disembarkation is not guaranteed because other vessels may exhaust a day's permitted disembarkations.

A local restriction that impedes the free flow of maritime commerce between the States or between the United States and foreign nations can also impair uniformity of federal approach to maritime issues. *Am. Dredging Co. v. Miller,* 510 U.S. 443, 457-58 (1994) (Souter J., concurring). Federal law subjects vessels to a nationally uniform regulatory regime that, although extensive and complex, imposes uniform procedures, standards, and practices governing vessel operations around the country and in a context of interaction with other maritime "flag states" around the world. The Ordinance's drastic restrictions and penalties will affect vessel routing decisions, require changes in embarkation and disembarkation operations at the vessel while lying in federal anchorages, and require cruise vessels to "work around" Bar Harbor's barriers to operations in Frenchman Bay. Decisions about routing, particularly given the complexities of cruise itinerary planning, are squarely within the realm of impacts on the "primary conduct" of vessels. *Id.* at 454 (rules upon which "maritime actors rely in making decisions about primary conduct," *i.e.*, "how to manage their business and what precautions to take" require national uniformity).[6]

---

[6] The holding in *American Dredging* was that a contested Louisiana forum selection provision did not implicate the federal interest in uniformity because it was not an operational rule affecting the primary conduct of vessels. *Am. Dredging Co.*, 510 U.S at 456-57. Here, the Ordinance directly impacts the primary conduct of vessels in their core functions while operating in U.S. waters near Bar Harbor and in cruise lines' business decisions about when and where to deploy vessels and the undertakings necessary to support those vessels in various itineraries throughout the United States and internationally. *See* PFF ¶¶ 145, 285-90.

---

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 11 -

**B.  The Ordinance Irremediably Conflicts with Federal Requirements**

Federal law governs maritime security, both on the vessels and at the secure facilities that receive disembarking passengers and crew. *See* Maritime Transportation Security Act of 2002, Pub. L. 107-295, 46 U.S.C. § 70101, *et seq.* ("MTSA"); Coast Guard Authorization Act of 2010, Pub. L. 111-281, 124 Stat. 2905 (2010) ("CGAA"); 33 C.F.R. parts 104, 105. Federal law also governs the lawful admission of aliens into the United States and prohibits State regulation that discriminates against aliens lawfully admitted. *See Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 419 (1948); Immigration and Naturalization Act of 1952, 8 U.S.C. § 1101, *et seq.* ("INA"). It also regulates the anchoring of vessels incident to the vessels' operations. 33 C.F.R. § 110.130. In each of areas, the Ordinance conflicts with applicable federal requirements.

**1.  *The Ordinance Conflicts with Regulations Implementing Federal Maritime Transportation Security Act Requirements***

In the aftermath of the terrorist attacks of September 11, Congress, through the MTSA and CGAA, established requirements, standards, and procedures for ensuring the safety of U.S. ports.[7] The private tender piers in Bar Harbor are subject to these maritime safety requirements, *see* 33 C.F.R. part 105; as are cruise vessels, *see* 33 C.F.R. part 104. These regulations, in some cases, have "preemptive effect over State or local regulations within the same field;" in others, they have "preemptive effect over State or local regulations … [that] actually conflict[ ] [with federal regulation] or [ ] frustrat[e] an overriding Federal need for uniformity. 33 C.F.R. § 101.112; *Seafarers' Access to Maritime Facilities*, 84 Fed. Reg. 12102, 12118 (Apr. 1, 2019) (amending 33 C.F.R. part 105) (Principles of federalism preclude the States from regulating in

---

[7] Section 811 of the CGAA requires MTSA facilities to "provide a system for seamen assigned to a vessel at that facility, pilots, and representatives of seamen's welfare and labor organizations to board and depart through the facility in a timely manner at no cost to the individual." 84 Fed. Reg. at 12102.

categories reserved for regulation by the Coast Guard. These principles "apply to [ ] regulations promulgated under the authority of the [MTSA]."").[8] Among other things, these regulations require vessels and facilities receiving the vessels to ensure timely shore access to individuals who work on the vessels ("seafarers", *i.e.*, the crew) and those who provide services to seafarers. 33 C.F.R. § 105.237 (facilities); *id*. § 105.200(b)(9) (facilities); *id*. § 104.200(b)(7) (vessels).

The issue of seafarer access to shore is a matter of considerable Federal concern. Maritime nations have vital interests in protecting their ports and marine terminals from terrorist infiltration and attack, but nations whose citizens provide shipboard personnel also have strong incentives to protect the ability of seafarers to make shore visits for medical care, supplies, repatriation, rest and recreation. The federal government's commitment to shore facility access by mariners reflects its awareness of an "internationally recognized obligation to protect the interest of seafarers' shore leave, including shoreside access." 84 Fed. Reg. at 12104. These are so important that if "private actors thwart or hinder the ability of the United States to fulfill its international obligations, such as by imposing fees on crewmembers as a condition to shoreside access in the United States, any and all legal and diplomatic responses … may be taken by the U.S. Government." 84 Fed. Reg. at 12104.

The Ordinance runs afoul of Part 104 and 105 requirements. Its disembarkation limit expressly and purposefully applies to all persons disembarking from cruise ships, including crew. *See* PFF ¶¶ 245. Under the Ordinance, any crew disembarking at Bar Harbor would be prohibited from disembarking if they are unfortunate enough to be the 1,001 or higher disembarkation of

---

[8] The maritime facilities security regulations preempt any state law or local regulation that conflicts with federal requirements or frustrates the federal need for uniformity. 33 C.F.R. § 101.112(b). The vessel security regulations preempt the field. *Id*. § 101.112(a).

the day. The Town's eve-of-trial efforts to interpret the Ordinance so as to exempt crew is
tantamount to admission of this irreconcilable conflict, but no amount of mere creative
interpretation can resolve it in a manner consistent with federal law. The Ordinance's inclusion
of crew in its prohibition is inconsistent with the United States' international obligation to protect
shoreside access. Secure maritime facilities, like the private piers, and any vessels calling at Bar
Harbor cannot comply with both their federal obligations and the Ordinance. Thus, the
Ordinance is preempted.

### 2. The Ordinance Conflicts with and Obstructs Customs and Immigration Screening of Entrants to the United States

The U.S. government has "broad, undoubted power over the subject of immigration and
the status of aliens." *Cormier*, 586 F. Supp. 3d at 38 (quoting *Arizona v. United States,* 567 U.S.
387, 394 (2012) (internal quotations omitted). Like the federal government's central role in
maritime affairs, federal immigration authority leaves no room for simultaneous regulation by
the States or local governments. They can "neither add to nor take from the conditions lawfully
imposed by Congress upon admission, naturalization and residence of aliens in the United States
or the several states." *Cormier*, 586 F. Supp. 3d at 38 (quoting *Toll v. Moreno,* 458 U.S. 1, 11
(1982) (in turn quoting *Fish & Game Comm'n,* 334 U.S. at 419 (1948) (internal quotations
omitted). "State laws [that] impose discriminatory burdens upon the entrance or residence of
aliens lawfully within the United States conflict with this constitutional derived federal power to
regulate immigration and have accordingly been held invalid." *Id.*

Cruise vessels calling at Bar Harbor operate primarily on itineraries that visit foreign
(primarily Canadian) ports. When Bar Harbor is the vessel's first port of call on a southbound
voyage from Canada, passengers and crew disembarking in Bar Harbor, whether U.S. citizens or

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 14 -

foreign nationals, are presented at Bar Harbor for federal immigration and customs inspection onboard the vessel at the federal anchorages and are cleared entry into the United States before they ever step foot on Bar Harbor soil.[9] A vessel re-entering the United States in Maine must call at a Class A port. In Maine, only Portland, Bar Harbor, and Eastport are Class A ports. Thus, only Portland, Bar Harbor, and Eastport are available "first ports of entry" for vessels coming from a foreign (likely Canadian) port. *See* PFF ¶¶ 117-126, 258-259, 263-264, 300.

Despite admission (or readmission) on inspection by CBP, foreign nationals visiting Bar Harbor are, pursuant to the numerical restrictions of the Ordinance, subject to exclusion from entry ashore in the United States because of the imposition by the Ordinance of an additional arbitrary condition of entry: That the admitted alien be one of fewer than 1,000 persons disembarked from cruise vessels within a given day. This additional condition on entry conflicts with the federal permission for admission and negates the lawful admission status previously conveyed by CBP. Citizens and lawful permanent residents would be denied entry under similar conditions, despite their also having established their entitlement or eligibility to return to the United States.[10] The Ordinance is a "burden not contemplated" by Congress or the federal system of border controls. *See, e.g.*, *Graham v. Richardson,* 403 U.S. 365, 379 (1971) (invalidating state restrictions on receipt of welfare benefits by lawful resident aliens as an "auxiliary burden" on entry or residence not contemplated by Congress). It directly prohibits what CBP's admission on inspection allows.

---

[9] CBP screens and admits foreign nationals traveling on northbound itineraries are screened and admitted on arrival at or near their U.S. port of embarkation before boarding the ship.

[10] An analogy to other modes of travel is illustrative of the affront to federal prerogatives in this field: Air passengers, citizens, lawful permanent residents, and foreign nationals arriving from abroad clear immigration and customs inspection at an airport facility, but are not allowed to depart the airport (or perhaps even to exit the aircraft) if they exceed a locally set numerical limit on daily arrivals.

