## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, *et al.* )<br><br>*Plaintiffs,* )<br><br>PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, )<br><br>*Plaintiff-Intervenor,* )<br><br>v. )<br><br>TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, )<br><br>*Defendant,* )<br><br>CHARLES SIDMAN, )<br><br>*Defendant-Intervenor.* ) | Civil Action No. 1:22-cv-416-LEW |

## PLAINTIFFS' POST-TRIAL BRIEF

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     PROCEDURAL BACKGROUND..............................................................................3

III.    BACKGROUND TO ENACTMENT OF ORDINANCE..............................................4
        Efforts to Expand the Tourist Season ................................................................5
        Cruise Ship Visits and the Shoulder Season .....................................................5
        Town Council Action—2008..............................................................................6
        Cruise Ship Committee ......................................................................................6
        Town Fees on Cruise Ships.................................................................................7
        Voluntary Passenger Caps .................................................................................7
        Large Cruise Ships/Foreign Flagged .................................................................8
        Cruise Ship Reservations....................................................................................9
        International Itinerary + Marquee Port Status ....................................................9
        Bar Harbor + Maine Ports ................................................................................10
        Cruise Ship Operations at Bar Harbor .............................................................10
        Cruise Ship Impact on Shoulder Season ..........................................................11
        Management of Cruise Ship Disembarkation....................................................12
        Recent Town Developments—July 2021 Suspension Order.............................13
        Working Group/Task Force—Memoranda of Agreement..................................13
        Citizens Initiative ............................................................................................15
        The Ordinance .................................................................................................15

IV.     LEGAL ARGUMENT.................................................................................................17
        A.  PLAINTIFFS HAVE ARTICLE III STANDING TO BRING THEIR CLAIMS ......17
            APPLL Standing ........................................................................................18
            Tender Owners Standing.............................................................................18
            Pier Owners Standing .................................................................................19
        B.  THE ORDINANCE IS PREEMPTED BY FEDERAL LAW....................................19
            1.  The Initiated Ordinance Conflicts with Federal laws protecting seafarers............19
            2.  The Initiated Ordinance Conflicts with Federal laws governing the admission of
                aliens ..................................................................................................22
        C.  THE ORDINANCE VIOLATES THE COMMERCE CLAUSE ..............................22
            1.  Origins and Purpose of Commerce Clause ......................................22
            2.  Judicial Review of State and Local Laws.........................................25
            3.  Commerce Clause Protects the Arteries of Commerce.....................26
            4.  The Ordinance is Facially Invalid under the Commerce Clause ....................27
            5.  The Ordinance Discriminates against Interstate Commerce in Purpose and
                Effect..................................................................................................29
            6.  Punitive Regime Designed Deters Large Cruise Ship Visits ..........................29
            7.  If Enforced the Ordinance will cause Cruise Ships not to visit Bar Harbor ....32
            8.  The Ordinance Discriminates against Interstate Commerce In Its Purpose ....35
            9.  The Ordinance does not serve a legitimate local purpose ..............................43
            10. The Ordinance's Purpose could be served by less discriminatory means .......47

       11. The Ordinance fails the Pike Balancing Test..................................................49

       12. The Ordinance Violates the Foreign Commerce Clause..............................50

     D.  THE ORDINANCE VIOLATES DUE PROCESS.....................................................52

V.     CONCLUSION..............................................................................................................54

## Table of Authorities

*Cases*

*American Trucking Associations, Inc. v. Michigan Public Service Comm'n*,
    545 U.S. 429, 433  (2005)............................................................................24, 29

*Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) ........................................17, 18, 19

*Baldwin v. G.A.F. Seelig, Inc*., 249 U.S. 511, 523 (1935)........................................23, 37

*Bayley's Campground, Inc. v. Mills*, 463 F.Supp.3d 22, 34 (D. Me.  2020)  ................27

*Bibb v. Navajo Freight Lines*, 359 U.S. 520 (1959) ......................................................26

*Bowman v. Chicago and Northwestern Railway Co.*, 125 U.S. 465 (1888).................26

*Brimmer v. Rebman*, 138 U.S. 78, 84 (1891)...........................................................44, 52

*Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904) ........................................................50

*C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 401-402 (1994)...........23, 24

*Camel and Cashmere Institute of America, Inc. v. Associated Dry Goods, Corp.*,
    799 F.2d 6 (1st Cir. 1986).  p. 18, n. 22...........................................................18

*Camps Newfound/Ottawa, Inc. v. Town of Harrington*, 520 U.S. 564, 571 (1997) ...............23, 44

*Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 343 (1992)................27, 28, 30, 31, 44

*Covington & Cincinnati Bridge Co. v. Commonwealth of Kentucky*, 154 U.S. 204 (1894)..........26

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000)  ................................51

*Doe v. Celebrity Cruise Lines, Inc*., 394 F.3d 891, 901 (11th Cir. 2004)........................35

*Edgar v. Mite Corporation*, 457 U.S. 624, 640 (1982)  ................................................50

*Edwards v. California*, 314 U.S. 160 (1941)...........................................................26, 27

*General Motors v. Tracy*, 519 U.S. 278, 300 (1997)......................................................28

*Gibbons v. Ogden*, 22 U.S (9 Wheat.) 1, 224 (1824)....................................................23

*Gloucester Ferry Co. v. Commonwealth of Pennsylvania*, 114 U.S. 196 (1888).........................26

*Granholm v. Heald*, 544 U.S. 460, 476 (2005)......................................................25, 29

*Guy v. Baltimore*, 100 U.S. (10 Otto) 434, 440 (1879)................................................23

*H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 537-538 (1949) .......................23, 24

*Hall v. DeCuir*, 95 U.S. 485 (1877)..............................................................................26

*Healey v. The Beer Institute*, 491 U.S. 324, 336 (1989)................................................24

*Henderson v. Mayor of New York*, 92 U.S. 259, 271 (1875) ....................................35, 51

*Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 184 (1st Cir. 1999)  ..................29

*Hughes v. Oklahoma*, 441 U.S. 322, 326 (1979)  ...............................23, 28, 37, 44, 49, 50, 52

*Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 353 (1977)..................18, 24, 49

*Huron Portland Cement Co. v. Detroit*, 362 U.S. 443 (1960)  ..............................25, 30, 44

*Japan Lines Limited v. County of Los Angeles*, 441 U.S. 434 (1979) .............................52

*Kansas City Southern Railway Co. v. Kaw Valley Drainage District of Wyandotte*
    *County, Kansas*, 233 U.S. 75, 79 (1914) .............................................................47

*Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662 (1981).............................26

*Kraft General Foods, Inc. v. Iowa Department of Revenue and Finance*,
    505 U.S. 71, 79 (1992)..........................................................................................51
*Lacoste v. Louisiana, Department of Conservation*, 263 U.S. 545, 550 (1924) ........................44
*Leisy v. Hardin*, 135 U.S. 100 (1890).......................................................................................26
*Lewis v. BTS Investment Managers, Inc.*, 447 U.S. 27, 35 (1980) .........................................24
*Louisiana v. Texas*, 176 U.S. 1 (1901) .....................................................................................46
*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)...........................................................17
*Maine v. Taylor*, 477 U.S. 131 (1986)...........................................................25, 28, 36, 37, 44, 47
*Michelin Tire Corp. v. Wages*, 423 U.S. 276, 285 (1976) ........................................................52
*Mugler v. Kansas*, 123 U.S. 623, 661 (1887)...........................................................................45
*Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, *514 U. S.* 175, *180 (1995)* ................................29
*Oregon Waste Systems, Inc. v. Environmental Quality Comm'n of the State of Oregon*,
    511 U.S. 93 100-101 (1994) ..........................................................................27, 29
*Penobscot Nation v. Frey*, 3 F.4th 484, 508 (1st Cir. 2021)......................................................17
*Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)..................................................25, 28, 29, 30, 32
*Pike v. Bruce Church, Inc.v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 (1970) .............25, 49, 50
*Portland Pipe Line Corp. v. City of South Portland*,
    332 F.Supp.3d 264, 283, 310 (D. Me. 2018) ........................................................30, 37, 44
*Raymond Transport, Inc. v. Rice*, 434 U.S. 429 (1978).............................................................26
*Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) .................................................................17
*South Dakota v. Wayfair, Inc.*, 138 S.Ct. 2080, 2089 (2018) ...............................................23, 25
*South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984)..........24,29, 32, 52
*Southern Pacific Company v. Arizona ex rel. Sullivan,* 325 U.S. 761, 767 (1945) ..........24, 26, 44
*Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ....................................................................17
*State v. Tauver*, 461 A.2d 1065, 1067-1068 (Me. 1983) ...........................................................31
*Steffel v. Thompson*, 415 U.S. 452, 459 (1974)........................................................................17
*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) .............................................17, 18
*Tart v. Commonwealth of Massachusetts*, 949 F.2d 490, 500-501 (1ˢᵗ Cir. 1991) ......................44
*Tennessee Wine and Spirits Association, Inc. v. Thomas,* 139 S.Ct. 2449, 2460 (2019) ........25, 45
*United Haulers Association, Inc. v. Oneida-Herkimer Management Authority*,
    550 U.S. 330, 338 (2005) ..............................................................................................25

## Statutes

17-A MRS § 402(1)(D)...............................................................................................................31
30-A MRS § 4452(3)(B)........................................................................................................16, 31
U.S. Const., Art. I, § 8 .............................................................................................................23

## Other Authorities

Bar Harbor Code Chapter 125, Article VII, Section 125-77 ......................................................15
Madison, Vices of the Political System of the United States, in 2 Writings of James
    Madison 362–363 (G. Hunt ed. 1901) .............................................................................23
Privileges and Immunities Clause and the Due Process Clause. *Id.* at 178, 183 ..........................27
The Federalist No. 22, pp. 143–145 (C. Rossiter ed. 1961) ........................................................23

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, *et al.* )<br><br>*Plaintiffs,* )<br><br>PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, )<br><br>*Plaintiff-Intervenor,* )<br><br>v. )<br><br>TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, )<br><br>*Defendant,* )<br><br>CHARLES SIDMAN, )<br><br>*Defendant-Intervenor.* ) | Civil Action No. 1:22-cv-416-LEW |

## PLAINTIFFS' POST-TRIAL BRIEF

The Plaintiffs, Association to Preserve and Protect Local Livelihoods ("APPLL"), B.H. Piers, L.L.C. ("BH Piers") and Golden Anchor, L.C., doing business as Harborside Hotel ("Harborside") (together, "Pier Owners"), B.H.W.W., L.L.C. ("BHWW"), Delray Explorer Hull 495 LLC ("495"), Delray Explorer Hull 493 LLC ("493"), and Acadia Explorer 492, LLC ("492" and (together, "Tender Owners") (herein, APPLL, the Pier Owners, and the Tender Owners are referred to collectively as "Plaintiffs"), hereby submit their Post-Trial Brief as follows:

## I.     INTRODUCTION

This case represents an extraordinary attempt by local initiative under the guise of the land use authority of a municipality to regulate matters of federal maritime law and interstate and

foreign commerce. The Initiated Ordinance enacted by the Town of Bar Harbor ("the Town") purports to manage alleged pedestrian congestion by eliminating large cruise ships from visiting Bar Harbor. The Initiated Ordinance directly regulates cruise ships (which are primarily foreign flagged) and their passengers and crew by imposing a limit on who may disembark from a cruise vessel at a federal anchorage and come ashore in Bar Harbor. The U.S. Constitution has long directed that such absolutism and local interference cannot stand.

First, federal maritime laws preempt this type of infringement. The Initiated Ordinance seeks to regulate matters that are subject to and conflict with federal maritime laws governing: (a) cruise ship design, operations, and maritime security for cruise ships and related maritime facilities, and (b) disembarkation practices (whether by passengers or seafarers) governed by federal maritime safety and immigration laws and regulations. The federal laws governing these matters preempt this local ordinance.

Second, the Commerce Clause under both interstate and foreign commerce considerations renders the Initiated Ordinance unconstitutional. The Initiated Ordinance disrupts and burdens interstate and foreign commerce in violation of the Commerce Clause with a local measure: (a) without a legitimate objective and designed as an effective prohibition on entry to Bar Harbor by virtually all foreign flagged cruise ships that have been visiting Bar Harbor for decades; (b) that discriminates against large cruise ship commerce in favor of smaller cruise ships and land-based hospitality and hotels; and (c) that advances an absolute limit serving as an effective prohibition on large cruise ship visitation when any less burdensome or restrictive alternatives will adequately address the alleged impacts to Bar Harbor.

Third, the Initiated Ordinance contravenes well-established due process requirements because it lacks any rational objective and lacks any "rational nexus" between the standard used in the Initiated Ordinance and its alleged anti-congestion objectives. The Ordinance lacks both a "legitimate" or "rational" objective in that it seeks to limit arbitrarily and capriciously, and without supporting empirical data, through the exercise of the land use authority of the Town, the number of seafarers and cruise ship passengers disembarking in Bar Harbor each calendar day of the year, who demonstrably have marginal, if any, impact on pedestrian congestion and completely ignores or fails to address impacts from land-based visitors.

For all these reasons, the Plaintiffs join in the Plaintiff-Intervenor's arguments in support of these claims and join in the Requested Relief asking the Court to issue a Permanent Injunction against the enforcement of the Initiated Ordinance.[1]

## II.   <u>PROCEDURAL BACKGROUND</u>

On November 8, 2022, the voters of Bar Harbor approved a citizens' initiative ("the Ordinance") which amended the Land Use Ordinance of the Town of Bar Harbor ("the Town") by limiting the number of persons who may, without penalty, disembark from a cruise ship to no more than 1,000 in a single calendar day. PFF 243. The Ordinance provided that the 1,000-person limit applied, without exception, to every day of the year, including days (and months) where no cruise ships call on Bar Harbor. *Id.* The limit on disembarkations from cruise ships to 1,000 persons per day, if enforced, would effectively bar all cruise ships with lower berth capacities in excess of 1,000 persons from Bar Harbor.

