## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS**, *et al.*,  ) ) ) | |
| Plaintiffs,  ) ) | |
| **PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION**,  ) ) ) | |
| Plaintiff-Intervenor  ) ) | |
| v.  ) ) | Civil Action No.1:22-cv-416-LEW |
| **TOWN OF BAR HARBOR**, a municipal corporation of the State of Maine,  ) ) ) | |
| Defendant,  ) ) | |
| **CHARLES SIDMAN**,  ) ) | |
| Defendant-Intervenor.  ) | |

### DEFENDANT TOWN OF BAR HARBOR'S POST-TRIAL BRIEF

Defendant Town of Bar Harbor (the "Town"), through its attorneys, Rudman Winchell,

submits its Post-Trial Brief, pursuant to this Court's Order setting the Post-Trial Briefing Schedule

(ECF 187), as follows:

### INTRODUCTION

This case concerns the legality of the Town's reasonable decision to exert its home rule

authority by enacting an ordinance (the "Ordinance") to reduce congestion and other undesirable

effects of cruise ship tourism by limiting the number of persons that may disembark cruise ships

in Bar Harbor. Although they purport to have filed this case to fulfill the purpose and objective of

Congress and to protect their remarkably unrestrained interpretation of maritime law, the reality is

Plaintiffs and Plaintiff-Intervenor are local businesses asking this Court to overturn the will of the people to protect their own unique and purely local economic interests. In essence, they ask this Court to give their chosen business model constitutional protection, at the expense of the people of Bar Harbor.

Neither the law nor the facts support their claims. Plaintiffs and Plaintiff-Intervenor have failed to identify any state or federal law that would apply to preempt the Town from limiting cruise ship disembarkations. Plaintiffs and Plaintiff-Intervenor have failed to demonstrate that the Ordinance, by design or by effect, discriminates against interstate commerce or foreign commerce, or imposes a clearly excessive burden on commerce. And finally, Plaintiffs and Plaintiff-Intervenor have failed to show that the Ordinance is without any rational basis, either for purposes of a due process analysis or a right to travel analysis.

## BACKGROUND

### Cruise Ship Visitation in Bar Harbor

Cruise ship visitation to Bar Harbor began in the late 1980s. (7/13/23 Tr. at 136.) Over the years, as the frequency and magnitude of these visits increased, the cruise industry began to have increasingly negative impacts on Bar Harbor. (7/13/23 Tr. at 114, 136-37, 231.) The Town's 2007 Comprehensive Plan recognized problems associated with cruise ship visitation, including congestion, water quality, and changes in the character of the Town making it a less desirable place to live and work. (DX 250A at 77, 85, 217-21, 344, 346, 351, 368-70, 396-97; 7/13/23 Tr. at 115-18). In 2007, the Town commissioned a study on how to manage cruise ship tourism in Bar Harbor. (7/13/23 Tr. at 111-114; DX 260.) Several key recommendations from this study— including implementation of passenger caps, the creation of a cruise ship committee, and

observance of an annual review process—would become the foundation for how the Town regulated cruise ships in subsequent years. (7/13/23 Tr. at 111-14.)

In 2008, the Town accepted a recommendation from the Town's Cruise Ship Study Task Force (which also recommended the formation of a standing Cruise Ship Committee) to implement daily cruise ship passenger caps of 5,500 passengers per day for the months of May, June, September and October, and 3,500 passengers per day for the months of July and August. (ECF 137 ¶ 9.) The daily passenger caps were calculated by using the lower berth capacity of cruise vessels. (*Id.* ¶ 10.) Those caps remained in place from 2008 through 2021. (*Id.* ¶¶ 11-14.)

While the passenger caps remained static, cruise ship visitation continued to swell, as more and larger ships visited Bar Harbor. (7/13/23 Tr. at 136-37.) There were more days with ships, and more days with multiple ships. (*Id.*) Around 2017, there was discussion in the Town of a proposal to purchase the old ferry terminal property and construct a deep water berthing pier for large cruise ships. (7/13/23 Tr. at 110-12, 231-32; PX 47.) This generated intense "angst" in the Town about the level of cruise ship visitation. (7/13/23 Tr. at 112, 123-25, 231-32.) While that pier was never constructed, cruise ship visitation continued to increase. In 2019, 158 cruise ships, with a combined lower berth capacity of 249,080 passengers, called at Bar Harbor—a town of 5,500 residents. (ECF 137 ¶ 32; 7/13/23 Tr. at 169.) There was not a single day in September 2019 without a cruise ship. (7/13/23 Tr. at 136.)

The Town Council received more and more communications from the community asking them to address cruise ship visitation. (7/13/23 Tr. at 138-39.) In January 2020, the Council directed the Cruise Ship Committee to study the impacts of cruise ship visitation on residents of the Town. (7/13/23 Tr. at 138-39.) Then, COVID-19 hit. As a result of the pandemic, no foreign-

flagged cruise ships were operating in 2020 or 2021.[1]  (7/13/23 Tr. at 137-38, 229.)  People noticed the difference; they continued to reach out to the Council during the pandemic to express concern about cruise ships returning.  (7/13/23 Tr. at 137-38, 229.)

In 2021, the Council commissioned a survey to try to better understand the concerns regarding cruise ship visitation and strategies to address them.  (7/13/23 Tr. at 139; DX 323.)  The Town's hired consultants hoped to receive 300 to 400 responses to the survey; they got 1,500.  (7/13/23 Tr. at 139-40, 167-70.)  A majority of the respondents expressed concern about congestion caused by cruise ship visitation.  (7/13/23 Tr. at 144-45.)  The survey results led the Council to conclude that cruise ship visitation should be reduced.  (7/13/23 Tr. at 151-52, 170.)

On February 15, 2022, the Town Council approved the formation and membership of a working group, which, in turn, negotiated with the cruise industry for modifications of the daily passenger caps.  (ECF 137 ¶ 15.)  This eventually led to the execution of a Memorandum of Agreement ("MOA") with each individual cruise line in September and October of 2022.  (ECF 137 ¶¶ 16-17, 19-20; 7/13/23 Tr. at 152-57; DX 327.)  The MOA included shortened the cruise ship season by eliminating the months of April and November, set lower daily passenger caps, and created new monthly caps.  (ECF 137 ¶ 18; 7/13/23 Tr. at 152-57; DX 327.)

### The Ordinance

Bar Harbor's Charter divides the legislative power of the Town between the Town Council and the voters acting through the Town Meeting; with very limited exceptions, the Town Meeting has exclusive authority to amend the Town's Land Use Ordinance.  (7/13/23 Tr. at 160, 163-64.)  In March 2022 (while the Council was engaged in the process that would ultimately lead to the

---

[1] American Cruise Lines, which is U.S.-flagged, was able to operate in 2021.  (PX 195 (hereinafter "Flink Depo.") at 31; 7/13/23 Tr. at 137-38, 229.)

4

execution of the MOAs), a seven-member petitioning committee which included Charles Sidman

submitted to the Town Council a petition proposing an amendment to the Town's Land Use

Ordinance.  (PX 209, 237, 243).  The proposed amendment provided: "As determined by the

Harbor Master, no more than 1,000 persons, in the aggregate, may disembark on a single calendar

day from any cruise ship(s) and come to shore on, over, or across any property located within the

Town of Bar Harbor…."  (PX 209.)  The proposed amendment further provided that the Harbor

Master "shall develop rules and regulations" to establish, among other things, a mechanism for

counting the number of persons disembarking each day, and a procedure for reporting violations

to the Code Enforcement Officer.  (*Id.*)  The proposed amendment gave enforcement authority to

the Code Enforcement Officer, based on information provided by the Harbor Master, and property

owners in violation were to be subject to a minimum $1000 penalty per "excess unauthorized

person."  (*Id.*)  The purpose statement submitted with the petition provides, in part:

> The purpose of this amendment to the Code is to require a permit to be issued to
> any property owner wishing to allow for the discharge of cruise ship passengers in
> the Town of Bar Harbor from their property, and to establish a codified limit on the
> number of passengers who may disembark from cruise ships and be transported to
> the Town of Bar Harbor per day. Underlying this proposed amendment is the fact
> that, in recent years, the Town has been a popular port of call for cruise ships of
> varying sizes, from which passengers disembark via tender boats that offload
> passengers directly into the downtown area. The large numbers of passengers have
> overwhelmed the downtown area, resulting in excessive congestion and traffic on
> public streets and sidewalks, frequent overcrowding of parks and other public
> spaces, and inundating local amenities and attractions, all of which result in a
> diminished quality of life for Town residents. The unchecked and continued influx
> of disembarking cruise ship passengers in the downtown area jeopardizes the
> Town's ability to deliver municipal services to Town residents and visitors (for
> example, cruise ship passengers), including the provision of public safety services
> (police and fire), emergency medical services (EMS), in-patient and out-patient
> services at local hospitals, pandemic control measures, and public sanitation
> services, and also impacts the ability of local shops, restaurants, and other
> businesses to attract and serve customers. A town-wide survey was conducted in
> 2021, showing that a majority of respondents believe that the volume of
> disembarking cruise ship passengers is too high and has a negative impact on the
> Town and the health, safety and welfare of its residents.

(PX 237 at 2.)  Mr. Sidman did not consider the MOA negotiated by the Council a viable alternative because the reductions were voluntary and too modest.  (7/13/23 Tr. at 273-74.)

On August 2, 2022, the Town Council voted to place the proposed amendment on the warrant for the November Town Meeting.  (ECF 137 ¶ 21.)  Voters approved the proposed amendment at the November 2022 Town Meeting and it became the Ordinance effective December 8, 2022.  (ECF 137 ¶ 22.)  Following the adoption of the Ordinance, the Town staff tasked with developed the rulemaking, at the direction of the council, has publicly and authoritatively stated in a written report delivered to the Council that it will not enforce the Ordinance to prohibit or cause a fine to issue for the disembarkation of persons that are recognized as "vessel personnel," "vessel crew," "seafarers assigned to a vessel," "pilots," and "representatives of seafarers' welfare and labor organizations" under 33 C.F.R. § 105.200 and 33 C.F.R. § 105.237.  (7/13/23 Tr. at 73-75; PX 204.)  This will be codified as part of the regulations contemplated by the Ordinance and necessary before the Ordinance can be enforced.  (7/13/23 Tr. at 161-64.)

<u>Procedural History</u>

On December 29, 2022, a group of local business interests filed this lawsuit challenging the constitutionality of the Ordinance.  (ECF 1.)  Plaintiffs consist of the Association to Preserve and Protect Local Livelihoods ("APPLL"), B.H. Piers, L.L.C., Golden Anchor, L.C., doing business as Harborside Hotel, B.H.W.W., L.L.C., Delray Explorer Hull 495 LLC, Delray Explorer Hull 493 LLC, and Acadia Explorer 492, LLC (collectively "Plaintiffs").  With the exception of APPLL, a membership organization made up of certain Bar Harbor businesses, Plaintiffs are all arms of the Walsh family group of companies, Ocean Properties, founded by Tom Walsh, which together operate two piers located on West Street in Bar Harbor and related tender ships used to transport passengers from cruise ships to the piers.  (7/12/23 Tr. at 59-62; ECF 137 ¶ 7.)  The

Plaintiff pier owners are the only entities that would be subject to fines under the Ordinance. (ECF 192 ¶ 212.)  The day after filing their Complaint, the Plaintiffs filed a motion for preliminary injunction, seeking to block the implementation of the Ordinance. (ECF 12.)

In the following weeks, Plaintiff-Intervenor Penobscot Bay and River Pilots Association (the "Pilots"), which provides pilotage services to certain cruise ships calling at Bar Harbor, intervened and filed its own Complaint against the Town (ECF 32, 41, 43), and Mr. Sidman successfully intervened as a defendant. (ECF 45, 63).  After the Town agreed not to enforce the Ordinance during the pendency of this lawsuit so long as discovery and the trial proceeded on an expedited basis, Plaintiffs withdrew their motion for preliminary injunction. (ECF 83).  Discovery proceeded pursuant to an expedited scheduling order (ECF 82), and a three-day trial was held in Bangor on July 11 through July 13, 2023.

## ARGUMENT

The Plaintiffs and the Pilots challenge the Ordinance on the grounds that the Ordinance (1) is preempted by federal law; (2) violates the dormant Commerce Clause; (3) violates substantive due process; (4) violates the constitutional right to travel; and (5) is preempted by Maine law.  The Town addresses each argument in turn.

## I.     Federal Law Does Not Preempt the Ordinance.

The Supremacy Clause of the U.S. Constitution states that the "Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "Federal preemption of state law takes three forms: express preemption, field preemption, and conflict preemption." *Puritan Med. Prods. Co. LLC v. Copan Italia S.P.A.*, 2018 ME 90, ¶ 13, 188 A.3d 853 (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990)).  These three forms of preemption may be summarized as follows:

> Express preemption occurs when Congress defines "explicitly the extent to which its enactments pre-empt state law." Field preemption occurs when a state law attempts to "regulate conduct in a field that Congress intended the Federal Government to occupy exclusively." Finally, conflict preemption occurs "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* (quoting *English*, 496 U.S. at 78-79) (citations and alterations omitted). The "[p]urpose of Congress is the ultimate touchstone." *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 427 (D. Me. 2017) [*Portland Pipe Line I*][2] (quoting *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 103 (1963)). Even where a federal law contains an express preemption clause, this "does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Id.* (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).