This Court recently addressed a similar issue concerning State legislation that deemed H-2A visa holders ineligible to serve as point-to-point logging truck drivers in the State. *Cormier*, 586 F.Supp. 3d 22. In *Cormier*, the plaintiffs argued that the State law restriction on use of foreign logging truckers could not be reconciled with their H-2A seasonal foreign worker visas, which permitted their presence in the United States for that same purpose.[11] The State law effectively allowed Maine to supersede the federal decision to permit the H-2A visa holders entry for the purpose of employment and ran "contrary to the federal government's vested authority to 'determin[e] what aliens shall be admitted to the United States [and] the period they may remain.'" *Cormier*, 586 F. Supp. 3d at 48 (quoting *Toll*, 458 U.S. at 11); *see also Cormier*, 51 F.4th at 10 (upholding district court because State law "would nullify the implicit federal right of the employer to hire foreign laborers on a temporary basis when – through a process established by federal law – federal officials have specifically determined that U.S. workers are unavailable for the job"). Here, both foreign nationals and U.S. citizens are admitted or re-admitted pursuant to action by CBP. As in *Maine Products*, the Town's disembarkation limit negates the effectiveness of that admission.

### 3. *The Ordinance Conflicts with the U.S. Coast Guard's Designation of Federal Anchorages in Frenchman Bay*

Federal law authorizes, empowers, and directs the Secretary of Homeland Security to "establish anchorage grounds for vessels in all harbors, rivers, bay, and other navigable waters of the United States whenever it is manifest … that the maritime and commercial interests of the

---

[11] The State's framing of the law as regulating the logging industry, not immigration, did not preclude the Court from declaring the law in conflict with congressional objectives. *See Maine Forest Products*, 586 F. Supp. 3d at 42. Similarly, that the Town calls the Ordinance a "land use" ordinance does not protect it from preemption for conflict with the purpose of CBP's grant of authority to enter the United States.

United States require such anchorage grounds for safe navigation." 33 U.S.C. § 471. The United States Coast Guard exercises this authority on behalf of the Secretary by designating anchorage grounds[12] for vessels consistent with Congress's mandate. *See generally* 33 C.F.R. part 110. The Coast Guard exercised this authority to designate anchorage grounds in Frenchman Bay (Anchorage A and Anchorage B) and issue regulations concerning their use. 33 C.F.R. § 110.130. Anchorage A is set aside for passenger vessels, small commercial vessels and pleasure craft. *Id.* § 110(b). Anchorage B is "reserved … for passenger vessels of 200 feet or longer." *Id.*

The Ordinance collides head-on with the broad use reservations in the federal regulations specific to Anchorages A and B. The Coast Guard designated the anchorages for use by passenger vessels, and in the case of Anchorage B, for large passenger vessels. The Ordinance, however, makes it operationally impossible for a larger vessel to use these anchorages because it limits disembarkations from those vessels to 1,000 persons in the aggregate, a number far less than the capacity of the majority of cruise vessels calling at Bar Harbor. These vessels will not use the anchorages if they cannot disembark all their passengers (and crew) into Bar Harbor. *See* PFF ¶¶ 160, 264, 268, 274-275, 277-282.

The Ordinance will deter use of the anchorages by mid-size and larger vessels, impose a non-federal preference for smaller vessels, and render the anchorages largely unfit for their

---

[12] Anchorage grounds are distinct from "special anchorage areas." The Coast Guard designates special anchorage areas, described in subpart A of part 110, to implement specific Inland Navigation Rules relating to lighting and sound signals in restricted visibility. The Coast Guard designates <u>anchorage grounds</u> pursuant to the Secretary's directive from Congress to ensure that the federal maritime and commercial interests are not hindered by unsafe conditions on the country's navigable waters. When the Coast Guard designates anchorage grounds, described in subpart B of part 110, it regulates more extensively. *Barber v. State of Hawaii*, 42 F.3d 1185, 1191 (9th Cir. 1994) ("Subpart B regulates anchoring and mooring more extensively."); *see Beveridge v. Lewis*, 939 F.2d 859 (9th Cir. 1991). The anchorage grounds in Frenchman Bay are established in subpart B. 33 C.F.R. § 110.130.

intended use. Anchorage designations are a federal prerogative that cannot be constrained by the imposition of conditions on use by localities. The Ordinance conflicts with federal law.[13]

## II.  The Ordinance Violates the Commerce Clause

The Constitution vests in Congress the power "[to] regulate Commerce with foreign Nations, and among the several States …." Art. I, § 8, cl. 3. This affirmative power to regulate interstate commerce also implicitly limits the power of the States "to regulate and interfere with interstate commerce." *Savage,* 478 F. Supp. 3d at 26-27; *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 143 S. Ct. 1142, 1152 (2023) (Gorsuch, J., plurality) (the Commerce Clause "also 'contain[s] a further, negative command,' one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject'") (quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)). The dormant Commerce Clause doctrine both bars States from "build[ing] up … domestic commerce" by imposing "burdens on the industry and business of other States," *Nat'l Pork*, 143 S. Ct. at 1152 (quoting *Guy v. City of Baltimore*, 100 U.S. 434, 443 (1879) (internal quotations omitted), and "ensures that state autonomy over local needs does not inhibit the overriding requirement of freedom for the national commerce," *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015). The dormant Commerce Clause applies to municipalities. *See, e.g., C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).

---

[13] Markers of federal preemption can overlap in varying degrees, and a state or local incursion into the field of interstate and international maritime commerce presents reviewing courts with intertwined Supremacy Clause and Commerce Clause issues. The Ordinance is such a case. It prohibits disembarkations of substantial numbers of immigration and customs-cleared passengers from federally permitted vessels operating in federal anchorages and on the navigable waters of the United States. The Supremacy Clause and the Commerce Clause present this Court with an independent basis for invalidating the Ordinance. Together, along with the incompatibility of the disembarkation limit with state law, there is no legitimate "safe space" in which the Ordinance can operate.

More than two centuries ago, the Framers' decision to vest power over commerce in the newly-created Congress was one of necessity – essential to securing the free flow of commerce and reducing the rising volume of trade restraints between the States[14] which "threaten[ed] … the peace and safety of the Union." *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 533 (1949) (internal citations, quotations omitted). *See Gibbons*, 22 U.S. at 224 (A "conflict of commercial regulations" between the States, "destructive to the harmony of the States, and fatal to their commercial interests abroad, "was the immediate cause, that led to the forming of a convention."). With the commerce power vested in Congress, States would no longer be permitted to "legislate according to [their] estimate of [their] own interests, the importance of [their] own products, and the local advantages or disadvantages of [their] position in a political or commercial view." *H. P. Hood & Sons, Inc.*, 336 U.S.at 533 (internal citation, quotations omitted). State regulation would no longer interfere with the nation's arteries of commerce or obstruct the interstate shipment of goods. *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2460 (2019); M. Farrand, *The Framing of the Constitution of the United States* 7 (1913) ("Interference with the arteries of commerce was cutting off the very life-blood of the nation."). Even absent affirmative federal legislation, the Commerce Clause would ensure an open and efficient interstate market. *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549-50 (2015) (Commerce Clause "strikes at one of the chief evils that led to the adoption of the Constitution, namely, state tariffs and other laws that burdened interstate commerce" by

---

[14] "Under the Articles of Confederation, the Constitution's precursor, the regulation of commerce was left to the States. This scheme proved unworkable, because the individual States, understandably focused on their own economic interests, often failed to take actions critical to the success of the Nation as a whole." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 599-600 (2012) (Ginsburg, J., concurring in part) (citing Vices of the Political System of the United States, in James Madison: Writings 69, 71, ¶ 5 (J. Rakove ed. 1999)).

"prohibiting States from discriminating against or imposing excessive burdens on interstate commerce without congressional approval." (internal citations omitted)).

For at least the first century of the Nation's history, the "primary use of the [Commerce] Clause was to preclude the kind of discriminatory state legislation that had once been permissible." *Gonzales v. Raich*, 545 U.S. 1, 16 (2005). The Supreme Court invalidated State regulations that "directly burdened or impede[d] interstate traffic or impair[ed] the usefulness of its facilities for such traffic." *Illinois Cent. R. Co. v. State of Illinois ex rel. Butler*, 163 U.S. 142, 154 (1896) (internal citations omitted); *Morgan v. Com. of Va.*, 328 U.S. 373, 380-81 (1946). Even where local laws professed to control a carrier only "when engaged within the State," they were struck down if they "necessarily influence[d] [the carrier's] conduct to some extent in the management of his business throughout his entire voyage." *Hall v. De Cuir*, 95 U.S. 485, 488-89 (1877). The Supreme Court expressed skepticism as to the constitutionality of state action that might "forbid[ ] all boats to land elsewhere than at a designated and limited part of the shore" even though the space designated for landing "was too small to permit the landing at the same time of vessels whose business required it." *Cincinnati, P., B.S. & P. Packet Co. v. Catlettsburg*, 105 U.S. 559, 564 (1881). It invalidated state laws that produced the unconstitutional effect of hindering or obstructing interstate commerce, even if the laws did not impose the obstruction by language alone. *See, e.g., Illinois Cent. R. Co.*, 163 U.S. at 153 (state law was "unconstitutional hindrance and obstruction of interstate commerce" because of its effects); *S. Covington & C. St. R. Co. v. City of Covington*, 235 U.S. 537, 547 (1915) (looking at "necessary effect" of local regulation).