In response to the Ordinance, Plaintiffs filed their three count Complaint against the Town asking this Court to declare that the Ordinance: 1) was preempted by federal law (Count I); 2)

---

[1]      The Plaintiffs adopt and incorporate herein all arguments raised by Plaintiff-Intervenor Penobscot Bay and River Pilots Association's Post-Trial Brief as they pertain to Plaintiff's Counts I-III.

violated the Commerce Clause (Count II); and 3) lacked a rational nexus between its purpose and the means employed to achieve its purpose (Count III). (EFC 1). Plaintiffs also filed a motion for a preliminary injunction. (ECF 12). All three Plaintiffs alleged that the Ordinance would cause large cruise ships to terminate their visits to Bar Harbor and that, in turn, the Plaintiffs would suffer a decline in revenues caused by the absence of cruise ship patrons. *Id.*, ¶¶ 28-32, 57-58, 62-64, 77, 88-89. In addition, the Tender Vessel Owners alleged that their special-purpose tender vessels, which were designed and built to ferry passengers and crew to and from the cruise ships, would effectively become obsolete. *Id.* ¶¶ 57-58, 63, 88-89. The Pier Owners alleged further that the Ordinance placed them particularly at risk because, in the event that more than 1,000 persons disembarked from cruise ships and entered into Bar Harbor over their piers, they alone could be sanctioned. *Id.* ¶¶ 43-44.

The Penobscot Bay and River Pilots' Association ("Pilots") later moved to intervene as a Plaintiff-Intervenor. (ECF 32). Later still, Charles Sidman, the principal Bar Harbor voter behind the initiative, moved to intervene as a Defendant-Intervenor. (ECF 45). The Pilots and Mr. Sidman were each granted intervenor status. (ECF 32, 63).

Discovery proceeded pursuant to an Expedited Scheduling Order. (ECF 82). At the same time, the Town committed that it would not seek to enforce the Ordinance until its validity had been finally adjudicated. With this assurance, Plaintiffs withdrew their Motion for a Preliminary Injunction. Discovery was concluded timely, and the case was tried on July 11-13, followed by an Order setting the Post-Trial Briefing Schedule. (ECF 187).

### III.   BACKGROUND TO ENACTMENT OF ORDINANCE

Since the 1880s, Bar Harbor has been a tourist destination. Visitors come from all over the United States and the world to visit Bar Harbor because of its proximity to the Maine coast and

Acadia National Park.[2] In support of the tourism economy, Bar Harbor businesses provide a broad array of hospitality services, including hotels, restaurants, tours, and retail shops.  For many years, Bar Harbor's tourist economy was limited to the period between Memorial Day and Labor Day. PFF 59.

**Efforts to Expand the Tourist Season**: At various times, business leaders made efforts to expand the tourist season, such as efforts to "bring people in via boat," including Navy vessels and cruise ships. *See* PFF 60.  In the late 1990's and early 2000's, several groups came together to grow the economic potential of the "shoulder seasons"—the months on either side of the Memorial Day-Labor Day period (April and May and September and October). *See* PFF 61.

**Cruise Ship Visits and the Shoulder Season**: In addition to promising growth for the shoulder seasons, it was recognized that cruise ship visits had some unique  and positive attributes which set them apart from land-based visitors, including: cruise ship visitors did not come by automobile; the Town could schedule and therefore prepare for each cruise ship visit; and the Town could impose a fee on each cruise ship visiting Bar Harbor, thereby, supporting the municipal services the visits would require. *See* PFF 63.

Working in conjunction with the Maine Department of Transportation and the Maine Port Authority, the Town commissioned a broad-based review which covered increasing cruise visits and increased activity such visits would bring. In 2007, the consulting firm of Bernello & Ajamil issued the Cruise Tourism Destination Management Plan (the "B&A Report").  *See* PFF 64. The Town of Bar Harbor formed a Cruise Ship Task Force to further review the B&A Report's findings and recommendations. PFF 65.

---

[2]         In 2021, Acadia National Park experienced approximately four million visitors. *See* PFF 54.

**Town Council Action—2008**: In 2008, the Bar Harbor Town Council, at the request of the Cruise Ship Task Force, adopted several recommendations of the Plan, including establishing voluntary, daily passenger caps to manage cruise ship visitation and forming a permanent committee—the Cruise Ship Committee—to review cruise ship activity, which would report annually to the Town Council. *See* PFF 62.

**Cruise Ship Committee**: In accordance with the B&A Report recommendations, the Town Council established a Cruise Ship Committee. PFF 66. The Cruise Ship Committee had no legislative power; it was "strictly advisory." PFF 66. The Cruise Ship Committee also included a place for a representative of "an entity receiving ship tenders"; in other words, the Pier Owners. PFF 67.[3] As Paul Paradis[4] explained, a representative of the Pier Owners was included "to bring their operational issues and suggestions to the table."[5] PFF 68. The Town Council also provided a seat on the Committee for a representative of CruiseMaine. PFF 69.[6]

The Cruise Ship Committee usually met eight to 10 times a year and the Harbormaster, the Chief of Police, and "other Town officials" were "almost always in attendance." PFF 70. At these meetings, the committee members would "update[e] each other of how the operation was going." *Id*.

Each year, the Cruise Ship Committee submitted reports to the Town Council and made recommendations with respect to the voluntary caps. PFF 168, 178. The Town Council had the

---

[3]   This position was filled by the Pier Owners' Director of Operations, Eben Salvatore. *See* Tr. 12-Jul. at 70-71.
[4]   Paul Paradis served on the Cruise Ship Committee from its inception in 2008 until he departed the Town Council in 2017 or 2018. He was the first Chair of the Committee and held that position until he became Chair of the Town Council. Tr. 11-Jul. at 143::21-25, 144:1-9.
[5]   Eben Salvatore, who had oversight responsibility for the Pier Owners, has held this position on the Cruise Ship Committee from 2010 to the present. Tr. 12-Jul. at 71:3-15. He assumed the Chair position in 2015. Tr. 12-Jul. at 74:7-10.
[6]   When she became Executive Director of CruiseMaine in 2018, Sarah Flink filled this *ex officio* slot. PX 195 at 28 (Flink).

authority to accept or reject the Cruise Ship Committee's recommendations. PFF 177. The Town Council annually reviewed and approved the Committee's reports, including the recommendations for voluntary daily cruise ship passenger caps. PFF 178.

**Town Fees on Cruise Ships**:  The B&A Report recommended that the Town set fees for cruise ship visits. PFF 71.  The Town Council accepted this recommendation and structured the fees so that they were allocated to municipal services where cruise ship visits had "a direct impact," including salary support for the Town Planner, the Police Department, and the Harbormaster.[7] PFF 71, 72.

At trial, Town Treasurer and interim Town Manager, Sarah Gilbert, testified that the Town collected fees from cruise ships based on the lower berth capacity of each ship that these were, in effect, "passenger fees." PFF 71. She testified that the Town applies the fees to "cruise ship-related expenditures." 71.[8]

**Voluntary Passenger Caps**:  The B&A Report also recommended that the Town consider setting voluntary passenger caps for cruise ship visits. PFF 168, 176. The Cruise Ship Task Force researched this issue and recommended daily passenger limits of 5,500 for May, June, September, and October and 3,500 for July and August. After some debate, the Town Council approved these

---

[7]     Mr. Paradis estimated that, at the point where he left the Town Council, the cruise ship fees has risen to $1,000,000 (or approximately 10 percent of the Town budget).   PFF 72.

[8]     By way of example, she noted that the Town constables who help manage tour buses picking up and dropping off cruise ship passengers are at other times engaged in general traffic enforcement. The Town allocates monies from the cruise ship fees to pay that portion of the constables' salaries that is attributable to their management of cruise ship passengers and tour bus services. Tr. 13-Jul. at 79-81. She also testified that these fees were intended to raise "enough revenue to cover the cost of [the passengers] entering into town."  Tr. 13-Jul. at 78;DX *348 and 349* and 345 (parking); Tr. 13-Jul. at 66-67, 71.

daily numbers. *Id.*  In accordance with the B&A Report, the daily passenger limits were tied to each cruise ship's "Lower Berth Capacity." PFF 169. [9]

Each year the Cruise Ship Committee monitored the community's experience with the voluntary caps, holding public meetings where the Committee accepted observations and comments on the caps from residents.  PFF 176. Although subject to annual reviews and approval (or disapproval) by the Town Council, from 2008 through 2021, the Town Council approved the voluntary caps remaining at 5,500 passengers per day for May, June, September, and October and 3,500 passengers per day for July and August. Such voluntary agreements were negotiated annually between the Town and the cruise ship industry. PFF 176-179.

**Large Cruise Ships/Foreign Flagged**: At trial, Sarah Flink, the Executive Director of CruiseMaine,[10] testified about her CruiseMaine's role in facilitating cruise ship visits to Maine. She explained that CruiseMaine's mission was to "support, educate, and promote all cruise communities in Maine seeking sustainable cruise ship tourism." PFF 24. Her duties require her to engage with cruise line operators and their umbrella organization, the Cruise Lines International Association ("CLIA"), as well as other cruise line operators. PFF 25.  Ms. Flink testified that she also works directly with municipalities as well as Maine-based businesses that serve cruise ship passengers, such as tour operators, as well as the harbor pilots.  PFF 24-25.

Ms. Flink said that the cruise ship market had four big companies—Carnival Corporation, Royal Caribbean, Norwegian Cruise Line Holdings, and, MSC."  PFF 26.  None of these four

---

[9]     "**Lower Berth Capacity.** The number of beds of standard height on a cruise vessel. The number of lower berths determines the vessel's normal passenger capacity." PFF 170. A cruise ship's lower berth capacity does not necessarily reflect the actual occupancy of a given cruise ship. PFF 171-173.
[10]     CruiseMaine had been part of the Maine Department of Transportation and Maine Port Authority. Now it is a part of the Maine Office of Tourism. PFF 23.

cruise lines is domestic nor are any of their large cruise ships U.S.-flagged.[11, 12]   PFF 26. By contrast, the domestic cruise lines' vessels are much smaller; the only domestic line operating in Maine is American Cruise Lines, which operates two vessels.[13] PFF 276.

**Cruise Ship Reservations:**   The Office of Tourism and CruiseMaine have established a registration system for Cruise ships planning to call at Maine ports called "PortCall." PFF 50-51. The cruise lines or their agents register with PortCall but, at Bar Harbor, the Harbormaster or his assistant retains the power to accept or reject each cruise line application. PFF 96-98. For a visit to Bar Harbor, a cruise line's registration with CruiseMaine is not enough. It must also obtain "confirmation" from Bar Harbor's Harbormaster who accepts reservations on a first-come, first-served basis for cruise ships. PFF 96-98.[14] Cruise lines plan their itineraries many months and even years in advance of each season. PFF 157-159.

**International Itinerary + Marquee Port Status**:  As a cruise ship port of call, Bar Harbor is part of an international cruise ship itinerary including New England, extending south to New York and New Jersey and north and east to the Maritimes, including, at times, Halifax, and north and west to the St. Lawrence Seaway and Montreal. See PFF 36.   In this international itinerary, Bar Harbor stands out as Maine's only "marquee" port. PFF 30-36. A marquee port has exceptional

---

[11]      Ms. Flink explained that no large cruise ships are built in the United States and because U.S. law requires domestic vessels be built in the United States, they are ineligible to become U.S.-flagged vessels. PX 195 at 14-15 (Flink).

[12]      Ms. Flink defined large cruise ships as those with a passenger capacity more than 1,000. PX 195 at 52-53, 83-84 (Flink); *but see* Tr. 13-Jul. at 303 (a "small cruise ship" has a "1,000 capacity or less"; a "large cruise ship" has a capacity above 1,500). This brief gives the term "large cruise ships" the same meaning as did Ms. Flink—vessels with a passenger capacity above 1,000 persons.

[13]      Ms. Flink testified that American Cruise Lines will be introducing a third cruise vessel in the fall of 2023. PX 195 at 19 (Flink).

[14]      The Town does not have a priority list for which ships get the anchorages if there is some competition for their use. The Town does not have, and has not had, an internal policy of giving preference to large cruise ships over smaller cruise ships for use of the anchorages. PFF 96-98. The harbormaster, in his capacity as lieutenant of special services, manages traffic only at the points of disembarkation for cruise ship passengers, Harborside and Harbor Place.

attributes that attract visitors and "help sell tickets." PFF 30-36. Bar Harbor, itself, is an attraction, but more significant is Bar Harbor's proximity to Acadia National Park. PFF 53-55.

**Bar Harbor + Maine Ports:** Four Maine ports have U.S. Coast Guard-approved Section 105 Security Plans and are qualified to take foreign-flagged vessels—Portland, Rockland, Bar Harbor, and Eastport. *See* PFF 296-298 (Bar Harbor). Three of these ports have been designated as Class A ports by U.S. Customs—Portland, Bar Harbor, and Eastport—allowing them to serve as "first ports of entry" for vessels arriving from foreign waters.[15] PFF 117-121 ("Bar Harbor is often the first port of call into the U.S.")]. The cruise lines operators give the lion's share of their business to Bar Harbor which receives about 60 percent of the passengers as compared to Portland, which receives 35 percent, with the other ports receiving the remaining five percent. *See e.g.* PFF 152.

**Cruise Ship Operations at Bar Harbor:** Bar Harbor does not have a land-based pier that can accommodate large cruise ships. PFF 78. That means that for the large cruise ships, Bar Harbor is a tender port. *Id.* As a tender port, the Cruise ships must anchor offshore at one of two federally designated anchorages in Frenchman Bay, known as Anchorage A and Anchorage B. PFF 86-87. Cruise ship passengers and crew are then transported by tender vessels to one of two privately-owned piers—owned and operated by the Pier Owners, Golden Anchor, LC and BH Piers, LLC, respectively. PFF 104.