When analyzing a claim of preemption, courts start "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 428 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Id.* (quoting *Altria*, 555 U.S. at 76). "[L]ocal land use restrictions for on-shore port facilities" are such a field, being "within the traditional realm of state and local police power." *Id.* at 444-45. Moreover, courts must keep in mind "the elementary rule . . . that every reasonable construction must be resorted to . . . in order to save a statute from unconstitutionality." *All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 35 (1st Cir. 2005)

---

[2] There are two opinions of this Court in the *Portland Pipe Line* case cited in this brief. The first deals with preemption issues on summary judgment. *Portland Pipe Line*, 288 F. Supp. 3d at 427-48. The second deals with the dormant Commerce Clause analysis after trial. *Portland Pipe Line Corp. v. City of S. Portland*, 332 F. Supp. 3d 264, 296-316 (D. Me. 2018). For clarity, this brief refers to these two decisions as *Portland Pipe Line I* and *Portland Pipe Line II*, respectively.

A.     **The Ordinance Does Not Interfere With the Harmony and Uniformity of Maritime Law.**

The Pilots first argue that the Ordinance poses a threat to the "uniformity" of federal maritime law.[3] "The courts have long held that Congress has the power to legislate against the backdrop of the general maritime law inherited at the founding and interpreted by the federal courts." *Portland Pipe Line I*, 228 F. Supp. 3d at at 445 (citing *The Lottawanna*, 88 U.S. 558, 559 (1874)); *see also* U.S. Const. art. 3, § 2, cl. 1 (extending the judicial power to "all cases of admiralty and maritime jurisdiction.")   In certain narrow circumstances, this general maritime law may preempt state and local laws even in the absence of a specific federal statute.  *See Portland Pipe Line I*, 288 F. Supp. 3d at 445.  The Supreme Court set forth the seminal test for such preemption in *South Pacific Company v. Jensen*, holding that a state or local law is preempted only "if it contravenes the essential purpose expressed by an act of Congress, or works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations."  244 U.S. 205, 216 (1917).

The relevant inquiry here is the third prong of the *Jensen* test, interference with the "harmony and uniformity" of maritime law.[4]  As this Court has explained, "[d]espite the broad language of the *Jensen* 'harmony and uniformity' test, courts have consistently applied this prong

---

[3] Plaintiffs do not make a similar argument.

[4] As to the first prong, the Pilots do not cite any federal statute directly governing this case, instead generally adverting to "pervasive" federal maritime regulation. *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 627 (1st Cir. 1994) ("Since no act of Congress directly governs our case, the first prong (contravention) is irrelevant to our case.")  The "characteristic feature" prong very narrowly applies to federal rules that either "originated in admiralty" or "ha[ve] exclusive application there." *Id.* (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 450 (1994).  For example, in *American Dredging*, a state open-forum statute making *forum non conveniens* unavailable in savings clause cases was not preempted by federal maritime law, even though *forum non conveniens* is part of federal maritime law.  510 U.S. at 450.  Similarly, in *Ballard*, federal maritime law did not preempt a state statute allowing private recovery of economic damages in the absence of bodily injury in oil pollution cases, even though such recovery is barred under federal maritime law. 32 F.3d at 631.  The Pilots do not invoke this second prong of *Jensen*, and it has no apparent application here.

narrowly from the beginning." *Portland Pipe Line I*, 288 F. Supp. 3d at 445. Indeed, *Jensen* itself

recognized that "[i]t would be difficult, if not impossible, to define with exactness just how far the

general maritime law may be changed, modified, or affected by state legislation. That this may be

done to some extent cannot be denied." 244 U.S. at 216. The Supreme Court's subsequent cases

have limited *Jensen* even further, confining it and its progeny to their facts. *Askew v. Am.*

*Waterways Operators, Inc.*, 411 U.S. 325, 337-38, 344 (1973). The Court has recognized that

states and local governments retain a "wide scope" to regulate maritime commerce:

> Although the corpus of admiralty law is federal in the sense that it derives
> from the implications of Article III evolved by the courts, *to claim that all enforced*
> *rights pertaining to matters maritime are rooted in federal law is a destructive*
> *oversimplification of the highly intricate interplay of the States and the National*
> *Government in their regulation of maritime commerce*. It is true that state law must
> yield to the needs of a uniform federal maritime law when this Court finds inroads
> on a harmonious system. But this limitation still leaves the States a wide scope.
> State-created liens are enforced in admiralty. State remedies for wrongful death and
> state statutes providing for the survival of actions . . . have been upheld when
> applied to maritime causes of action. . . . State rules for the partition and sale of
> ships, state laws governing the specific performance of arbitration agreements, state
> laws regulating the effect of a breach of warranty under contracts of maritime
> insurance—all these laws and others have been accepted as rules of decision in
> admiralty cases, even, at times, when they conflicted with a rule of maritime
> law which did not require uniformity. . . . *Maritime law is not a monistic system. The*
> *State and Federal Governments jointly exert regulatory powers today as they have*
> *played joint roles in the development of maritime law throughout our history.*

*Romero v. Internat'l Terminal Operating Co.*, 358 U.S. 354, 373-74 (1959) (emphasis added)

(footnotes omitted), *superseded by statute on other grounds as recognized in Portland Pipe Line*

*I*, 288 F. Supp. 3d at 446; *see also Am. Dredging Co. v. Miller*, 510 U.S. 443, 451-54 (1994)

(recognizing limitations of *Jensen*'s uniformity principle).

This Court recently applied *Jensen* in *Portland Pipe Line I*. There, a pipeline operator

challenged a local land use ordinance prohibiting loading crude oil onto tankers, or the construction

of structures for that purpose, on the South Portland waterfront. *Portland Pipe Line I*, 288 F. Supp.

3d at 329.   The Court concluded that the ordinance was not preempted under *Jensen* and its

progeny.   First, the Court could find "no case under *Jensen* striking down a local restriction on the

loading or unloading of a particular good." *Id.* at 447. The ordinance, the Court reasoned, "simply

does not resemble the compensation laws, damages rules, or tort causes of action that courts

analyzed for possible *Jensen* 'harmony and uniformity' conflict with maritime law." *Id.*   Second,

the Court found the federal interest in uniformity to be weak where the ordinance "restricts *on-

shore facilities and conduct*, and therefore, only incidentally affects a tanker during the narrow

window of time in which it is docked in the Harbor." *Id.* (emphasis added).   Third, the Court

reasoned that local interests were "at their peak" when regulating "on-shore facilities" and activity

and effects "within its borders." *Id.* The Court recognized that this shoreside regulation could

*affect* maritime vessels, but rejected that as a basis for preemption:

> There is a federal interest in the flow of maritime commerce, but [Plaintiff] does
> not cite any cases suggesting this has ever given vessels unrestricted access to any
> stretch of shoreline for any purpose they wish. Any ban on goods or conduct within
> a coastal jurisdiction will affect maritime vessels by prohibiting them from
> unloading or loading that good or participating in that conduct while docked. But
> this broad an interpretation of maritime preemption under *Jensen* would "push the
> line shoreward" and "engulf everything" historically left to coastal jurisdictions.

*Id.* (quoting *Askew*, 411 U.S. at 344).

The same analysis from *Portland Pipe Line I* applies here.   First, just as the plaintiff in

*Portland Pipe Line I* failed to cite any case "under *Jensen* striking down a local restriction on the

loading or unloading of a particular good," the Pilots cite no cases striking down restrictions on

disembarking passengers as preempted under *Jensen*.   Indeed, the only case the Pilots cite,

*American Dredging*, has nothing to do with restrictions on unloading goods or passengers, and

notably *upheld* the challenged state law against a *Jensen*-based preemption challenge.   510 U.S. at

451-54 (holding that statute depriving maritime defendants of *forum non coveniens* defense available under federal maritime law was not preempted under *Jensen*).

Second, the federal interest in uniformity is (at least) equally as weak in this case as it was in *Portland Pipe Line I*. The Ordinance limits the disembarkation of passengers from cruise ships, and therefore, only incidentally affects a cruise ship during the narrow window of time in which it is anchored in Bar Harbor. The Ordinance does not regulate the activity of cruise ships at sea. The Pilots suggest that the Ordinance impacts vessels "while operating in U.S. waters near Bar Harbor and in cruise lines' business decisions about when and where to deploy vessels." (ECF 190 at 11 n.6.) But again, as this Court pointed out in *Portland Pipe Line I*, such an effect on maritime vessels is necessarily incidental to *any* regulation of goods or conduct by a coastal jurisdiction. The Pilots' interpretation would effectively strip the Town of any power to regulate activity within its own borders. Moreover, other circuits have upheld state laws with much more far-reaching and direct burdens on vessels at sea. *See Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1158 (9th Cir. 2011) (upholding against *Jensen* challenge California's Vessel Fuel Rules even though they applied to vessels more than three miles from the state's coast).

Third, the people of Bar Harbor's interest in regulating activity that occurs on its waterfront is just as strong as South Portland's interest was in *Portland Pipe Line I*. The Ordinance is a land use measure that operates exclusively on the owners of land within the Town and regulates activity that occurs exclusively within the Town, to address effects of that activity that occur exclusively within the Town. As this Court has recognized, this is precisely the area in which state and local interests are at their peak. *Portland Pipe Line I*, 288 F. Supp. 3d at 447-48. That the federal government may regulate cruise ships and other vessels in other regards does not deprive state and local governments of their power to protect the interests of their inhabitants, absent a clear conflict

with federal law. *See, e.g.*, *Askew*, 411 U.S. at 341 ("Even though Congress has acted in the admiralty area, state regulation is permissible, absent a clear conflict with the federal law."); *Huron Portland Cement Co. v. City of Detroit, Michigan*, 362 U.S. 440, 442, 447 (1960) ("In the exercise of [police] power, the states and their instrumentalities may act, in many areas of interstate commerce and maritime activities, concurrently with the federal government. . . . Thus, a federally licensed vessel is not, as such, exempt from local pilotage laws . . . or local quarantine laws . . . or local safety inspections . . . or the local regulation of wharves and docks.").

> ### B.    The Ordinance Does Not Conflict With Any of the Federal Laws Cited by Plaintiffs and the Pilots.

The Plaintiffs and the Pilots allege that the Ordinance conflicts with a raft of federal regulations.[5]  In no respect have they shown any scintilla of conflict between the Ordinance and any federal law, much less overcome the presumption against preemption, which is particularly strong where, as here, a municipality exercises its traditional police powers to enact land use restrictions for on-shore port facilities. *See Portland Pipe Line I*, 288 F. Supp. 3d at 428, 444-45.

> ### 1.    The Ordinance Does Not Conflict with Federal Laws Regarding Seafarers' Shore Access.

The Plaintiffs' and the Pilots' primary conflict preemption argument is based on regulations governing maritime facilities set forth in 33 C.F.R. part 105.  Specifically, they argue that the Ordinance conflicts with the requirement that owners and operators of covered maritime facilities ensure shore access to seafarers working on vessels. *See* 33 C.F.R. §§ 105.200, 105.237. The regulations Plaintiffs cite require facility operators (such as the facilities operated by the

---

[5] In framing the issue as a matter of implied conflict preemption, the Plaintiffs and the Pilots appear to concede that federal law does not expressly preempt the Ordinance.  To the extent they do not so concede, any such claim must fail because, as discussed in greater detail below with respect to each supposedly conflicting federal law, neither the Plaintiffs nor the Pilots point to any express preemption language that bears any relation to the Ordinance.

Plaintiff pier owners) to implement a "system . . . coordinating shore leave for vessel personnel or crew-change out . . . with vessel operators in advance of a vessel's arrival." 33 C.F.R. § 105.200(a)(9). This advance coordination for shore leave must ensure "timely access" "without unreasonable delay" taking into account factors such as the length of time the vessel in in port, the vessel watch schedules, the facility's "safety and security procedures," and "[a]ny other factors specific to the . . . facility that could affect access to and from the vessel." 33 C.R.R. § 105.237. The regulations in 33 C.F.R. part 105 only have preemptive effect over local laws that "would conflict with the regulations . . . either by actually conflicting or by frustrating an overriding Federal need for uniformity."[6] 33 C.F.R. § 101.112(b).