These cases, and others, presented the courts with hundreds of opportunities to examine the boundaries of the States' authority to regulate commerce under the Commerce Clause and the

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 20 -

point at which Congress's national authority over commerce might give way to a State's exercise of its regulatory police powers. The decisions that followed led to two primary principles upon which today's dormant Commerce Clause doctrine rests: "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2090-91 (2018). These principles also operate to constrain the States from imposing upon the foreign commerce of the Nation. *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 66-68 (1st Cir. 1999) (internal citation omitted) (Foreign Commerce Clause prohibits local laws that discriminate against or unduly burden foreign commerce or "harm[ ] federal uniformity in an area where federal uniformity is essential"), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000); *Barclays Bank v. Franchise Tax Bd.*, 512 U.S. 298, 310 & n.9 (1994) (while language of dormant Commerce Clause jurisprudence most often concerns interstate commerce, essentially the same doctrine applies to international commerce). Whether economic protectionism[15] or unduly burdensome,[16] state regulation cannot "unjustifiably … discriminate against or burden the interstate [and international] flow of articles of commerce." *Northeast Patients Group v. United Cannabis Patients and Caregivers of Maine*, 45 F.4th 542, 547 (1st Cir. 2022) (quoting *Or.*

---

[15] The "clearest example of [economic protectionist legislation] is a law that overtly blocks the flow of interstate commerce at a State's borders." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623-24 (1978) (internal citation omitted); *see Hughes v. Oklahoma*, 441 U.S. 322, 336-37 (1979) (state law forbidding transportation of natural minnows out of the State facially discriminated against interstate commerce in violation of the Commerce Clause).

[16] "[T]he matters for ultimate determination here are the nature and extent of the burden which the state regulation of interstate trains, adopted as a safety measure, imposes on interstate commerce, and whether the relative weights of the state and national interests involved are such as to make inapplicable the rule, generally observed, that the free flow of interstate commerce and its freedom from local restraints in matters requiring uniformity of regulation are interests safeguarded by the commerce clause from state interference." *S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 770-71 (1945).

*Waste Sys., Inc. v. Dep't of Env't Quality of Or.,* 511 U.S. 93, 98 (1994)).

The Ordinance violates these well-established principles. The Ordinance materially restricts the free flow of interstate commerce into Bar Harbor. It effectively bars cruise vessels from disembarking cruise passengers traveling in interstate commerce. It discriminates against interstate commerce, effectively eliminating international cruise lines operating foreign-flag cruise vessels as competitors in the Bar Harbor vacation market. All this amounts to a substantial, unjustified burden. Under any test, the Ordinance violates the Commerce Clause.

### A.  The Ordinance Discriminates Against Interstate Commerce

The dormant Commerce Clause prohibits state regulation that "restrain[s] the transportation of persons and property across its borders," *Edwards*, 314 U.S.at 173 ; creates "an impediment to the free navigation" of the nation's arteries of commerce by instrumentalities of interstate transportation, *Sherlock v. Alling*, 93 U.S. 99, 102 (1876); or "benefit[s] in-state economic interests by burdening out-of-state competitors,'" *Nat'l Pork Producers*, 143 S. Ct. at 1152-53 (internal citations omitted). It does not matter the form of a State's barriers to commerce. The Commerce Clause "forbids discrimination, whether forthright or ingenious. In each case it is [the court's] duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994) (internal citations and quotations omitted); *see Smith v. Turner*, 48 U.S. 283, 458 (1849) ("It is a just and well-settled doctrine established by this court, that a State cannot do that indirectly which she is forbidden by the Constitution to do directly.").

Thus, a "discriminatory law is 'virtually *per se* invalid,'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (internal citations omitted), and may be sustained "only on a

---

showing that [the law] is narrowly tailored to advance a legitimate local purpose," *Tennessee Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2461 (internal citations and quotations omitted). The practical scope of a suspect state law has no bearing on whether the law is discriminatory and therefore unconstitutional. *Wyoming v. Oklahoma*, 502 U.S. 437, 455-56 (1992) (internal citations omitted); *see New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 276 (1988) ("where discrimination is patent … neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown").

### 1. The Ordinance Impedes the Free Flow of Interstate Commerce Across State and International Lines

Since *Gibbons v. Ogden*, the dormant Commerce Clause has been understood to invalidate state regulation that substantially impedes the free flow of interstate commerce. States may not legislate themselves into economic isolation by banning the transportation of certain commerce in, out of, or through the State or restricting the manner in which that transport occurs. *See, e.g.*, *Edwards*, 314 U.S. at 173; *Morgan*, 328 U.S. at 386 ("[N]o state law can bar transportation of passengers across its boundaries."); *Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 667 (1981) (state limit on truck length invalid where State asserted that law "reduces road wear within the State by diverting much truck traffic to other States"). Here, the Ordinance effectively bars the transportation of certain persons (those disembarking from cruise ships) into Bar Harbor *and* restricts the manner in which that transport occurs. It is unconstitutional.

### (a) The Ordinance is a Protectionist Measure Designed to Benefit Bar Harbor Interests at the Expense of Interstate Commerce

Discriminatory and economically protectionist state regulations block the flow of interstate commerce. *See, e.g.*, *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623-24 (1978)

---

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 23 -

(the "clearest example of [economic protectionist legislation] is a law that overtly blocks the flow of interstate commerce at a State's borders" (internal citation omitted)); *Edwards v. California*, 314 U.S. 160, 173 (1941) (invalidating California law that prohibited out-of-state indigents from entering California); *Hannibal & St. J.R. Co. v. Husen*, 95 U.S. 465 (1877) (invalidating law that restricted the driving of Texas, Mexican or Indian cattle into any county of the state between March and November as a plain interference with transportation, an obstruction of interstate commerce, and discriminatory as between the property of citizens of one state and that of citizens of another state). When local regulation "amounts to simple economic protectionism, [the] virtually *per se* rule of invalidity has applied." *Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992) (internal citations and quotation marks omitted).

In *Edwards v. California*, the Supreme Court invalidated a California law that prohibited the transportation of indigent persons into the State. 314 U.S. 160 (California statute "fail[ed] under any known test of the validity of State interference with interstate commerce"). The law violated the Commerce Clause because its "express purpose and inevitable effect" was to "prohibit the transportation of indigent persons across the California border," a "burden upon interstate commerce [that was] intended and immediate …. the plain and sole function of the statute." *Edwards*, 314 U.S. at 174. The *Edwards* court recognized the California statute for what it was—California's protectionist attempt to conserve its own financial resources and place the financial burden of assisting indigent persons on its sister States. *Id*. at 166, 175-76 (State justified measure as means to curb "the huge influx of migrants into [the State]" and arrest the "health, morals, and especially finance" problems caused thereby); *see CSX Transp., Inc. v. Williams*, No. CIV.A. 05-338EGS, 2005 WL 902130, at *20 (D.D.C. Apr. 18, 2005), *rev'd*, 406 F.3d 667 (D.C. Cir. 2005) (suggesting that statute in *Edwards v. California* was "motivated, at

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 24 -

least in part, by economic protectionism"); *City of Philadelphia*, 437 U.S. at 627 (characterizing *Edwards* as an attempt to "preserve the State's *financial* resources by fencing out indigent immigrants") (emphasis added).

Here, as in *Edwards*, the Ordinance regulates the transportation of interstate and international travelers into Bar Harbor. Restrictions like this on the interstate transportation of persons impede interstate commerce. *Camps Newfound/Owatonna, Inc.*, 520 U.S. at 573-74 (discrimination limiting access of nonresidents to summer camps created impediment to interstate commerce in the form of travel); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241 (1964) (commerce was substantially affected by private race discrimination that limited access to the hotel and thereby impeded interstate commerce in the form of travel); *Serv. Mach. & Shipbuilding Corp. v. Edwards*, 617 F.2d 70, 73 (5th Cir.) ("The movement of persons falls within the protection of the commerce clause …"); *aff'd,* 449 U.S. 913 (1980); *see Edwards,* 314 U.S. at 177 (Douglas, J., concurring) (the ability to move persons from State to State "occupies a more protected position in our constitutional system than does the movement of cattle, fruit, steel and coal across state lines"); *see also Bayley's Campground, Inc. v. Mills*, No. 20-1559, 2021 WL 164973 (1st Cir. Jan. 19, 2021) (noting that courts have applied strict scrutiny review to regulations impinging on the constitutional "right to travel").

The Ordinance is no less of a protectionist impediment to travel than the California law in *Edwards*. The Purpose section of the Initiative asserts that the Ordinance is necessary to reduce the strain on Town municipal resources occasioned by cruise passenger disembarkations in Bar Harbor. In furtherance of that goal, the Ordinance imposes a strict prohibition – no more than 1,000 persons from cruise vessels can disembark into Bar Harbor each day. *See* PFF ¶¶ 201, 208-210, 222. In *Edwards*, California banned the transportation of indigents from outside the State.

Here, the Town is banning the transportation of persons into Bar Harbor if those persons are disembarking from cruise vessels. The Town is erecting a barrier around itself and letting other ports and States deal with the "burden" of cruise vessel disembarkations.[17]

Enforcement of the Ordinance is protectionist in other ways. Without cruise ships in Bar Harbor, the Town will generate more parking revenue because paid parking spaces will not be blocked for cruise tour buses. And, in Mr. Sidman's mind at least, smaller, boutique cruise vessels will call at Bar Harbor, and their wealthier passengers will spend more during their visit, inuring to the benefit of local shop owners and restaurateurs. *See* PFF ¶ 240.