Initially, tender services were provided by boats that had been designed for whale watch tours. PFF 163. In recent years, the tender duties have been performed by tender vessels which

---

[15]    The port of entry at Portland is more than a 170-mile drive from Acadia National Park; the port of entry at Eastport is more than a 110-mile drive from Acadia National Park. (ECF 137, ¶¶ 27-29). The port of entry at Bar Harbor is less than a 2-mile drive from Acadia National Park. *Id.* ¶ 30. If cruise ships re-entering the United States cannot clear customs in Bar Harbor, Eastport, or Portland, they will need to clear customs at a port outside of Maine. PFF 263.

the Tender Owners had specially designed and constructed for this task. PFF 163.  Each vessel has been licensed by the U.S. Coast Guard. *See e.*g. PFF 163-167. They can accommodate up to 149 passengers. *See e.g.* PFF 12-14, 80.

The tender vessels provide a shuttle service bringing people to and from the cruise ships in shifts.  *Id*. There is a time gap between these trips which can range from 20 to 45 minutes. *See* PFF 111. This means that persons arriving from cruise ships do not arrive at the piers all at once.  At times, cruise ships use their own tender vessels to transport passengers and crew to the piers.  *See* PFF 104.  At other times, the cruise ships will engage the tender vessels of the Tender Owners for this service.

The tender vessels transport passengers and crew coming from the cruise ships to the private piers owned and operated by the Pier Owners, where they disembark and enter Bar Harbor. *See e.g.* PFF 12-14, 80.  The piers, themselves, are also licensed by the U.S. Coast Guard. PFF 82-83.  To obtain these licenses, the Pier Owners fulfilled the Coast Guard's requirements under 33 C.F.R. Part 105. *See Id*.

Cruise lines operators make arrangements with the two Pier Owners for the use of their piers to disembark and reembark their passengers and crew and compensate them for that use. These facilities have enabled Bar Harbor to operate as a Class A Port. PFF 82-83; 106, 119.  These Pier Owner's two private piers are the only cruise ship tender landing facilities in the Town. *Id*.

**Cruise Ship Impact on Shoulder Season:**  Over time, cruise ship visits to Bar Harbor increased. The numbers of such visits have been heavily weighted in favor of September and October with as much as two-thirds of cruise passenger visits to Bar Harbor occurring in those two months. PFF 47. The Town experienced considerable success in attracting visits from cruise ship

lines. As was hoped, in so doing, Bar Harbor expanded its narrow tourist season to include May and, more notably, September and October.[16] *See* PFF 62, 63, 161.

**Management of Cruise Ship Disembarkation**: Cruise ships calling at Bar Harbor typically arrive in the morning and depart in the late afternoon on the day they arrived. PFF 84. Upon arriving at the pier, passengers would either join tours to visit Acadia National Park conducted by motor vehicles ranging from motor coaches to smaller tour buses or simply walk into downtown Bar Harbor.  PFF 113-114.  At the end of their brief stay, the cruise ship passengers and crew return to these piers where the tender vessels return them to the cruise ships.  PFF 116.

The B&A study prepared a map showing the walking patterns of disembarking cruise ship passengers in Bar Harbor. PFF 73. Mr. Paradis testified that he was quite familiar with the map and that he and his fellow members of the Cruise Ship Committee referred to it often. PFF 73-74. Mr. Paradis observed the B&A map was a "correct representation" of those walking patterns. *See* 73-74.  He confirmed that, as depicted in the B&A map, the intensity of cruise ship passenger foot traffic greatly diminished toward lower Main and Mount Desert Streets and that, as a result, "we received complaints from businesses in those areas that 'they didn't see a lot of activity from cruise visitation.'" PFF 74-75. In response to those complaints, and the Cruise Ship Committee's recommendation, the Town Council directed that tour buses returning from Acadia National Park to offload at the Village Green where, from there, they could "filter[] through the town." PFF 75.

---

[16]     Kristi Bond testified that before the visits from large cruise ships began to increase her business in the shoulder seasons it was difficult to keep her businesses open year-round, though she did so to give her employees year-round employment.   See e.g. PFF 367-368.   After cruise ship visits increased, so did Ms. Bond's revenues.  *Id.* She testified that, if the large cruise ships stopped coming, her businesses would see a decline in revenues.  PFF 364-365.   Kevin Desveaux also testified that if the large cruise ships stopped coming, he would experience a decline in revenues and a large commercial loan for which he was responsible would be at risk.   PFF 368-369.   The testimony of Ms. Bond and Mr. DesVeaux was consistent with Prof. Todd Gabe's 2016 economic impact study.   Tr. 12-Jul.(Gabe) at 207:5-25-212:1-13.

The cruise ship visits also posed challenges for the Police Department in managing the cruise ship tour buses and pedestrian entry into Bar Harbor. Police Chief James Willis testified that the Police Department developed practices to resolve these issues. PFF 195. Harbormaster Christopher Wharff is also a lieutenant in the Bar Harbor Police Department. In the latter capacity, he has responsibility for managing the pedestrian and vehicular (tour buses) traffic that arise with every cruise ship visit. He testified to improvements in the management of pedestrian and vehicular traffic that he implemented in 2022, adding in making those improvements he worked with and was assisted by Mr. Salvatore, the Director of Operations for the Pier Owners and the Tender Vessel Owners. PFF 110; *see also* PFF181-195. These changes improved the movement of people and vehicles on cruise days. *See e.*g. PFF 110, 229, 231.

**Recent Town Developments—July 2021 Suspension Order**: On July 21, 2021, the Town Council instructed the Harbormaster not to confirm cruise line applications to visit Bar Harbor. PFF 180. The suspension order remained in effect for more than a year until August of 2022 and, while it was in effect, no cruise ship applications could be confirmed. *Id.*

**Working Group/Task Force—Memoranda of Agreement:** On February 15, 2022, the Town Council authorized a five-member working group/task force ("Working Group") to review cruise ship visits. PFF 180. The members of the Working Group were Town Councilors Jill Goldthwait, Valerie Peacock, then-Town Manager, Kevin Sutherland, Harbormaster Wharff, and Sarah Flink. *Id.*

In August of 2022, the Working Group produced a proposed "Memorandum of Agreement" ("MOA"), setting daily and monthly passenger limit for the Town Council's consideration. PFF 181-195. Although representing Town policy on cruise ship visits, the MOA's terms were not enacted into an ordinance. Rather, the MOA was proposed as a written agreement

between the Town and the cruise lines which were submitted to the individual cruise lines for their approval (nor not) on a take-it-or-leave-it basis. *Id*.

The MOA required a "comprehensive review" each November "of the capacity of the Town to manage daily and monthly passenger capacities set forth in the MOA." *Id*. Town Councilor Peacock explained that the annual review process was intended to allow the Town "to collect[] objective data to really think about how to see if this starting place of this MOA was actually going to do enough for the Town to reduce visitation." *Id*. The MOA set its own sunset provision whereby it would expire on December 31, 2023. *Id*.

Like the voluntary caps, the MOA also relied on Lower Berth Capacity for its passenger limits. *Id*. The MOA set daily limits of 3,800 passengers for May, June, September, and October. *Id*. This contrasted with 5,500-passenger daily limit for these months under the longstanding voluntary caps. PFF 62, 174-176. The MOA left intact the 3,500-passenger daily limit for the months of July and August but, for the first time, subjected those caps to a monthly ceiling of 65,000 total passengers. PFF 181-195. May and June were also subjected to a monthly passenger cap of 30,000 and September and October were subjected to a monthly passenger ceiling of 65,000. *Id*. In effect, the MOA reduced the passenger visits under the voluntary cap system by 30

percent.[17],[18]  Town Manager Sutherland signed the MOA for each cruise line on September 28, 2022. *Id.*[19]

By the time the Town Council approved the MOA in August of 2022, the Town Council's July 21, 2021 prohibition on the confirmation of cruise line applications had been in effect for more than a year. As each cruise line committed to accepting the MOA's terms, that cruise line's pending applications were confirmed. *See e.g.* PFF 180; *see also* 181-195.  Even so, about 20 cruise line applications that the Town Council had left hanging were eventually denied because they did not meet the MOA's terms.[20] *Id.*

**Citizens Initiative:** On March 16, 2022, Charles Sidman filed a proposed citizens initiative amendment to Section 125-77 of Article VII, Bar Harbor Code Chapter 125. Bar Harbor's Land Use Ordinance ("the Initiative"). PX 209.  The Initiative was supplemented by a "Purpose" section which purported to explain why the Initiative was needed. PX 237.

**The Ordinance:** The Initiative was submitted to and approved by Bar Harbor voters at the November 8, 2022 Town Meeting. PFF 243; PX 210. It was duly incorporated into the Town's Land Use Ordinance in Article VII, Chapter 125, Section 125-77(H)(1)-(5) and, in accordance

---

[17]     Under the MOA limits, 20 of the pending cruise ship visit applications for the 2023 season were ineligible and the applications for those visits were denied. Ms. Flink testified that these denials excluded a total of 30,317 prospective cruise ship passengers. PX 162; PX 195 at 47-48, 58-59, 96-97 (Flink). She also determined that for the 2024 season an additional 51 cruise ships with a total of 71,824 passengers would also be ineligible to visit Bar Harbor. PX 195 at 60 (Flink); *see also* (ECF 137, ¶18).

[18]     Ms. Peacock testified that the Pan-Atlantic survey (DX 323) did not govern the terms of the MOA. When asked whether that survey "inform[ed] your drafting of the MOA?", Ms. Peacock answer, "[n]o. I think—not specifically…I did not get a clear path to policy out of this from my perspective." Tr. 13-Jul. at 170:5-9.

[19]     From September 28 through Octoer 22, 2022, the following cruise lines also signed the MOA: Viking Cruises, American Cruise Lines, Magical Cruise Company, Ltd. d/b/a Disney Cruise Line, Holland America Line, Hurtigruten Expeditions, Norwegian Cruise Line, Pearl Seas Cruises, Princess Cruises, Royal Caribbean Cruises, Ltd., Seabourn Cruise Line, and Windstar Cruises Marshall Island, LLCs. (DX 327-004-014); *see also* (EFC 137, ¶ 17).

[20]     Harbormaster Wharff testified that, in whether to confirm PortCall applications, he had been guided by the MOA standards. Tr. 13-Jul. at 18:4-12.

with the Town Charter, became effective on December 8, 2022. (ECF 137 ¶ 22).  It contains no legislative findings. *Id., passim.*

As approved by Bar Harbor voters, the Ordinance comprises five sections. Section 2 provides that, "no more than 1,000 persons, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come ashore on, over, or across any property located within the Town of Bar Harbor." PX 210, §2. Section 2 is comprehensive, applying to all such persons and providing no exceptions for anyone disembarking from cruise ships for health-related emergencies or other urgent reasons.  By its plain terms, it applies to all 365 days of the year.  *Id.*

Section 3 charges the Harbormaster with developing "rules and regulations" to implement the Ordinance. Section 3 provides further that the owners of the piers at which persons coming from cruise ships would disembark—the Pier Owners—would be required to obtain a permit.

Section 4 divides responsibility for enforcing the Ordinance with the Harbormaster having to keep track of and count persons disembarking from cruise ships and, if the 1,000-person daily cap is exceeded, tracking those numbers and reporting violations to the Code Enforcement Officer. *Id.* Tr. 13-Jul. at 22-23. The Code Enrorcement Officer is charged with citing the Pier Owners for any violations. PX 210, §4.

Section 4 also provides that "each disembarking person exceeding the daily permitted daily limit" constitutes a "specific violation" within the meaning of 30-A M.R.S. § 4452(3)(B). *Id.*  For each such person, a "minimum $100 penalty" is imposed. *Id.* The $100 per-person fine is a minimum because § 4452(3)(B), to which Section 4 is tied, states that, "[t]he minimum penalty for a specific violation is $100 and the maximum penalty is $5,000." 30-A M.R.S. § 4452(3)(B). Therefore, the $100 per person fine is only a floor.  Presumably, fines would increase if the 1,000-person limit was to be frequently violated. Section 4 assigns enforcement authority to the Code

Enforcement Officer. Section 4 provides that the fine shall be imposed solely and exclusively on the Pier Owners as the holders of permits issued by the Town. *Id.*

Although the Ordinance did not become effective until December 8, 2022, (ECF 137, ¶22), the Ordinance expressly made 1,000-person daily limit retroactive to March 17, 2022. *Id.* at §5.

## IV.   **LEGAL ARGUMENT**

### A.  **PLAINTIFFS HAVE ARTICLE III STANDING TO BRING THEIR CLAIMS.**

To establish standing a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (*citing Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Penobscot Nation v. Frey*, 3 F.4th 484, 508 (1st Cir. 2021) (*quoting Spokeo and Lujan*). The threat of enforcement alone "may suffice as an 'imminent' Article III injury in fact." *Id.* (internal citations omitted).

The rationale for pre-enforcement standing is that a plaintiff should not have to "expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (*quoting Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).  "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or [if] there is a '"substantial risk" that the harm will occur.'" *Id.* (*quoting Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Specifically, a plaintiff satisfies the injury-in-fact requirement when they allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289,

298 (1979); *see also Driehaus*, 573 U.S. at 161-68 (applying three-part test it articulated in *Babbit* for pre-enforcement injury-in-fact analysis).

At trial, the Plaintiffs presented testimony that they intend to continue to engage with cruise ships and their passengers and crew via tender, pier, or sales of goods and services. Such activities are affected by the constitutional interest of engaging in commerce.

**APPLL Standing**:  APPLL[21] presented testimony from certain members showing each operates a tourist-dependent business and that, if the Ordinance is enforced and large cruise ships stop coming to Bar Harbor, they will experience a decline in revenues.[22]  *See* PFF 364-371.

**Tender Owners Standing:**  The growth in cruise ships visits required the Tender Owners to expand and improve the services they provided. Therefore, in 2017, the Tender Owners arranged for the design and construction of three new tender vessels to be used "just for tendering."  PFF 360-361. The tender vessel designers gathered considerable, particularized information about the tender vessel operations and designed the vessels to perform that service.  *Id. See also*, Tr. 12-Jul. at 83-87. The Tender Owners also commissioned the design and construction of special-purpose barges to complement the work of the tender vessels. PFF 163-166.  Cruise ships pay for the tender vessels' services.  Tr. 12-Jul. at 108.   Mr. Salvatore testified that the tender vessels were specially designed to serve the large cruise ships, and if those ships stopped coming to Bar Harbor, that purpose would terminate, and the Tender Owners would suffer a decline in revenues.   *See* PFF 358.