There is no conflict between these regulations and the Ordinance.  First, the Town has publicly and authoritatively stated that it will not enforce the Ordinance to prohibit or cause a fine to issue for the disembarkation of persons that are recognized as "vessel personnel," "vessel crew," "seafarers assigned to a vessel," "pilots," and "representatives of seafarers' welfare and labor organizations" under 33 C.F.R. § 105.200 and 33 C.F.R. § 105.237.  (7/13/23 Tr. at 73-75; PX 204.)  This will be codified as part of the regulations contemplated by the Ordinance and necessary

---

[6] In effect, 33 C.F.R. § 101.112(b) simply recites the familiar principles of implied preemption.  The Pilots also cite preemption language regarding regulations of *vessels* in 33 C.F.R. part 104, which do have preemptive effect over local regulations within the same field. *See* 33 C.F.R. § 101.112(a) ("The regulations in 33 CFR parts 101, 103, 104, and 106 have preemptive effect over State or local regulation within the same field.").  But they fail to cite any provision of part 104 whatsoever, let alone any that could even arguably be considered to be "within the same field" as the Ordinance, which does not regulate vessels in any way.  Likewise, the Plaintiffs cite 46 C.F.R. Chapter I, Subchapter H, which "set[s] forth uniform minimum requirements for passenger vessels" and does have "preemptive effect over . . . local regulations in the same field." 46 C.F.R. § 70.01-1.  But again, Plaintiffs fail to explain how the Ordinance could be considered to be "in the same field" as or conflict with these regulations.  These regulations cover a variety of topics, such as the carriage of combustible liquid cargo in bulk, the inspection of lifesaving appliances, inspection for pollution prevention, the location of crew spaces, fire detection systems, the number of fire axes on board, when radar readings must be provided on the bridge, persons that must be excluded from the navigation bridge while underway, and safety information that must be provided in promotional literature.  No provision in Subchapter H would or could be frustrated by not having more than 1,000 passengers per day going into Bar Harbor from cruise ships.

before the Ordinance can be enforced.  (7/13/23 Tr. at 161-64.)  In evaluating a facial challenge to

a state or local law, a federal court must consider any limiting construction of the body charged

with enforcing it.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989) (stating "[i]n

evaluating a facial challenge to a state law, a federal court must . . . consider any limiting

construction that a state court or enforcement agency has proffered" (quoting *Hoffman Estates v.*

*The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, n. 5 (1982))); *Grayned v. City of Rockford*,

408 U.S. 104, 110 (1972) (noting courts must extrapolate meaning of ordinance from its words

and "the interpretation of the statute given by those charged with enforcing it"); *IMS Health Inc.*

*v. Ayotte*, 550 F.3d 42, 63 (1st Cir. 2008) (applying same rule to Commerce Clause challenge),

*abrogated in part on other grounds by Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011); *McGuire*

*v. Reilly*, 386 F.3d 45, 58 (1st Cir. 2004) (interpreting safe harbor for "employees or agents" in

state law regulating speech within buffer zone around abortion clinic to exclude trained, pro-choice

advocate volunteer "escorts," in accordance with Attorney General's interpretation, to avoid First

Amendment problem).

    Second, even in the absence of this clarification by the Town, "the elementary rule" of

statutory construction is that "every reasonable construction must be resorted to . . . in order to

save a statute from unconstitutionality." *Gwadosky*, 430 F.3d at 35.  It is certainly reasonable, in

the context of an ordinance seeking to reduce the congestion caused by cruise ship

disembarkations, to interpret "persons" as meaning "passengers."  Third, even if the Ordinance

did apply to seafarers, all that the regulations require is that covered facilities implement a system

for advance coordination of shore access for seafarers.  The regulations specifically contemplate

that such a system will have to take into account local factors specific to the port, the vessel, and

the facility.  Nothing in the Ordinance prevents the Plaintiff pier owners from implementing such

a system. Cruise ship schedules are known in advance—generally *several years* in advance—including the date and time a particular ship is scheduled to arrive and depart. (7/11/23 Tr. at 99:15-25; ECF 137 ¶ 23.)  Plaintiffs fail to explain why they cannot fully account for the Ordinance's disembarkation limit when engaging in advance coordination the cruise ships, as the regulations require.

> **2.    The Ordinance Does Not Conflict With Federal Laws Regarding Customs and Immigration Screening.**

In their post-trial briefs, Plaintiffs and the Pilots argue for the first time that the Ordinance is also preempted due to conflict with federal customs and immigration laws.  No hint of such a claim appears anywhere in either party's pleadings, save a single, general reference to "customs and immigration compliance" as part of a laundry list of areas of federal regulation touching in some way upon cruise ships.  (ECF 1 ¶ 72; ECF 43 ¶ 81.)  Neither party's pre-trial brief mentions any such argument whatsoever.  (ECF 160 at 6-7 & n.4; ECF 164 at 3-6.)

To the extent this unplead, nascent claim has any vitality, it fails.  Neither the Plaintiffs nor the Pilots cite any actual provision of federal law supposedly in conflict with the Ordinance.  That is because no such conflict exists.  Contrary to the Plaintiffs' and Pilots' contentions, nothing in the Ordinance imposes anything resembling an additional "condition of entry" on immigrants seeking to enter the United States.  As discussed in greater detail with respect to the Commerce Clause analysis, the Ordinance does not discriminate on the basis of the origin of ships or their passengers,[7] rendering the few cases cited by the Pilots wholly inapposite. *See  Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 38-39 (D. Me. 2022) ("State laws which impose *discriminatory* burdens upon the entrance or residence of aliens lawfully within the United States

---

[7] Incidentally, by the Plaintiffs' and Pilots' own admission, cruise ship passengers are overwhelmingly domestic.  (ECF 192 ¶ 43; Flink Depo. at 24.)

conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid." (emphasis added) (quotation marks omitted)); *see also Graham v. Richardson,* 403 U.S. 365, 378 (1971) (quoting same language).

Moreover, the Ordinance does not, and could not, prohibit entry into the U.S. It merely sets limits on the number of passengers of cruise ships—regardless of the origin of either the passengers or the ships—that may disembark in Bar Harbor on a particular day. Nothing in the Ordinance prevents cruise ships, of any size or origin, from anchoring in Frenchman Bay. (Flink Depo. at 110-11; 7/13/23 Tr. at 24-26.) Nothing in the Ordinance prevents Customs and Border Protection from boarding those ships and screening passengers for entry into the U.S. (7/11/23 Tr. at 107:14-25.) Anyone screened and admitted may disembark in Bar Harbor or anywhere else in the country, including but not limited to any of the two other Class A ports in Maine. (Flink Depo. at 20, 111; ECF 137 ¶¶ 24, 26, 28.) The pier owners simply face penalties if they permit more than 1,000 daily disembarkations in Bar Harbor. It is in no way "impossible" to comply with both federal customs and immigration screening and the Ordinance, and the Ordinance stands as no obstacle to the screening process's purpose of preventing illegal entry into the U.S.

### 3. The Ordinance Does Not Conflict With Federal Laws Designating Anchorages.

Finally, the Pilots suggest that the Ordinance is preempted by the Coast Guard's designation of anchorage grounds in Frenchman Bay. The regulations of 33 C.F.R. Chapter I, Subchapter I, Parts 109-110—which do not state that they have preemptive effect over local regulations—describe various "anchorage grounds" for vessels in navigable waters of the United States. These regulations do not require that any vessel come to any of the waters specified in Subchapter I, nor contemplate that the designation of anchorage grounds somehow displaces local laws. So, for example, 33 C.F.R. § 110.4 (titled "Penobscot Bay, Maine"), sets forth by point

bearing and yards descriptions areas in Rockland harbor "limited to vessels no greater than 20 meters," and other specific anchorage locations and regulations for Camden Harbor, Stonington Harbor, and Passagassawakeag River in Belfast Bay. The note to subsection 110.4(d) encourages mariners using the Belfast anchorages to contact "local" authorities, such as the "local harbormaster, to ensure compliance with any additional applicable . . . local laws." Section 110.130 provides the locations of anchorage areas for Frenchman Bay, Bar Harbor, and specifies that the anchoring of vessels there "is under the coordination of the local Harbormaster."

No provision in Subchapter I would or could be frustrated by not having more than 1,000 persons per day going into Bar Harbor from cruise ships anchored in Frenchman Bay. That Plaintiffs and the Pilots theorize that fewer large cruise ships will choose to visit Bar Harbor if the Ordinance goes into effect does not mean that the Town has somehow prohibited or made it "impossible" for such vessels to use these anchorages. That some of these vessels might, as a matter of business judgment, decide not to call at Bar Harbor if they cannot disembark their full passenger capacity does not interfere with the Coast Guard's designation of the anchorages for use by vessels who do wish to make use of them for their designated purposes.[8]

## II.    The Ordinance Does Not Violate the Commerce Clause.

The Commerce Clause, in addition to establishing the power of Congress "[t]o regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, has also been interpreted to limit the regulatory power of the states, *see, e.g.*, *Nat'l Pork Producers Council v. Ross*, ___US___, 143 S. Ct. 1142, 1152 (2023); *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330 (1996); *W. Lynn*

---

[8] The Plaintiffs and the Pilots appear to have abandoned any claim that the Ordinance is preempted by the grab bag of treaties cited in their complaints; they do not once reference it in their post-trial briefs. (ECF 1 ¶¶ 84-87; ECF 42 ¶¶ 92-95.) Likewise, they appear to have abandoned any preemption claim based on Centers for Disease Control and Prevention regulations intended "to prevent the introduction, transmission, and spread of communicable disease from foreign countries into the [United] States," 42 C.F.R. § 71.1(a), to the extent their complaints could be read to state such a claim. (ECF 1 ¶¶ 73-74 n.2; ECF 42 ¶ 83 n.7.)

*Creamery, Inc. v. Healy*, 512 U.S. 186, 192 (1994); *New Energy Co. v. Limbach*, 486 U.S. 269,

273 (1988). The so-called "dormant Commerce Clause" prohibits states from adopting "regulatory

measures designed to benefit in-state economic interests by burdening out-of-state competitors."

*Fulton Corp.*, 516 U.S. at 330 (quotation marks omitted). The dormant Commerce Clause prevents

states and local governments from engaging in economic protectionism by "burdening the flow of

commerce across its borders in a way that commerce within the state is not burdened." *John T.*

*Cyr & Sons, Inc. v. State Tax Assessor*, 2009 ME 52, ¶ 25, 970 A.2d 29 (citing *Fulton Corp.*, 516

U.S. at 330-31). The dormant Commerce Clause applies to both state and local laws. *Fla. Transp.*

*Servs. v. Miami-Dade Cty.*, 703 F.3d 1230, 1243 (11th Cir. 2012) (citing *Fort Gratiot Sanitary*

*Landfill v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 355 (1992)).

The dormant Commerce Clause's limitation on state and local power is far from absolute.

"In the absence of conflicting federal legislation, the States retain authority under their general

police powers to regulate matters of legitimate local concern, even though interstate commerce

may be affected." *Lewis v. Bt Inv. Managers*, 447 U.S. 27, 36 (1980) (quotation marks omitted).

As the Supreme Court stated almost forty years ago:

> The Commerce Clause significantly limits the ability of States and localities to
> regulate or otherwise burden the flow of interstate commerce, but it *does not elevate*
> *free trade above all other values*. As long as a State does not needlessly obstruct
> interstate trade or attempt to place itself in a position of economic isolation, it
> retains broad regulatory authority to protect the health and safety of its citizens and
> the integrity of its natural resources.

*Maine v. Taylor*, 477 U.S. 131, 151 (1986) (emphasis added) (citation and quotation marks

omitted). The Supreme Court recently reaffirmed this principle, and expressed an even narrower

understanding of the role of the dormant Commerce Clause in our federalist system of democracy:

> [T]he Framers equipped Congress with considerable power to regulate interstate
> commerce and preempt contrary state laws. In the years since, this Court has
> inferred an additional judicially enforceable rule against certain, especially

discriminatory, state laws adopted even against the backdrop of congressional silence. *But extreme caution is warranted before a court deploys this implied authority. Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of extreme delicacy, something courts should do only where the infraction is clear.*

*Nat'l Pork Producers*, 143 S. Ct. at 1165 (emphasis added) (citations and quotation marks omitted).

The principle of antidiscrimination lies at the "very core" of the Supreme Court's modern dormant Commerce Clause jurisprudence. *Nat'l Pork Producers*, 143 S. Ct. at 1153. "Discrimination," in this context, means "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-338 (2008)); *see also Portland Pipe Line Corp. v. City of S. Portland*, 332 F. Supp. 3d 264, 299 (D. Me. 2018) [*Portland Pipe Line II*] ("'Discrimination' in this context simply means differential treatment of instate and out-of-state economic interests that benefits the former and burdens the latter." (quotation marks omitted)). If a law discriminates against out-of-state goods or interests, it is unconstitutional unless it is narrowly tailored to advance a "legitimate local purpose." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, ___US___, 139 S. Ct. 2449, 2461 (2019); *see also Wal-Mart P.R., Inc. v. Zaragoza-Gomez*, 834 F.3d 110, 126 (1st Cir. 2016) ("If we determine that the law is facially discriminatory, it is virtually per se invalid." (quotation marks and alterations omitted)); *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 185 (1st Cir. 1999) ("In the jurisprudence of the dormant Commerce Clause, a finding of facial discrimination is almost always fatal.").

A plaintiff challenging a law bears the burden of demonstrating that it discriminates against interstate commerce. *Gwadosky*, 430 F.3d at 40. "Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v.*

*Tracy*, 519 U.S. 278, 298 (1997) (footnote omitted). In order to show discrimination, then, a plaintiff must "identify an in-state commercial interest that is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009) (quotation marks and alterations omitted). This is because "laws that draw distinctions between entities that are not competitors do not 'discriminate' for purposes of the dormant Commerce Clause." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 49 (2d Cir. 2007) (citing *Tracy*, 519 U.S. at 300). "[I]n the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Tracy*, 519 U.S. at 300. If discrimination is shown, the burden shifts to the government to show that the local benefits of the law outweigh its discriminatory effects, and that there was no nondiscriminatory alternative by which it could protect those benefits. *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).