The Ordinance's burdens fall squarely on outsiders. Larger cruise vessels will effectively be banned from Bar Harbor. The opportunity to visit Bar Harbor by cruise vessel will be substantially reduced. *See* PFF ¶¶ 41-44, 274-275. There is nothing out-of-state cruise lines or visitors can do to change this result, politically at least. *Edwards*, 314 U.S. at 174 (finding inability of non-residents to "exert political pressure … in order to obtain a change in policy" relevant to Commerce Clause analysis).

The Ordinance makes it impossible for the majority of cruise vessels in the New England/Canada cruise trade to disembark their full complement of passengers, not to mention any crew on board. Because "[t]ransportation of a cargo by water is impossible or futile unless the thing to be transported is put aboard the ship and taken off at destination," the Ordinance overtly blocks the flow of commerce at the waters' edge and "halt[s] forevermore" cruise vessel visitation at the port of Bar Harbor for all but the smallest cruise vessels. *Pittston Warehouse*

---

[17] Any effort by the Town to suggest alternative ports (*i.e.*, Bucksport, Searsport, Portland, Rockland) confirms that a hoped-for effect of the Ordinance is to push cruise operators into other municipal jurisdictions.

*Corp. v. City of Rochester*, 528 F. Supp. 653, 660 (W.D.N.Y. 1981) (likening barrier to "outright economic isolationism and patent economic protectionism").

Bar Harbor seeks to isolate itself from a problem common to any popular tourist destination by raising a barrier to the free flow of interstate commerce. *See Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334 (1992); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 504 U.S. 353 (1992); *City of Philadelphia*, 437 U.S.at  628. But Bar Harbor cannot remove itself from the cruise market any more than "Texas can remove its oil refineries, or California can block off its wineries, or Michigan can monopolize its auto industry." *Fla. Transp. Serv., Inc. v. Miami-Dade Cnty.*, 757 F. Supp. 2d 1260, 1278 (S.D. Fla. 2010), *aff'd*, 703 F.3d 1230 (11th Cir. 2012); *see Catlettsburg*, 105 U.S. at 564. Nor can Bar Harbor impose "on out-of-state commercial interests the full burden of conserving" Bar Harbor's municipal resources or reducing tourism congestion in Bar Harbor. *City of Philadelphia*, 437 U.S. at 628. The Town has moved to slow or freeze the flow of commerce for protectionist reasons. Therefore, the Ordinance falls squarely within an area that the Commerce Clause places off limits to State regulation.

### *(b) The Ordinance Burdens Instrumentalities of Interstate Transportation*

As are overt protectionist state policies, local burdens on instrumentalities of interstate transportation are at odds with the promise of free-flowing interstate commerce inherent in the dormant Commerce Clause. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 380 (2023) ("some of our cases … have expressed special concern with certain state regulation of the instrumentalities of interstate transportation"); *see also Sherlock*, 93 U.S. at 102 (noting that the Commerce Clause prohibited state legislation that impeded free navigation or "prescribed conditions in accordance with which commerce in particular articles or between particular places

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 27 -

was required to be conducted"). On this basis, the Supreme Court has invalidated state laws that delayed or decreased the efficiency of the interstate movements of trucks and trains, *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959) (contour mudguards on trucks); *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761 (1945) (length of trains); *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429 (1978) (use of "doubles"); deprived instrumentalities of interstate transportation the infrastructure or facilities necessary for interstate movement, *Kansas City S. Ry. Co. v. Kaw Valley Drainage Dist. of Wyandotte Cnty., Kan.*, 233 U.S. 75 (1914) (destruction of bridge used by railroad lines); *Pittston Warehouse Corp.*, 528 F. Supp. 653 (prohibited port to be used for commercial interstate and international shipping activities); *Illinois Cent. R. Co.*, 163 U.S. at 154 (a State "can do nothing which will directly burden or impede the interstate traffic of the company, or impair the usefulness of its facilities for such traffic"); *see also Catlettsburg*, 105 U.S. at 564 (would be "oppressive and arbitrary" for locality to designate an exclusive place for landing vessels that then did not accommodate vessels whose business required them to land there); and controlled the manner in which instrumentalities of interstate transportation conducted their businesses, *Morgan v. Com. of Va.*, 328 U.S. 373, 380-81 (1946) (internal citation, quotations omitted) (specific seating arrangements for different races in interstate motor travel); *see also De Cuir*, 95 U.S.at 488-89 (state law influenced carrier's conduct "in the management of his business throughout his entire voyage"); *Illinois Cent. R. Co.*, 163 U.S. at 153 (less efficient path of interstate travel); *see also City of Covington*, 235 U.S. at 546-48 (number of passengers in streetcars). Here, the Ordinance runs into all three of these roadblocks.

First, the Ordinance interferes with the efficient movement of instrumentalities of interstate transportation. *Southern Pacific Company*, *Bibb*, and *Raymond Motor Transportation* are instructive. In *Southern Pacific Company v. Arizona*, the Supreme Court invalidated a state

law limiting the operation of trains within the State to no more than fourteen passengers or seventy freight cars, even though operation of longer trains was standard practice throughout the United States. 325 U.S. 761, 771. To operate within the State law's constraints, Southern Pacific was required to haul over 30 percent more trains in the State, which translated into more locomotives, more manpower, delays in traffic, diminished volume, and ultimately increased operating costs and decreased efficiency. *Id*. at 772. These effects "materially impeded the movement of … interstate trains" and "impose[d] a serious burden on the interstate commerce conducted by" the railroad. *Id*. at 773. Further, the State law's safety objectives, which were "at most, slight and dubious," did not "outweigh the national interest in keeping interstate commerce free from interferences which seriously impede it and subject it to local regulation which does not have a uniform effect on the interstate train journey which it interrupts." *Id*. 776, 779.

Similarly, in *Navajo Freight Lines, Inc.*, and *Raymond Motor Transp., Inc.*, the Supreme Court struck down state laws that imposed non-standard or restrictive equipment requirements on interstate trucks and trailers. 359 U.S. 520 (1959); 434 U.S. 429 (1978). In *Bibb*, the Illinois statute at issue, which required the use of a certain type of rear fender mudguards on trucks and trailers operated within the State, conflicted with the standards for mudguards in Arkansas, such that "if a trailer [were] to be operated in both States, mudguards would have to be interchanged, causing a significant delay in an operation where prompt movement may be of the essence." 359 U.S. at 528. *Raymond Motor* involved a challenge to a Wisconsin statute that governed the length and configuration of trucks operated within the State. 434 U.S. at 431. The statute generally prohibited the operation of trucks longer than 55 feet and thus prohibited the use of double-trailer units. *Id*. at 431-32. It "imposed a substantial burden on the interstate movement of goods" by, among other things, substantially increasing the costs of such movements, "slow[ing]

the movement of goods … by forcing [carriers] to haul doubles across the State separately, to haul doubles around the State altogether, or to incur the delays caused by using singles instead of doubles to pick up and deliver goods." *Id*. at 445. Neither statute could be saved by the local safety objectives asserted by the States. *Bibb*, 359 U.S. 520; *Raymond Motor*, 434 U.S. 429. Both violated the Commerce Clause. *Id*.

Here, the Ordinance imposes an exceptional operating restriction on cruise vessels calling at Bar Harbor. Understanding full well that cruise lines will not call at ports where all passengers cannot disembark, the authors of the Initiative landed on a 1,000-person disembarkation limit to "keep out the biggies" and only welcome "much smaller" cruise vessels. The deployment of those much smaller cruise vessels, however, is the exception in the New England/Canadian Maritimes trade, the exception in general for new ship acquisitions by cruise lines, and impossible entirely for cruise lines that have only larger cruise vessels in their fleets. The mandated operation of very small vessels, simply for the privilege of disembarking passengers in Bar Harbor, eliminates all efficiencies that cruise lines obtain by operating larger vessels. *See* PFF ¶¶ 240, 270-274, 276.

The Ordinance also is out-of-step with the rest of the similarly-situated ports in the United States. No other significant port physically capable of disembarking passengers from similar-sized vessels restricts disembarkation in the same manner as the Ordinance. Cruise vessels, deployed for the sole and primary purpose of facilitating interstate and international travel, generally stop at multiple ports in different states and in foreign countries. Unlike trucks or trains, however, cruise vessels do not have the luxury of adding or subtracting capacity mid-voyage. Operating in a manner consistent with the Ordinance's restrictions would require cruise lines to operate smaller cruise vessels at higher costs and decreased efficiencies throughout an

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 30 -

entire cruise itinerary, even though every other port on the itinerary would permit disembarkation from larger ships. *See* PFF ¶¶ 34, 36, 120, 124, 160.