---

[21]    With Plaintiffs' claims being limited to declaratory and injunctive relief, APPLL may stand in for its members. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 42-343 (1977); *see also Camel and Cashmere Institute of America, Inc. v. Associated Dry Goods, Corp*., 799 F.2d 6 (1ˢᵗ Cir. 1986).]

[22]    APPLL, the Tender Owners, and the Pier Owners did not present detailed evidence of possible revenue losses because they have not yet experienced any such revenue losses and proof of a particular degree of revenue loss is irrelevant to proving any constitutional challenges to the Ordinance.

**Pier Owners Standing**: As cruise ship visits to Bar Harbor increased, so also did the demand for use of the Pier Owners' piers. Consequently, the Pier Owners invested monies in the piers to accommodate this increased cruise-based traffic. PFF 359, 362, 363. Mr. Salvatore also testified that the cruise ships pay monies for the use of the piers and that, if the large cruise ships stopped coming to Bar Harbor, the Pier Owners would suffer a decline in revenues. *Id*.

In addition, Mr. Salvatore confirmed that the only punitive mechanism of the Ordinance is a fine against the Pier Owners. PFF 212.  He acknowledged that, although the Town is not now enforcing the Ordinance, if it were to do so, the Pier Owners would continue to provide their services and would contest any fine the Town may impose. Tr. 12-Jul. at 110.

Aside from being at risk of revenue loss, the Pier Owners are also at risk because the Ordinance singles them out as the only entities that can be sanctioned if the 1,000 person per day limit is exceeded. The Pier Owners' exposure to fines under the Ordinance, by itself, is sufficient to invest them with Article III standing.  The extent to which the Ordinance's fine system places the Pier Owners at risk is discussed below and incorporated by reference into this Article III standing argument.

Rounding out the analysis in *Babbitt* regarding injury-in-fact, there is no dispute that Plaintiffs' service of cruise ships, their passengers, and crew is proscribed by the 1000 person per day limitation set out in the Ordinance, nor is there any dispute that the Town intends to enforce the Ordinance if found constitutional by this Court.

## B.  THE ORDINANCE IS PREEMPTED BY FEDERAL LAW.

### 1.  The Initiated Ordinance Conflicts with Federal laws protecting seafarers.

A substantial body of federal law controls and regulates the operations of cruise vessels serving the interstate and maritime foreign commerce of the United States. These vessels are

subject to federal inspection and supervision in a variety of areas, including construction standards, environmental protection requirements, operational and navigational procedures, customs and immigration compliance, security measures, maritime navigation, and health and safety requirements. The federal government, through the United States Coast Guard[23] and other federal agencies, routinely prescribes practices, procedures, and standards for vessel operations. *See, e.g.*, 46 C.F.R. Subchapter H (containing requirements for inspection, certification, and operations). These Coast Guard regulations expressly have "the force of law" and "preempt[ ] … State or local regulations in the same field." 46 C.F.R. § 70.01-1.

The federal government regulates various aspects of port and maritime facility operations through, among other laws, the Federal Maritime Transportation Security Act of 2002 (MTSA), Pub. L. 107-295, codified at 46 U.S.C. 70101, *et seq*., and the Coast Guard Authorization Act of 2010, Pub. L. 111-281, 124 Stat. 2905 (2010). These federal laws and regulations apply to maritime facilities that accept vessels with disembarkers from cruise ships (both crew and passengers); the regulations issued to implement MTSA are clear that they are intended to be preemptive. *See* 33 C.F.R. § 105.105(a)(2).

These laws and regulations require, among other things, that the owner or operator of such a facility ensure shore access to individuals who work on the vessels ("seafarers") and those who provide services to seafarers. U.S. Dep't of Homeland Security, Coast Guard, *Final Rule: Seafarers' Access to Maritime Facilities*, 84 Fed. Reg. 12,102 (Apr. 1, 2019); 33 C.F.R. § 105.200(b)(9); 33 C.F.R. § 105.237. These regulations require maritime terminal facilities to provide safe, timely, and uniform access for *all* seafarers seeking to disembark from cruise ships

---

[23]     "The Coast Guard shall . . . administer laws and promulgate and enforce regulations for the promotion of safety of life and property on and under the high seas and waters subject to the jurisdiction of the United States." 14 U.S.C. § 102.

and all other vessels using such facilities. As with the federal regulations governing vessels, the regulations governing maritime facilities "have preemptive effect over State or local regulations insofar as a State or local law or regulation applicable to the facilities covered by part 105 would conflict with the regulations in part 105, either by actually conflicting or by frustrating an overriding Federal need for uniformity." 33 C.F.R. § 101.112(b).

The Pier Owners own and operate two piers—BH Piers and Harborside—both of which are regulated by the federal government, including the United States Coast Guard. Each pier has the necessary approvals from the Coast Guard which requires that the piers are secure and that they provide unimpeded access facilities for seafarers to come ashore.  The Ordinance's year-round restriction limiting persons disembarking from large cruise ships and entering into Bar Harbor to no more than 1,000 per day stands as an obstacle to the Part 105 requirement the Pier Owners to ensure unencumbered shore access to *all* individuals who work on the cruise vessels ("seafarers," *i.e.*, the crew) and those who provide services to seafarers. 33 C.F.R. § 105.237.[24]

The Ordinance's 1,000-person per day ceiling conflicts with the Pier Owners' obligation under federal law to provide access to all disembarking seafarers. The Ordinance puts the Pier Owners at risk of admitting some but not all seafarers or even admitting no seafarers at all. In sum, the Pier Owners cannot comply with their federal obligations to seafarers and, at the same time, comply with the Ordinance. The Ordinance is thus preempted as it stands as an obstacle to the effectiveness of these federal laws. *Maine Forest Prod. Council v. Cormier,* 51 F.4th 1, 11-12 (1st Cir. 2022)

---

[24]     "[W]hen Congress has unmistakably ordained that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall." *Arcadian Health Plan, Inc. v. Korfman*, No. 1:10-CV-322-GZS, 2010 WL 5173624, at *4 (D. Me. Dec. 14, 2010), *aff'd*, No. CIV. 10-322-P-S, 2011 WL 22974 (D. Me. Jan. 4, 2011) (quoting *Jones v. Rath Packing Co.*, 430 U .S. 519, 525 (1977) (internal punctuation and citation omitted)).

**2. The Initiated Ordinance Conflicts with Federal laws governing the admission of aliens.**

The extensive federal regulatory regime is not limited to the Coast Guard. Other federal agencies, including Customs and Immigration, regulate aspects of the passenger cruise line industry (including the admission or readmission of foreign national passengers after inspection). Relevant to the Port of Bar Harbor, this is especially true of the foreign-flagged large cruise ships, which cover ports extending from the mid-Atlantic states through New England, the Maritime provinces, and Quebec. As has been seen, in this international itinerary, Bar Harbor stands out as a "first port of entry," a Class A port under U.S. Customs, where foreign nationals and U.S. citizens returning to the United States may clear customs and immigration before entering into the United States.

Foreign national and U.S. citizen passengers arriving from a Canadian port may be readmitted to the United States (after inspection aboard the ship on its arrival in federal anchorage at Bar Harbor). However, the Ordinance imposes another condition of entry—that the disembarking person is not above the 1,000-person daily limit. The Ordinance treats all such numerically offensive persons as having failed to qualify for admission into the United States (at least via Bar Harbor) thereby, in effect, supplementing federal criteria for admission with one imposed by this Maine municipality. The Ordinance thus makes it impossible to comply with U.S. Customs laws and frustrates their effective operation—standing as an obstacle to their effectiveness and enforcement. Because the Ordinance conflicts with these federal laws, it is preempted by them. *Maine Forest Products Council,* 51 F.4th at 11-12.

**B. THE ORDINANCE VIOLATES THE COMMERCE CLAUSE.**

**1. Origins and Purpose of Commerce Clause.**

The Commerce Clause was intended to end the "jealousies and retaliatory measures" that had divided the States in the pre-Constitutional era. *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994) (*citing* The Federalist No. 22, pp. 143–145 (C. Rossiter ed. 1961) (A. Hamilton); Madison, Vices of the Political System of the United States, in 2 Writings of James Madison 362–363 (G. Hunt ed. 1901)). During that period, the commerce of the United States was in an "oppressed and degraded state." *Guy v. Baltimore*, 100 U.S. (10 Otto) 434, 440 (1879). Interstate rivalries had engendered a "a conflict of commercial regulations destructive to the harmony of the States". *Camps Newfound/Ottawa, Inc. v. Town of Harrington*, 520 U.S. 564, 571 (1997) (*quoting Gibbons v. Ogden*, 22 U.S (9 Wheat.) 1, 224 (1824) (Johnson, J., concurring)). Under the weak Articles of Confederation, the States competed so sharply with one another that the resultant chaos was "an immediate reason for calling the Constitutional Convention." *South Dakota v. Wayfair, Inc*., 138 S.Ct. 2080, 2089 (2018) (*quoting Hughes v. Oklahoma*, 441 U.S. 322, 326 (1979).

The Constitution resolved this perilous situation by empowering the central government "to regulate commerce with foreign nations, among states, and with the Indian tribes." U.S. Const., Art. I, § 8. Thus, "[t]he Constitution…was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc*., 249 U.S. 511, 523 (1935). It established the "principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control the economy…and has its corollary that the states are not separable economic units." *H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 537-538 (1949). The Constitution freed the United States from the dangers of "economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes*, 441 U.S. at 325-326.

The Constitution mandates "the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce." *Healey v. The Beer Institute,* 491 U.S. 324, 336 (1989). Under this regime, a state "may not place itself in a position of economic isolation."  *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S 383, 401-402 (1994) (O'Connor, J., concurring) (quoting*, H.P. Hood & Sons, Inc.,* 336 U.S. at 537-538).

Moreover, the Supreme Court has held that the Commerce Clause has its own motive force in defense of the national economy that the Constitution itself had made possible. "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized to be a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984) (*citing Lewis v. BTS Investment Managers, Inc*., 447 U.S. 27, 35 (1980)). This constitutional force, the "dormant" or "negative" Commerce Clause, acts as a "negative command" creating "an area of trade free from interference by the States." *American Trucking Associations, Inc. v. Michigan Public Service Comm'n,* 545 U.S. 429, 433 (2005) (internal citations omitted).

While vesting in the Constitution power sufficient to vindicate the interests and defense of a national economy, the Commerce Clause did not, thereby, divest the States of all power to legislate on economic matters. As the Supreme Court has explained, "[i]n the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or, to some extent, regulate it." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 350 (1977) (*quoting Southern Pacific Company v. Arizona ex rel. Sullivan,* 325 U.S. 761, 767 (1945)). Therefore, although the Constitution mandates a national economy, States may enact valid

laws addressing matters of local or statewide significance. *See Wayfair, Inc.*, 138 S.Ct. at 2091 (reviewing case law on State authority over local matters); *see e.g., Maine v. Taylor*, 477 U.S. 131 (1986) (State may ban potentially-diseased out-of-state baitfish); *Huron Portland Cement Co. v. Detroit,* 362 U.S. 443 (1960) (city may regulate air quality).

### 2.  Judicial Review of State and Local Laws

As the Supreme Court has observed, the jurisprudence on the dormant Commerce Clause is "deeply rooted in our case law." *Tennessee Wine and Spirits Association, Inc. v. Thomas,* 139 S.Ct. 2449, 2460 (2019). "Modern precedents rest upon two primary principles that mark the boundaries of a State's authority to regulate interstate commerce." *Wayfair, Inc.,* 138 S.Ct. at 2090.

The first principle is that "state regulations may not discriminate against interstate commerce." *Id.* at 2091. "State laws that discriminate against interstate commerce face 'a virtually *per se* rule of invalidity.'" *Granholm v. Heald,* 544 U.S. 460, 476 (2005) (internal quotation marks omitted). As used in this test, "'discrimination' simply means the differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Association, Inc. v. Oneida-Herkimer Management Authority*, 550 U.S 330, 338 (2005) (internal citations omitted). The Supreme Court has explained that "[t]he clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders." *Philadelphia v. New Jersey,* 437 U.S. 617, 624 (1978).

The second principle is that "States may not impose undue burdens on interstate commerce. *Id.* Compliance with this principle requires that "State laws…regulat[e] even-handedly to effectuate a legitimate local public interest ... [and such laws] will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Wayfair, Inc.,* 138 S. Ct. at 2091 (*quoting Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 (1970)).

### 3. Commerce Clause Protects the Arteries of Commerce

The Commerce Clause protects "the instrumentalities of commerce." Supreme Court cases on this aspect of Commerce Clause protection of the national economy are legion. *See, e.g.*, *Kassel v. Consolidated Freightways Corp. of Delaware,* 450 U.S. 662 (1981); *Raymond Transport, Inc. v. Rice*, 434 U.S. 429 (1978); *Bibb v. Navajo Freight Lines,* 359 U.S. 520 (1959); *Southern Pacific Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761 (1945); *Bowman v. Chicago and Northwestern Railway Co,* 125 U.S. 465 (1888); *Hall v. DeCuir,* 95 U.S. 485 (1877). Common to all these cases was a state law that impeded the free flow of the transportation of goods or persons or both. In each case, the state impediment was held to be violation of the Commerce Clause.

As will be seen below, the unrebutted record in this case has established that, like the state laws in the foregoing cases, the municipal law here at issue also erects an impediment to the free flow of commerce—the ability of large cruise ships to move persons from port to port according to itineraries that are interstate and frequently international. The operators of large-scale cruise vessels occupy a distinct spot in the broad realm of commerce covering the movement of goods and persons. Their business is wholly dependent on the movement of people.

Time and again the Supreme Court has held that the Commerce Clause protects against state or local legislation impeding the free transport of persons. *See*, *e.g.* *Edwards v. California,* 314 U.S. 160 (1941); *Covington & Cincinnati Bridge Co. v. Commonwealth of Kentucky*, 154 U.S. 204 (1894); *Leisy v. Hardin*, 135 U.S. 100 (1890); *Gloucester Ferry Co. v. Commonwealth of Pennsylvania*, 114 U.S. 196 (1888).