If the plaintiff cannot prove discrimination—that is, if the law is facially neutral and regulates in-state and out-of-state interests evenhandedly, with only incidental effects on interstate commerce—the law will be upheld unless the plaintiff shows that "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Walgreen Co. v. Rullan*, 405 F.3d 50, 55 (1st Cir. 2005) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)); *see also Town of Southold*, 477 F.3d at 47; *Tri-State Rubbish v. Town of Gray*, 632 A.2d 134, 136 (Me. 1993). This standard derives from the Supreme Court's decision in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, and has been considerably narrowed in recent years, as discussed below. *See infra* Part II.B.[9]

---

[9] Courts had previously considered there to be a separate, *per se* rule against state or local measures with "extraterritorial" reach, regulating commerce beyond their borders, even if they do not discriminate against

21

A.     **The Ordinance Does Not Discriminate Against Interstate or Foreign Commerce.**

There are three ways that a law may be deemed to be discriminatory: (1) it is discriminatory on its face (*i.e.*, it imposes restrictions on out-of-state businesses but not local competitors); (2) it is facially neutral but discriminates in effect (*i.e.*, it conveys a competitive advantage on local businesses with respect to out-of-state competitors); or (3) it is facially neutral but has a discriminatory purpose (*i.e.*, the legislative history of the law shows that it was intended to benefit local businesses over out-of-state interests). *Town of Southold*, 477 F.3d at 48-49; *see also Gwadosky*, 430 F.3d at 35 (noting a state statute may discriminate against interstate commerce "on its face, in purpose, or in effect"). The Ordinance is none of these things.

1.     **The Ordinance Is Facially Neutral.**

Any suggestion of facial discrimination in this case can be swiftly rejected. On its face, the Ordinance does not distinguish between in-state and out-of-state interests. The Ordinance applies to all cruise ships, regardless of their origin or destination. It draws no distinctions based on the origin of the passengers or crew aboard the ships, the flag the ship flies, or whether the cruise line in question is foreign or domestic. It applies with equal force to all cruise ships. This is the very definition of a facially neutral law. *See Portland Pipe Line II*, 332 F. Supp. 3d at 300 (holding ordinance that prohibited loading of crude oil on South Portland waterfront was facially

---

out-of-state economic interests. *See, e.g.*, *Gwadosky*, 430 F.3d at 35, 41; *Portland Pipe Line*, 332 F. Supp. 3d at 296-99. Recently, however, the Supreme Court roundly rejected any such rule, clarifying that the cases on which that supposed rule was based "[i]nstead . . . typif[y] the familiar concern with preventing purposeful discrimination against out-of-state economic interests." *Nat'l Pork Producers*, 143 S. Ct. at 1153-57. In any event, the Ordinance does not have extraterritorial reach—it is a land use measure that applies only to local pier operators and restricts activity occurring solely within Bar Harbor. That it may have *effects* outside of Bar Harbor is complete irrelevant, so long as those effects are not protectionist in nature. *Id.* at 1155 ("In our interconnected national marketplace, many (maybe most) state laws have the practical effect of controlling extraterritorial behavior." (quotation marks omitted)).

neutral in that it did not mention "source, destination, or residency" and bound local entities to the same extent as non-local ones).

### 2.     The Ordinance Does Not Discriminate in Effect.

Plaintiffs' and Pilots' claim that the Ordinance discriminates in effect fails for the simple reason that they have not shown that the Ordinance protects in-state interests from out-of-state competition.   They fail to identify any local interest that the Ordinance supposedly favors over out-of-state competitors.  "In the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Portland Pipe Line II*, 332 F. Supp. 3d at 300 (quoting *Tracy*, 519 U.S. at 300). "[I]f local legislation leaves all comers with equal access to the local market, it does not offend the dormant Commerce Clause."  *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 188 (1st Cir. 1999).

Here, the Ordinance operates equally on all cruise ship disembarkations within the Town, leaving all with equal access to the Town.   There are no in-state cruise lines.   When there are no direct in-state competitors to be relatively advantaged, there can be no discrimination of the type that the dormant Commerce Clause prohibits (*i.e.*, economic protectionism).  *Portland Pipe Line II*, 332 F. Supp. 3d at 300-01 ("[W]hen there are no direct competitors to suffer a relative disadvantage from the supposedly protectionist state law, there is no risk of the kind of economic protectionism that the dormant Commerce Clause prohibits."); *All. of Auto. Manufacturers v. Gwadosky*, 304 F. Supp. 2d 104, 113 (D. Me. 2004) (holding that a state law relating to automobile manufacturing could not "discriminate against out-of-state manufacturers, because as a matter of fact, there are no in-state manufacturers to be favored").

If anything, the Ordinance burdens *in-state* economic interests, *i.e.*, the interests of the Plaintiffs and Pilots (if their cataclysmic forecasts hold water), while having no discernible impact one way or the other on out-of-state interests. The fact remains that pursuant to the Ordinance, cruise ships can still come to Bar Harbor if they desire, or if they do not want to, they can just go somewhere else.  An ordinance "cannot be said to favor in-state commercial interests at the expense of out-of-state competitors when the entities most directly harmed by the practical effects of the [o]rdinance are in-state, local businesses." *Portland Pipe Line II*, 332 F. Supp. 3d at 301.

Although the Plaintiffs and the Pilots pretend that the Ordinance "prohibits" or "bans" large cruise ships from calling at Bar Harbor, the mask occasionally slips.  For instance, the Pilots complain that the Ordinance "eliminates all efficiencies that cruise lines obtain by operating larger vessels." (ECF 190 at 30.)  The real complaint, then, is that cruise lines whose preferred business model involves mega-ships might choose not to come to Bar Harbor if they cannot disembark their entire complement of passengers in a single day, and that, in turn, might reduce revenues flowing to the Plaintiffs and the Pilots.  But neither the cruise lines nor local interests that have cast their lot with the cruise lines are entitled to constitutional protection of their business model.  The dormant Commerce Clause prohibits protectionism—it does not protect particular interstate firms or their chosen "methods of operation" from regulation. *Nat'l Pork Producers*, 143 S. Ct. at 1162; *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978).  The "elimination of efficiencies" for one group of out-of-state operators compared to another group of out-of-state operators is not protectionist, and has repeatedly been rejected as the basis for a dormant Commerce Clause challenge. *Nat'l Pork Producers*, 143 S. Ct. at 1162; *Exxon*, 437 U.S. at 127.  Any harm to the profits of cruise lines or their local partners is not harm to *commerce*.

Plaintiffs and the Pilots place a great deal of emphasis on portraying cruise ships as inherently "foreign."[10] (*See, e.g.* ECF 190 at 43 ("The Ordinance's burdens fall exclusively on foreign-flagged cruise vessels engaged in international itineraries."); ECF 191 at 51 ("If enforced, the Ordinance places Bar Harbor off-limits to large cruise vessels—which are primarily foreign flagged—and disrupts the flow of foreign commerce.") But even laws that primarily or even *exclusively* burden out-of-state companies—which the Ordinance does not—do not violate the dormant Commerce Clause unless they do so to the benefit of in-state competitors. As the Supreme Court has recognized, "[t]he fact that the burden of [a state law] falls soley on interstate companies . . . does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce." *Exxon*, 437 U.S. at 126; *see also Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 402 (3d Cir. 1987) ("[S]howing that out-of-state firms happen to be the only ones currently interested in engaging in activity foreclosed by facially evenhanded state regulation has not by itself been held to trigger heightened scrutiny.").

Plaintiffs and the Pilots conflate potentially having an *effect* on a national or international market with prohibited protectionism. For example, the Pilots complain that the Ordinance impacts "business decisions about when and where to deploy vessels and the undertakings necessary to support those vessels in various itineraries throughout the United States and internationally." (ECF 190 at 11 n.6.) But having an "impact" on a national or international market is not the invidious discrimination that the dormant Commerce Clause forbids.[11] To the contrary, the Supreme Court has clearly stated that the dormant Commerce Clause does not prohibit local regulation simply because it touches on a national market. *Exxon*, 437 U.S. at 128 ("[W]e cannot

---

[10] For a discussion of the questionable nature of that characterization, *see infra* note 16.

[11] The Supreme Court explicitly rejected this kind of "extraterritorial effects" analysis in *National Pork Producers*, 143 S. Ct. at 1153-57. (*See also supra* note 9.)

adopt appellants' novel suggestion that because the economic market for petroleum products is nationwide, no State has the power to regulate the retail marketing of gas.") As this Court observed in *Portland Pipe Line II*, this is the ordinary and expected effect of any coastal jurisdiction exercising any of the regulatory authority reserved to it under the Constitution. 332 F. Supp. 3d at 315-16 ("Any local regulation or prohibition on a large and important industry will inevitably touch on federal commerce in a broad sense, given the realities of a modern globalized economy."); *see also Nat'l Pork Producers*, 143 S. Ct. at 1155-56 ("In our interconnected national marketplace, many (maybe most) state laws have the practical effect of controlling extraterritorial behavior.") This is particularly the case in a state like Maine:

> Maine is the only state that shares a border with only one other state, and Maine also shares a border with Canada. It may often be true, especially in small, rural, and relatively geographically isolated states like Maine, that certain industries or markets are comprised of a small number of firms or even a single firm. *Just because commerce in a market originates in another state or country does not mean that otherwise evenhanded regulations or prohibitions on that market automatically have the "practical effect" of discriminating against interstate or foreign commerce.*
>
> The logical implication of [such an] argument is that many perfectly ordinary health and welfare regulations would violate the dormant Commerce Clause. In a modern globalized economy, if this were enough to trigger strict scrutiny for local restrictions that are otherwise agnostic as to the state or country of origin, there would be scant room remaining for state and local police powers. *On the contrary, courts have carefully resisted the impulse to conflate neutral regulations that harm interstate firms with the sort of economic protectionism that the dormant Commerce Clause forbids.*

*Portland Pipe Line II*, 332 F. Supp. 3d at at 302-03 (emphasis added) (footnote omitted).

The Plaintiffs and the Pilots seek to avoid the rather straightforward conclusion that the Ordinance is not protectionist in a number of ways. First, they cast the Ordinance as favoring local hotels over out-of-state cruise ships. But while cruise ships and amenities associated with land-based tourism may in some instances compete for tourist dollars in a very general sense, this does

not make cruise lines and hotels direct competitors. A visit to Bar Harbor for a few hours (or less) as part of a seven- or fourteen-day cruise up and down the eastern seaboard (Flink Depo. at 17) is not at all comparable to an overnight trip to Bar Harbor requiring a hotel stay. And of course, a visitor who comes to Bar Harbor by other means cannot simply "book" an overnight stay on a cruise ship—which typically do not remain in Bar Harbor overnight in any event. (7/12/23 Tr. at 107-08, 186, 198-99; 7/13/23 Tr. at 16-17, 239; ECF 137 ¶ 6.) These are different products for different types of visitors to Bar Harbor with different needs and priorities. This argument regarding supposed favoritism towards local hotels is also undercut by the fact that the business interests bringing this very lawsuit are just as "local" as hotels—indeed, the Walsh family which owns the non-APPL Plaintiffs also owns a number of hotels, including in Bar Harbor. (7/12/23 Tr. at 60, 62-68, 75-76.)

Really, Plaintiffs' and Pilots' complaint is that the Ordinance supposedly favors "land-based" tourism over cruise ship tourism. But so-called "land-based"[12] tourism is no more or less "interstate" than cruise travel. By their own admission, "[o]ver 80 percent of Maine's land-based visitors originate in the mid-Atlantic, New England, or eastern Canada." (ECF 192 ¶ 43; Flink Depo at 24.) Plainly, many "land-based" visitors are from outside of Maine. More importantly, visitors to Bar Harbor by means other than cruise ships do not pose the same congestion problems that the Ordinance is intended to address, because they do not arrive in Bar Harbor in the same highly concentrated manner, both temporally and spatially. (7/13/23 Tr. at 237-39, 265.) It is entirely appropriate for the Town to treat cruise ship disembarkations differently based on their distinguishing characteristics. *See Philadelphia v. New Jersey*, 437 U.S. 617, 627 (1978) (noting

---

[12] The Plaintiffs and the Pilots appear to either silently lump air travel and non-cruise ship water travel into "land-based" tourism, or ignore their existence altogether. But travelers to Maine by air or by ships without overnight accommodations logically require land-based accommodations like hotels, just like those who come by car, bus, or the like.

dormant Commerce Clause permits "discriminat[ion] against articles of commerce coming from outside the State [if] there is some reason, apart from their origin, to treat them differently"). To the extent that the Ordinance does not tackle any negative effects of "land-based" visitation, the Supreme Court "has made clear that a legislature need not strike at all evils at the same time or in the same way, and that a legislature may implement its program step by step, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981) (quotation marks, alterations, and citations omitted). Moreover, the Town has a number of initiatives that seek to address negative effects of "land-based" tourism, including paid parking, limitations on short-term vacation rentals, public transportation, and improving sidewalks and walking paths. (7/13/23 Tr. at 67-71, 81-83, 100-01 164-67, 232.)

The Pilots' alternative protectionism theories are even less compelling. The Pilots' suggestion that the Ordinance benefits local interests at the expense of out-of-state competitors because "the Town will generate more parking revenue because paid parking spaces will not be blocked for cruise tour buses" (ECF 190 at 26) is ridiculous on its face and makes no attempt to demonstrate the kind of preference among competitors with which the dormant Commerce Clause is concerned. Bar Harbor parking enforcement is not a competitor of Royal Caribbean or Princess Cruises. Even if it were, the Pilots present no evidence that the Town stands to benefit from increased parking fees if cruise traffic slows, because cruise ship traffic to the Town also generates revenue in the form of fees. (7/13/23 Tr. at 75-81, 99-100.) And, in any event, the purpose of paid parking spaces is not to generate revenue, but to discourage long-term parking and help ensure the availability of parking. (7/13/23 Tr. at 68-69, 81-82.) Such revenue can only be put to limited uses dictated by statute. *See* 30-A M.R.S. § 3009(1)(C).