Second, the Ordinance deprives cruise vessels of the necessary infrastructure and facilities to conduct their business. *Illinois Cent. R. Co.*, 163 U.S. 142. For every cruise voyage employing a foreign-flagged vessel, a call at a Class A port is essential to the planned movement of the vessel in order to ensure compliance with U.S. cabotage laws. *See* 46 U.S.C. § 55103. The Ordinance deprives cruise vessels the use of one of Maine's three Class A ports, meaning that cruise vessels entering Maine from a foreign port must call at another, less convenient and less desirable, Class A port in Maine (if there is enough capacity) or bypass Maine altogether. *See* PFF ¶¶ 119-126, 258-264.  *See also Levin Richmond Terminal Corp. v. City of Richmond*, 482 F. Supp. 3d 944, 956 (N.D. Cal. 2020) (indicating that law effectively precluded transport of coal and petcoke in interstate and overseas markets by shutting down terminal that was essential to movement of products and would result in the need to use far-away terminals may impose substantial burden on interstate commerce). The Ordinance also deprives cruise vessels of the use of the private piers, even though the piers can safely accommodate cruise vessel tendering traffic and have been doing so for years. *See Catlettsburg*, 105 U.S. at 564 ("oppressive and arbitrary" for locality to designate an exclusive place for landing vessels that then did not accommodate vessels whose business required them to land there); *see also Pittston Warehouse Corp.*, 528 F. Supp. at 662 ("banning trailer ship service and cargo in actuality halts what apparently is the only viable means of commercial activity at the port").

Cruise lines are in the business of transporting and landing passengers at desirable ports of call. *See* PFF ¶¶ 28-29, 145-148. The transportation of passengers assumes and requires the ability to land those passengers at their destination. The transportation of passengers is "not

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 31 -

completed until" the passengers "are disembarked at the pier of the city to which they are carried." *Gloucester Ferry Co. v. Com. of Pennsylvania*, 114 U.S. 196, 213-14 (1885). The Ordinance effectively makes it impossible for cruise lines to disembark passengers at Bar Harbor.

Finally, the Ordinance will influence the business of the cruise lines in the New England/Canada trade. In *South Covington*, the Supreme Court invalidated local regulations that dictated the maximum number of passengers allowed in a streetcar and the number of streetcars that the operator had to have in service in order to accommodate the public at all times within the City's capacity restrictions. *S. Covington & C. St. R. Co. v. City of Covington*, 235 U.S. 537, 546-48 (1915). The local restrictions in effect determined how the streetcar operator was to run its business in the City and in neighboring cities across State lines, impeding traffic in those other cities. *Id*. Here, like in *South Covington*, the Ordinance will influence how cruise lines structure their business and itineraries in in the New England/Canadian Maritimes trade. It will impact vessel routing decisions and likely reduce interstate and international travel patterns to, from, and within the United States and between the United States and foreign countries. It will require cruise lines to work around the unavailability of Bar Harbor as a port of call. It will force changes in embarkation and disembarkation operations at the vessel while lying in anchorage in Frenchman Bay. *See* PFF ¶¶ 285-290. Should any cruise vessel anchor in Frenchman Bay and tender passengers into Bar Harbor, the Ordinance will determine how many interstate cruise passengers can disembark at Bar Harbor, thus requiring cruise lines and passengers to order their movements (*i.e.*, get off or stay on the cruise vessel) according to the Ordinance. *See Morgan*, 328 U.S. at 380-81 (local regulation violated Commerce Clause because it required "interstate passengers to order their movements … in accordance with local … requirement").

PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 32 -

The Ordinance will influence the cruise lines' development and management of their cruise line itineraries and operations in the New England/Canada trade. *De Cuir*, 95 U.S. at 488-89 (invalidated local law that influenced carrier's conduct "in the management of his business throughout his entire voyage"). As a port of call, Bar Harbor offers a multitude of "pluses" for a cruise itinerary. It is a Class A port so can be scheduled for a call after one or more calls at foreign ports. It is conveniently located. A call at Bar Harbor mid-cruise works well in itineraries in terms of time, speed, and distance. And as the marquee port in Maine, a stop at Bar Harbor sells cruise vacations. *See* PFF ¶¶ 30-33, 57, 117-126, 154.

Judicial endorsement of the Ordinance likely will engender "scores of copycat bans" by port municipalities in and outside of Maine, eventually causing cruise traffic (or any other traffic a locality finds objectionable) to "grind to a halt." *CSX Transp., Inc*., 2005 WL 902130 at *18 (denying preliminary injunction), *rev'd*, 406 F.3d 667 (D.C. Cir. 2005). This exercise is not a speculative one. Other localities are watching this case. Commerce, and particularly maritime commerce, cannot function, let alone flourish, if local seaports take it upon themselves to impose requirements on maritime commerce conducted at their ports, abruptly changing supply lines, suppressing commerce at the port, and potentially driving it out of the State. *See S. Covington & C. St. R. Co.*, 235 U.S.at 547 (1915) (finding that "commerce cannot flourish" if states are permitted to impose varying regulations on interstate transportation, such as regulations controlling the number of passengers in a street car); *Edwards*, 314 U.S. at 176 ("The prohibition against transporting indigent non-residents into one State is an open invitation to retaliatory measures, and the burdens upon the transportation of such persons becomes cumulative.").

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 33 -

## 2. *The Ordinance Excludes Out-of-State Cruise Lines and the Majority of Foreign-Flag Cruise Vessels from the Local Market*

"The Commerce Clause presumes a national market free from local legislation that discriminates in favor of local interests." *C & A Carbone, Inc.*, 511 U.S. 383 at 392 ; *see Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979) (local laws may not discriminate against interstate commerce, on their face, in their purpose, or in their effect). State regulation that "has either the purpose or effect of significantly favoring in-state commercial interests over out-of-state interests" discriminates against interstate commerce in violation of the Commerce Clause. *Walgreen Co. v. Rullan*, 405 F.3d 50, 55 (1st Cir. 2005).

State regulations discriminate against interstate commerce when they confer an advantage on local entities or impose a burden on out-of-state entities competing in a single market. *Gen. Motors Corp.*, 519 U.S. at 300; *Portland Pipe Line Corp. v. City of S. Portland*, 332 F. Supp. 3d 264, 300 (D. Me. 2018) (local preference requires actual or prospective competition between favor and disfavored entities in a single market). Even a regulation that does not, on its face, make geographical distinctions can discriminate against interstate commerce. *C & A Carbone, Inc.*, 511 U.S. at 389-91 (ordinance was discriminatory even though it "not differentiate solid waste on the basis of its geographic origin" because it increased costs for out-of-state interests and prevented all but the local operator from performing the initial processing step, thus "depriv[ing] out-of-state businesses of access to a local market").

In *Island Silver & Spice, Inc. v. Islamorada, Vill. of Islands*, the district court invalidated a local zoning ordinance imposing limitations on the use of Village property for "formula retail" (*i.e.*, chain) stores. 475 F. Supp. 2d 1281 (S.D. Fla. 2007), *aff'd*, 542 F.3d 844 (11th Cir. 2008). Under the zoning ordinance, a formula retail store use would not be approved unless the use

PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 34 -

abided by certain street level frontage and square footage limitations, and chain stores, with their standardized requirements, could not operate within the ordinance's size constraints. Thus, the ordinance effectively prevented nationally and regionally-branded retail chain stores from establishing a presence in the Village, eliminating them from the local market. 475 F. Supp. 2d at 1291. The Eleventh Circuit determined that the Village's similar "formula restaurant" zoning ordinance violated the Commerce Clause. *Cachia v. Islamorada, Vill. of Islands*, 542 F.3d 839 (11th Cir. 2008). The formula restaurant ordinance's "complete prohibition of chain restaurants sharing certain characteristics amount[ed] to more than the regulation of methods of operation, and serve[d] to exclude national chain restaurants from competition in the local market." *Id.* at 843. It had the practical effect of discriminating against interstate commerce. *Id.*; *see Hughes*, 441 U.S. at 336 ("[t]he principal focus of inquiry must be on the practical operation of the state, since the validity of state laws must be judged chiefly in terms of their probable effects") (quoting *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 37 (1980)).

Here, the relevant market is the Bar Harbor vacation market, but the result is the same as in *Cachia* and *Island Silver & Spice*. Cruise lines operate in the global vacation market and compete with other vacation alternatives, like hotels,[18] for travelers' discretionary leisure dollars. *See* PFF ¶¶ 146-148.

> [C]ruises are advertised and used by consumers buying floating accommodations. Michael Skapinker, *A Market with the Wind in Its Sales,* Fin. Times Ltd., Feb. 20, 1993 at 14 ("Caribbean cruisers regard their ship as a floating hotel."); Sheila McGovern, *Cruise Craze: Riding Down the River,* Montr. Gazette, Aug. 17, 1992 at F8 ("Today's cruise ships are like floating hotels.").

---

[18] The Pilots use the term "hotels" as a shorthand for the many types of overnight accommodations available in Bar Harbor and the surrounding area, including but not limited to short-term rentals, bed-and-breakfasts, other types of lodging – all of which are in-state "resident competitors."

*Vavoules v. Kloster Cruise Ltd.*, 822 F. Supp. 979, 983 (E.D.N.Y. 1993). In the Bar Harbor

vacation market, international cruise lines compete with Bar Harbor hoteliers[19] to offer travelers

an essential element of every vacation – overnight accommodations at the traveler's destination.

For cruise lines competing in the New England/Canada trade, Bar Harbor – *the* marquee

destination port in the region – is the *sine qua non* of their itineraries. *See* PFF ¶¶ 27-33, 57-58,

154. *See Isham v. Pac. Far E. Line, Inc.*, 476 F.2d 835, 836 (9th Cir. 1973) ("Where a passenger

or cruise vessel puts into numerous ports in the course of a cruise, these stopovers are the *sine*

*qua non* of the cruise.").