*Edwards* is particularly instructive because in that case the court held that the Commerce Clause barred the states from imposing economic prerequisites on persons coming across their borders from other states. 314 U.S. at 177. The two concurring opinions emphasized that this right

was also protected by the Privileges and Immunities Clause and the Due Process Clause. *Id.* at 178, 183; *see also Bayley's Campground, Inc. v. Mills*, 463 F.Supp.3d 22, 34 (D. Me. 2020) (citing *Edwards*). The two latter rights are considered to accrue to and be held by individuals, but that is not true of the equivalent right under the Commerce Clause. Although *Edwards* shows that the Commerce Clause protects an individual's right to travel, it protects that right in defense of protecting the national economy and all those dependent on it from state or local obstruction of the right to transport persons as well as for persons to be transported. The Ordinance places Plaintiffs at economic—and in the Pier Owners' case—at punitive risk because it threatens the ability of persons to move freely in commerce by their own chosen means of conveyance—it purports to bar that means of conveyance to those persons.

Therefore, as with other ways in which the Ordinance violates the Commerce Clause, Plaintiffs may challenge the Ordinance on the grounds that it impedes the individual's right to travel by this particular means of conveyance in violation of the Commerce Clause. And, in addition to their other Commerce Clause challenges, Plaintiffs do challenge the Ordinance on the grounds that, by restricting the right to transport persons, as well as the individual's right to be transported, it violates the Commerce Clause.

### 4. The Ordinance is Facially Invalid under the Commerce Clause.

Under strict scrutiny, where a state statute or local ordinance causes economic discrimination, "the [Commerce Clause's] virtual per se rule" applies. *Oregon Waste Systems, Inc. v. Environmental Quality Comm'n of the State of Oregon,* 511 U.S. 93 100-101 (1994). The Supreme Court has held that "'economic protectionism' may be made on the basis of either discriminatory purpose…or discriminatory effect." *Chemical Waste Management v. Hunt,* 504

U.S. 334, 343 n. 6. (1992).  Economic discrimination may be found in a challenged law "either on its face or in its practical effect." *Taylor*, 477 U.S. at 138 (quoting *Hughes,* 441 U.S. at 336).

Discriminatory purpose or effect triggers "[t]he "virtually *per se* rule of invalidity," *Philadelphia,* 437 U.S. at 624,  which applies "not only to laws motivated solely by a desire to protect local industries from out-of-state competition, but also to laws that respond to legitimate local concerns by discriminating arbitrarily against interstate trade." *Hunt*, 504 U.S. at 344 n. 6 (quoting in part *Taylor*, 477 U.S. at 148 n. 19). Against this background, the Ordinance is intentionally discriminatory in at least two respects.

First, its 1,000-person-per-day limit—covering every day of the calendar year—effectively excludes virtually all persons arriving at Bar Harbor by large cruise ships. Yet, it leaves entirely unaffected persons arriving by land—no matter in what numbers or by whatever means of conveyance. This discrimination is blatant. In addition, the Ordinance's author and chief proponent, Charles Sidman, promoted the Initiative that became the Ordinance as a way of weeding out the less well-to-do large cruise ship patrons and displacing them with patrons of small cruise ships with superior wealth and taste. Tr. 13-Jul. at 302; DX  357.

Second, the Ordinance is calculated to and would have the effect of encouraging the traveling public to choose Bar Harbor's land-based hotels over the large and essentially barred cruise ships. Cruise ships and land-based hotels are competitors in the same economic sector. See, *General Motors v. Tracy*, 519 U.S. 278, 300 (1997).

Paul Grigsby of Holland America, confirmed this competition when he testified that cruise ships and hotels compete with one another "in the holiday space" for the would-be patrons' discretionary dollar.   PX 191at 13(Grigsby).   Adam Goldstein, former president of Royal Caribbean Cruises, Ltd., supported this same point. Describing his experience in which Royal

Caribbean both competed with land-based hotels and worked with them, leading him to coin the term for the competition for the potential customers' "discretionary dollars for travel and leisure" as between "frenemies." Tr. 12-Jul. at 163-164, 167.  As is further discussed below, in this very distinct realm of commerce—this "hospitality space"—the Ordinance chooses sides. It effectively excludes large cruise ships from Bar Harbor, thereby creating a decisive advantage for the land-based hotels. *See also* PX 14 (Bar Harbor overnight land-based accommodations); Tr. 13-Jul. at 95-96.

### 5.   The Ordinance Discriminates against Interstate Commerce in Purpose and Effect.

The dormant Commerce Clause forbids the States from engaging in "economic protectionism." *Philadelphia,* 437 U.S. at 624. The Supreme Court has explained that "[t]he clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders." *Id.*; *accord South-Central Timber Development Co.  v. Wunnicke*, 467 U.S. at 100; *see also American Trucking Associations, Inc.,* 545 U.S. at 433 ("This negative command prevents a State from "jeopardizing the welfare of the Nation as a whole" by "plac[ing] burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear") *quoting Oklahoma,* 514 U.S. at 180); accord, *Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 184 (1ˢᵗ Cir. 1999). "This rule is essential to the foundations of the Union." *Granholm v. Heald*, 544 U.S. 460, 472 (2005).

Such legislation is discriminatory because "[n]o state may attempt to isolate itself from a problem that is common to the several states by raising barriers to the free flow of trade."  *Oregon Waste Systems, Inc.*, 511 U.S. at 107 (*citing Hunt,* 504 U.S. at 346 n. 9). The record in this case establishes beyond peradventure that the Ordinance raises such barriers.

### 6.   The Punitive Regime Deters Large Cruise Ship Visits.

The Ordinance is intended and has the effect of barring large cruise ships from Bar Harbor, thus erecting a local barrier to this form of commerce. That Ordinance's operative standards are: 1) a 1,000-person daily limitation applicable every day of the year, and 2) singling out of persons disembarking from large cruise ships as the only persons subject to this exclusionary limitation.[25] Driving these standards is a punitive regime, which is imposed solely on the Pier Owners and made a condition—by means of a Town-issued permit—for them to operate the piers.[26]

In considering the Ordinance's effect, it should be clear that the sanction it would impose on the Pier Owners is not a fee or a toll—it is a fine.  PX 210 (§125-77(H)(4)). As Harbormaster and police Lieutenant Christopher Wharff testified, fines are intended to deter prohibited conduct; here, the disembarkation and entry into Bar Harbor of all persons arriving by cruise ship. *Id. See also*, Tr. 13-Jul. at 38.

As Defendant-Intervenor Sidman explained, by his own calculations, had the Ordinance been enforced against the cruise ship visits that were covered by the Ordinance's retroactivity clause and had they disembarked their full lower berth capacity, the Town could have imposed as much as $4,000,000 in fines against the Pier Owners. Tr. 13-Jul. at 310:16-25, 311:1-11. But, if anything, Mr. Sidman's estimate was conservative because he assumed that the $100-per-person fine was constant for each disembarking person above 1,000, which it clearly is not. To the

---

[25]     It bears special emphasis that the Ordinance's object is persons—that is, human beings.  There is no suggestion that, because the individuals come into Bar Harbor from cruise ships they pose special, identifiable health or safety threats or are inherently "noxious." *Cf. Hunt*, 504 U.S. at 347 (citing *Philadelphia,* 437 U.S. at 629) (state police power to regulate "noxious articles"); *see also Huron Portland Cement,* 362 U.S. at 441-442 (restrictions on vessel's impact on air quality); *Portland Pipe Line v. City of South Portland.* 332 F. Supp. 3d 264, 278-279 (D. Me. 2018) (restrictions on facilities tied to importation of petroleum products). Indeed, Mr. Sidman, himself, admitted that he could not tell the difference between persons disembarking from cruise ships and other persons. 13-Jul. at 308:7-24.

[26]     In a December 15, 2022 Memo to Chief of Police Willis, Lt. Wharff advised that he interpreted the Ordinance's permit provision as requiring the Pier Owners to obtain a municipal permit "for a specific ship, on a specific date and time, for a specific location and a certain number of passengers." PX 66.001.

contrary, as previously discussed, the disembarkation of each person above the 1,000-person limit is expressly defined as a "specific violation" under 30-A MRS § 4452(3)(B). This means that, the greater the number of persons disembarking over the 1,000-person ceiling, the greater would be the Pier Owners' exposure under Section 4452(3)(B)'s escalating fines which, conceivably, could reach $5,000 for each disembarking person. Given the passenger and crew capacity of large cruise ships, if all persons (passengers and crew) disembarked a given ship, crossed the piers, and entered into Bar Harbor, the fines imposed on the Pier Owners could reach staggering proportions.[27]

Plainly, the Ordinance was intended to strongly encourage the Pier Owners to adhere to and cooperate in the enforcement of the 1,000-person daily limit. The ineluctable conclusion is that the Ordinance means what it says: if its validity is upheld and if it is enforced, in no single calendar day will more than 1,000 persons disembark from a cruise ship and enter the Town.

The Supreme Court has held that under the Commerce Clause a "State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Hunt*, 504 U.S. at 341. Yet the Ordinance does just that. Although it would impose a fine rather than a tax, this is a distinction without a difference. The "incident" that triggers the Ordinance's fine is the entry of a cruise ship passenger or crew member, necessarily coming to Bar

---

[27]    Although not part of this legal challenge, there is a serious question as whether the Pier Owners could lawfully prevent a disembarking person from landing at a pier and entering into Bar Harbor by denying admission to that person and, if that person persisted. Tr. 13-Jul. at 37:18-25-41:1-23, 45:14-24,46:1; 17-A MRS § 402(1)(D) (criminal trespass); See also *State v. Tauver*, 461 A.2d 1065, 1067-1068 (Me. 1983) (owner of property which public is invited to enter must have "some justification"). First, it is an incontestable legal fact that, but for the Ordinance, under the laws of the United States and the State of Maine all disembarking persons would be lawfully entitled to cross the pier and enter into Bar Harbor.  This being so, does the 1,000-person daily limit provide the requisite "justification" under *Tauver* for the Pier Owners to bar all such persons from their otherwise public property? Even more pointedly, would it empower them to use force to prevent a noncompliant person from entering? This is a serious question for the Town, too, as the Pier Owners could ask for police assistance to cite such persons for criminal trespass or even arrest them. At trial, Lt. Wharff initially testified that the refusal of a disembarking person to comply with the Pier Owners' instruction not to enter Bar Harbor would be constitute a criminal trespass.  Tr. 12-Jul. at 37:18-25-41:1-23, 45:14-25-46:1.  Later, when asked whether the Pier Owners could restrain such a person, Lt. Wharff advised that he would need legal guidance on that point. Tr. 12-Jul. at 45:14-25-46:1.

Harbor by means of either interstate or foreign commerce entering Bar Harbor. By contrast that same person, if entering Bar Harbor by land would face no impediment whatsoever.  Thus, the Ordinance, "overtly blocks the flow of interstate commerce at a State's borders," a restriction which the Supreme Court has described as "the clearest example" of prohibited discriminatory legislation.  *Philadelphia,* 437 U.S. at 624; *accord Wunnicke,* 467 U.S. at 100.

### 7.  If Held Valid and Enforced the Ordinance will cause Cruise Ships not to visit Bar Harbor.

Well before the Ordinance's adoption, the cruise lines had clearly informed Town officials of certain aspects of their operations which required the Town's accommodation and, without which, the cruise lines could not continue their visits to Bar Harbor.  The cruise lines made their positions clear in a series of letters beginning July 30, 2021 and ending December 15, 2021 from their umbrella trade association, CLIA. PX 211-213.

In its July 30 letter, CLIA explained that "the scheduling of cruise port calls is a complex, multi-party process involving not only arrangements for the vessels, themselves, but also contractual commitments to and arrangements with vendors, suppliers, and service providers." PX 211.  In a letter dated December 15, 2021, CLIA addressed a proposal from a Town Councilor that no more than 70 percent of the lower berth capacity of each cruise ship be permitted to enter into Bar Harbor. PX 213.  CLIA explained that cruise ships simply could not operate under such a restriction saying, "CLIA members are not in a position to choose which passengers are allowed to disembark at a destination." *Id.*

In the days leading up to the November 8, 2022 vote, Ms. Flink prepared an analysis of the effect that the Initiative would have on visits by cruise ships and cruise ship passengers which she "co-produced" with the Town and which were set forth in a circular to be distributed to the voting public.  PX 195 at 54, 56 (Flink). Ms. Flink made it clear that she, herself, was "entirely

responsible" for the numbers calculating the termination of large cruise ship visits that the Initiative would cause.[28] PX 195 at 52 (Flink).   Ms. Flink reviewed PortCall reports for 2021 and 2019 and simply removed all cruise ships with a passenger capacity greater than 1,000. PX 195 at 52-53, 83-84(Flink). The Town issued a flyer to Bar Harbor voters which included Ms. Flink's calculations as well as the cruise ship passenger reductions under the MOA.  PX 162, DX 471.  PX 195 at 54-55 (Flink).

After the Ordinance was enacted, Ms. Flink, checking with Harbormaster Wharff, tried to assess the Ordinance's impact on the 2023 and 2024 cruise ship seasons.[29] PX 195 at 57 (Flink). She concluded that, for the 2023 season, the Ordinance would bar 40 cruise ships with a lower berth capacity of 48,892 passengers. PX 162, PX 195 at 61 (Flink). For the 2024 season, the Ordinance would bar 38 ships with a total passenger capacity of 79,869.  PX 162, PX 195 at 51 (Flink).

Paul Grigsby of Holland America testified that Holland America's cruise ships had been calling at Bar Harbor longer than he had been with the company—more than 23 years. *See* PFF 58. He said that the passenger capacity of all of Holland America's cruise ships exceed 1,000 passengers. PFF 274.  Addressing the Ordinance's impact on Holland America's bookings, he said, "[t]he ordinance as it stands now would dissuade me from calling Bar Harbor." PX 191at 12 (Grigsby); see also PFF 280.