The Pilots also suggest that, presuming that the Ordinance will attract "smaller, boutique" cruise ships with "wealthier passenger [who] will spend more during their visit," this will "inur[e] to the benefit of local shop owners and restaurateurs." (ECF 190 at 26.)  But again, an alleged benefit to one group of local interests over another group of local interests does not offend the dormant Commerce Clause.

The last gasp of Plaintiffs' and Pilots' argument is that the Ordinance regulates cruise ships, and therefore regulates the "instrumentalities of interstate commerce," citing a line of Supreme Court cases regarding trucks, trains, and the like. *See, e.g.*, *Bibb v. Navajo Freight Lines*, 359 U.S. 520 (1959) (concerning a state law specifying certain mud flaps for trucks and trailers); *S. Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761 (1945) (addressing a state law regarding the length of trains).  But the Ordinance does not, in fact, regulate cruise ships.  It regulates the use of land in the Town.

More importantly, the Ordinance simply does not cause the kinds of burdens on commerce that concerned the Court in this line of cases.  For example, the issue in *Bibb* was that the state law at issue required contoured mud flaps for trucks and trailers that were different than the straight flaps required by surrounding states. 359 U.S. at 529-30.  Compliance with both states' rules was impossible, requiring operators to change mudguards at the border, a process which took two to four hours and could be dangerous, depending on their cargo.  *Id.* at 523, 527.  Moreover, it was "conclusively shown" that the contoured flap "possesse[d] no advantages over the conventional or straight mud flap . . . required in most of the states," and in fact there was "convincing" evidence that the contoured flaps were actually *less* safe than straight flaps.  *Id.* at 525.  The Court held that the nonexistent (or even counterproductive) safety benefits of the state law could not justify the "heavy burden" on interstate commerce caused by the state law.  *Id.* at 530-31.

Similarly, in *South Pacific*, Arizona imposed restrictions on the length of trains that drastically reduced the number of train cars that could be connected compared to other states (in some cases, more than halving the length at which trains were typically operated). 325 U.S. at 763, 771. Compliance with the law, then, "require[d] interstate trains of a length lawful in other states to be broken up and reconstituted" as they entered and exited Arizona. *Id.* at 773. As in *Bibb*, although purportedly a safety measure, the law actually made trains *more* dangerous, increasing the number and severity of accidents because it resulted in an increased number of trains. *Id.* at 775-79. In light of its heavy burden on interstate commerce and nonexistent (or even deleterious) effect on safety, the Court struck down the law. *Id.* at 783-84.

Unlike the laws in *Bibb* and *South Pacific*, the Ordinance here does not dictate how cruise ships are to be constructed, equipped, or operated. The Ordinance does not stop cruise ships as they pass through Bar Harbor's local waters and compel them to change their configuration or reduce the number of passengers they are carrying. Indeed, the Ordinance does not act on cruise ships at all. Rather, the Ordinance merely provides that only 1,000 passengers may disembark in Bar Harbor on a given day. Cruise lines are free to continue to operate as they so choose. Cruise lines, including those with ships with more than 1,000-passenger capacity, may continue to call at Bar Harbor (but pier owners must limit disembarkations in accordance with the Ordinance), or they may simply call elsewhere. The laws in *Bibb* and *South Pacific* afforded operators no such choice. Moreover, the laws in *Bibb* and *South Pacific* provided no local benefit—indeed, they actively *reduced* safety. As discussed below, the Ordinance benefits the people of Bar Harbor by reducing congestion caused by cruise ships disembarkations and improving their quality of life. *See infra* Part II.B.

### 3.      The Ordinance Has a Non-Discriminatory Purpose.

Courts have expressed skepticism that a law that does not have a discriminatory effect

could nevertheless violate the dormant Commerce Clause through discriminatory purpose alone.

*See, e.g.*, *Gwadosky*, 430 F.3d at 36 n.3 ("While courts routinely recite this test, there is some

reason to question whether a showing of discriminatory purpose alone will invariably suffice to

support a finding of constitutional invalidity under the dormant Commerce Clause."); *Portland*

*Pipe Line II*, 332 F. Supp. 3d at 300 (noting argument that an ordinance intended to discriminate

is "largely undercut" if its "practical effect is not to discriminate"); *see also Lewis*, 447 U.S. at 37

("The principal focus of inquiry must be the practical operation of the statute, since the validity of

state laws must be judged chiefly in terms of their probable effect.")  Where the Ordinance does

not discriminate either on its face or in effect, it is questionable whether even an overt

discriminatory purpose would pose a dormant Commerce Clause problem.

Thankfully, the Court need not answer this question, because the Ordinance is non-

discriminatory in its purpose.  The Ordinance's statement of purpose, although not enacted as part

of the Ordinance, is some evidence of its purpose.  That statement provides, in relevant part:

> [I]n recent years, the Town has been a popular port of call for cruise ships of varying
> sizes, from which passengers disembark via tender boats that offload passengers
> directly into the downtown area. The large numbers of passengers have
> overwhelmed the downtown area, resulting in excessive congestion and traffic on
> public streets and sidewalks, frequent overcrowding of parks and other public
> spaces, and inundating local amenities and attractions, all of which result in a
> diminished quality of life for Town residents. The unchecked and continued influx
> of disembarking cruise ship passengers in the downtown area jeopardizes the
> Town's ability to deliver municipal services to Town residents and visitors (for
> example, cruise ship passengers), including the provision of public safety services
> (police and fire), emergency medical services (EMS), in-patient and out-patient
> services at local hospitals, pandemic control measures, and public sanitation
> services, and also impacts the ability of local shops, restaurants, and other
> businesses to attract and serve customers. A town-wide survey was conducted in
> 2021, showing that a majority of respondents believe that the volume of

> disembarking cruise ship passengers is too high and has a negative impact on the
> Town and the health, safety and welfare of its residents.

(PX 237 at 2.)  Nothing in that statement adverts in any way to the origin of the ships or their passengers or crew, or any other matter that could plausibly be linked to economic protectionism. The evidence adduced at trial showed that the Ordinance was the culmination of a political process that played out over many years in which the residents of Bar Harbor—who had in previous years been more broadly supportive of cruise ship visitation—came to the collective determination that cruise ship visitation had ballooned to a point at which the large numbers of passengers disembarking in downtown Bar Harbor was creating congestion problems and otherwise negatively affecting their quality of life. (7/13/23 Tr. at 111-22, 136-39.)  This causal relationship was brought into clear focus during the COVID-19 pandemic, when there were two years of no cruise ships. (7/13/23 Tr. at 137-38, 229.)  Residents increasingly conveyed to the Council that they felt excessive cruise ship disembarkations made Bar Harbor a worse place to live and work, including by a survey that garnered some 1,500 responses—more than one-fourth Town's total population. (7/13/23 Tr. at 138-45, 167-70; DX 323.)  That survey is explicitly mentioned in the Ordinance's purpose section. (7/13/23 Tr. at 271.)  Several residents of the Town testified that they voted for the Ordinance for exactly these reasons. (7/13/23 Tr. at 212-16, 218-22, 224-39.)

Seeking to muddy the waters, the Plaintiffs and the Pilots heavily emphasize certain statements of Defendant-Intervenor Charles Sidman as supposedly revealing some hidden protectionist purpose.  There are several problems with this laser focus on Mr. Sidman.  First, in the context of traditional legislation, statements of individual legislators are of little probative value. *See, e.g.*, *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 306-07 (2017) ("What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators. . . . [F]loor statements by individual legislators rank among the least illuminating forms of

legislative history."); *Allen v. Attorney Gen. of State of Me.*, 80 F.3d 569, 575 (1st Cir. 1996) ("As

a general matter, courts must be chary of overvaluing isolated comments by individual solons.");

*City of Redondo Beach v. Padilla*, 260 Cal. Rptr. 3d 263, 274-75 (Ct. App. 2020) ("[E]xpressions

of individual legislators generally are an improper basis upon which to discern the intent of the

entire Legislature." (quotation marks omitted)); Robert C. Farrell, *Legislative Purpose and Equal

Protection's Rationality Review*, 37 Vill. L. Rev. 1, 29-31 (1992) (noting that statements of

individual legislators are of limited value in determining legislative purpose, as they are "selective

and sometimes contradictory").  As one commentator put it:

> Statements from the floor represent the motivations of individual legislators.  As a
> result, the statements vary greatly and are often contradictory.  Additionally, only
> a small percentage of legislators casting votes typically explain for the record the
> reasons for their vote.  It is thus arbitrary to give weight only to those views that
> were saved in the legislative record.

Farrell, *supra*, at 30.  While remarks of individual legislators "are evidence," they "[c]learly . . .

are not controlling and do not compel any conclusion that the remarks reflect legislative intent."

*Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 14 n.4 (1st Cir. 2010).

Second, this case does not involve traditional legislation, but rather a citizen-initiated

ordinance.  In this scenario, the "legislature" is the voting population of the Town of Bar Harbor,

acting through its Town Meeting. *See Wawenock, LLC v. DOT*, 2018 ME 83, ¶ 16, 187 A.3d 609

("Interpreting citizen-enacted legislation requires us to 'ascertain the will of the people' rather than

the will of the Legislature." (quoting *Opinion of the Justices*, 2017 ME 100, ¶ 7, 162 A.3d 188)).

This makes reliance on the statements of any one person an even more dubious method of divining

legislative intent.  As this Court has indicated, "'[s]tatements by a law's private-sector proponents

sometimes can shed light on its purpose' but the isolated correspondence of a single proponent

'has little (if any) probative value in demonstrating the objective of the legislative body as a

whole.'" *Portland Pipe Line II*, 332 F. Supp. 3d at 303 (quoting *Gwadosky*, 430 F.3d at 39). Mr. Sidman is only one of seven members of the Petitioning Committee that initiated the Ordinance. (7/13/23 Tr. at 262-63.) His statements cannot be understood as representative of all of the other six members of that committee, let alone the entire electorate of Bar Harbor that actually enacted the Ordinance.[13]

In any event, the Plaintiffs' and the Pilots' fixation on Mr. Sidman avails them nothing, because nothing in Mr. Sidman's statements contains any hint of the type of protectionist discrimination that might run afoul of the dormant Commerce Clause. Rather, his statements uniformly show a concern with the negative effects of large numbers of passengers disembarking from cruise ships on a single day. The Plaintiffs and the Pilots seek to read discriminatory purpose into the Ordinance by conflating Mr. Sidman's references to "big" ships with "foreign" ships, and his references to "small" ships with "local" ships. (ECF 191 at 36 (citing PX 72, DX 357)). But, of course, "big" is not "foreign," and "small" is not "local."[14] The Ordinance applies to all cruise ships, big or small, local or foreign—indeed the smaller ships that Plaintiffs and the Pilots contend the Ordinance favors are themselves exclusively out-of-state. That larger cruise ships tend to be foreign-flagged (Flink Depo. at 13-15, 19-20) is simply a function of those cruise lines' chosen business model and methods of operation, which the dormant Commerce Clause does not protect.

---

[13] Plaintiffs appear to have had a recent change of heart about the importance of Mr. Sidman's—or any one individual's—state of mind. As Plaintiffs' counsel recognized at trial, "this ordinance is not the will of Charles Sidman, it's the will of the voters of Bar Harbor." (7/13/23 Tr. at 107.) Counsel later continued: "I would really very strongly object to any individual . . . coming in and testifying as to what the intent of the voters were when the voters decided to endorse this on November 8th." (*Id.* at 132.)

[14] Plaintiffs also suggest that Mr. Sidman "promoted . . . the Ordinance as a way of weeding out the less well-to-do large cruise ship patrons and displacing them with patrons of small cruise ships with superior wealth and taste." (ECF 191 at 28.) But even if this were an accurate reflection of the Ordinance's legislative intent, this is categorically not the type of "discrimination" with which the dormant Commerce Clause concerns itself—protection of in-state interests from out-of-state competitors.

*See infra* note 16. Large cruise ships remain free to call at Bar Harbor—the piers simply may not disembark more than 1,000 passengers a day. If the cruise lines that operate these large ships feel it is not sufficiently profitable for them to continue to call at Bar Harbor with this limit in place, they may simply take their business elsewhere—but they would in no sense have been "excluded" from Bar Harbor except by their own choice.

While reasonable people might disagree with the opinion of Mr. Sidman or any of the large majority of voters who favored the Ordinance, or the method by which the Ordinance seeks to remedy the problems associated with cruise ship visitation, there is absolutely no evidence that the Ordinance was motivated in any way—let alone primarily—by economic protectionism aimed at benefiting in-state interests over out-of-state competitors. *See Exxon*, 437 U.S. at 125, 127-28 (noting that while one might doubt the "wisdom" of a particular measure, this does not equate to discrimination against interstate commerce). This makes sense, given that the Ordinance *does not* benefit in-state interests over out-of-state competitors. *See Portland Pipe Line II*, 332 F. Supp. 3d at 300 (noting argument that an ordinance intended to discriminate is "largely undercut" if its "practical effect is not to discriminate").

**B.      The Ordinance Does Not Impose a "Clearly Excessive" Burden on Interstate or Foreign Commerce in Relation to its Local Benefits.**

When a law does not facially discriminate, or have the purpose or effect of favoring local economic interests over foreign or out-of-state interests, it is upheld unless the burdens on foreign or out-of-state interests are clearly excessive in relation to the putative local benefits. *See Portland Pipe Line II*, 332 F.Supp.3d at 308 (citing *Pike*, 397 U.S. at 142.) State and local laws "frequently survive this *Pike* scrutiny." *Id.* (quoting *Davis*, 553 U.S. at 339). Because the Plaintiffs and the Pilots cannot show that the Ordinance imposes any burden at all on foreign and interstate

commerce, they certainly cannot show that the Ordinance imposes burdens on foreign and interstate commerce that are clearly excessive in relation to its putative local benefits.