As Mr. Sidman predicted, the Ordinance's effect will be to prohibit the vast majority of

cruise vessel calls in Bar Harbor.[20] Cruise lines will not include Bar Harbor on their itineraries if

all their passengers cannot get off the ship. Travelers will not book a cruise that calls at Bar

Harbor but does not let passengers get off the ship. The Ordinance will exclude the "biggies."

*See* PFF ¶¶ 240, 258-275, 277-282.

Cruise lines cannot compete on equal footing with local hoteliers if, to offer Bar Harbor

or Acadia National Park, they must bus passengers at least 110 miles from another port in Maine.

*See* PFF ¶¶ 31, 53-56, 148-156, 259-263. "As the saying goes, 'location, location, location' is

what really matters." *Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 327 (5th Cir. 2022)

(citing, *e.g., Or. Waste Sys., Inc. v. Department of Environmental Quality*, 511 U.S. 93, 99-100

---

[19] Cruise lines and hotel operators are "substantially similar." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 342-43 (2008) (discrimination requires a "comparison of substantially similar entities"); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298-99 (1997) (same); *Portland Pipeline*, 332 F. Supp. 3d at 300 (same).

[20] Eighty percent of the booked calls for 2023 were scheduled for vessels with lower berth capacities in excess of 1,000 passengers. Some lines only deploy larger capacity vessels on their New England/Canada itineraries or only have larger capacity vessels in their fleets. *See* PFF ¶ 268.

---

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 36 -

(1994)). The Ordinance does not just make it more difficult for cruise lines to compete in the Bar Harbor/Acadia National Park vacation market; it effectively forbids any cruise line operating larger capacity vessels from participating altogether.[21] Thus, the Ordinance discriminates against interstate commerce.

### 3. The Town Cannot Show that the Ordinance is the Least Discriminatory Means of Achieving Legitimate Local Interests

Discriminatory laws may be saved from constitutional invalidation in only one circumstance – when the State proves that the local law serves a legitimate local purpose and that it has chosen the least discriminatory means available to serve that legitimate local purpose. *See Chem. WasteMgmt., Inc. v. Hunt*, 504 U.S. 334, 344 (1992) ("The burden is on the State to show that 'the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.'" (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992) (emphasis added)); *see Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007) (discriminatory law survives if "the government [can] show that the local benefits of the law outweigh its discriminatory effects and that the government lacked a nondiscriminatory alternative by which it could protect the local interests" (internal citation omitted)). If there are "*any* available alternative methods for enforcing [the government's] legitimate policy goals," the law is unconstitutional. *Hignell-Stark*, 46 F.4th at 325 (quoting *Dickerson v. Bailey*, 336 F.3d 388, 402 (5th Cir. 2003) (emphasis added)). The Town has many options to address any alleged problems caused by cruise ship visitation. *See* Section II.B.2, *infra*. But it chose one that the Constitution

---

[21] The Ordinance gives local hoteliers a distinct competitive advantage over out-of-state cruise lines by depriving their vessels of a useable disembarkation point in close proximity to the much-desired Bar Harbor and Acadia National Park. *Cf. Portland Pipeline*. 332 F. Supp. 3d at 300-01 (no discrimination because local businesses were most directly harmed by ordinance).

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 37 -

forbids.

**B.  The Ordinance Unduly and Unjustifiably Burdens Interstate Commerce**

Even if a local restriction on commerce is arguably non-discriminatory, it is not automatically saved from constitutional invalidity. Rather, a state law that "regulates even-handedly to effectuate a legitimate local public interest" can violate the Commerce Clause if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see Wayfair, Inc.*, 138 S. Ct. at 2090–91; *see also Dep't of Revenue of Ky.*, 553 U.S. at 353; *see also Industria y Distribution de Alimentos v. Trailer Bridge*, 797 F.3d 141, 146 (1st Cir. 2015) (applying *Pike*). To be sure, the "line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause" and the category that is nonetheless invalid because of its burdens upon interstate commerce can be less than clear. *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986). Here, the Ordinance's substantial burdens on interstate commerce cannot be justified by the local interests that it purports to serve. *Cf. Portland Pipeline*, 332 F. Supp. 3d at 309-10 (ordinance's burdens on commerce outweighed  by "ample and weighty local benefits").

### 1.  The Ordinance's Impositions on Interstate Commerce Are Substantial

The Ordinance imposes substantial burdens on interstate commerce. *See* Section II.A, *supra*.  The Ordinance will introduce inefficiencies, delays, and disruptions in interstate travel. *See Air Transp. Ass'n of Am., Inc. v. Healey*, No. 18-CV-10651-ADB, 2021 WL 2256289, at *9 (D. Mass. June 3, 2021) (A state "statute that causes disruptions to and/or delays in interstate travel can impose a burden under the dormant Commerce Clause."). The Ordinance in effect is no different than the Hawaii regulation at issue in *Young v. Coloma-Agaran. Young v. Coloma-*

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 38 -

*Agaran*, No. CIV.00-00774HG-BMK, 2001 WL 1677259 (D. Haw. Dec. 27, 2001), *aff'd*, 340

F.3d 1053 (9th Cir. 2003). In that case, the regulation substantially burdened interstate commerce

because it prohibited long-standing commercial vessel operations in Hanalei Bay and

"effectively denie[d] to tourists the ability to enjoy Hanalei Bay in a boat." *Id.* at , at *11, *15

Here, the Ordinance severely restricts cruise tourism in Bar Harbor by effectively prohibiting

larger capacity vessel calls, thus reducing options for tourists to visit Bar Harbor. *See* Section

II.A, *supra*. Thus, the burdens on interstate commerce are substantial.

The Ordinance's burden must be assessed, not only by its immediate impact on interstate

commerce in Bar Harbor, but by looking at what would happen to interstate commerce in the

national market if coastal tourist destinations walled their ports off to cruise traffic.[22] *Healy v.*

*Beer Inst.*, 491 U.S. 324, 336 (1989) ("[T]he practical effect of the statute must be evaluated not

only by considering the consequences of the statute itself, but also by considering … what effect

would arise if not one, but many or every, State adopted similar legislation."); *U & I Sanitation*

*v. City of Columbus,* 205 F.3d 1063, 1069 (8th Cir. 2000) (courts must "adopt an aggregate

analysis whereby [they] consider the interstate effect on the [relevant] market if several

jurisdictions were to adopt similar ordinances"); *Fla. Transp. Serv., Inc.*, 757 F. Supp. 2d at 1278

(S.D. Fla. 2010), *aff'd* , 703 F.3d 1230 (11th Cir. 2012) ("To assess the burden that the stevedore

permit ordinance (as applied) places on interstate commerce one need only assume what would

happen if all port-owning municipalities closed off their ports for the benefit of a group of

---

[22] The Ordinance does not manage any physical capacity limitations of the port of Bar Harbor nor is its
disembarkation limit calculated to promote efficient use of any physical limitations of the port or the
private piers. *Fla. Transp. Serv., Inc. v. Miami-Dade Cnty.*, 757 F. Supp. 2d 1260, 1278-79 (S.D. Fla.
2010), *aff'd*, 703 F.3d 1230 (11th Cir. 2012) (stevedore ordinance could not be justified by any physical
limitation of port's ability to accommodate only a certain number of stevedores).

existing and primarily local stevedores."). Here, an aggregate analysis suggests effects that would substantially diminish, if not cripple, cruise tourism in the U.S. The value and success of a cruise voyage is dependent upon the desirability of the ports of call on the itinerary, and a cruise itinerary represents a delicate balancing of time (for the vessel to get to each port), speed (required to reach each intermediate port), and distance (between intermediate ports). Cruise lines would be left with few, if any, workable itineraries if a multitude of desirable destination ports remove themselves from maritime access. *See* PFF ¶¶ 159-160. It is hard to imagine a local interest that would trump the destruction of a vibrant and expanding interstate market. *See U & I Sanitation*, 205 F.3d 1063, 1072 (8th Cir. 2000) ("[i]f states and cities wish to enact laws that threaten to substantially restrict or eliminate a particular interstate market, they must advance weight[y] justifications," not attenuated local benefits).

### 2. The Town's Purported Local Justifications for the Ordinance Do Not Outweigh Its Substantial Burdens on Interstate Commerce

The Town likely will claim a variety of local interests as justification for the Ordinance. None, however, tips the balance in favor of constitutionality. *Young*, 2001 WL 1677259 at *11 ("Eliminating the presence of tourists … is not a proper reason for [a burden on commerce] as it directly contradicts the very purpose of the Commerce Clause.").

The Town will likely frame the elimination of cruise tourism in Bar Harbor as an unfortunate consequence in the Town's pursuit of its interests in congestion reduction and municipal resource conservation. The Town may argue that its obligation to respond to local "feelings" of "too much cruise tourism" in Bar Harbor justify any burdens occasioned by the Ordinance. *See* PFF ¶ 191. Feelings, however, are not a legitimate local interest, or at least, are not a local interest that outweighs the Ordinance's burdens on interstate commerce. The Supreme

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 40 -

Court confronted burdensome State legislation based on feelings in *Raymond Motor*. 434 U.S. at 437 (although the asserted justification for the regulations was highway safety, "[t]he reason for the Commission's adoption of these regulations, according to the Chairman, was its belief that the people of the State did not want more vehicles over 55 feet long on the State's highways"). Feeling did not justify the State's actions in *Raymond Motor*, and they should not here.