---

[28]   Ms. Flink testified that the assumption on which she relief in conducting her analysis—that, if enforced, the Ordinance would cause large cruise ships no longer to visit Bar Harbor—was based on her own knowledge of cruise line business practices and the CLIA letters to the Town Council. In addition, she also spoke with representatives of Royal Caribbean, Holland America, and Norwegian Cruise Lines who confirmed to her that if the Ordinance were enforced, they would not come to Bar Harbor. PX 195 at 41, 51-52, 80-81(Flink).

[29]   The Ordinance was made retroactive to March 16, 2022.  PX 210 (Article VII, Chapter 125, § 125-77(H)(5).  All cruise ship applications that had been held in abeyance pursuant to the July 21, 2021 Town Council order were subject to the Ordinance's 1,000-person per day limit. Therefore, those post-July 1, 2021 applications that the Town had accepted under the MOAs were excluded. PX 195 at 61-65 (Flink).

Chris Martin, also of Holland America, was more emphatic saying that, even though Bar Harbor "carries a lot of value with our cruise passengers," if subjected to a 1,000-person limit, Holland America would not call on Bar Harbor. PX 193 at 4(Martin); *see also*, PFF 280, 290. He agreed that "it would not be acceptable for [Holland America] to schedule port calls where it could not disembark all its passengers." *Id.* He explained that "we need to be able to offer our passengers, every passenger onboard, the ability to debark at any port of call." *Id.*

Juan Kuryla of Norwegian Cruise Lines Holdings testified that the capacity of all of Norwegian's 18 cruise ships exceeded 1,000 passengers. PX 192 at 02-03 (Kuryla); *see also* PFF 280, 290. He added that such vessels required large crews, advising that a vessel with a capacity of 4,000 passengers would have a crew of 1,500 to 1,600. *Id.*; PX 192 at 03 (Kuryla). Mr. Kuryla confirmed the CLIA letters' emphasis on the lead time required to set itineraries, saying that scheduling Norwegian itineraries requires advance planning of two years or more. PX 192 at 9(Kuryla); *see also* (ECF 137, ¶ 23). He said that, for Norwegian, the Ordinance's 1,000-person ceiling was "untenable." PX 192 at 13(Kuryla). Mr. Kuryla explained the Ordinance "creates issues with our marketing" and with "guest satisfaction" as well as presenting issues of logistics and "fairness." When asked about fairness, he discussed how Norwegian could not pick "winners and losers." PX 192 at 13-14 (Kuryla). Mr. Kuryla said in planning its itineraries, Norwegian acts on the assumption that "all passengers should be able to go ashore." PX 192 at 14(Kuryla). In sum, he confirmed that, for Norwegian, the Ordinance's limit was "disqualifying." PX 192 at 14(Kuryla). No witness contradicted this testimony.

Mr. Goldstein put the Ordinance's passenger limitation into a broader context. He said that "[m]ost cruise ships do roundtrip cruises starting at point A, ending at point A, visiting other ports in between." Tr. 12-Jul. at 168. He added that "[t]he ports of call are vital to the cruise industry.

Over decades of consumer research, if you ask customers what's important to them, the first thing they want to know is where is this going to go." *Id.* at 169. He confirmed that the disembarkation of passengers at each port of call was "essential to having a destination experience that you can get on and off the ship"; describing it further as a "core function." *Id.* Mr. Goldstein testified that, in his 30 years of experience in the cruise industry, Royal Caribbean had never marketed a port visit with the caveat that some, but not all, passengers could disembark nor was he aware of any other cruise lines doing so. *Id.* at 182-183; see also PFF 290. He said that any such marketing program by a cruise line would have resulted in decreased sales. *Id.*[30]

The cruise ship executives' testimony was consistent with the pre-Ordinance CLIA letters and Ms. Flink's pre-enactment discussions with cruise ship lines. Undergirding their testimony was the plain fact that people pay for transport from one point to another and the inability to disembark frustrates the core purpose of the trip. The Supreme Court has recognized this essential element of waterborne transport of persons saying, "[t]he transportation of a passenger from Liverpool to the city of New York is one voyage. It is not completed until the passenger is disembarked at the pier in the latter city. A law or a rule emanating from any lawful authority, which prescribes terms or conditions on which alone the vessel can discharge its passengers, is a regulation of commerce; and, in case of vessels and passengers coming from foreign ports, in a regulation of commerce with foreign nations." *Henderson v. Mayor of New York*, 92 U.S. 259, 271 (1875); *see also Doe v. Celebrity Cruise Lines, Inc*., 394 F.3d 891, 901 (11th Cir. 2004).

### 8. The Ordinance Discriminates against Interstate Commerce in Its Purpose.

---

[30]     Although not a defense to the Ordinance's constitutionality, it bears emphasis that the cruise line representatives also testified that the cruise lines would not assume all or even some of the fines the Ordinance would impose on the Pier Operators. PX 193 at 6 (Martin), PX 192 at 14-15 (Kuryla). When asked whether a cruise line would pay some or all of a vendor's fine, he responded, "[i]t would not happen," adding that in his experience, "that never happened." Tr. 12-Jul. at 184.

The Ordinance, then, discriminates against interstate and foreign commence in its effect. By itself, this shows that, on its face, it discriminates in violation of the Commerce Clause. *Maine v. Taylor*, 477 U.S. at 138.   There is, however, abundant evidence in the record that the Ordinance's exclusionary effect was purposeful.

In a February 16, 2022 e-mail to supporters, Mr. Sidman flatly stated that the Initiative's 1,000-passenger per day limit would bar ships with capacities greater than 1,000 passengers, listing Oceana Pax Vista (1,200 passengers), Zaandam (1,718 passengers), and Norwegian Escape (5,218 passengers) among those that would be "disallowed." PX 72. [31] Mr. Sidman returned to this theme in a March 17, 2022 e-mail to Lincoln Millstein in which he again listed those cruise ships that would be "allowed with the cap at 1,000/day" and those that would be "disallowed."  DX 357. Here he confirmed the Initiative's self-evident purpose: "[s]o, we're only getting rid of the biggies."  DX 357.[32]

On April 13, 2022, writing to then-Town Manager Kevin Sutherland, Mr. Sidman was more circumspect. He explained that the Ordinance "would not per se limit ships from anchoring in our waters," but predicted that it would "likely reduce the motivation to do so since only 1,000 persons in total per day will be allowed to disembark without substantial additional revenue penalties being paid to the Town directly by the property owners involved."  PX 240.

At trial, when discussing large cruise ships, Mr. Sidman's bluntly stated that he did "not believe they should be coming to Bar Harbor"; he allowed that he was "not against them sailing the seas."  Tr. 13-Jul. at  304:4.  It is evident, then, that the insuperable wall that the Ordinance, if

---

[31]    At that point, the limit on disembarkations per day was limited to 1,000 "passengers." This was later changed to 1,000 "persons" to ensure the inclusion of cruise ship crew who might also disembark.  DX 249, 401, Tr. 13-Jul. at 321.

[32]    In a related series of e-mails in March of 2022 in which led to the word "passenger" being struck from the Ordinance and replaced by "persons," Mr. Sidman also discussed the Initiative's exclusionary purpose, ensuring that it applied to crew members as well as passengers. *See also*, PX 209, 213, 230, 237.

held valid and enforced, would raise above Bar Harbor to large cruise ships is fully consistent with and in the Ordinance's service to Mr. Sidman's personal convictions.

The practical effect of the Ordinance—that one may travel by cruise ship to Bar Harbor but may not disembark—is comparable to the New York law which the Supreme Court characterized as "[t]he importer…may keep his milk or drink it, but sell it he may not." *Baldwin v. G.A.F. Seelig*, 294 U.S. 511, 521 (1935); *see also* Tr. 13-Jul. at 327:7-25,328:1(on driving to Bar Harbor and parking but being unable to emerge from one's car).

Because the Ordinance discriminates on its face against interstate commerce, the Town (and the Ordinance's co-author, Mr. Sidman) bear the burden of showing that the Ordinance serves a legitimate local purpose' *and* that the purpose could not be served as well by available nondiscriminatory means." *Taylor*, 477 U.S. at 138 (*quoting Hughes*, 441 U.S. at 336). Therefore, a thorough assessment is warranted of the evidence bearing on the two primary elements of the Ordinance: 1) the year-long 1,000-per-per-day limit on disembarkations by persons arriving in Bar Harbor by cruise ship, and 2) the Ordinance's application of this limitation solely to such persons as opposed to all persons arriving in Bar Harbor by all other means of conveyance.

The Ordinance was not accompanied by legislative findings. PX 210. Nor was any evidence adduced at trial that the enactment of the Ordinance was preceded by any extensive public inquiry or based on any formal assessments of the assertedly adverse impacts that cruise ship visits have on Bar Harbor. (Tr. 13-Jul, *passim*). In these respects, the Ordinance differs markedly from that at issue in this Court's consideration of the *Portland Pipe Line* case. *Cf. Portland Pipe Line Corp.*, 332 F.Supp.3d at 283, 310 (the City made "a series of legislative findings"; the City made "lengthy legislative findings").

The only conceivable source attempting an explanation for the Ordinance is the "Purpose" section appended to the citizen initiative. PX 237.[33] This part of the Purpose section asserts:

> The unchecked and continued influx of cruise ship passengers in the downtown area jeopardizes the Town's ability to deliver services to Town residents and visitors (for example cruise ship passengers), including the provision of public safety services (police and fire), emergency medical services (EMS), inpatient and outpatient services at local hospital, pandemic control measures, and other public sanitation services, and also impacts the ability of local shops, restaurants, and other businesses to attract and serve customers.

PX 210; *see also* Tr. 13-Jul. at 314:1-25, 317:4.[34]

Mr. Sidman "directed the drafting and editing" of the Purpose section.  PFF 17, 18.  When asked whether in drafting the assertion that cruise ship passengers have placed the provision of police and fire services, including EMS services, in jeopardy, or whether he had consulted with the police department or the EMS services division of the fire department, Mr. Sidman answered that he did not. Tr. 13-Jul. at 318:4-16. He added that he did not do so because "I didn't believe it was necessary to consult with them." *Id.* When pressed further on the relevance of the actual experience of the police and fire departments on whether cruise ship passengers jeopardized their ability to provide services to the community, Mr. Sidman answered that he did not ask them about their actual experiences because "it was not pertinent" to the assertions the Purpose section. Tr. 13-Jul. at 318:19-23.

---

[33]    The Purpose section referred to the 2021 Pan-Atlantic Survey.  PX 237; *see also* PX 204-0002.  On direct examination, Mr. Sidman was asked whether that survey "contributed to not setting the limit of cruise ship passengers at zero" and answered, without elaboration, "[i]t was one of the factors, yes."  Tr. 13-Jul. at 271:25.

[34]    The Purpose portion of the Initiative was apparently drafted before the wording of the Initiative, itself, was changed to remove "cruise ship passengers" and "passengers" and replace those references with "persons."  It appears as though the wording of the Purpose section was not changed to reflect this change.

As discussed below, Police Chief James Willis, Fire Chief Matt Bartlett, Harbormaster and police Lieutenant Christopher Wharff, and former Town Councilor Paul Paradis directly contradict the Purpose section's allegations about the risks cruise ship visits pose to the Town.

Chief Willis testified that he had been on the Bar Harbor police force since 2009.  PX 197 at 104(Willis). In his experience, he denied that cruise ship passengers had "drawn uniquely on police services as opposed to persons arriving in Bar Harbor form other means of conveyance." PX 197at 133 (Willis).  Nor could he think of a single instance in which, because of a cruise ship, Bar Harbor police had delayed service to anyone needing assistance or had to render police services because a cruise ship was visiting. PX 197at 142-144 (Willis). He concluded by denying that cruise ship passengers jeopardized the Police Department's ability to provide a secure environment for Bar Harbor. PX 197at145-146 (Willis).

Fire Chief Bartlett flatly denied that cruise ships put "further strain" on the Fire Department. PX 197 at 6 (Bartlett). He acknowledged that, at times, the Fire Department had responded to calls from "the piers," but estimated those calls at about 35 a year compared to a total of 1,500 to 1,600 calls annually. PX 197 at 11(Bartlett). He denied that there had ever been any circumstance in which "crowds of people" had prevented EMS from providing assistance in Bar Harbor. PX 197 at 10 (Bartlett). Chief Bartlett said that, during his tenure with the Fire Department he has seen an increase in tourism but was unable to differentiate the contribution to cruise ships as opposed to other kinds of tourism made to that increase. PX 187 at 9.

Harbormaster and police Lieutenant Christopher Wharff testified that his police responsibilities included managing the progress of persons disembarking from cruise ships to tour buses or into Bar Harbor. He testified to recent improvements in the management of the tour buses, Tr. 13-Jul. at 34-35, and when asked whether those improvements had enhanced the safety of

pedestrians and persons in vehicles, he responded: "I think the safety of persons was never an issue before so I don't…I don't see that there was any improvement there. I think it was always at its highest level." Tr. 13-Jul. at 35; *see also*, Tr. 13-Jul. at 56.

Finally, Paul Paradis testified that at no point during his long tenure on the Bar Harbor Town Council, including his service on the Cruise Ship Committee, did any Town officers report that the presence of cruise ship passengers in Bar Harbor had jeopardized the delivery of municipal services. Tr. 12-Jul. at 55-56.

In addition to the assertions that cruise ship passengers "jeopardized" the Town's ability to provide police, fire, and EMS services—all of which Chief Willis, Chief Bartlett, and Lieutenant Wharff rejected—the Purpose section also asserted that cruise ship passengers jeopardized "in-patient and out-patient services at local hospitals, pandemic control measures, and public sanitation services." PX 210. The trial record, however, is devoid of even a shred of evidence supporting these assertions.[35, 36]

This leaves only the Purpose's contention that cruise ship passengers "also impact[] the ability of local shops, restaurants, and other businesses to attract and serve customers." PX 210. Here, again, the evidentiary cupboard is bare. The only evidence of a business adversely affected by cruise ship passengers and crew provided by Mr. Sidman provided was his own. Mr. Sidman testified that he has operated an art gallery in Bar Harbor—Argosy II—which is currently located at 6 Mount Desert Street but which, for 28 years, also operated from 110 Main Street. He testified

---

[35]     The provenance of the Purpose's contention regarding in-patient and out-patient services is discussed below.