At the outset, it must be recognized that, although *Pike* is not dead, it is on life support. This is evident in the Supreme Court's recent opinion in *National Pork Producers v. Ross*, 143 S. Ct. 1142. There, three justices of the Court indicated that they would do away with *Pike*'s balancing test completely. *See id.* at 1159-61, 1163-64 (plurality opinion of Justice Gorsuch with respect to Parts IV-B and IV-D, joined by Justices Thomas and Barrett); *see also id.* at 1172 (Kavanagh, J., concurring in part and dissenting in part) (recognizing that Justice Gorsuch's opinion in Parts IV-B and IV-D, joined by Justices Thomas and Barrett, would overrule *Pike*). While a majority of the Court is apparently not prepared to fully move on from *Pike*, the Court nevertheless articulated a far narrower understanding of *Pike* than the Plaintiffs and Pilots would have this Court apply.

First, the Court held that, although a genuinely nondiscriminatory state law might theoretically be invalid under *Pike*, there is "no clear line" separating *Pike* and the Court's antidiscrimination precedents. *Id.* at 1157 (quoting *Tracy*, 519 U.S. at 298 n.12). Indeed, *Pike* itself turned on the existence of discrimination—although the law in that case was facially neutral, its practical effects revealed the discriminatory purpose of insulating in-state cantaloupe processing and packaging businesses from out-of-state competition by requiring cantaloupes grown in the state to be processed and packaged in state. *Id.* at 1158 (citing *Pike*, 397 U.S. at 138-140, 145-46). *Pike's* "heartland" lies in the same anti-protectionist principles underlying the balance of the Court's dormant Commerce Clause jurisprudence; *Pike* merely "serves as an important reminder that a law's practical effects may also disclose the presence of a discriminatory

purpose." *Id.* at 1157-59; *see also* R. Fallon, *The Dynamic Constitution* 311 (2d ed. 2013) (observing that *Pike* serves to "'smoke out' a hidden" protectionism).

Second, the Court held that, before *Pike* balancing is even required, the plaintiff must first show a "substantial burden" on interstate commerce. *Id.* at 1161-63 (plurality opinion of Justice Gorsuch as to Part IV-C, joined by Justices Thomas, Sotomayor, and Kagan); *see also id.* at 1172, 1176 (Kavanagh, J., concurring in part and dissenting in part) (recognizing that four-justice plurality opinion in Part IV-C is "controlling precedent"). The California law challenged in *National Pork Producers*, Proposition 12, prohibited in-state sale of pork from pigs "confined in a cruel manner" that prevented them from lying down, standing up, extending their limbs, or turning around. *Id.* at 1150-51. The plaintiffs—organizations representing pig farmers and processors—alleged that Proposition 12 would require sweeping changes to the vertically integrated pork production industry in order to segregate and trace pork that complied with California law. *Id.* at 1161-62. The Court held that plaintiffs had failed to allege substantial harm to interstate commerce, and therefore did not even reach *Pike* balancing. *Id.* at 1161-63. The Court noted that pork producers had a choice: "They may provide all their pigs the space the law requires; they may segregate operations to ensure pork products entering California meet its standards; or they may withdraw from that State's market." *Id.* at 1162-63. Even though that choice primarily fell on out-of-state business, this was not a substantial burden on interstate commerce, but rather a burden on a "particular structure or method of operation" that the dormant Commerce Clause does not protect. *Id.* at 1162 (alteration omitted) (quoting *Exxon*, 437 U.S. at 127). Market share shifting from "one group of profit-seeking, out-of-state businesses (farmers who stringently confine pigs and processors who decline to segregate their products)" to another "who raise and trace Proposition 12-compliant pork" did not offend the Constitution. *Id.*

Similarly, *Exxon Corp. v. Governor of Maryland* involved a Maryland law prohibiting petroleum producers from operating retail gas stations in the state. 437 U.S. at 119-21. Because Maryland had no in-state petroleum producers, the law's "divestiture requirements" fell "solely on interstate companies," and threatened to force some of them to withdraw entirely from the state. *Id.* at 125-27. The plaintiffs claimed that the law thereby interfered with the natural functioning of the interstate market and would change the market structure by weakening independent refiners. *Id.* at 127. The Court found this insufficient as a matter of law to demonstrate a substantial burden on interstate commerce. The "burden" was not on commerce, but on their particular business model, and the dormant Commerce Clause does not protect "the particular structure or methods of operation in a retail market." *Id.* "[I]nterstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Id.* at 127.

Like the plaintiffs in *Exxon* and *Ross*, the Plaintiffs and Pilots have not shown any burden on interstate commerce, much less a substantial one. The Plaintiffs and the Pilots, having failed to show the type of protectionist discrimination that is *Pike*'s "heartland," allege a number of supposed deleterious effects the Ordinance will have on the bottom line of some cruise lines and their own local businesses. But again, the dormant Commerce Clause does not protect "the particular structure or method of operation" of the cruise industry. *Nat'l Pork Producers*, 143 S. Ct. at 1162 (alteration omitted) (quoting *Exxon*, 437 U.S. at 127). Rather, it defends against laws that create local preferences. Under the Ordinance, all cruise lines retain equal access to the local market, no matter their origin. *See Houlton*, 175 F.3d at 188. Again "[i]n the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce

*or undue burden upon it*, to which the dormant Commerce Clause may apply." *Portland Pipe Line II*, 332 F. Supp. 3d at 300 (emphasis added) (quoting *Tracy*, 519 U.S. at 300).

Because no substantial burden on interstate commerce has been shown, the Court need not reach the question of the Ordinance's local benefits for purposes of *Pike* balancing.  But the Ordinance has a number of clear local benefits.  Town Council Chair Valerie Peacock testified to the long history of concerns regarding ballooning cruise ship visitation, as well as different approaches the Town has taken to try to address the problem, including voluntary passenger caps.  (7/13/23 Tr. at 111-26, 136-57, 167-76).  Over fifteen years ago, the Town's 2007 Comprehensive Plan recognized problems associated with cruise ship visitation, including congestion, water quality, and changes in the character of the Town making it a less desirable place to live and work.  (DX 250A at 77, 85, 217-21, 344, 346, 351, 368-70, 396-97; 7/13/23 Tr. at 115-18).  Over time, more and more ships began to call at Bar Harbor, and the ships got larger and larger.  (7/13/23 Tr. at 136-37.)  There were more days with ships, and more days with multiple ships, to the point where, in September 2019, there was not a single day without a ship.  (*Id.*)  In recent years, surveys of residents showed that most people were concerned about congestion due to cruise ship disembarkations.  (7/13/23 Tr. at 139-45; DX 323)  Plaintiffs and Pilots' own expert, Dr. Todd Gabe, testified that cruise passengers increase sidewalk congestion.  (7/12/23 at 250; DX 319, 402.)  Indeed, the Pilots admit, as they must, that the Ordinance will achieve "reduction in passenger traffic at the piers themselves or in the near proximity to the piers."  (ECF 190 at 41.)

The Plaintiffs and the Pilots quibble with the magnitude of these benefits, or dismiss them as based on "feelings."  But they cite no authority that local laws must have *economic* or easily quantifiable benefits to survive *Pike* scrutiny.  Indeed, state and local laws can be upheld based on noneconomic considerations like quality of life, aesthetics, or morality, even when those concerns

may be "somewhat overstated" but "sincere." *Portland Pipe Line II*, 332 F. Supp. 3d at 310-12 (upholding ban on crude oil loading on waterfront where municipality had "sincere concerns" about air quality, aesthetics, and effects on waterfront redevelopment goals); *see also Nat'l Pork Producers*, 143 S. Ct. at 1159 (noting difficult of balancing economic burdens of animal cruelty law against noneconomic benefit of promoting animal welfare).

Ultimately, Plaintiffs' and Pilots' contentions amount to little more than a policy disagreement that is best left to the legislative process rather than circumventing that process by judicial fiat. If business interests, including those that brought this lawsuit, as well as the cruise lines themselves, take issue with the Ordinance, they can avail themselves of those processes at the local, state, and federal levels. Plaintiffs could lobby the Council and their fellow citizens, or even vote in Councilors more amenable to their views. Instead, they ask this Court to do what they have been unable or unwilling to do politically, even calling as a witness a *former* member of the Council sympathetic to their position. (7/11/23 Tr. at 130-31, 135.) The dormant Commerce Clause is not a substitute for a democratic policymaking process—rather it is a tool to be deployed with "extreme caution" and "extreme delicacy," against "especially discriminatory" laws, and "only where the infraction is clear." *Nat'l Pork Producers*, 143 S. Ct. at 1165. If the Ordinance really does threaten some massive disruption of the cruise industry—notably, the cruise industry has declined to join this challenge to the Ordinance—the industry is free to petition Congress to intervene under the "wakeful" Commerce Clause. *Id.* at 1160-61.

The Ordinance does not discriminate against foreign or out-of-state business interests, and it provides a better quality of life and a more enjoyable experience for persons living, working, and visiting Bar Harbor. The Plaintiffs' and Pilots' Commerce Clause challenges fail, therefore, because even if these local lifestyle benefits from the Ordinance are modest and difficult to

quantify, the Ordinance imposes no demonstrated burden on foreign and interstate commerce, let alone one that is "clearly excessive" in relation to them. The burden of which the Plaintiffs complain is only the burden on their local business interests and preferred methods of doing business, not a burden on interstate commerce.

### C.   The Ordinance Does Not Violate the Dormant Foreign Commerce Clause.

"The dormant Foreign Commerce Clause exists to ensure that the United States speaks with a unified voice when it engages in foreign trade." *Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 329 (1st Cir. 2012). "The same analytical framework applies to the dormant Foreign Commerce Clause as is used for the dormant Interstate Commerce Clause, except that state restrictions that burden foreign commerce are subjected to a more rigorous and searching scrutiny, and consideration is given to any impediment of the federal government's ability to speak with one voice in regard to regulation of foreign commerce." *Hartford Enters. v. Coty,* 529 F. Supp. 2d 95, 104 (D. Me. 2008) (citations and quotation marks omitted).  In order to make out a claim under this "one voice" rubric, Plaintiffs and the Pilots must show discriminatory treatment against foreign commerce in the form of a "preference for domestic commerce over foreign commerce." *Kraft Gen. Foods v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 79 (1992).  They have failed to do so.[15]

As discussed above with respect to the general dormant Commerce Clause analysis, no discrimination exists in this case.  The Ordinance applies to all disembarkations from cruise ships

---

[15] Plaintiffs' and the Pilots' arguments here are little more than a retread of their preemption arguments. Indeed, several of the cases on which they rely are not even Commerce Clause cases, but rather preemption cases. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374 n.8 (2000) (declining to reach issues of foreign affairs power or dormant Foreign Commerce Clause because Court concluded state statute conflicted with federal law); *United States v. Locke*, 529 U.S. 89, 94 (2000) ("Today we must determine whether these more recent [Washington] state laws [regulating tanker operations and design] can stand despite the comprehensive federal regulatory scheme governing oil tankers.  Relying on . . . federal statute . . . , we hold that some of the State's regulations are pre-empted . . . .").

in Bar Harbor, regardless of the origin of either the passengers or the ship. That some (but not all)

cruise ships are foreign flagged, and that some (but not all) may call at Bar Harbor after calling at

a foreign (Canadian) port is of no relevance. This has no bearing whatsoever on the application of

the Ordinance, rather, it is incidental to those cruise lines' own choice to skirt the burdens of U.S.

laws.[16] Other than these minimal concessions to avoid U.S. regulations, cruise ships that call in

this region shuttle mostly domestic passengers among mostly domestic ports. (ECF 192 ¶ 43;

Flink Depo. at 24; 7/12/23 Tr. at 173-74) In effect, Plaintiffs and the Pilots request that this Court

enshrine the cruise lines' choice of business model in the U.S. Constitution, and hold that the

Constitution guarantees them unfettered access to local ports.