Assuming any of the Town's purported local interests are legitimate, the Town must do something more than recite those interests to avoid constitutional invalidity. *Kassel*, 450 U.S. at 670 ("[T]he incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack."). Rather, the Town must demonstrate that the Town's interests are advanced by the Ordinance, and the Ordinance's asserted benefits are not "illusory." *U & I Sanitation*, 205 F.3d at 1070-71 (when asserted local interest is not advanced by the burdensome action, benefits to be achieved are illusory). Here, it is sheer speculation that the Ordinance will result in any demonstrable benefits. With respect to the Town's interest in reducing congestion, the Town has no evidence that cruise passengers cause any more congestion in downtown Bar Harbor than other visitors, or that a substantial reduction in cruise passenger traffic will produce any measurable decrease in downtown sidewalk congestion, except, of course, a reduction in passenger traffic at the piers themselves or in near proximity to the piers. Because congestion at the piers is not the sole congestion problem to be solved, the Ordinance does little, if anything, to address what actually appears to be the issue for Bar Harbor – late afternoon and evening congestion attributable to land-based tourists. *See* PFF ¶¶ 219-220, 2223-230, 293. If street and sidewalk congestion or the inability to deliver municipal resources were truly the Town's concerns, the Town would place a daily, weekly, or monthly limit on *all* visitors coming into Bar Harbor. Instead, the Ordinance only limits disembarkations from cruise

vessels. *See Young*, at 2001 WL 1677259 at *13 (ban not supported by any evidence that targeted vessels imposed any more risk of damage than vessels not covered by the ban).

It is also sheer speculation that the Ordinance will remedy the purported drain on municipal resources, which the Ordinance blames on cruise passengers. First, the Town has no evidence that cruise passengers monopolize municipal resources at all, much less more so than all other tourists. Second, the Town's interest in conserving municipal resources is, at bottom, an economic one, *see* Section II.A.1(a), *supra*, which the Town addressed for decades by bankrolling the cost of municipal resources required to accommodate cruise visitation through the imposition and collection of passenger and port fees paid to the Town by cruise lines for the privilege of visiting Bar Harbor.[23] *See Carbone*, 511 U.S. at 405-06 (O'Connor, J., concurring) (evaluating ordinance under balancing test and rejecting argument that town's need to ensure financial viability of transfer station justified ordinance's effects upon interstate commerce, where town could raise revenue through other means). *See* PFF ¶¶ 63, 71-72.

In any event, the Town has many less burdensome options at its disposal. *U & I Sanitation*, 205 F.3d at 1070 ("When a law that burdens interstate commerce serves some legitimate local purpose, the availability of a less burdensome alternative is relevant to the inquiry that *Pike* requires." (citing *Pike*, 397 U.S. at 142)). The Town could, for example, install crowd management fences and barriers or curbs on automobile traffic or parking on major streets to allow pedestrians to be dispersed over wider areas, designate areas for tour bus queuing and marshalling, make sidewalk improvements to increase pedestrian capacity (including removal of planters, park benches, large wheeled plastic lobsters, and other obstacles to persons moving on

---

[23] Such a measure spawns its own constitutional challenge, no doubt, but not from the Pilots.

foot), or employ directional movement controls for vehicles and pedestrians during times of peak visitor impact.

Compared to the unsubstantiated local benefits of the Ordinance, the Ordinance's burdens on interstate commerce clearly exceed any local benefit to be gained from its enforcement. Thus, even under the Commerce Clause's more lenient test for constitutionality, the Ordinance receives a failing grade. The Ordinance violates the Commerce Clause.

### C.  The Ordinance Violates the Foreign Commerce Clause

In every way the Ordinance discriminates against and substantially burdens interstate commerce, it discriminates and substantially burdens foreign commerce. Maritime commerce is, at its core, foreign commerce. Thus, the Ordinance's burdensome impositions are even more inimical to the Commerce Clause's promise of the free flow of commerce. *See Antilles Cement Corp. v. Acevedo Vila*, 408 F.3d 41, 46 (1st Cir. 2005) (There is an even "more pressing need for uniformity in the realm of foreign commerce") (internal quotation omitted).

The Ordinance's burdens fall exclusively on foreign-flagged cruise vessels engaged in international itineraries. The Ordinance imposes constraints on disembarking passengers that are different from other similarly-situated U.S. and foreign ports. The Ordinance's restrictions directly impact the complicated, advanced planning necessary to successfully execute an international cruise ship itinerary. The Ordinance does not need to distinguish between foreign and domestic producers on its face or even discriminate in favor in-state businesses (although, here, it does discriminate) to violate the Foreign Commerce Clause. *Nat'l Foreign* Trade Council, 181 F.3d at 67-68, *aff'd sub nom. Crosby*, 530 U.S. 363; *see Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 79 (1992) (concluded that local favoritism was not an essential element for violation of the Foreign Commerce Clause). A threat to the continued viability of the

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 43 -

United States' participation in an international market and the uniformity demanded thereby is enough.

### III. The Ordinance Violates the Maine Constitution

Maine municipalities enjoy broad legislative, or "home rule," authority. Me. Const. Art. VIII, pt. 2, § 1; Me. Rev. Stat. tit. 30-A, § 3001 ((implementing home rule authority, which reserves for municipalities power that is "not denied either expressly or by clear implication"). Thus, municipalities have the authority to act on all matters to the same extent as the State of Maine, except when such municipal action would be inconsistent with "a comprehensive and exclusive regulatory scheme" inconsistent with the local action, *Midcoast Disposal, Inc. v. Town of Union*, 537 A.2d 1149, 1150-51 (Me. 1988), or "prevent[ ] the efficient accomplishment of a defined state purpose," *E. Perry Iron & Metal Co. v. City of Portland*, 941 A.2d 457, 462 (Me. 2008). *See Portland Pipe Line Corp.*, 947 F.3d at 17 (internal citations omitted). In either case, the pertinent inquiry is "whether the local action would frustrate the purpose of any state law," *Sawyer Env't Recovery Facilities, Inc. v. Town of Hampden*, 760 A.2d 257, 263-64 (Me. 2000), or ""prevent[ ] [its] efficient accomplishment," *Smith v. Town of Pittston*, 820 A.2d 1200 (Me. 2003).

The Ordinance frustrates the purpose of two state laws. First, it frustrates the purpose of the State's comprehensive regulation of pilotage by conflicting with, and effectively constraining, the Pilots' statutory authority to "pilot any vessel required to take a state pilot anywhere upon the pilotage area for which the pilot is licensed," and hindering the Pilots' ability to maintain the system of pilotage in their designated pilotage area. The Ordinance's direct and indirect impacts on Maine's system of pilotage extend beyond the financial harm of the Pilots. Pilotage is a critical component of safe and efficient maritime transportation and is necessary to

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 44 -

Maine's participation in interstate and international commerce. Second, the Ordinance frustrates the State's interests in supporting and growing the Maine tourism industry and first-time visitation to the State. Invalidity begets invalidity. The Ordinance is just as unacceptable under the Maine Constitution as it is under the federal Constitution.

### A. The Ordinance Interferes with the Maine Legislature's Comprehensive and Exclusive Regulatory Scheme for State Pilotage

Consistent with Congress's permissive continuation of the state pilotage system in the Lighthouse Act of 1789,[24] the State of Maine controls pilotage along the State's coastline through the Maine State Pilotage Act (the "Act"). The Act establishes a comprehensive, compulsory, and non-competitive pilotage system for the State. *See* Me. Rev. Stat. tit. 38, § 85, et seq. The State's purposes for its system of pilotage are set out explicitly in the Act:

> It is declared to be the policy and intent of the Legislature and the purpose of this subchapter to provide for a system of state pilotage in order to provide maximum safety from the dangers of navigation for vessels entering or leaving the waters described in this subchapter, to maintain a state pilotage system devoted to the preservation and protection of lives, property, the environment and vessels entering or leaving these waters at the highest standard of efficiency and to insure the availability of pilots well qualified for the discharge of their duties in aid of commerce and navigation.

Me. Rev. Stat. tit. 38, § 85. To effectuate these purposes, the Act requires that "[e]very foreign vessel and every American vessel under register, with a draft of 9 feet or more, entering or departing from any port or harbor … take a [State-licensed] pilot." Me. Rev. Stat. tit. 38, § 86. The Act's coverage is extensive. Its requirements apply in "all Maine coastal waters and

---

[24] *An Act for the Establishment and Support of Lighthouses, Beacons, Buoys and Public Piers*, Act of Aug. 7, 1789, ch. 9, 1 Stat. 53, 54 (1789). The Lighthouse Act was the ninth act of Congress and has been recognized as Congress's first exercise of its power under the Commerce Clause. Paul G. Kirchner & Clayton L. Diamon, *Unique Institutions, Indispensable Cogs, and Hoary Figures: Understanding Pilotage Regulation in the United States*, 23 U.S.F. Maritime L.J. 168, 172 (2010).

navigable waters" and to all vessels with a draft of 9 feet or more, save only a few exceptions, including, as relevant here, vessels under enrollment.[25] *Id*. §§ 86-A, 87-A. The Act establishes minimum qualifications for pilots and a means for licensing state pilots. *Id*. §§ 90, 91. It criminalizes the unlicensed piloting of vessels in State waters. *Id*. § 88. The Act also controls pilots' compensation. *Id*. §§ 96, 98. Finally, the Act bestows upon licensed pilots the authority to "pilot any vessel required to take a state pilot anywhere upon the pilotage area for which the pilot is licensed." *Id*. § 97. A pilot's authority to determine the route, location, timing, and other aspects of executing a successful piloting engagement within his pilotage area is absolute. *See id*.[26] To be sure, the Act establishes a comprehensive and exclusive regulatory scheme for pilotage. The State exercises a controlling role with regard to pilotage and leaves no room for municipality involvement. *See Sawyer Env't Recovery Facilities, Inc.*, 760 A.2d 257 (state law explicitly provided role for State). *Cf. Portland Pipe Line Corp.*, 240 A.3d 364 (Me. 2020) (no preemption where state law recognized and affirmed municipal home rule authority, and local ordinance did not conflict with purpose of state law).