[36]     Mr. Sidman testified that the Purpose's assertion that cruise ship passengers jeopardized "public sanitation services" referred to "several municipal restroom facilities" which are available year-round but which "in the summer [are] overused. They get out of supplies. They fill up with trash. Ther are lines. It's a mess." Tr. 13-Jul. at 270:5-10. Mr. Sidman did not testify that he had ever brought these conditions to the attention of responsible municipal officials, nor, by his testimony, did he explain how cruise ship visitors uniquely or distinctly contributed to the conditions he described. Tr. 13-Jul.*, passim*.

that he closed the 110 Main Street store because "it just became too stressful and obnoxious taking customers from one location to another.  Fighting through the crowds."  Tr. 13-Jul. at 259: 19-21. He added that "we are told by our customers time and time again that they will not come into town and into our business on a cruise ship day," Tr. 13-Jul. at 261:25-262:1, and that 2021—the year COVID-19 restrictions barred any large cruise ships from visiting Bar Harbor—Argosy II had had its "best year ever." Tr. 13-Jul. at 261:10-11.

Yet, on cross-examination, Mr. Sidman equivocated in his testimony. He acknowledged that on the "landing page" to Argosy II's website, it touted its 2022 season, which coincided with the return of cruise ships to Bar Harbor, as having been "another splendid season" which was "tantalizingly close to last year's record." Tr. 13-Jul. at 300-310; PX 236 at 13. Moreover, Mr. Sidman identified no other Bar Harbor business that had, as alleged in the Purpose section, experienced "impacts" (presumably adverse) due to cruise ship passengers.[37] Tr. 13-Jul., *passim.*

In stark contrast to Mr. Sidman's uncertain claims about the adverse impact that cruise ship visits have on Argosy II, testimony abounds that cruise ship visits benefit the business community and do not impede their ability to serve their patrons.  *See*, *supra* at 12, n. 16.

When asked open-ended questions about the pedestrian risks cruise ship passengers caused, Mr. Sidman pointed to sidewalk widths, sidewalk benches, "ice cream lobsters," and "stick-out porches" which, "if you don't see it, you're going to fall over." Tr. 13-Jul. at 256:4-15. Describing his own "safety concerns attributable to the crowds," Mr. Sidman listed "tripping, particularly, or

---

[37]    Though lacking any support from responsible Town officials for the Purpose section's assertions and having offered threadbare and ambivalent evidence as to the effects of cruise ship visits on his own business, Mr. Sidman was not without recourse. Although by his own admission, he had logged 80,000 hours observing pedestrian traffic in Bar Harbor, this sustained experience which would seem to have produced a wealth empirical observations, yielded no support for the Purpose section's contentions. Tr. 13-Jul. at 317-318. Mr. Sidman admitted that at no time had he witnessed a circumstance where the presence of pedestrians on Bar Harbor's sidewalks—whether on a cruise ship day or not—had jeopardized the provision of police services. *Id.*

when I am accompanying people, or customers, or when I'm carrying materials, boxes, paintings, et cetera, and going out into the streets. It's always a risk." Tr. 13-Jul. at 256.  He did not testify, however, to any specific incident in which, whether because of the presence of cruise ship passengers or "crowds" in general, he had tripped, much less fallen.[38] Tr. 13-Jul*., passim*.

Moreover, Mr. Salvatore's testimony as well as the Captain's Logs for the tender vessels showed that cruise ship passengers and crew do not simply disembark all at once and enter Bar Harbor. Rather, they are ferried in by the tender vessels, often with significant intervals between each trip. PX 200, 201.

In addition, at the request of the Town, Dr. Gabe evaluated the impact that a very large cruise ship—larger than those allowed under the voluntary caps—would have on pedestrian traffic. *See* Tr. 12-Jul.215:5-25, 216-227:14; DX 319. The event chosen was the visit of the Anthem of the Seas, with a lower berth capacity of 4,180 passengers, to Bar Harbor on August 27, 2018. Tr. 12-

---

[38]    Mr. Sidman did, however, seek to document the pedestrian congestion which concerned him and was the implicit focus of the Initiative's Purpose. So, on June 22 and 25, 2023, he went to Main Street in Bar Harbor and took photographs. Tr. 13-Jul. at 252; DX 503-505. Mr. Sidman said that he took the photograph identified as Exhibits 503, 504, and 505 on June 22, 2023 when the Norwegian Pearl was visiting Bar Harbor. He said that Exhibit 503 depicted a part of Main Street and the adjacent sidewalk and that that was a "hot spot" because it was in front of an ice cream shop. Tr. 13-Jul. at 254, 309. He said that the area depicted in Exhibits 504 and 505 were not "hotspots." Asked whether Exhibit 503, showed "typical congestion in Bar Harbor on a cruise ship day," he responded, "[w]ell, it's substantial. It would be meaningful to someone trying to walk purposefully". Tr. 13-Jul. at 253. On direct examination, Mr. Sidman had no comment for Exhibit 504 except that it did depict a "hot spot"—the sidewalk in front of an ice cream store. Tr. 13-Jul. at 254.
    Mr. Sidman testified that he took the photograph marked Exhibit 506 three days later on June 25. Tr. 13-Jul. at 255. He did not identify the location depicted in the photograph but noted that it revealed "the only way you could tell a cruise ship passenger" because "the gentleman with the walker" had an I.D. tag. *Id*. Mr. Sidman's counsel moved Exhibits 502-505 into evidence, but not Exhibit 506.
    On cross-examination, Mr. Sidman acknowledged that he could identify only one person in Exhibit 506; that was the man with the walker and the I.D. Tr. 13-Jul. at 306-307.  As for the people depicted in Exhibits 503 through 505, Mr. Sidman was unable to say whether any of them were or were not cruise ship passengers. Tr. 13-Jul.  at 308-310.  Mr. Sidman was also shown video footage of Main Street from Exhibit 84, captioned "June 22, 2023, 1:151 P.M. looking west" the day the Norwegian Pearl was in town. Tr. 13-Jul.  at 324-330. He advised that video showed a corner where "there could be congestion." Tr. 13-Jul. at 326.

Jul.at 223:8-12, 226:11-13. Dr. Gabe prepared for this assessment by walking the streets of Bar Harbor for a period of 66 days and noting his observations and eventually publishing a peer-reviewed report entitled "Measurement and analysis of neighborhood congestion: Evidence from sidewalk pedestrian traffic and walking speeds" in Growth and Change in June of 2020.[39]  DX 319; *see also* DX402 (PowerPoint).

Dr. Gabe summarized his report with a slide showing the following: 1) with average sidewalk "congestion"—one could walk a distance of 100 feet in 20.04 seconds; 2) on August 27, 2018, with no cruise ship in port the average time to walk that same 100 foot distance was 22.00 seconds); and 3) on August 27, 2018, with Anthem of the Seas in port, the average time to walk that same 100 feet rose to 24.8 seconds. DX 402 at 18. Thus, with the larger-than-allowed Anthem of the Seas in port and its passengers and crew walking Bar Harbor's sidewalks, 4.4 seconds was added to the time needed to walk this 100-foot walk on an "average congestion" day and only 2.08 seconds were added to the time required to walk that distance on the day Anthem of the Seas arrived, but before any persons had disembarked. DX 402 at 18, *see also* Tr. 12-Jul.215:5-25, 216-227:14.

Dr. Gabe's pedestrian study and testimony are fully consistent with the video recordings of pedestrian traffic on Main Street in Bar Harbor during the June 22, 2023 visit of the Norwegian Pearl. *See* PX 83-86. *See also* Tr. 13-Jul. at 324-329.

**9.   The Ordinance does not serve a legitimate local purpose.**

It is evident that the Initiative's Purpose sought to invoke the Town's police powers. The Supreme Court has recognized that state and local police powers are among the "residuum" of

---

[39]     At trial, Prof. Gabe explained that he used the word "congestion" as "shorthand for the number of people that you would encounter on a sidewalk per one hundred feet" and that he did not for it to indicate an "overabundance of people."  Tr. 12-Jul. at 261.

powers these governments retain and may exercise, subject to the constraints of the Commerce Clause. *See e.g., Taylor*, 477 U.S. at 151-152; *Huron Portland Cement Co.,* 362 U.S. at 447-448; *Tart v. Commonwealth of Massachusetts*, 949 F.2d 490, 500-501 (1st Cir. 1991); *Portland Pipe Line Corp*, 332 F. Supp. 3d at 308-314. At the same time, on several occasions, the Supreme Court has struck down local laws that were based on reserved police powers. *See* e.*g., Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. at 780-781 (collecting cases). Therefore, the evidence adduced at trial bearing on the Purpose Section's assertions must be closely examined.

It bears emphasis that whether a state statute or local ordinance serves a legitimate local purpose, the reviewing court must conduct its own analysis of and may not defer to a state or local government's explanation of and justification for the law at issue. *Hughes*, 441 U.S. at 336; *Lacoste v. Louisiana, Department of Conservation*, 263 U.S. 545, 550 (1924). If an attempted justification lacks substance, it will fail. *Hunt,* 504 U.S. at 343 ("But only rhetoric, and not explanation, emerges as to why Alabama targets only interstate hazardous waste to meet these goals."); *see also Brimmer v. Rebman*, 138 U.S. 78, 84 (1891) ("although avowedly enacted to protect its people against the sale of unwholesome meats, has no real or substantial relation to such an object, but, by its necessary operation, is a regulation of commerce beyond the power of the state to establish."). Nor will characterizing a law as a particular type of law—here a "land use ordinance"—save it from such scrutiny. *See Camps Newfound/Owatonna, Inc.,* 520 U.S. at 574 ("real estate tax" burdened interstate commerce). As the Supreme Court observed, "the evils of protectionism can reside in legislative means as well as legislative ends." *Hughes,* 441 U.S. at 337.

Therefore, if "a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relationship to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge,

and thereby give effect to the Constitution." *Tennessee Wine and Spirits Association v. Thomas,* 139 S.Ct. at 2464 (quoting *Mugler v. Kansas,* 123 U.S. 623, 661 (1887)). Thus, the trial record must be searched for support or lack thereof of evidence justifying the year-long, 1,000-person daily disembarkation limit and the Ordinance's imposition of this limitation on such persons and on no other persons arriving in Bar Harbor by all other means of conveyance. As discussed above, no Town official responsible for the oversight of the departments providing the services allegedly "jeopardized" by cruise ship passengers provided any support for those assertions. Nor, as also has been seen, did Mr. Sidman, himself, provide any focused testimony supporting them.

There is, however, an explanation for this lack of substantial evidentiary support—that is, that the Ordinance's reliance on the police power was pro forma—more in the nature of a legalistic incantation, than a studied and intentionally-supported invocation of and reliance on this well-recognized source of local authority.

To begin with, Mr. Sidman, himself, testified that many among his core of supporters were motivated by cruise issues entirely unrelated to pedestrian traffic such as "environmental issues or social justice issues" whereas, for his part, "[m]y own personal priority was the congestion and the access issue." Tr. 13-Jul. at 264:17-18. Among his supporters was Arthur Greif, whom he credited with assisting in writing the Purpose section. Tr. 13-Jul. at 267:10-14; *see also*, 2 Tr. 13-Jul. at 263:2-5. The evidentiary record fully supports Mr. Sidman on this point. On March 12, 2022, Mr. Sidman wrote to his informal group of Initiative supporters and circulated a draft of the Purpose section. DX 412.   The next day, Arther Greif responded recommending the insertion of two phrases. *Id*.  First, he recommended the phrase "municipal services to Town residents (including cruise ship Passengers) such as the provision…." Second, he recommended the insertion,

following the reference to "(EMS)" of "in-patient and out-patient services at local hospitals, pandemic control measures." Id.

Mr. Greif explained why these additions were important saying, they would "buttress the LUO [Land Use Ordinance] against legal challenges" by "strip[ping] away the residents only impact language and strengthen[ing] the health concerns." *Id.* He reinforced the importance of these recommendations by explaining "[i]n the early 20th century, the US Supreme Court allowed New Orleans to bar ships that had passed a quarantine inspection down-river because of a yellow fever outbreak. That is still good case law."[40] *Id.* Later that day, Mr. Sidman wrote back acknowledging his receipt of Mr. Grief's note. *Id.* The Purpose as finally appended to the Initiative shows that Mr. Greif's recommendations were accepted and incorporated in full. PX 237.[41]

The Town, and more strikingly, the author of the Purpose section and the Ordinance's most prominent supporter, Mr. Sidman, failed to produce a scintilla of evidence that cruise ship passengers (or cruise ship crews for that matter) were jeopardizing Town infrastructure, the provision of Town services, hospital operations, pandemic control measures, or impacts to the public and business. That is because no such proof exists. Nearly 90 years ago, the Supreme Court warned against such machinations. In arresting language summarizing Commerce Clause jurisprudence, the Court said, "[t]he decisions…show that a state cannot avoid the operation of

---

[40]     It appears that Mr. Greif was likely referring to *Louisiana v. Texas*, 176 U.S. 1 (1901). In that case, Louisiana challenged a Texas law barring persons coming to Texas from New Orleans because of an outbreak of yellow fever there. The Supreme Court concluded that it lacked jurisdiction over Louisiana's claim and dismissed the case without reaching the merits. 176 U.S. at 22-23.

[41]     This part of the Purpose section with Mr. Grief's additions is set forth in bold is as follows: "The unchecked and continued influx of disembarking cruise ship passengers in the downtown area jeopardizes the Town's ability to deliver **municipal services to Town residents and visitors (**for example **cruise ship passengers)** including **the provision** of public safety services (police and fire), emergency medical services (EMS). **In-patient and out-patient services at local hospitals, pandemic control measures,** and public sanitation services." PX 237, 412.

this rule by simply invoking the convenient apologetics of the police power." *Kansas City Southern Railway Co. v. Kaw Valley Drainage District of Wyandotte County, Kansas,* 233 U.S. 75, 79 (1914).