---

[16] As Ms. Flink explained, for a vessel to be domestic-flagged in the U.S., it must: (1) be owned by a U.S. company, (2) have been built in the U.S., and (3) be largely crewed by an American crew. (Flink Depo.at 14-15.) *See also* 46 U.S.C. §§ 12112, 12113 (requiring vessel be built in U.S. and owned by U.S. entity to receive coastwise endorsement). Flying a foreign "flag of convenience" allows cruise lines to avoid U.S. taxes and regulations and paying for American labor. *See* 26 U.S.C. § 883(a)(1) (exempting from taxation "[g]ross income derived by a corporation organized in a foreign country from the international operation of a ship or ships"); *Cruise Connections Charter Mgmt. 1, LP v. AG of Can.*, 967 F. Supp. 2d 115, 131 (D.D.C. 2013) ("In the cruise industry, cruise lines are structured to avoid paying corporate taxes. They sail foreign flagged ships and normally are in port for less than 24 hours. These conditions help the cruise lines avoid taxes."); Arman Avagyan, *Addressing the Criticism on Flags of Convenience: Should Flags of Convenience Be Abolished for the Cruise Industry?*, 28 Sw. J. Int'l L. 129, 130 (2022) (noting flags of convenience "give cruise companies the ability to shift their profits from high-tax jurisdictions that strictly enforce safety and labor regulations to lowtax jurisdictions with often weakly enforced safety and labor regulations"); Avery E. Autin, *The ADA Aboard Foreign-Flag Cruise Ships: Addressing the Questions Left Unanswered by Spector v. Norwegian Cruise Line Ltd.*, 96 Tul. L. Rev. 531, 534 (2022) (noting cruise lines fly flags of convenience in order to be subject to "lower taxes, lower operating costs, and fewer regulations"). As a direct consequence of the cruise lines' race to the bottom in terms of regulation, their itineraries *must* include a non-U.S. port, in order to comply with the Passenger Vessel Services Act, which prohibits coastwise transport of passengers between U.S. ports by foreign vessels. 46 U.S.C. § 55103 (prohibiting vessels from transporting passengers between U.S. ports unless they are "wholly owned by citizens of the United States" and have coastwise endorsement under 46 U.S.C. § 12112.). As Adam Goldstein explained, "you have to go to Canada in order for the ship to be a qualifying cruise in this region if you're starting from the United States and/or ending in the United States." (7/12/23 Tr. at 173-74). The characteristics upon which Plaintiffs and the Pilots seek to define cruise lines as inherently "foreign" are, in fact, largely a fiction to allow mainly U.S.-based companies to avoid U.S. laws. *See* Avagyan, *supra*, at 145 n.88 (noting that cruise industry is "an American industry on its surface" because three largest cruise companies are headquartered in Miami, Florida). The only cruise line active in Maine that flies under the flag of the United States is American Cruise Lines. (ECF 137 ¶ 31; Flink Depo. at 19-20.)

Here again, this Court's decision in *Portland Pipe Line II* is instructive. There, the plaintiff pipeline operator argued that a ban on loading crude oil on the South Portland waterfront violated the dormant Foreign Commerce Clause because federal uniformity was needed in commercial shipping, and because the law impaired the federal government's ability to speak with "one voice" to other nations in the context of cross-border pipelines. *Portland Pipe Line II*, 332 F. Supp. 3d at 295. This Court disagreed. First, the ordinance did not explicitly target any foreign countries, and did not conflict with any specific federal laws. *Id.* at 314-15. Second, such a broad understanding of the dormant Foreign Commerce Clause would effectively prohibit coastal jurisdictions from regulating *any* significant industry:

> Consider the federal rule that [plaintiff] implies is necessary in order to avoid impairing federal uniformity in an area where federal uniformity is essential. The uniform federal rule apparently must prohibit localities from banning certain petroleum handling activities like crude oil loading within their borders. *To put it another way, according to [plaintiff's] argument, the dormant Commerce Clause requires all coastal jurisdictions to allow crude oil loading at their shores. Otherwise, oil markets would shut down if many or all localities chose to prohibit such activities.*

> But the same could be said of nearly any local prohibition on any good, service, or activity pursuant. If every jurisdiction prohibited handling fireworks, interstate and international markets in fireworks would shut down. If [plaintiff] were correct, many of South Portland's longstanding prohibitions on other industrial activities would also be invalid, as would those of other localities, like Portland and Cape Elizabeth. *There is no indication in the caselaw that the "one voice" test requires all coastal jurisdictions to permit all activities that might contribute to a significant international market.*

> The Ordinance merely has "foreign resonances" because it impacts a piece of cross-border infrastructure and a large industry. *Any local regulation or prohibition on a large and important industry will inevitably touch on federal commerce in a broad sense, given the realities of a modern globalized economy.* But that does not mean it impermissibly interferes with the government's ability to "speak with one voice" when regulating foreign commerce or impairs uniformity in an area where federal uniformity is essential.

*Id.* at 315-16 (emphasis added). Like the ordinance in *Portland Pipe Line II*, Bar Harbor's Ordinance does not target any foreign country. And like *Portland Pipe Line II*, "foreign resonances" do not suffice to show an overriding need for federal uniformity.

The Pilots seek to cast the Ordinance as an extreme outlier, complaining, without evidence and with numerous qualifications, that "[n]o other significant port physically capable of disembarking passengers from similar-sized vessels restricts disembarkation in the same manner as the Ordinance."[17] (ECF 190 at 30.) However, they later let slip that their real concern is "copycat bans" by other municipalities, which they suggest would grind cruise traffic to a halt. (*Id.* at 33.) Setting aside the speculative nature of this argument,[18] it is unclear how this logically follows. If, as the Pilots fear, other municipalities enacted similar ordinances, that would not leave cruise ships with competing, inconsistent obligations to different municipalities requiring them to choose between complying with one command over another. As in *Portland Pipe Line II*, the "nightmare scenario" the Pilots suggest "is not perplexing disuniformity, it is simply unfavorable uniformity." 332 F. Supp. 3d at 315. Although such unfavorable uniformity might offend the Pilots, it does not offend the dormant Foreign Commerce Clause.

### III.    The Ordinance Does Not Violate Plaintiffs' Due Process Rights.

Plaintiffs argue that the Ordinance violates their substantive due process rights. "[U]nder the federal Due Process Clause, a state action will be reviewed for strict scrutiny only where it interferes with a fundamental right; otherwise, it is reviewed under the more lenient rational basis

---

[17] The basis for this claim is unclear. Notably, Rockland, which is one of the other Maine ports that can accept foreign-flagged vessels (Flink Depo at 19-20, 127), only allows *six total ships* of over 500 lower berth capacity per year, unless a waiver is authorized. (Flink Depo. at 95-96.)

[18] The evidence showed that at least one community that does not currently receive cruise ships—Searsport—is interested in doing so and in becoming a Class A port, and is well situated and equipped to do so. (Flink Depo. at 10, 91; 7/11/23 Tr. at 91, 113-17; DX 426).

standard." *Kenyon v. Cedeno-Rivera*, 47 F.4th 12, 24 (1st Cir. 2022). "A law survives rational

basis review so long as the law is rationally related to a legitimate governmental interest." *Cook*

*v. Gates*, 528 F.3d 42, 55 (1st Cir. 2008). This standard is satisfied as long as there is some

"reasonably conceivable state of facts that could provide a rational basis" for the challenged law.

*Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 107 (1st Cir. 2015) (discussing rational basis

standard in context of equal protection and substantive due process challenges).

    As Plaintiffs recognize, this is an exceedingly low bar. Yet, Plaintiffs do nothing to carry

their heavy burden other than rehashing the same arguments made in support of their Commerce

Clause challenge, as already addressed above. In particular, Plaintiffs again improperly cast Mr.

Sidman in the role of a legislative body and treat his statements as if they constitute the sole source

of legislative history for the Ordinance. They do not—as discussed above, they are particularly

weak evidence of legislative intent. The Ordinance emerged out of and was a direct reaction to a

years-long legislative process in which the Council attempted to better manage congestion in

downtown Bar Harbor caused by disembarking cruise passengers. *See supra* Part II.B. Plaintiffs

also assign significance to the fact that the Ordinance applies year-round rather than seasonally.

This type of narrow tailoring argument has absolutely no relevance to a rational basis analysis.

Where it is certainly "conceivable' that the Ordinance will reduce congestion and demands on

local services, and otherwise improve quality of life in Bar Harbor, *see supra* Part II.B, the

Ordinance easily survives rational basis review.

## IV.    Plaintiffs Have Neither Pleaded Nor Proven a Violation of the Right to Travel.

    In the midst of their Commerce Clause arguments, Plaintiffs, for the first time, appear to

challenge the Ordinance on the basis of the "individual right to travel." (ECF 191 at 27.) This

comes as something of a surprise, as their 128-paragraph Complaint does not plead any violation

of the right to travel (ECF 1), and indeed, Plaintiffs have affirmatively sworn off any such claim and acknowledged that they do not have standing to assert any such rights. In their Motion for Preliminary Injunction, Plaintiffs state: "Plaintiffs do not, themselves, plead the rights of the traveling public." [19] (ECF 12 at 24 n.12.)

Even if any such claim were in play here, it avails Plaintiffs nothing. The "right to travel" consists of three components: (1) the right to leave one state and enter another, (2) the right to be "treated as a welcome visitor rather than an unfriendly alien when temporarily present" in another state," and (3) the right of travelers who elect to become permanent residents to be treated like other citizens of that state. *Saenz v. Roe*, 526 U.S. 489, 500 (1999). Only the first component—the right to physically enter the state—is even arguably at issue here. "The constitutional protection of a right to travel from state to state is not contravened when a State enacts and enforces reasonable regulations to promote public safety." *State v. Elliott*, 2010 ME 3, ¶ 18, 987 A.2d 513 (citing *State v. Quinnam*, 367 A.2d 1032, 1034 (Me. 1977)). "As long as a statute constraining such activity bears a rational relationship to the state's legitimate governmental purpose, the government action is not unconstitutional."[20] *Id.* Travelers do not have a constitutional right to the most convenient form of travel. *Town of Southold v. Town of East Hampton*, 477 F.3d 477 F.3d 38, 54 (2d Cir. 2007); *Houston v. FAA*, 679 F.2d 1184, 1198 (5th Cir. 1982). Likewise, "burdens on a single mode of transportation do not implicate the right to interstate travel." *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999).

---

[19] The Pilots, for their part, make a single reference to the right to travel in a string citation parenthetical, but do not purport to make any right to travel argument. (ECF 190 at 25.)

[20] Only when a state acts to restrict travel "with intent to settle and abide" must the law withstand strict scrutiny. *Brown v. Dep't of Inland Fisheries & Wildlife*, 577 A.2d 1184, 1185 (Me. 1990) (quoting *Cole v. Housing Auth.*, 435 F.2d 807, 811 (1st Cir. 1970)); *see also Lambert v. Wentworth*, 423 A.2d 527, 532 (Me. 1980) (stating that where a "residency requirement is not a real impediment to interstate travel," the usual rational basis standard, not strict scrutiny, is applied).

A law survives rational basis review so long as there is some "reasonably conceivable state of facts that could provide a rational basis" for the law. *Mulero-Carrillo*, 790 F.3d at 107. As discussed above with respect to Plaintiffs' Due Process challenge, the Ordinance easily clears this exceedingly low bar.

## V.   Maine Law Does Not Preempt the Ordinance.

The Maine Constitution grants municipalities broad "home rule" authority to enact laws "on all matters, not prohibited by Constitution or general law, which are local and municipal in character." Me. Const. art. VIII, pt. 2, § 1. The Maine Legislature has codified and implemented this constitutional reservoir of municipal authority in 30-A M.R.S. § 3001, which provides, in relevant part:

> **§3001. Ordinance power**
>
> Any municipality, by the adoption, amendment or repeal of ordinances or bylaws, may exercise any power or function which the Legislature has power to confer upon it, which is not denied either *expressly or by clear implication*, and exercise any power or function granted to the municipality by the Constitution of Maine, general law or charter.
>
> **1. Liberal construction.** This section, being necessary for the welfare of the municipalities and their inhabitants, shall be liberally construed to effect its purposes.
>
> **2. Presumption of authority.** There is a rebuttable presumption that any ordinance enacted under this section is a valid exercise of a municipality's home rule authority.
>
> **3. Standard of preemption.** The Legislature shall not be held to have implicitly denied any power granted to municipalities under this section unless the municipal ordinance in question would frustrate the purpose of any state law.

30-A M.R.S. § 3001(1)-(3) (emphasis added). In other words, ordinances are presumed to be valid exercises of municipalities' home rule powers, unless preempted "expressly" or "by clear implication." Interpreting this provision, the Law Court has said that

> [p]ursuant to the "home rule" provision of 30-A M.R.S. § 3001 . . . a municipality may exercise its authority to adopt an ordinance if that power is not denied either expressly or by clear implication under state law. Local ordinances are presumptively valid, 30-A M.R.S. § 3001(2), and an ordinance will be invalidated only when the Legislature has expressly prohibited local regulation, or when the Legislature has intended to occupy the field and the municipal legislation would frustrate the purpose of a state law. Accordingly, an ordinance will be preempted only when state law is interpreted to create a comprehensive and exclusive regulatory scheme inconsistent with the local action or when the municipal ordinance prevents the efficient accomplishment of a defined state purpose.

*Portland Pipe Line Corp. v. City of S. Portland*, 2020 ME 125, ¶ 23, 240 A.3d 364 (quoting *Dubois*

*Livestock, Inc. v. Town of Arundel*, 2014 ME 122, ¶ 13, 103 A.3d 556).

While the Maine Legislature has enacted laws regulating navigation, *see, e.g.*, 38 M.R.S.

§§ 1-285, it has made clear that municipalities retain home rule authority over their own local

waters. Of particular note is Maine's Harbor Masters Act, 38 M.R.S. §§ 1-13. The Harbor Masters

Act provides, in relevant part:

> The municipal officers of all maritime towns . . . may make rules and regulations, with suitable provision for enforcement, to keep open convenient channels for the passage of vessels in the harbors and waterways of the towns or townships for which they act, and may establish the boundary lines of those channels and assign suitable portions of their harbors and other coastal and tidal waters within their jurisdiction for anchorages.
>
> . . .
>
> Such rules and regulations as may be made by those municipal officers . . . shall be enforced and carried out by the harbor master of that town or unorganized township, or any other law enforcement officer of the State or any political subdivision of the State.