The Pilots are responsible for operating and maintaining a system of pilotage that delivers maximum safety for vessels, operates at the highest standard of efficiency, and ensures the availability of well-qualified pilots to provide pilotage services to all vessels requiring such services. A safe and efficient system of pilotage provides significant benefits to Maine and her residents. It helps keep Maine's ports efficient and commerce flowing, facilitates the flow of

---

[25] Enrollment of vessels means "the recording and certification of vessels employed in coastwise or inland navigation" and is distinguished from registration of vessels employed in foreign commerce.

[26] If the Town were to apply the Ordinance in a manner that prohibited anchoring of vessels whose lower berth capacities exceeded 1,000, singly or in combination, the Ordinance would directly usurp a pilot's authority to pilot any vessel required to take a state pilot anywhere upon the pilot's pilotage area.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 46 -

goods, and avoids delays. It also avoids shortages of commodities that might otherwise result from long wait times or other delays in taking on a pilot. *See* PFF ¶¶ 348-353.

The Pilots achieve safety and efficiency in accordance with the Act by providing "as needed" pilotage services in their region. The Pilots operate 24 hours a day, 7 days a week, 365 days a year to facilitate the safe and efficient movement of year-round commercial cargo traffic and seasonal commercial passenger traffic over a swath of coastal waters stretching 75 miles across from Boothbay Harbor to Frenchman Bay and 75 miles from the west pilot station on Penobscot Bay to the Penobscot River Port of Brewer. *See* PFF ¶¶ 318-354.

A safe and efficient system of pilotage carries high fixed costs. The State does not subsidize pilotage operations. The Pilots must be self-sufficient in operating and maintaining their system of pilotage. Particularly, the Pilots' revenues, which are necessarily constrained by opportunity (volume of maritime traffic) and rate regulation, must be sufficient to adequately plan for and finance the capital costs and manpower requirements necessary to maintain the system of pilotage in Frenchman Bay and Penobscot Bay. *See* PFF ¶¶ 310, 314, 355-356.

The Act does not guarantee financial success or wealth for State-licensed pilots. It does, however, presuppose a bedrock condition upon which this Nation was founded – the free flow of interstate and foreign commerce. The ability to budget for and maintain a system of pilotage consistent with the Act's requirements is predicated upon uniformly regulated maritime trade. Business cycles are a fact of life and revenues will ebb and flow accordingly, but the free flow of commerce is absolute. A safe and efficient system of pilotage cannot not exist in a world where various coastal municipalities grant themselves entitlement to turn on and off the tap of interstate and foreign commerce based on local political pressures. The Ordinance prevents the efficient provision of safe and efficient pilotage systems in the State. The Ordinance is preempted.

---

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 47 -

**B.  The Ordinance Frustrates the Purpose of Maine's Economic and Community Development Statutes**

Maine is deeply invested in fostering economic growth and development in the State. In furtherance of this interest, state agencies are charged with "formulat[ing] and implement[ing] economic development policies and programs that are consistent with an economic development strategy for the State." Me. Rev. Stat. tit. 5, § 13052. Because the "State's economic development programs and policies and the economies of municipalities and regions mutually affect each other," local action *inconsistent* with the State's economic development strategy prevents the accomplishment of the State's goal of coordinated economic growth and development for the State. *See id*. (finding that the lack of coordination of State, municipal, and regional economic efforts is not in the best interest of the State).

Maine is known as *Vacationland* for a reason. Tourism is a vital economic driver and source of economic stability and growth for Maine. *See* PFF ¶¶ 20-21. The State invests significant resources to support tourism growth and has directed state-level agencies to develop and implement strategies to increase tourism-based revenues, including cruise tourism. Specifically, the Maine legislature created the Office of Tourism to support and grow the tourism industry in Maine, promote the state as a tourist destination, maximize the effectiveness of state and private sector contributions in attracting visitors to the State, and increase tourism-based revenues. Me. Rev. Stat. tit. 5, §§ 13090-C , 13090-E.

CruiseMaine is an initiative of the Office of Tourism. Through CruiseMaine, the State supports, educates, and promotes cruise communities in Maine seeking sustainable cruise ship tourism. One of the Office of Tourism's highest priorities is encouraging first-time visitation to Maine because a significant percentage of first-time visitors become repeat visitors to the State.

---

PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 48 -

Cruise tourism uniquely advances this priority. First-time cruise visitors come from a broader geographical region than land tourists, thereby expanding the pool of potential first-time visitors. For this reason, perhaps, cruises bring a lot of first-timers to the State, and more than half of cruise visitors intend to return to Maine, either by land or by cruise. Also, cruise tourism helps the State stretch tourism activity into the "shoulder seasons" (those months where the State generally does not see significant land tourism) and in fact peaks during this time. Cruise tourism, especially in the shoulder season, helps to prolong tourism-related jobs, enables businesses to operate longer, and brings tax revenue through increased economic activity. *See* PFF ¶¶ 22-49.

The Ordinance is completely and utterly inconsistent with the State's tourism goals. Bar Harbor and neighboring Acadia National Park likely are the two most important tourism assets in the State. Whether coming by cruise or by land, a trip to *Vacationland* likely would not be complete without visiting Bar Harbor and Acadia National Park. The Ordinance effectively denies an entire segment of tourist activity (cruise tourism) admission to Bar Harbor and Acadia National Park. In so doing, the Ordinance frustrates the purpose of Maine's Economic and Community Development statutes generally, and its tourism statutes specifically, prevents the efficient accomplishment of tourism growth and promotion of the State as a tourist destination, and is inconsistent with the legislature's statutory command for coordinated economic growth and development. *See Sawyer Env't Recovery Facilities, Inc.*, 760 A.2d at 63-64. Thus, the Ordinance is preempted.

## Relief Requested

The Pilots ask this Court to enter a declaratory judgment and permanent injunction barring enforcement of the Ordinance. A permanent injunction may issue where the plaintiff

---

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S POST-TRIAL BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

establishes irreparable injury, legal remedies are inadequate, and the public interest and balance of hardships favor an injunction. *Puerto Rico Ass'n of Mayors v. Velez-Martinez*, 482 F. Supp. 3d 1, 9 (D.P.R. 2020) (granting injunction in First Amendment case) (citing *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 148 (1st Cir. 2008); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006); and *Siembra Finca Carmen, LLC. v. Sec'y of Dep't of Agric. of Puerto Rico*, 437 F. Supp. 3d 119, 137-38 (D.P.R. 2020)).

The Pilots have established that the Ordinance violates the U.S. Constitution and the Maine Constitution.[27] Legal remedies are inadequate. The public interest is best served if Bar Harbor is prohibited from violating the federal Constitution and the Maine Constitution. The balance of harms clearly favors the Pilots. Without an injunction, enforcement of the Ordinance will cause the Pilots irreparable constitutional harm. The Pilots are entitled to a permanent injunction prohibiting the Town from enforcing the Ordinance.

## Conclusion

The Pilots request that the Court enter judgment in favor of the Pilots on all claims, enter a declaration that the Ordinance violates the U.S. Constitution and/or the Maine Constitution, and enter a permanent injunction forbidding the Town from enforcing the Ordinance.

---

[27] A constitutional violation is generally sufficient to establish irreparable injury. *Cf. Fireside Nissan, Inc. v. Fanning*, 30 F.3d 206, 211 (1st Cir. 1994) (no irreparable injury where state action did not violate the Commerce Clause) (citing *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990), *cert. denied*, 499 U.S. 921 (1991) (finding constitutional violation sufficient to establish irreparable injury); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (same)).

Respectfully submitted,

|  |  |
|---|---|
| | */s/ Kathleen E. Kraft* |
| Twain Braden | C. Jonathan Benner (*pro hac vice*) |
| Thompson Bowie & Hatch LLC | Kathleen E. Kraft (*pro hac vice*) |
| 415 Congress Street | Thompson Coburn LLP |
| P.O. Box 4630 | 1909 K Street N.W., Suite 600 |
| Portland, ME 04112-4630 | Washington, D.C. 20006 |
| (207) 774-2500 | (202) 585-6900 (main) |
| tbraden@thompsonbowie.com | (202) 585-6969 (fax) |
| | kkraft@thompsoncoburn.com |

John S. Kingston (*pro hac vice*)
Thompson Coburn LLP
One U.S. Bank Plaza
St. Louis, MO 63101
(314) 552-6000 (main)
(314) 552-7000 (fax)
jkingston@thompsoncoburn.com

*Attorneys for Plaintiff-Intervenor Penobscot Bay and River Pilots Association*

Date: September 1, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of September, 2023, I caused the foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

*/s/ Kathleen E. Kraft*