In sum, the Town and Mr. Sidman have failed to produce evidence of a legitimate local interest supporting either: 1) limiting the number of persons who may disembark from a cruise ship on a single day to 1,000 for every day of the year, and 2) singling out persons disembarking from cruise ships for this limitation as opposed to all other persons who arrive in Bar Harbor by other means of conveyance. The Ordinance is invalid on its face under the Commerce Clause.

**10. The Ordinance's Purpose could be served by less discriminatory means.**

Although the Ordinance does not serve a legitimate local purpose, assuming for the sake of argument that it does, because it discriminates against interstate and foreign commerce, the Town must demonstrate that it could not achieve the Ordinance's purported Purpose "by available nondiscriminatory alternatives." *Taylor,* 477 U.S. at 151. This it cannot do.

Indeed, the Town's own evidence is to the contrary.  First, from 2008 until 2022, the Town Council annually approved and the cruise lines agreed to voluntary passenger caps. Supra at p. 8. Each annual approval of these voluntary caps by the Town Council constitutes proof that the Town could accommodate these numbers. The Town's reinstitution of the voluntary caps would serve the Ordinance's Purpose and would be a less discriminatory alternative to the Ordinance's 1,000-person, year-round, daily cap. Second, in August of 2022, the Town Council approved and endorsed the Working Group's recommendations for daily (and monthly) caps which were then set forth in the MOA. Upon approval by the Town Council, these caps became Town policy.  PX 197 at 73.

When asked at trial whether the Town Council approved the passenger caps in the MOAs because the Council believed that Bar Harbor could accommodate those numbers of cruise ship

visitors, Council Chair Peacock agreed. She then added, "[l]ike I said earlier, the Town had already been accommodating caps that were higher than that. We were [] proven to be able to do that effectively." Tr. 13-Jul. at 189:13-15. Putting the MOA caps, themselves, in more context, she explained, "I think we were trying to balance not so much just what the [] caps were putting out there in terms of whether the Town can handle it or not, like, logistically or within [] the space of the Town, but whether what we were going to put out there would result in a reduction that felt like a reduction to the Town and the way that the Town was asking us to do."[42] Tr. 13-Jul. at 189: 13-21.

When asked whether the MOA's passenger limits were "reasonable," Council Chair Peacock answered, "I definitely would not have put my name or brought anything forward on a passenger cap that I felt like the Town could not manage to have or do effectively or not do well." Tr. 13-Jul. at 155:6-9. Later she returned to the MOA caps adding, "[s]o when you say 'is it reasonable'? I think—can the Town of Bar Harbor manage this type of visitation? Yes, we can. We have already been doing it." Tr. 13-Jul. at 156:3-5. She then said, "[y]ou heard the harbormaster say that safety has never been an issue. That's Number 1 for me." Tr. 13-Jul. at 156:6-7.

Both the longstanding voluntary daily passenger caps and the MOA caps were approved by the Town Council and constitute formal policy judgment by that body that Bar Harbor can accommodate cruise passengers in these numbers. Of course, neither the voluntary agreement nor voluntary passenger caps are before this Court for adjudication on the merits. Nonetheless, the Court may consider them as Town-approved passenger numbers that would serve the purpose that the Ordinance purports to serve in a manner less burdensome on interstate and foreign commerce than the Ordinance.

---

[42]   In citing the voluntary caps and the MOA caps on cruise ship passengers, Plaintiffs take no position on whether these limitations are the correct limitations.

**11. The Ordinance fails the Pike Balancing Test.**

Assuming, *arguendo*, that the Ordinance is valid on its face, it must be reviewed under the standards set forth in *Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970). Under *Pike*, the Court "must inquire (1) whether the challenged statute regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce." *Hughes*, 441 U.S. at 336 (*citing Pike,* 397 U.S.  at 142). The burden to show discrimination is borne by the party challenging the law; if the challenger does so, "the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hughes,* 441 U.S. at 336 (quoting *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 353 (1977)).

Taking the second factor first, as has been discussed above at length, the Ordinance does not serve a legitimate local interest. Rather than repeat that this brief's analysis of the invalidity of Ordinance's claim to serve a legitimate local interest, that argument is incorporated herein in its entirety by reference.

The Ordinance also fails the third factor—whether the Town has available to it "nondiscriminatory alternatives" which would be "adequate" to serve the Ordinance's purpose. Under *Pike,* the Town bears the burden of proving this point.  Here again, in its argument that the Ordinance is facially invalid, this brief has identified nondiscriminatory alternatives which include the voluntary passenger caps and the MOA passenger caps that are not only available to the Town

but have been approved the Town Council, itself. Plaintiffs incorporate those arguments here in their entirety.

This leaves the first factor—whether the Ordinance is "even-handed" in its application and whether its effects on commerce are only "incidental." As has been seen, the Ordinance is not even-handed because it singles out persons disembarking from cruise ships alone to purportedly remedy conditions to which a vastly larger of number persons—those arriving in Bar Harbor by all means of conveyance other than cruise ships contribute. And, in doing so, the Ordinance (and the evidentiary record in this case) fails to explain how persons disembarking from cruise ships uniquely contribute to those conditions to which so many other persons incontestably contribute as well. The Ordinance is not even-handed under *Pike.*

In addition, the effects of the Ordinance on interstate and foreign commerce are not "incidental." *Hughes,* 441 U.S. at 336; *see also Edgar v. Mite Corporation*, 457 U.S. 624, 640 (1982) ("The Commerce Clause, however, permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited.") (internal citations omitted).

The Ordinance directly bars entry into Bar Harbor of all persons disembarking from cruise ships above the 1,000-person daily cap. That is its express purpose. The Ordinance thus directly regulates the movement of persons traveling in interstate and foreign commerce by cruise ship. Moreover, as the cruise line operators confirmed, due to this restriction on cruise ship disembarkations, if the Ordinance is held valid and enforced, it will prevent large cruise ships from calling at Bar Harbor. Therefore, the Ordinance's effect on commerce is not incidental and it fails all of the *Pike* standards and violates the Commerce Clause.

**12. The Ordinance Violates the Foreign Commerce Clause.**

The Ordinance also discriminates against foreign commerce. The federal government has "exclusive and absolute" authority in matters pertaining to foreign commerce. *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904). This federal supremacy, inherent in the Foreign Commerce Clause and the Foreign Affairs Power and essential in areas of maritime commerce (which is inherently international), leaves little room for state or local action. *See e.g.*, *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000); *United States v. Locke*, 529 U.S. 89, 108 (2000). (recognizing a need for "uniformity of regulation for maritime commerce"); *Kraft Gen. Foods, Inc. v. Iowa Dept. of Revenue and Fin.*, 505 U.S. 71, 79 (1992) ("the Foreign Commerce Clause recognizes that discriminatory treatment of foreign commerce may create problems, such as the potential for international retaliation, that concern the Nation as a whole.").

The Ordinance facially discriminates against foreign commerce. It imposes its arbitrary disembarkation limitation only on the transport of persons by cruise vessel. These cruise vessels operate in foreign commerce and facilitate the international transportation of passengers. Because of Bar Harbor's operational convenience as a Class A port, many of the cruise ships call at Bar Harbor after calling at a foreign port. PFF 120-122, 125.  If enforced, the Ordinance places Bar Harbor off-limits to large cruise vessels—which are primarily foreign flagged—and disrupts the flow of foreign commerce.[43] *See* PFF 299, 376.

---

[43]     The Town does not have the authority to impose its own rules upon the landing of passengers in the United States. *See Henderson v. Mayor of City of New York*, 92 U.S. 259, 273 (1875) ("The laws which govern the right to land passengers in the United States from other countries ought to be the same in New York, Boston, New Orleans, and San Francisco."). The Supreme Court has often found that local laws frustrating the international transportation of passengers violate the foreign Commerce Clause. In *Henderson*, the Court struck down an attempt by New York to require a surety for passengers arriving in New York from foreign countries. 92 U.S. 259. Similarly, in *Chy Lung v. Freeman*, the Supreme Court struck down a California law requiring an examination of passengers arriving from foreign countries upon landing because Congress alone "has the power to regulate commerce with foreign nations: the responsibility for the character of those regulations, and for the manner of their execution, belongs solely to the national government. If it be otherwise, a single State can, at her pleasure, embroil us in disastrous quarrels with other nations." 92 U.S. 275, 280 (1875).

"It is a well-accepted rule that state restrictions burdening foreign commerce are subjected to a more rigorous and searching scrutiny. It is crucial to the efficient execution of the Nation's foreign policy that 'the Federal Government ... speak with one voice when regulating commercial relations with foreign governments." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 100 (1984) (*quoting Michelin Tire Corp. v. Wages*, 423 U.S. 276, 285 (1976)); *see also Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434 (1979).

### D. THE ORDINANCE VIOLATES DUE PROCESS

At this point, it bears emphasis that Plaintiffs are only claiming that **this** Ordinance is unconstitutional.  No constitutional claims beyond **this** Ordinance are here at issue.

The Supreme Court has long recognized that there must be a substantial relationship between the objective of a state or local law and the means the law employs to put that objective into effect. *Brimmer v. Rebman*, 138 U.S. 78, 84 (1891). More recently, it appears that the Supreme Court may have subsumed this standard into its requirement that such laws that burden interstate or foreign commerce must, in the first instance, serve a legitimate local purpose. *See* discussion, *infra*. Independent of the Commerce Clause, however, the Due Process and Equal Protection Clauses broadly require that there be a rational nexus between a law's purpose and standards and the processes that the law would employ to achieve it. *See Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988) (Due Process Clause bars municipal price control law from being arbitrary, discriminatory, or demonstrably irrelevant to the [legislation's] policy").  Thus, "[i]f the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied."  *Nebbia v. New York,* 291 U.S. 502, 516 (1943).

A Due Process review requires an assessment of "whether overall, a program is arbitrary, discriminatory or irrelevant to a legitimate legislative goal." *Vaqueria Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 483 (1st Cir. 2009). *Irizarry* concerned an appeal of a District Court injunction. The *Irizarry* Court upheld the District Court's determination that plaintiffs had shown that they were likely to succeed in proving that there was "no rational nexus between the regulatory scheme established by [the administrative agency] and programs goals." *Id.* at 483. The Court also upheld the District Court's ruling that, at trial, the plaintiff was likely to prove that "the regulatory scheme was "arbitrary, and thus violated due process." *Id.* at 484 (citing *Nebbia*, 291 U.S. at 537).

Although the standards that legislation must meet to survive a due process challenge are low, the Ordinance cannot meet them. First, it imposed a limit of 1,000-person disembarking from cruise ships and imposed that limit for every single day of the year—without variation—even though, through long experience, the Town had determined that the tourist season was variable and that caps on cruise ship passengers should reflect that. Both the voluntary caps and the MOA caps reflected this considered, experience-based reality.

Mr. Sidman acknowledged that the 1,000-person daily limit applied every day of the year including days when no large cruise ships had ever arrived or were ever expected.  Tr. 13-Jul. at 313:1-4. Although he admitted that in May, for example, Bar Harbor did not get a lot of land-based visitors, he had deliberately made the 1,000-person limit uniform and inflexible. Tr. 13-Jul. at 313-314.  Even so, he acknowledged that this rigid limit was "not rigorously defensible." Tr. 13-Jul. at 312:17-22. When asked whether cruise ship visitors arriving in May created "an intolerable pedestrian problem for the Town of Bar Harbor," Mr. Sidman responded, "[w]e just didn't want to get into various limits at different times of the year."  Tr. 13-Jul. at 313:24-25.

By his own testimony, Mr. Sidman acknowledged that the Ordinance's year-long, daily 1,000-person limit was not based on experience. It was, in fact, imposed to serve Mr. Sidman's personal opposition to large cruise ships coming to Bar Harbor and, in keeping with that bias, framed to "keep the biggies out."

The evidence in this case, therefore, establishes that the year-round 1,000-person per day limit on disembarkments from large cruise ships is arbitrary and lacks any rational nexus to its ostensible goal of managing the presence of visitors in Bar Harbor.  It applies as fully in off-season as well as the "shoulder seasons" as it does in the busiest tourist months. The Ordinance violates the Due Process Clause and the Equal Protection Clause. *Irizarry,* 587 F.3d at 483

In addition, the Ordinance is arbitrary in that to address an abundance of persons in public spaces—the vast majority of which on a given day arrive by land—the Ordinance singles out one group—persons disembarking from large cruise ships—and omits everyone else. Moreover, it does so without having produced any supporting evidence that those disembarking from such ships impose any significant, identifiable, and undue burden on the Town's provision of essential municipal services.  The Ordinance's singular focus on visitors from large cruise ships to the exclusion of all others is discriminatory. *Id.* at 583. It is also arbitrary and bears no rational, demonstrable purpose to the Ordinance's purported goal. For these reasons as well, it violates the Due Process Clause and Equal Protection Clause. *Pennell*, 485 U.S. at 11*, Irizarry,* 587 F.3d at 483-848.

## V.    CONCLUSION

For all the foregoing reasons, the Plaintiffs respectfully request that the Court enter judgment in favor of the Plaintiffs on all claims, enter a declaration that the Ordinance violates the

United States Constitution, and enter a permanent injunction forbidding the Town from enforcing the Ordinance.

Dated this 2nd day of September, 2023.

Respectfully submitted,

*/s/ Janna L. Gau*

Timothy C. Woodcock, Bar #1663
P. Andrew Hamilton, Bar # 2933
Patrick W. Lyons, Bar #5600
Janna L. Gau, Bar #6043

**EATON PEABODY**
80 Exchange Street
Bangor, ME 04402-1210
(207) 947-0111
twoodcock@eatonpeabody.com
ahamilton@eatonpeabody.com
plyons@eatonpeabody.com
jgau@eatonpeabody.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of September, 2023, I caused the foregoing document to be served upon all counsel of record via email.

/s/Janna L. Gau