38 M.R.S. § 2. Where municipal officers have established such channel lines, the statute provides

that the harbor master "shall assign" mooring spaces. 38 M.R.S. § 3. The Act also has provisions

regarding transfers of and rental arrangements regarding mooring assignments, allotment of

mooring spaces to non-residents, and other matters. *See* 38 M.R.S. §§ 3, 3-A, 7-A, 8. Although

it restricts certain practices with respect to mooring assignments, the statute provides:

> *Nothing in this subchapter may be construed to be a limitation on the authority of municipalities to enact ordinances to regulate the assignment or placement of moorings and other activities in their harbors.* These ordinances may include, but are not limited to: A process for assigning mooring privileges and determining the location of moorings; a waiting list for the assignment of mooring privileges; a fee schedule; construction standards for moorings; time limits on the mooring of vessels; a process for appeals from decisions of the harbor master; provisions that recognize that mooring privileges in lawful existence on the effective date of an ordinance may be preserved or continued after adoption of that ordinance, the location and use to be determined by the harbor master or other appropriate local authority; and provisions that establish a harbor commission or committee to administer the ordinance or ordinances and oversee the duties of the harbor master. Regulations adopted by the municipal officers under section 2 remain in effect unless the *municipality's legislative body enacts an ordinance pertaining to the same matter pursuant to the Constitution of Maine, Article VIII, Part 2, and Title 30-A, section 3001* [the home rule provisions discussed above].

*Id.* § 7 (emphasis added).  In other words, the Legislature explicitly recognizes and leaves undisturbed "the authority of municipalities to enact ordinances to regulate . . . activities in their harbors," and even explicitly identifies municipalities' constitutional and statutory home rule powers as the source of that authority.  *Id.*; *see also Griffin v. Town of Cutler*, Civ. No. 05-52-B-W, 2006 WL 2668460 at *16 (D. Me. Sept. 15, 2006) (recommended decision of magistrate judge later adopted by court) (noting that Harbor Masters Act does not "take away any regulatory power held by the municipality").[21]

The Pilots argue that two particular sets of Maine statutes preempt the Ordinance.  Each is addressed in turn.

### A.     The Ordinance Does Not Interfere with the Maine Pilotage Statute.

The Pilots first allege that the Ordinance is preempted by 38 M.R.S. §§ 85 *et seq*. (the "Pilotage Statute").  The Pilotage Statute establishes the Maine Pilotage Commission and requires that certain vessels entering or departing from certain ports or harbors in Maine take a pilot licensed

---

[21] Consistent with the statute, Bar Harbor has given its Harbormaster authority to accept or reject cruise ship bookings based on the Town's standard operating procedures, and assign cruise ships berths in either Anchorage A or Anchorage B in Frenchman Bay.  (7/13/23 Tr. at 17-19; PX 29A.)

under those statutes.  38 M.R.S. §§ 86, 86-A, 87-A, 89-90.  The goal of the Pilotage Statute is to ensure the safety of vessels entering and leaving Maine waters.  38 M.R.S. § 85.  To that end, the Statute makes pilotage compulsory for covered vessels, and likewise requires that pilots provide those services.  (7/11/23 Tr. at 93:13-21.)  The Statute also charges the Pilotage Commission with setting pilots' rates.[22]  38 M.R.S. §§ 90(1)(B), 96.

Nothing in the Pilotage Statute expressly or by clear implication requires that very large cruise ships come to Bar Harbor, much less that they be permitted to disembark more than 1,000 passengers daily.  Limiting cruise ship disembarkations in Bar Harbor to 1,000 passengers daily poses absolutely no threat to the safety of vessels navigating in Maine waters.  Indeed, if the Pilots' and Plaintiffs' catastrophizing regarding large cruise ships removing Bar Harbor from itineraries proves accurate, this would arguably *enhance* the safety of nearby waters by reducing the volume of large ship traffic. The Pilotage Statute as applied to Frenchman's Bay was enacted in 1985, long before any significant large cruise ship traffic came to Bar Harbor, *see* P.L. 1985, c. 389, § 33, so the Legislature could have hardly intended by that to require Bar Harbor to maximize the number of cruise ships or other ships coming to Bar Harbor in need of a pilot.

The Pilots' real complaint is that the Ordinance would reduce their revenue if less large cruise ships visit Bar Harbor. But, as the Pilots admit, the Pilotage Statute "does not guarantee financial success or wealth for State-licensed Pilots." (ECF 190 at 47.)  The purpose of the Statute and the pilotage system it creates is to ensure safety, not to generate revenue.  (7/11/23 Tr. at 90:18-21.)  Nothing in the Statute requires the people of Bar Harbor, or any other municipality, to give up their home rule authority in order to maximize revenue for the Pilots.  Seeking to avoid this

---

[22] These standard rates are charged to the ships serviced.  From those funds, individual pilots are paid a monthly salary, and if there is a surplus at the end of the year, it is distributed to the pilots in the form of a bonus. (7/11/23 Tr. at 90:5-17.)

rather straightforward conclusion, the Pilots complain that any such revenue reduction might force them to make operational changes, such as moving from an "as needed" service model to an "as available" model, and possibly no longer having a pilot boat permanently stationed in Frenchman Bay. It is unclear how this could be the case, when the CAT ferry service, which in 2022 resumed operations after more than a decade hiatus, will require pilotage services in Bar Harbor on a daily basis throughout the summer months. (7/11/23 Tr. at 87-89, 100-01; 7/13/23 Tr. at 23-24.) But even if this were true, the Statute does not require them to maintain "as needed" pilotage services in Frenchman's Bay. (7/11/23 Tr. at 117:17-24.) The Pilots tailoring their operations to the demand for their services is exactly what the Statute contemplates. *See Bay Ferries, Ltd. v. Bd. of Comm'rs for the Port of Portland*, No. AP-17-48, *7 (Me. Super. Jun. 1, 2018) (Walker, J.) (noting, in decision vacating 50% rate increase for Portland Pilots as unsupported by substantial evidence, that "trimming the staff is an expected response to lower demand for pilotage services"). As the Pilots' President, Captain David Gelinas, testified, the Pilots will "figure out a way of still addressing the needs of whatever smaller ships were going to Bar Harbor." (7/11/23 Tr. at 72:2-15.)

The Pilots' argument, in addition to having no basis in the Statute, requires this Court to assume that the Maine Pilotage Commission would deny the Pilots any rate increases necessary to maintain adequate service as required by the Statute. Not only is there no evidence to support such a proposition, the evidence strongly suggests the contrary. As Captain Gelinas—a member of the Pilotage Commission for nearly two decades—testified, the Commission is committed to ensuring safety of its pilots. (7/11/23 Tr. at 96:2-13.) The Pilots sought, and were granted, a substantial rate increase as recently as fall 2022, which became effective January 1, 2023. (7/11/23 Tr. at 58-59, 89-90.) That rate increase was necessary in part because of the complete cessation

of cruise ship visitation for two years due to the COVID-19 pandemic.[23]   (7/11/23 Tr. at 58-59.)

It is unclear why the Commission would deny a rate increase necessary for the Pilots to maintain

adequate service when its charge is to maintain the pilotage system, and it very recently

demonstrated that it will raise rates to account for reductions in cruise ship visitation.  This does

not even take into account the Pilots' entirely new revenue stream in the form of the CAT ferry.

(7/11/23 Tr. at 87-89.)  As noted above, the pilotage system existed long before any cruise ships

called at Bar Harbor; there is no reason, in law or logic, why the pilotage system would not

continue as designed if less large cruise ships called at Bar Harbor.

### B.     The Ordinance Does Not Interfere with Maine's Tourism Statutes.

The Pilots also allege that the Ordinance is preempted by 5 M.R.S. §§ 13052, 13055,

13090-C and 13090-E (the "Tourism Statutes").  These statutes, among other things, establish the

Maine Office of Tourism to create marketing and development strategies for state tourism and to

administer components of that strategy.  Nothing in the Tourism Statutes expressly or by clear

implication requires towns to have ordinances or facilities to maximize the number of tourists

coming to town.  The Tourism Statutes plainly do not intend to confer upon the Office of Tourism

hegemonic control over how towns regulate motels, hotels, water parks, museums, historic

locations, restaurants, piers, harbors, and all other things impacting on developing influxes of

tourists.  Rather, the statutes contemplate that the Office of Tourism will cooperate with and

provide assistance to municipalities.  The Statutes establish the Department of Economic and

Community Development, of which the Office of Tourism is a part, to "*work with* municipalities"

to promote economic development.  5 M.R.S. § 13053 (emphasis added).  Likewise, the duties of

---

[23] The Pilots similarly warned in 2021 that they might have to move to an "as necessary" model of service
if they did not receive COVID relief money.  (7/11/23 Tr. at 118-19; DX 442.)

the Director of the Office of Tourism are to provide "support" and "assistance" to local agencies and decisionmakers.  5 M.R.S. § 13090-C(2)(C), (E).

The CruiseMaine initiative of the Office of Tourism, on which the Pilots rely, also reflects this reality. CruiseMaine, as the Pilots recognize, "supports, educates, and promotes cruise communities in Maine seeking sustainable cruise ship tourism."  (ECF 190 at 48; *see also* ECF 192 ¶ 24; Flink Depo. at 9:3-6, 108:1-5.)  But the Pilots' argument elides the key word "seeking" from that mission statement.[24]  CruiseMaine's Executive Director, Sarah Flink, testified that "[a]s a State agency and as a contract with the State agency, our primary job is to advocate for and support our communities here in Maine."  (Flink Depo. at 12:19-20.)  She added: "My remit is to assist each individual port community with its goals.  It is not my job to determine their goals . . . I do take my direction from the leadership in those communities."  (Flink Depo. at 108:9-13.)  In other words, CruiseMaine, like the Office of Tourism, and the Department of Economic and Community Development more broadly, exists to help municipalities achieve their own economic goals, not to impose the State's goals on municipalities.  The Pilots would have the Court read the Tourism Statutes to *require* municipalities to maximize cruise ship visitation.  That interpretation has no basis in the Statutes.[25]

## CONCLUSION

The Supreme Court has long recognized, and recently reaffirmed, "the usual legislative power of a State to act upon persons and property within the limits of its own territory, a feature of our constitutional order that allows different communities to live with different local standards."

---

[24] The Pilots' argument also elides the word "sustainable," which recognizes that certain levels or modes of cruise ship tourism are *unsustainable*.

[25] The Pilots also appear to ascribe constitutional significance to Maine's nickname, "Vacationland." This is akin to arguing that municipalities may not regulate tree cutting because Maine is also known as the "Pine Tree State."

*Nat'l Pork Producers*, 143 S. Ct. at 1156.  This case represents an effort by a narrow subset of local business interests to wield the Constitution as a cudgel to force upon the people of Bar Harbor their chosen method of doing business, no matter its local costs.  If, as a matter of business judgment, certain cruise lines decide not to do business in Bar Harbor because the Town has chosen to protect its citizens by limiting the number of daily disembarkations to 1,000, that is their choice.  Cruise lines—or local business interests that have chosen to tie their fortunes to cruise lines— potentially reevaluating their chosen business models based on local land use controls is not an event of constitutional significance.  *See id.* at 1161; *Exxon*, 437 U.S. at 127-28.  It is the natural and expected effect of coastal jurisdictions exercising their long-recognized home rule authority in a modern, interconnected marketplace.  *See Nat'l Pork Producers*, 143 S. Ct. at 1155-56; *Portland Pipe Line II*, 332 F. Supp. 3d at 297-98, 302-03, 315-16.

The logical endpoint of the Plaintiffs' and Pilots' case is that the Constitution *requires* coastal jurisdictions like Bar Harbor to allow "any good, service, or activity" within their borders if those products have a significant interstate or international market.  *See Portland Pipe Line II*, 332 F. Supp. 3d at 315-16.  But the Constitution does not, and has never required any such thing.  Rather, the Constitution envisions interplay between federal, state, and local regulation of commerce and navigation, with federal law giving states and municipalities a wide berth to exercise their traditional police powers.  *See Nat'l Pork Producers*, 143 S. Ct. at 1165; *Romero*, 358 U.S. at 373-74.  If Congress, in the exercise of its legislative judgment, wishes to displace some portion of those state and local powers, it may do so.  In the face of congressional silence, however, a clear showing of conflict with federal law or protectionist discrimination against interstate commerce is required before the Constitution is implicated.  No such showing has been made in this case.

For all of the foregoing reasons, Defendant Town of Bar Harbor requests that this Court enter judgment in its favor.

Dated at Bangor, Maine, this 6th day of October, 2023.

/s/ Allison A. Economy, Esq.
Allison A. Economy, Bar No. 5336
aeconomy@rudmanwinchell.com

/s/ Jonathan P. Hunter, Esq.
Jonathan P. Hunter, Bar No. 4912
jhunter@rudmanwinchell.com

/s/ Stephen W. Wagner, Esq.
Stephen W. Wagner, Bar No. 5621
swagner@rudmanwinchell.com

Attorneys for Defendant Town of Bar Harbor
RUDMAN WINCHELL
84 Harlow Street
P.O. Box 1401
Bangor, ME 04402
207.947.4501

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2023, I electronically filed the foregoing Defendant Town of Bar Harbor's Post-Trial Brief using the CM/ECF system, which will provide notice to all counsel of record in this case.

Dated: October 6, 2023

/s/ Jonathan P. Hunter, Esq.
Jonathan P. Hunter, Bar No. 4912
Attorney for Defendant
RUDMAN WINCHELL
84 Harlow Street
P.O. Box 1401
Bangor, ME 04402
207.992.2562
jhunter@rudmanwinchell.com