# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, *et al.* )<br><br>  *Plaintiffs,* )<br><br>PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, )<br><br>  *Plaintiff-Intervenor,* )<br><br>v. )<br><br>TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, )<br><br>  *Defendant,* )<br><br>CHARLES SIDMAN, )<br><br>  *Defendant-Intervenor*. ) | Civil Action No. 1:22-cv-416-LEW |

## PLAINTIFFS' REPLY BRIEF

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     THE STRUCTURE AND PURPOSE OF THE ORDINANCE ............................1
        The Ordinance................................................................................................1
        The Ordinance is Focused on Disembarking Persons....................................2
        The Ordinance is Inflexible ..........................................................................3
        The Ordinance is Indirect...............................................................................4
III.    ARGUMENT ......................................................................................................6
        A.  The Ordinance is Preempted by Federal Law........................................6
            1.  The Ordinance conflicts with Federal Law protecting Seafarers......6
            The Meaning of the word "Persons" is clear ....................................8
            Authoritative Construction of the Ordinance...................................10
            Litigation-Inspired ...........................................................................11
            Pier Owners can "Sort it Out".........................................................11
            The Town is not a Pier Owner .........................................................12
            2.  The Ordinance conflicts with Federal Law governing the admission of
            aliens. ................................................................................................13
        B.  The Ordinance Violates the Dormant Commerce Clause.........................17
            The Ordinance Discriminates against Interstate Commerce............................17
            The Ordinance bars Cruise Ships ...................................................23
            The Ordinance burdens Arteries of Commerce ...............................25
            The Ordinance Violates Commerce Clause Right to Travel .........................31
            The Local Interest Served must be Legitimate ...............................32
        C.  The Ordinance Violates Due Process Standards.......................................33

## TABLE OF AUTHORITIES

*Cases*

*Alliance of Auto. Mfgrs v. Gwadosky,* 430 F.3d 30, 35(1ˢᵗ Cir. 2005)..........................................7, 9

*Bayley's Campground, Inc. v. Mills*, 463 F.Supp.3d 22, 34 (D. Me. 2020) ...................................32

*Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 159-160 (1st Cir. Jan 19, 2021)....................32

*Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 523-530 (1959)  .................................26, 27, 28

*Buck v. Kuykendall*, 67 U.S. 307, 314 (1925) ..............................................................................31

*Camps Newfound/Ottawana, v. Town of Harrington*, 520 U.S. 564, 573 (1997) ..........................17

*Case of the State Freight Tax*, 82 U.S. (15 Wall.) 232 , 279 (1872) ..............................................17

*Citizens against Rent Control v. City of Berkely,* 454 U.S. 290, 295 (1981) ...................................1

*Corn v City of Lauderdale Lakes*, 997 F.3d 1369 (11ᵗʰ Cir. 1993)..................................................33

*Dean Milk Co. v. Madison*, 340 U.S. 349, 354 (1951).....................................................................32

*Edwards v. People of California*, 314 U.S. 160, 173-174 (1941)................................................31, 32

*Exxon v. Governor of Maryland*, 437 U.S. 117, 127 (1978).......................................23, 24, 25, 30

*General Motors Corp. v. Tracy*, 519 U.S. 278, 298 n. 12 (1997)......................................................26

*Gloucester Ferry Co. v. Pennsylvania,* 114 US. 196 (1885)......................................................29, 30

*Graham v. Richardson*, 403 U.S. 365, 379 (1971).............................................................................17

*Hall v. DeCuir*, 95 U.S. 485 (1877) .................................................................................................29

*Henderson v. Mayor of City of New York*, 92 US. 259, 271 (1875).........................................17, 29

*Hughes v. Oklahoma,* 441 U.S. 322, 325–326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) ...............32

*Isham v. Pacific Far East Line, Inc*., 476 F.2d 835, 836 (9ᵗʰ Cir. 1973) ........................................29

*Kansas City Southern Ry. v. Kaw Valley Drainage District,* 233 U.S. 73, (1914) ...................22, 28

*Kassel v. Consolidated Freightways Corp. of Del*., 450 U.S. 662 (1981)  .....................................29

*Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ................................................................................9

*Lutz v. City of York, Pennsylvania*, 899 F.3d 255 (3d Cir. 1990)  .................................................22

*Maine v. Taylor*, 477 U.S. 131, 138 (1986)....................................................................................32

*Mississippi Railroad Comm'n v. Illinois Cent. Railroad Co.*, 203 U.S. 335 (1906) ......................29

*Morgan v. Commonwealth of Virginia*, 328 U.S. 373 (1946)  ........................................................29

*National Pork Producers Council v. Ross,* 143 S. Ct. 1142 (2023)  ...........23, 24, 25, 26, 28, 30, 32

*Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970)............................................................26, 32

*Port Richmond & Bergen Point Ferry Co. v. Board of Chosen Freeholders*,
    234 U.S. 317, 326 (1914) ..........................................................................................................29

*Portland Pipe Line v. City of South Portland*, 288 F. Supp. 321 (D. Me. 2017)
    (*Portland Pipeline I*) ...........................................................................................................18, 20

*Portland Pipe Line v. City of South Portland*, 332 F.Supp. 2d 264 (D. Me. 2018)
    (*Portland Pipeline II*)......................................................................................18, 19, 20, 34

*Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 447 (1978)............................................26, 29

*Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 763-782 (1945) .............26, 27, 28

*Takashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) .......................................................14

*Tart v.  Commonwealth*, 949 F.2d 490 (1ˢᵗ Cir. 1991) .....................................................................34

*Toll v. Moreno*, 458 U.S. 1, 11 (1982).......................................................................................14, 17

*Truesdell v. Friedlander*, 80 F.4ᵗʰ 762, 777 (6ᵗʰ Cir. 2023) ..........................................................31

*Village of Belle Terre v. Boraas,* 416 U.S. 1, 9 (1974).....................................................................33

*Ward v. Rock against Racism*, 491 U.S. 781, 795-96 (1989)...........................................................7,

*Washington State Apple Advertising v Hunt*, 432 U.S. 333, 353 (1977).........................................32

*Wawenock, LLC v. Dept. of Trans.*, 2018 ME 83, ¶ 16, 187 A.3d 609, 618 ................................10

<u>Statutes and U. S. Codes</u>
30-A MRS §2001(14)  ................................................................................................9
30-A MRS §4452(3)(B) .................................................................................2, 4, 13
33 C.F.R. §105.200 ....................................................................................................7
33 C.F.R. §105.237 .............................................................................................7, 12
42 U.S. Code §1983 .................................................................................................17

<u>Other Authorities</u>
Bar Harbor Code Chapter 125, Article VII, Section 125-77 ...............................1, 5, 11
The American Heritage Dictionary of the English Language (ed. 1976) .......................9
Webster's Collegiate Dictionary (current edition) ........................................................9

## I.     <u>INTRODUCTION</u>

The structure and terms of the Ordinance are central to each of Plaintiffs' claims. Indeed, and this cannot be overstated, each of Plaintiffs' constitutional claims is directed at specific terms of *this Ordinance* which by their nature, purpose, and effect violate the constitutional provisions here at issue. Plaintiffs' claims do not, therefore, ask this Court to rule on whether a municipality may ever unilaterally impose disembarkation caps on cruise ships—the answer to that question must await different circumstances than those now before this Court. Rather, Plaintiffs challenge the terms and standards in *this Ordinance* and the sufficiency of its rationale.

Plaintiffs are, of course, aware that the Ordinance was presented to and approved by the voters pursuant to the Town's Initiative process. But approval of the Ordinance by the voters rather than by the Town Council in its legislative capacity does not insulate it from Plaintiffs' constitutional challenges. For, as the Supreme Court has observed, "[i]t is irrelevant that the voters rather than the legislative body enacted [the local law], because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." *Citizens against Rent Control v. City of Berkely,* 454 U.S. 290, 295 (1981).

The terms, standards, and rationale of this Ordinance are at issue before this Court and, therefore, as an aid to the arguments that follow, a detailed review of the text of the Ordinance is warranted.

## II.     <u>THE STRUCTURE AND PURPOSE OF THE ORDINANCE</u>

**The Ordinance.** The Ordinance amended Bar Harbor Code § 125-77 of Article VII of Chapter 125 (Land Use Activities) by adding Section H(1)-(5).[1] PX 210. The Ordinance comprises five sections, the heart of which is § 2.  Section 2 provides as follows:

---

[1]      In general, § 125-77 applies to "permits governing certain activities." Although included in § 125-77, the Ordinance is not a true land use law. It purports to limit access to any part of the Town from persons

1

> As determined by the Harbor Master, no more than 1,000 *persons*, in the aggregate, may disembark in a single calendar day, from any cruise ship(s) and come ashore on, over, or across any property located within the Town of Bar Harbor; provided, however, that this subsection shall not apply to cruise ship reservations that have been accepted by the Harbor Master prior to March 17, 2022.

PX 210 (emphasis added).

The Ordinance's essential characteristics are its singular focus on *persons* disembarking from cruise ships and setting foot within the Town's limits, the rigidity of its standards, and the indirection of its punitive regime.

**The Ordinance is Focused on Disembarking Persons**: Section 2 of the Ordinance singles out "persons" who "disembark…from any cruise ship(s)." The term "persons" recurs throughout the Ordinance. *See* § 2 (requiring the Harbor Master to develop a "reservation system for cruise ships that transport *persons* by watercraft for disembarkation" and to devise "a mechanism for counting and tracking the number of *persons* disembarking each day." (emphasis added); *see also* § 4 (providing that "each disembarking *person* exceeding the permitted daily limit" constitutes a "specific violation under 30-A MRS § 4452(3)(B), resulting in a minimum $100 penalty per excess authorized *person*.") (emphases added).

The Ordinance's concentration on persons arriving at Bar Harbor by cruise ship is also demonstrated by what it omits—namely, all those "persons" who comprise most visitors to Bar Harbor who arrive by any means of conveyance other than cruise ships. The Ordinance has nothing to say about them. By further contrast, the Ordinance extends a warm welcome to the first 1,000 disembarking persons but, as § 4 of the Ordinance puts it, the 1,001[st] person is "unauthorized". *Id.* § 4. By implication, this means that the Ordinance has somehow "authorized" the first 1,000 disembarking persons while withholding that "authorization" from the 1,001[st] and all who would

---

disembarking from cruise ships above the number 1,000 for each calendar day. It purports to require a permit from Pier Owners conditioned on this limit.

follow. But the Ordinance provides not a scintilla of text explaining how or why the 1,001st person differs from the 1,000th person.

**The Ordinance is Inflexible:** Section 2 specifies the act which the disembarking persons commit that is sanctionable—"com[ing] to shore on, over, or across any property located within the Town of Bar Harbor." The Ordinance lists no other sanctionable act. Its punitive regime is triggered solely by the presence of such disembarking persons on "any property" in the Town. *Id.* §2. Here, the Ordinance also displays its second prominent characteristic—inflexibility. For, as the Ordinance plainly states, it is the disembarking person's presence on "*any* property located within the Town of Bar Harbor"—not just certain property—that triggers the punitive regime. *Id.* (emphasis added).

The Ordinance also sets a rigid limit of 1,000 on the number of persons who may disembark without penalty—a limit that applies without exception every day of year. It does not vary with the well-known and well-documented tourist seasons, with the intense months of July and August bordered on each side by the "shoulder seasons" of May and June and September and October. Nor does it acknowledge the long periods where tourist visitation dwindles to a trickle—November through April—including months such as December and January in which there is no record evidence that any cruise ship has ever called at Bar Harbor.

Yet another inflexible element is the Ordinance's temporal limitation. For, in addition to tying the 1,000-person maximum to disembarking persons who set foot in Bar Harbor, the Ordinance imposes a temporal limit—that is, no more than 1,000 such persons may set foot in Bar Harbor in a single "calendar day." *Id.* §2. As with the well-known variability of Bar Harbor's seasonal economy, it is equally well known that, upon disembarking, many cruise ship passengers board buses and are taken straight away to Acadia National Park. Their stay in Bar Harbor is

limited. PFF 113-114. Yet, even while they are away from and outside the limits of Bar Harbor, no other disembarking persons may set foot within the Town limits. The calendar day limit is absolute and admits to no exceptions, accommodations, or adjustments of any type.

**The Ordinance is Indirect:** Having made it crystal clear that the "evil" at which it is directed is persons disembarking from cruise ships—the Ordinance provides no mechanism for sanctioning any of the disembarking persons or the cruise ships who brought them. Instead, the totality of the Ordinance's punitive regime is directed at the Pier Owners—private owners of Town-permitted facilities that, before the Ordinance's enactment, were generally open to the public. This is the essence of indirection.

Section 4 of the Ordinance establishes a punitive enforcement regime that applies only to the Pier Owners, making them alone culpable and sanctionable for each "excess unauthorized person" setting foot in Bar Harbor. *Id.* §4. Notwithstanding intimations to the contrary in the Defendants' post-trial briefs, there can be no doubt that § 4's sanctions are not tolls or fees—they are punitive measures intended to deter the Pier Owners from allowing more than 1,000 disembarkers in a single calendar day *and* to motivate the Pier Owners to bar access to any such persons over the 1,000-person-per day limit.

These features of § 4's regime are evident from its express provision that "*each disembarking person* exceeding the permitted daily limit" constitutes a "specific violation under 30-A MRS §4452(3)(B)" and from its further provision that, under the same statutory authority, the $100 per person fine is a "minimum" for each "excess unauthorized person."[2] *Id.* (emphasis added).

---

[2]     Under 30-A MRS § 4452(3)(B), the minimum penalty for a "specific violation" is $100 and the maximum penalty is $5,000.

Thus, under the guise of its police powers and the more particular rationale of "land use" authority, § 4 of the Ordinance purports to forcibly enlist the Pier Owners as the Ordinance's de facto enforcers (thereby turning them into the Town's enforcement agents).    Sections 2 and 3 authorize and mandate the establishment of a regulatory structure to implement the Ordinance's land use-based indirection. Section 3 directs the Harbor Master to devise a mechanism for counting disembarking persons and a reservation system for the cruise ships which would carry them to Bar Harbor. *Id*. §3. It directs that the Harbor Master devise a "mandatory procedure" for reporting violations to the Code Enforcement Officer; and, any other provisions *Id., §3.    Section 2 complements Section 3 by requiring that "any property owner issued permit under §125-77(H)" must comply with the regulations that the Harbor Master issues to implement the Ordinance.  *Id.* §2.

Although § 5 principally provides that the Ordinance has retroactive effect to March 17, 2022, it also provides a particular limitation on enforcement authority directing that the Town "will not take any enforcement action under this subsection with regard to any cruise ship visits occurring prior to the date of adoption by voters at Town Meeting." PX 209.  In sum, the Ordinance is focused exclusively on persons disembarking from cruise ships with the first 1,000 such persons being welcome in Bar Harbor and all the rest warranting the invocation of the Town's police powers the moment they set foot on "any property" located within Bar Harbor. The Ordinance's single-minded focus on persons disembarking from cruise ships is reinforced by inflexible numerical and temporal standards that apply without exception to "calendar day" of the year. Finally, the Ordinance gets its bite not by sanctioning any disembarking person or the disfavored means of conveyance—cruise ships—by which they arrived, but by attempt to coerce the Pier Owners into barring all "excess unauthorized persons" admission to Bar Harbor. *Id.* §4.

By its plain terms, the Ordinance is calculated to keep persons arriving at the Port of Bar Harbor outside the limits of the Town and, more particularly, off its soil. For the exercise of this power over these persons, the Town is relying on its police powers and its authority to manage land use. Based on these ostensible rationales for the Ordinance, it must follow that the 1,001[st] disembarking person has noxious and toxic qualities which warrant the Town's exercise of its police powers to protect the community from this person and all others above the 1,000 limit.  Yet, the Ordinance, itself, lacks any legislative findings that make any of this plain.[3] Left only with the Ordinance's text, therefore, all that is clear is that more than 1,000 disembarking persons in a single calendar day pose some challenge to the Town.

The Ordinance's focus on disembarking persons and their setting foot within the Town limits is intended to support the legal fiction that this is a "land use" measure. So, too, is the Ordinance's indirection which purports to impose the entire burden and risk of its illicit regulatory scheme on the Pier Owners. By contrast, the Ordinance's rigidity as to the unvarying limit on "authorized" disembarkations for each calendar day, with no variation for any time of year, reveals the Ordinance's true purpose—to impose disembarkation limits so low that no large cruise ship will ever call at the Port of Bar Harbor again.

### III.  ARGUMENT

#### A.  The Ordinance is Preempted by Federal Law.

##### 1.  The Ordinance conflicts with Federal Law protecting Seafarers.

Both Plaintiffs and Pilots contend in the primary briefs that the word "persons" as used in the Ordinance, as applied to those disembarking from cruise ships, includes a cruise ship's crew, as well as its passengers. This argument is premised on the word's breadth, comprehending, as it

---

[3]       Plaintiffs are aware that, while circulated as an Initiative, the proposed ordinance was accompanied by a "Purpose" section. PX 243. Plaintiffs will address the Purpose section below.

does, human beings in general. Because the term "person" necessarily includes members of the cruise ship's crew, it runs afoul of Federal laws and regulations protecting the crew members' disembarkation rights and is thus preempted.

The first point the Town raises to dispute this contention is that "the Town has publicly and authoritatively stated that it will not enforce the Ordinance to prohibit or cause a fine to be issued for the disembarkation of persons that are recognized as 'vessel personnel,' 'vessel crew,' 'seafarers assigned to a vessel', 'pilots', and 'representatives of seafarers' welfare and labor organizations' under 33 C.F.R. §105.200 and 33 C.F.R. 105.237. (7/13/23 Tr. at 73-75; PX 204)." *Town's Br.* at 14.[4] The Town characterizes this as a "limiting construction" that this Court "must consider". *Id.* at 15 (quoting *Ward v. Rock against Racism*, 491 U.S. 781, 795-96 (1989)). Mr. Sidman takes the same position. *See Sidman Br.* at 9.

Second, the Town quotes *Alliance of Auto. Mfgrs v. Gwadosky* for the point that "every reasonable construction must be…resorted to save a statute from unconstitutionality." 430 F.3d 30, 35 (1st Cir. 2005); *Town Br.* at 1. The Town then proposes that "[i]t is certainly reasonable, in the context of an ordinance seeking to reduce the congestion caused by cruise ship disembarkations to interpret 'persons' as meaning 'passengers." *Town Br.* at 1.

The Town's third argument assumes that the Ordinance does, in fact, apply to seafarers and asserts that the federal laws and regulations "specifically contemplate that [advance coordination of shore access] will take into account local factors specific to the port, the vessel, and the facility". *Id.* at 15. From this point, the Town attempts to shift the burden to the Pier Owners arguing that "[n]othing in the Ordinance prevents the Plaintiff pier owners from implementing [a system that allows seafarers to disembark]." *Id.* at 15-16. Citing the long lead times that attend the formulation

---

[4]     The Town promises "[t]his will be codified as part of the regulations contemplated by the Ordinance and necessary before the Ordinance can be enforced. (7/13/23 Tr. at 161-64)." *Town's Br.* at 14-15.

of cruise ship travel itineraries, the Town attempts to turn the tables on the Pier Owners complaining that "Plaintiffs fail to explain why they cannot fully account for the Ordinance's disembarkation limit when engaging in advance coordination the cruise ships, as the [Federal] regulations require." *Id.* at 16.

In a footnote, Mr. Sidman makes another argument:  that the Ordinance only imposes fines on the Pier Owners and that the Federal laws and regulations prevent the Pier Owners from charging fees to the disembarking crew members. *Sidman Br.* at 10 n. 4. Sidman argues that the Ordinance imposes fines solely on the Pier Owners and, as the Town does not own the piers, even though the crew members may be barred from accessing the shore, there can be no violation of the Federal laws and regulations guaranteeing their access.  *Id.*

**The Meaning of the word "Persons" is clear:**  At various points in their briefs, the Town and Mr. Sidman emphasize and exalt the Ordinance as the "will of the people"; a pure expression of popular democracy. That is, except when they don't. The Town's belated effort to manipulate the meaning of "persons" as used in the Ordinance—enthusiastically supported by Mr. Sidman— is one such instance.

To begin with, although the Ordinance suffers from fatal constitutional infirmities, it is not ambiguous. On the contrary, the Ordinance employed plain and commonly understood words to convey its meaning to the voters. "Persons" is such a word.  The Bar Harbor Town Land Use Code, itself, already defines "person". Section 125-109 of the Land Use Code defines "person" as "[a]n individual, corporation, governmental agency, municipality, trust, estate, partnership, association,

two or more."[5] As an amendment of the Land Use Code, the Ordinance must be seen as having adopted and incorporated this definition.[6]

The Ordinance employs "persons" throughout its regulatory and enforcement sections. PX 210 §§ 2-4. Moreover, as has been discussed above, the word "persons" comprehensive reach is fully consistent with the Ordinance's implicit alleged rationale that those persons exceeding 1000 who disembark from cruise ships and set foot in Bar Harbor in a calendar day pose a unique risk to the public, warranting the invocation of the Town's police powers.

The inherent clarity of the meaning of "persons", coupled with the Ordinance's apparent intent to broadly sweep in all cruise ship disembarkers, place in proper context the authorities Defendants call to their aid. For example, the Town invokes "'the elementary rule' of statutory construction…that 'every reasonable construction must be resorted to…in order to save a statute from unconstitutionality.'" *Town Br.* at 1 (quoting *Alliance of Auto. Mfgrs. v. Gwadosky*, 430 F.3d 30, 35 (1st Cir. 2005). The key word is "reasonable".

Nothing in the rules of construction requires interpretative heroics from a court to "save" a law from its plain meaning. Speaking to the analogous situation where the meaning of an agency's interpretation of its own rules is at issue, the Supreme Court advised that, "[f]irst and foremost, a court should not [defer] unless the regulation is genuinely ambiguous. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). "If uncertainty does not exist, there is no plausible reason for

---

[5]    Bar Harbor Town Land Use Code, Section 125-109, https://ecode360.com/8375980#8375980; *see also* Bar Harbor Town Land Use Code, Section 125-108, https://ecode360.com/8375965 ("In the interpretation and enforcement of this chapter, all words other than those specifically defined herein, except construction or structure-related terminology, shall have the meaning implied by their context in the chapter or their ordinarily accepted meanings as found in the current edition of Webster's Collegiate Dictionary").

[6]    Beyond that, the dictionary definition of "person" is also clear: "A living human being, especially as distinguished from an animal or thing." The American Heritage Dictionary of the English Language (ed. 1976). In addition, "person" is statutorily defined as "an individual, corporation, partnership, firm, organization or other legal entity." 30-A M.R.S. § 2001(14).

deference" and a court should apply its plain terms "just as it would any other law." *Id.* This rule applies with special force when the law in question has been adopted by a duly elected representative body or the voters at large acting in their legislative capacity.

So, before this Court may endorse the Town's belated determination that "persons" as used in the Ordinance excludes five specific categories of cruise ship crew members—"vessel personnel", "vessel crew", "seafarers assigned to a vessel", "pilots", and "representatives of seafarers welfare and labor organizations"—it must find that the word "persons" is ambiguous. *See Town Br.* at 14. Yet, for the reasons stated above, there is no ambiguity.

**Authoritative Construction of Ordinance**: The Town and Mr. Sidman also claim that the Town's interpretation of "persons" to exclude each of the five categories of cruise ship crew members was adopted "publicly and authoritatively." *Town's Br.* at 14; *Sidman's Br.* at 9. Plaintiffs have no quarrel with the first assertion—the Town's adoption of this interpretation was quite public. As for the second, Plaintiffs have searched the briefs of the Town and Mr. Sidman in vain for the source of the power that made the Town's interpretation "authoritative." That is not surprising because it would have to include the authority to override, by administrative interpretation, the clearly expressed will of the people.

Here, again, it bears emphasis that the Ordinance was enacted by the voters of Bar Harbor in their capacity as popular legislators. Under these circumstances, any interpretation of the Ordinance's meaning must turn on the voters' legislative intent. *See Wawenock, LLC v. Dept. of Trans.*, 2018 ME 83, ¶ 16, 187 A.3d 609, 618 (interpretation of citizen-enacted legislation requires the court "ascertain the will of the people").

With the meaning of this term of the Ordinance clear, the Town lacks the authority to interpret it away. The Court should reject the Town's attempt to arrogate the legislative power of

10

Bar Harbor's voters through a "clarification" imposed by administrative fiat. *See* 30-A M.R.S. § 3004(4) ("[A]n ordinance may be revised only by following the procedure required for its original enactment."); *Davis v. SBA Towers II, LLC*, 2008 ME 82, ¶ 14–17, 979 A.2d 86 (overturning Planning Board's "redefining" of terms as errors of law and inconsistent with the ordinance).

**Litigation-Inspired:** Although the Ordinance's plain meaning deprives the Town of the authority to reshape the Ordinance's meaning, the additional point must be made that the Town's belated and remarkably precise recasting of the word "person" was clearly inspired by the Town's realization that "person's" broad sweep spelled litigation peril for the Ordinance. The trail is clear. It is set forth in the Town's May 31, 2023 memorandum, "Update on Land Use Ordinance § 125-77(h) Rulemaking". PX 204.001-002.

In that memorandum, the Town explained that it was "clarify[ing] the meaning of the term 'persons' as that term…is used in Sections 125-77(H)(2), (3), and (4)." *Id.* The memorandum went on to explain that this "clarification" was required "to avoid a potential conflict with federal law in the implementation of the Ordinance." *Id.* The commendable candor of the Town's memorandum makes clear that new "interpretation" is no "clarification"; it is an attempt to avoid the preemption implications over the Ordinance's intentionally broad reach. The Court should reject the Town's transparent attempt to inoculate the Ordinance against its obstruction of these Federal laws and regulations.

**Pier Owners can "Sort it Out"**:  As noted above, the Town defends this point by shifting the burden to the Pier Owners who have "fail[ed] to explain why they cannot fully account for the Ordinance's disembarkation limit" when coordinating with cruise lines for arrivals. *Town Br.* at 16. In effect, the Town is arguing that the Pier Owners should act on the Town's invalid amendment of the Ordinance and pretend, along with the Town and Mr. Sidman, that the word "persons"

contains hidden exceptions for crew members that mysteriously track Federal laws and regulations. Moreover, by taking this tack, the Town has only further demonstrated one more of the many ramifications of the Ordinance's indirect enforcement system—how the Pier Owners (private parties owning and operating publicly accessible properties) are to find the authority to effectively screen persons arriving from cruise ships to determine which are crew members and which are not. The Town does not suggest how this is to be done.

**The Town is not a Pier Owner:**  In a footnote, Mr. Sidman argues that the Ordinance does not violate the Federal laws and regulations guaranteeing shore access to cruise ship crew members because Section 105.237(e) of Chapter 33, Code of Federal Regulations "only prevents the facility owners and operators from charging fees '*to the individual* to whom such access is provided.'" *Sidman Br.* at 10 n. 4. (italics in Sidman Brief). His argument continues with the further point the Federal laws and regulations protecting cruise ship members do not apply to the Town because the Town is "not a facility owner or operator." *Id.*

These are hypertechnical contentions that, as so often is the case, rely on the Ordinance's indirection—its coerced enlistment of the Pier Owners as the Ordinance's enforcers and, thereby, the putatively responsible parties in barring the entry of cruise ship crew into Bar Harbor. Yet, Mr. Sidman's footnoted attempt to escape the Ordinance's frustration of the policy behind these Federal laws and rules only serves to prove, no matter how circuitous its effect, that the Ordinance is the sole impediment to cruise ship crew disembarkation. The Ordinance's indirection cannot save it from preemption on this point.

## 2.   The Ordinance Conflicts with Federal law governing the admission of aliens.

In their initial post-trial briefs, Plaintiffs and Pilots both argued that the Ordinance conflicted with the general authority of the Federal Government over immigration. *Pls' Br.* at 22; *Pilots' Br.* at 14-16.  The Town disputes these claims by asserting that, "nothing in the Ordinance imposes anything resembling an additional 'condition of entry' on immigrants seeking to enter the United States. *Town's Br.* at 16. Mr. Sidman supports this point but takes it further, arguing that "the Ordinance does not deny entry to anyone or impose any additional requirement of any passenger, whether they be foreign nationals or U.S. citizens; they may still come ashore, evidence established at trial that neither the harbor master nor [the Pier Owners] will stop anyone from coming ashore." *Sidman Br.* at 12.

The Defendants' assertions again rest on the Ordinance's indirection. As noted above, the Ordinance establishes a punitive regime, the sole and essential condition of which is the entry of the 1,001st person disembarking from a cruise ship in a calendar day and "com[ing] to shore on, over, or across any property" within the Town limits. PX 210 §2. The Ordinance provides that persons above the 1,000-person limit are "excess unauthorized persons." *Id.* § 4. For each such "excess unauthorized person", however, the Ordinance sanctions only the Pier Owners, subjecting them to a per-person fine that could escalate—at the Town's discretion—to as much as $5,000 per "excess unauthorized person."  *Id.* §§ 3-4; 30-A M.R.S. § 4452(3)(B).

The Town and Mr. Sidman appear alert to the implications of the Town stopping a person who has been cleared on the cruise ship for entry into the United States—or, as the Ordinance puts it, "com[ing] ashore, on, over, or across any property located within the Town of Bar Harbor."  PX 210 §2. While denying its effect, they tacitly acknowledge, as they must, that the 1,001st person to disembark could be excluded from setting foot in the United States at Bar Harbor solely by force

of the Ordinance; thus, placing "a discriminatory burden upon the entrance or residence of an alien lawfully within the United States." *Toll v. Moreno*, 458 U.S. 1, 11 (1982) (quoting *Takashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948)).

Those persons who shall have been deemed "excess unauthorized persons" under the Ordinance have, nonetheless, been lawfully admitted to the United States. And, as far as the Federal Government is concerned, they may all come ashore. This being so, the *only* impediment to their doing so would be the Ordinance. For the 1,001st disembarker and all who follow, their federal immigration and customs clearance means nothing. The Town has determined that they are a threat to the health, safety, welfare, and peace of mind of the whole community and that they degrade their quality of life—impacts so severe that they warrant the invocation of the Town's police powers and land use authority to "zone" them out beyond the Town limits.

This presents both the Town and Mr. Sidman with an unpalatable spectacle. The prospect of persons cleared by Federal immigration and customs authorities being denied admission to the United States solely on the strength of the Ordinance has prompted the Defendants to advance arguments that this is not so. Their efforts, however, have only enmeshed them in a morass of contradictions.

The Town argues that "[a]nyone screened and admitted may disembark in Bar Harbor or anywhere else in the country, including but not limited to any of the other Class A ports in Maine." *Town Br.* at 17. The Town explains that this is so because "[t]he pier owners simply face penalties if they *permit* more than 1,000 disembarkations in Bar Harbor." *Id.* (emphasis added).[7] Mr. Sidman

---

[7]     The Town's implication that, notwithstanding the Ordinance's punitive regime, the Pier Owners somehow possess the authority to "permit" all persons above the 1,000-person daily limit to enter into the limits of Bar Harbor is curious and warrants comment.  First, the Town does not explain the source of this permissive authority. It is certainly does not come from the Ordinance, as there the admission of "excess unauthorized persons" into the Town is prohibited and subject to escalating fines. PX 210 §§ 2, 4. What the Town appears to be suggesting is that the Pier Owners may simply flout the law and endure punitive

contends that "testimony at trial established that neither the harbor master nor [the Pier Owners] will stop anyone from coming ashore." *Sidman Br.* at 12. For the Pier Owners, Mr. Sidman cited the testimony of Eben Salvatore that the Pier Owners would contest the fine and continue to provide pier services. Tr. 12-Jul. at 110:6-13. But this was clearly conditional testimony that, *if* the Ordinance were upheld and enforced, the Pier Owners would challenge it and seek an authoritative ruling from an appropriate court.[8]

As for nonenforcement by the Town, Mr. Sidman cited the testimony of Harbor Master Christopher Wharff that he would take no steps to prevent cruise ship disembarkers from entering within the limits of Bar Harbor. Tr. 13-Jul. at 22:9-23. Mr. Sidman carefully omitted, however, Bar Harbor Police Lt. Wharff's subsequent testimony that, if the Pier Owners asked for the assistance police department to cite an "excess unauthorized person" for criminal trespass for defying the Pier Owners' instructions and entering into Bar Harbor, in his capacity as lieutenant in the police department, he would consider that person as warranting the issuance of a criminal trespass summons. Tr. 13-Jul. at 37:18-25-41:1-23.

There is an air of delusion and even denial in the Town's and Mr. Sidman's efforts to explain away the barrier to admission into the United States that the Ordinance clearly raises. On the one hand, as the Town and Mr. Sidman vigorously argue elsewhere (but not here), for its legal validity,

---

consequences. Although at trial the Pier Owners' representative confirmed that, if the Ordinance is enforced, they would contest it (Tr. 12-Jul. at 110:6-13), nothing in that testimony suggests that the Pier Owners believe that the Ordinance (or any other Town authority) gives them the discretion to waive the Ordinance's application to persons that the Ordinance deems to be "unauthorized." Nor does the Town explain what would happen if, to avoid the Ordinance's enormous, escalating fines, the Pier Owners do not "permit" those "unauthorized" persons to "come to shore."

[8]     In advancing this argument, Mr. Sidman also overlooked his own testimony in which he acknowledged that the Ordinance's punitive regime had real teeth. Mr. Sidman himself calculated that, if the Ordinance had been enforced in 2023, the Pier Owners would have been exposed to as much as $4,000,000 (at the minimum fine of $100 per "excess unauthorized person") in fines under Section 4 of the Ordinance. Tr.13-Jul. at 310:20-25-311:1-11; *see also* PX 201 §4.

the Ordinance relies entirely on the premise that disembarking persons above the number of 1,000 in a given calendar day are so noxious that they imperil the health, safety, security, and quality of the life of all who reside in or visit (by means other than cruise ships) the Town.  Indeed, they contend, so serious are the risks that the "excess unauthorized persons" pose that the Town  is justified in invoking its police powers and its land use management authority to impose an onerous punitive regime on the private owners of the piers at which these numerically undesirable persons appear; a regime stiff enough to ensure that, if Ordinance is upheld, the Pier Owners will have ample incentive to comply.

On the other hand, when confronted with the reality that, if enforced, the Ordinance would prevent persons who had been cleared by Federal authorities to enter the United States from doing so, the Town and Mr. Sidman change direction and argue that all such "excess unauthorized persons" will be admitted anyway.  As a consolation prize for admitting (through the Pier Owners' acquiescence) this peril to "come to shore", the Town stands to collect astronomical fines on the Pier Owners which, if the Ordinance is upheld, the Town and Mr. Sidman blithely assure this Court, the Pier Owners will pay endlessly and without protest.

The Ordinance is structured to impose ruinous fines on the Pier Owners.  If the Ordinance is upheld and enforced, its punitive regime is intended to create a strong incentive for the Pier Owners to take steps to avoid the imposition of those fines.  It is obvious that, in the event that any "excess unauthorized person" who were to insist on his or her right to enter the United States at Bar Harbor, in order to avoid the imposition of a fine for that person and any others who might be inspired by that example, the Pier Owners would have either have to force those persons from the piers or seek the assistance of the Bar Harbor Police Department.[9]

---

[9]      Although not currently at issue in this case, it remains that, if the Ordinance were upheld and the Pier Owners were forced to apply it, the Ordinance's indirection would not protect the Town. For, in the

The foregoing is both the logic and practical effect of the Ordinance's indirect enforcement system. No amount of avoidance or denial from the Town or Mr. Sidman can change this. And so, Plaintiffs and Pilots are correct that the Ordinance does indeed place burdens on the admission of aliens (and U.S. citizens) to the United States. *Toll,* 458 U.S. at 11; *see also Graham v. Richardson*, 403 U.S. 365, 379 (1971) (invalidating State "auxiliary burdens" on lawful resident aliens' receipt of welfare benefits).[10]

## B.  The Ordinance Violates the Dormant Commerce Clause

**The Ordinance Discriminates against Interstate Commerce.** In their initial briefs Plaintiffs and Pilots have explained that hotels and cruise lines compete for leisure dollars in the holiday market. They also emphasized the Ordinance's effect of favoring land-based, intrastate transportation over interstate and international waterborne transportation. Plaintiffs will not repeat

---

former case, the Pier Owners would clearly be acting under the Ordinance's compulsion and, in doing so, would also be acting "under color" of Bar Harbor law within the meaning of Section 1983 of Title 42. If the Town were to assist the Pier Owners in barring "excess unauthorized persons" from Bar Harbor—whether by civil or criminal summons or by arrest—Bar Harbor would be directly at risk from such civil rights claims.

[10]     The Town and Mr. Sidman also fail to appreciate that, even if their arguments were accepted and notwithstanding the Ordinance's formidable punitive, it would not save the Ordinance. That is because the Ordinance is clearly a capitation-based surcharge on each passenger over 1,000 in a given day.  Long ago, the Supreme Court ruled that States could not impose taxes or bonds on good or persons just because they arrive at or pass through that State.  *See Henderson v. Mayor of City of New York*, 92 US. 259, 271 (1875) (bond for arriving passenger); *Case of the State Freight Tax*, 82 U.S. (15 Wall.) 232 , 279 (1872) (tax on goods). In *Camps Newfound/Ottawana, v. Town of Harrington*, the Supreme Court considered a municipal tax on out-of-state campers. 520 U.S. 564, 573 (1997).  In holding that head tax invalid under the dormant Commerce Clause, the Court said: "We have held that special fees assessed on nonresidents directly by the State when they attempt to use local services impose an impermissible burden on interstate commerce."  *Id.* at 578 (internal citations omitted).

Considering these authorities, if, as the Town and Mr. Sidman contend all the "excess unauthorized persons" are free to enter Bar Harbor, and, if the Town fines the Pier Owners on a per-excess person basis, then the Town will have assessed a charge tied directly to, though not imposed upon, each such excess person. Moreover, this per-person fine is assessed solely on those persons arriving at Bar Harbor by indisputably interstate and likely international transport. By contrast, the Town imposes no fine or fee on persons arriving Bar Harbor by any other means of conveyance, including those persons arriving from landward. Therefore, even under Defendants' permissive admission policy, the Ordinance fails.

those arguments here. However, Defendants' characterization of certain Supreme Court decisions in response to those arguments must be addressed.

The Town claims that the Ordinance is facially neutral in all respects. *Town. Br* at 22. But, as has been explained above, this is only superficial, as it masks the Ordinance's intent to accomplish indirectly what the Town and Mr. Sidman know they cannot accomplish directly—the effective banning of large cruise ships from Bar Harbor. The Town rests much of its arguments in this regard on *Portland Pipe Line v. City of South Portland*, 332 F.Supp. 2d 264 (D. Me. 2018) (*Portland Pipe Line II*). The same is true of Mr. Sidman, who relies on both *Portland Pipe Line II* and its predicate summary judgment decision, *Portland Pipe Line v. City of South Portland*, 288 F. Supp. 321 (D. Me. 2017) (*Portland Pipe Line I*).

The Defendants' overreliance on *Portland Pipeline I and II* is misplaced – those cases are inapposite to the matter here before the Court. *See Portland Pipeline Corp. v. City of S. Portland*, 288 F. Supp. 3d 321 (D. Me. 2017) ("*Portland Pipeline I*"); *Portland Pipeline Corp. v. City of South Portland*, 332 F. Supp. 3d 264 (D. Me. 2018) ("*Portland Pipeline II*"). It is a comparison of apples and oranges—or specially, here, petroleum and people.

In stark contrast to the dearth of legislative record in Bar Harbor, the South Portland City Council made a series of legislative findings in support of the Clear Skies Ordinance.[11] *Portland*

---

[11]    Those findings included: (1) The Community Vision as set forth in the Comprehensive Plan "embraces a diverse mixed-use waterfront community; a green city that protects its air quality; an education community where schools and a waterfront college campus are not impacted by incompatible adjacent uses, including new or expanded sources of significant air pollution; and a city that is a desirable destination and a desirable, livable community."; (2) "The proposed bulk crude oil loading operation would have constituted a new land use, which has never been a traditional land use within the City, and which would have significantly impacted future development of the City's waterfront, air quality, scenic ocean views, and land-use planning vision."; (3) "The bulk loading of crude oil onto marine tank vessels would likely result in an increase in emissions" of Hazardous Air Pollutants (HAPs) and Volatile Organic Compounds (VOCs) from oil storage tank facilities within the City," some of which are known to be or may reasonably be anticipated to be "acutely or chronically toxic, carcinogenic, mutagenic, teratogenic, or neurotoxic."; (5) PPLC's tank facilities are in close proximity to elementary schools, preschools, the South Portland High School and athletic fields, a community center, a large senior city housing facility, and numerous residential

*Pipeline II* at 283-84. These findings were based on a record compiled before a "Draft Ordinance Committee" that held a series of 19 meetings totaling more than 60 hours.[12] *Id.* at 282. The public comments and legislative history there demonstrate that concerns over air quality, aesthetics, and waterfront redevelopment goals pervaded this robust public process. As opposed to Mr. Sidman's strategy here, the "[legislative findings] were not merely tacked-on justifications after savvy attorneys instructed the City Council to 'bulletproof' the Ordinance. . . ." *Id.* at 310.

The City of South Portland provided abundant evidence of the local benefits of the Clear Skies Ordinance. Meanwhile, the Defendants failed to show the actual benefits of the Ordinance to the people of Bar Harbor. Instead, we have testimony from the main drafter and proponent of the Ordinance that he did not consult local EMS, fire, police services before drafting the Ordinance. *Pls' Br.* at 38. We also have the testimony from the Bar Harbor police chief, fire chief, and harbormaster that persons disembarking from cruise ships are not a safety issue for Bar Harbor. *Id.* at 39-40.

Moreover, the Clear Skies Ordinance was a narrowly drafted exercise of the City of South Portland's police powers through land use regulation:

> [The Clear Skies Ordinance] functions in much the same way as if the City had simply removed pipeline facilities or crude oil handling facilities from the list of approved activities while grandfathering in the existing facilities and uses. That approach would permit PPLC to continue its current business when market conditions support northbound flow, but would prevent it from installing the new facilities and structures it would need in order to alter or expand its business

---

districts and that these areas would experience air quality impacts associated with the bulk loading of crude oil.; and (6) The two proposed 70-foot VDUs to be constructed under PPLC's 2008-2009 project would "be located in close proximity to city parks with diverse recreational uses, including Bug Light Park, Willard Beach, Fisherman's Point, and the Greenbelt Walkway," and would "likely be among the tallest industrial structures on the South Portland waterfront and, due to their size and character, would negatively impact waterfront scenic values and property values." *Portland Pipeline II* at 283.

[12]     The Draft Ordinance Committee was comprised of three members: an attorney who had represented the Natural Resources Council of Maine; the Director of Ocean Policy at the Center for American Progress; and a financial professional, environmental compliance manager at manufacturing facilities and timber sites, and former environmental regulatory specialist for International Paper. *Id.* at 282.

activities.

*Pipeline II* at 308. Juxtaposed, the purported "land use" Ordinance's purpose and effect is to exclude most cruise ships sailing the Eastern Seaboard from calling port in Bar Harbor. Said another way, the Ordinance does not just prevent the expansion of an ongoing form of commerce in Bar Harbor, it effectively kills it.

In Bar Harbor, the object of the Town's exercise of its police powers is a small subset of human beings—those arriving in Bar Harbor by cruise ships. The clear implication of the Ordinance is that somehow persons disembarking from cruise ships—that is, the 1,001[st] such person and those who follow—pose dangers to the community at large. In this respect, the Ordinance is categorical; but what is the basis for the categorization? Here, the actions taken by the City of South Portland in the *Portland Pipeline I and II* stand in stark contrast to the Ordinance.

Unlike the ordinance approved by the City of South Portland, the Ordinance here lacks any legislative findings. The nature, extent, intensity, duration, and all other aspects the implied toxicity of persons (above 1,000) who disembark from cruise ships is not apparent from the Ordinance's text and can only be inferred. But the only clue is the rigid 1,000-person limit, itself, which, as has been explained, applies not only to the well-known tourist-intense months of July and August and the less intense "shoulder months" of May and June and September and October, but to every calendar day of every month of the year, without exception.

Left only with the Ordinance for guidance on this categorical rule of exclusion for this particular set of human beings, the only possible inference is that, for this set of persons, their noxious quality (or qualities) is so dangerous and so immutable, or otherwise incapable of management, that a blanket ban is warranted. But this only raises the question, if those disembarking from cruise ships above the number 1,000 pose the same danger to the community

on January 1 as they pose on July 1, what is the nature of that danger? Clearly, on this point the text of the Ordinance should control, but given its sweeping, rigid terms, the Ordinance provides no clue. Recourse must be had to some other authority.

There are two obvious candidates.  One is the "Purpose" section of the Ordinance when, in the form of an Initiative, it was circulated to the voters. The second are the communications between Mr. Sidman, the Ordinance's originator and chief proponent, and others concerning the proposed ballot measure's purpose and intended effect. In raising these points, Plaintiffs do not concede that they are necessarily valid as legislative history, but with the text of the Ordinance silent, out of an abundance of caution, Plaintiffs' must address them.[13]

As to the Purpose section, Plaintiffs and Pilots have addressed that at length in their briefs. *See Pls Br.* at 38-43. Here, it only bears repeating that Mr. Sidman, himself, was the Purpose's principal author and that, for the Purpose's broad pronouncements about the strain that cruise ship passenger on various essential Town services, he consulted no Town officials because, as he explained to this Court, the knowledge of those officials was not "pertinent" to these assertions. *Pls Br.* at 38. The contrast between the Ordinance's and the City of South Portland's respective invocations of police powers becomes stark. Where the City of South Portland carefully developed a record to support its restriction of the importation of petroleum products, the author of the Ordinance invoked those same powers without consulting anyone with firsthand knowledge of the Town services in question.

Turning to Mr. Sidman's pre-enactment communications, it again bears emphasis that his exchange with attorney Arthur Grief reveals a calculated and wholly unsupported attempt to rest

---

[13]     Only when statutory language is ambiguous does a court "examine other indicia of legislative intent, such as legislative history." *Raposa v. Town of York,* 2019 ME 29, ¶ 11 n.3, 204 A.3d 129 (*citing Kimball v. Land Use Regulation Comm'n*, 2000 ME 20, ¶ 18, 745 A.2d 387) (quotation marks omitted).

the Ordinance on an imagined health crisis posed by the "excess unauthorized persons" disembarking from cruise ships. *Pls Br.* at 45-46.  A state or local government cannot ensure the survival of a particular law by "simply invoking the convenient apologetics of the police power." *Kansas City Southern Ry. v. Kaw Valley Drainage District*, 233 U.S. 73, 79 (1914) (Holmes, J.). But that is what the exchange between Mr. Sidman and attorney Grief reveals—the false and unsupported invocation of health concerns posed by the 1,001[st] disembarker and those who may follow.  *Pls Br.* at 45-46.

Despite the opacity of the Ordinance's text and the insufficient pre-enactment record supporting the Purpose section of the Initiative, the trial provided both the Town and Mr. Sidman with ample opportunity to document the particulars of the toxic nature of the "unauthorized" cruise ship disembarkers. This was the course that the City of York followed in *Lutz v. City of York, Pennsylvania*, 899 F.3d 255 (3d Cir. 1990).  *Lutz* concerned an Ordinance barring "cruising"; that is, "repetitive, unnecessary driving." *Id.* at 257.  Although the York ordinance was clear on what was prohibited, it was not as clear on the rationale supporting it. When the ordinance was challenged, city officials testified that it was prompted by vehicularpro congestion. *Id.* at 257.  As the Court explained, the "several York officials defended the ordinance", including police officers, a police dispatcher, and the fire chief-ambulance administrator.  *Id.*, 257-258.

The July trial on the Ordinance provided both the Town and Mr. Sidman with ample opportunity to produce evidence of the reasons supporting the Ordinance's unyielding categorization and condemnation of cruise ship disembarkers. But Town officials responsible for administrating the municipal services that were supposedly in peril denied knowledge of any such risk. *Pls Br.* at 38-40, 47-48.

**The Ordinance bars Cruise Ships:**   Relying heavily on the Ordinance's indirection, both the Town and Mr. Sidman deny that the Ordinance bars large cruise ships from coming to Bar Harbor. The Town is particularly inventive on this point, contending that what is really at issue is the cruise lines' "preferred business model" which "involves mega-ships" which "might choose not to come to Bar Harbor if they cannot disembark their entire complement of passengers in a single day, and that, in turn, might reduce revenues flowing to Plaintiffs and Pilots." *Town Br.* at 24. This means, the Town proposes, that the cruise lines and the "local interests that have cast their lot with the cruise lines" have not raised constitutional claims; rather, they are merely seeking protection "of their business model." *Id.* For this point the Town rests on the notion that all that is really at issue are the cruise lines' "methods of operation" and that the Commerce Clause does not protect "methods of operation."  *Id.* As authorities for this point, the Town relies on *National Pork Producers Council v. Ross,* 143 S. Ct. 1142 (2023) and *Exxon v. Governor of Maryland*, 437 U.S. 117 (1978). Neither supports the Town's position.

*Exxon* concerned a Maryland statute that barred producers or refiners of petroleum products from operating retail service stations within the state and which required those producers and refiners to extend "voluntary allowances" to all the retail service stations they supplied. 437 U.S. at 120. Exxon challenged, inter alia*,* the law under the dormant Commerce Clause.  *Id.* at 123-124. The Supreme Court rejected Exxon's Commerce Clause claim, making several findings which included that the statute was not discriminatory. *Id.* at 125. The Court also found that due to the presence of "several interstate marketers" which were not affected by the new law, "it does not prohibit the flow of interstate goods". *Id.* at 126. The Court also found that even if some producers and refiners terminated sales in Maryland, others would fill the void, commenting that "there is no reason to assume that their share of the entire supply will not be promptly replaced by other

interstate refiners." *Id.* at 127. Finally, the Court observed that just because the petroleum market was national in scope that did not mean that the Commerce Clause "of its own force, preempts the field of retail gas marking." *Id.* at 128.

*Exxon* concerned a very different situation than presented here—one in which a state law forced vertically integrated petroleum producers and refiners to divest themselves of their retail service stations. A requirement which, the Court found, would not disrupt the "the flow of interstate goods" or diminish the provision of petroleum products to Maryland, *id.* at 126-27, nor would the statute "impede the flow of interstate goods." *Id.* at 128.

*National Pork* concerned a Commerce Clause claim by pork producers challenging a California law governing the raising of pigs. 143 S. Ct. at 1149-50. In rejecting the pork producers' challenge, *National Pork* relied in part of *Exxon v. Governor of Maryland*, noting that in that case, "the vertically integrated businesses faced a choice: They could divest themselves of their production capacities or withdraw from the local retain market"; a choice which the Court concluded was open to the pork producers as well. *Id.* at 1161-62. The Court further noted that the pork producers also had the option of simply complying with the California standards, at which point that market would remain open to them. *Id.* at 1163.

The disparities between the laws in *Exxon* and *National Pork* and the Ordinance here are immediately apparent. In contrast with *Exxon*, the cruise lines are not vertically integrated companies with components they can shed. Moreover, unlike *Exxon,* the Ordinance would eliminate large cruise ships from coming to Bar Harbor and no other such cruise lines would take their place. There is nothing in the record that remotely suggests that small cruise ships would or could fill the void. There would be disruption in the flow of interstate commerce for cruise ships and their patrons.

Unlike in *National Pork*, the cruise lines do not have the option of simply complying with the Ordinance's standards and the market would open to them. For reasons they had earlier made clear to Bar Harbor, they cannot call on ports that force them to choose which passengers (and crew) may disembark and which may not. *Pls Br.* at 32-35. Moreover, as is discussed further below, as the Court did in *Exxon*, *National Pork* recognized the significance of Commerce Clause jurisprudence protecting the instrumentalities and arteries of commerce from even nondiscriminatory disruption by state and local laws.

**The Ordinance burdens Arteries of Commerce.** Plaintiffs and Pilots argue that the Ordinance burdens the "arteries" and "instrumentalities of commerce" in violation of the Commerce Clause. *Pls Br.* at 26-27; *Pilots Br.* at 27-34. The Town and Mr. Sidman have attempted to meet these arguments in different ways. The Town simply dismissed these arguments and at least some of the authorities on which they relied on the grounds that, unlike the laws at issue in those cases, "the Ordinance does not, in fact, regulate ships. It regulates the use of land in the Town." *Town Br.* at 29. To support this point, the Town asserted that the Ordinance does not attempt to govern cruise ship design or navigation, it "merely provides that only 1,000 persons may disembark in Bar Harbor in a given day." *Id.* at 30. For his part, Mr. Sidman relied on Supreme Court decisions comprising the "ferry line of cases." *Sidman Br.* at 29 n. 18. The Ordinance, however, is of a piece with those laws that the Supreme Court has struck down in protecting the instrumentalities and arteries of commerce and, the ferry line of Supreme Court decisions provides the Ordinance with no support.

The Town is wrong because the Ordinance does regulate ships because it intervenes at the very point at which a portion of the cruise ship's trip is to be consummated—the point of

disembarkation—and bars "excess unauthorized persons" from doing so. Mr. Sidman is wrong because the ferry line decisions not only fail to support his point, they defeat it.

Before turning to those arguments, Supreme Court precedent on instrumentalities and the arteries of commerce must be addressed. In *National Pork,* the plurality opinion noted that "some of our cases…have expressed special concern with certain state regulation of the instrumentalities of transportation." 143 S. Ct. at 1159. The plurality then cited to footnote 2 of the opinion. In the same vein, the concurring opinion of Justice Sotomayor, which Justice Kagan joined, observed that cases under *Pike* "have invalidated state laws…that appear to have been genuinely nondiscriminatory' in nature." *Id.* at 1166 (citing *General Motors Corp. v. Tracy*, 519 U.S. 278, 298 n. 12 (1997). Consistent with the plurality opinion, Justice Sotomayor then noted that, "[o]ften, such cases have addressed state laws that impose burdens on the arteries of commerce, 'trucks, trains, and the like.'" *Id.* at 1166. Significantly, Justice Sotomayor then cited to the same footnote 2 on which the plurality relied for this point.

The plurality's footnote 2, in turn, cited to several Supreme Court decisions: *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 523-530 (1959); *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 763-782 (1945); *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 447 (1978). Footnote 2 concluded with the comment that the pig breeding controls at issue in that case did not fit within this line of cases stating: "Nothing like that exists here. We do not face a law that impedes the flow of commerce. Pigs are not trucks or trains." *National Pork*, 143 S.Ct. at 1159 n. 2.

The Town's summary dismissal of this line of cases dealing with the movement of persons and goods is premised on its insistence that the Ordinance does no more than regulate land use. Town Br. at 29. But these cases cannot be so easily circumvented. That is because the *National Pork* plurality and Justices Sotomayor and Kagan are quite clearly correct—there is a line of

Supreme Court Commerce Clause cases that placed special scrutiny on state and local attempts to clog these "arteries of commerce".

*Bibb v Navajo Freight* is illustrative. In *Bibb,* the Supreme Court considered an Illinois law requiring a particular type of mudflaps on trucks; one different from those required by most other states. 359 U.S. at 526-528. The Court expressly found that the mudguard requirement was "nondiscriminatory". *Id.* at 529. It also found, however, that it "severely burdens interstate commerce." *Id.* at 528. Given the isolated character of the state mudguard standard, the Court concluded that the evidence supporting the mudguard's supposedly superior safety characteristics was "far too inclusive" when held against the evidence showing that the mudguard requirement "severely burdens interstate commerce" and invalidated the requirement as violative of the Commerce Clause. *Id.* at 528-530.

*Bibb* demonstrates that, where a state or local rule significantly burdens the movement of goods and people in interstate commerce, a court must closely scrutinize that law under the dormant Commerce Clause to evaluate the nature and extent of the burden it has imposed on interstate commerce and the rationale and value supporting it. Even where the state interest is compelling—including state standards governing road safety measures—the law is not immune from scrutiny.  Finally, *Bibb* makes clear that, in conducting the latter evaluation, a court does not and cannot accept any proffered justification at face value. It must conduct its own assessment and make its own judgment. Although exemplary of a line of cases protecting the "instrumentalities" and the "arteries" of commerce, *Bibb* is only one in a long line of such cases.

*Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761 (1945) provides yet another example. There, Arizona limited number of cars that could be attached to a train engine to 14 for

passenger trains and 70 for freight trains. *Id.* at 763. In considering a dormant Commerce Clause change to these restrictions, the Court framed the questions posed as:

> the nature and extent of the burden which the state regulation of interstate trains, adopted as a safety measure, imposes on interstate commerce, and whether the relative weights of the state and national interests involved are such to make inapplicable the rule, generally observed, that the free flow of interstate commerce and its freedom from local restraints in matters requiring uniformity of regulation are interests safeguarded by the commerce clause from state interference.

325 U.S. at 770-771.

The Court then considered such factors as that "approximately 93% of freight traffic and 95% of passenger traffic" traversing Arizona was intestate; that the Arizona restrictions require the railroads to haul 30% more trains than would otherwise be the case; that the longer trains reduced transportation costs, whereas complying with the restrictions greatly increased costs; and other similar factors. *Id.* at 771.

In striking down the Arizona law as repugnant to the Commerce Clause, the Court commented that, "[t]he principle that, without controlling Congressional action, a state may not regulate interstate commerce so substantially as to affect its flow or deprive it of needed uniformity in its regulation is not to be avoided by 'simply invoking the convenient apologetics of the police power.'" *Id.* at 779-780 (quoting *Kansas City Southern Ry. V. Kaw Valley Drainage District,* 233 U.S. 73, 79 (1914) (Holmes, J.)). Thus, the Court made it clear that in evaluating a state or local law under the Commerce Clause, a state or local government's mere invocation of the police power would not, by itself, suffice to sustain the law in question. In addition, as was true of *Bibb,* in *Southern Pacific*, the Court found no evidence that the Arizona restrictions were intended to benefit in-state economic interests at the expense of out-of-state interests.

As footnote 2 in *National Pork* implied, there are many Supreme Court decisions invoking the dormant Commerce Clause to strike down state and local laws, even those with no

demonstrated discriminatory purpose or, indeed, effect, that impede the instrumentalities or clog the arteries of commerce. These include but are by no means limited to: *Kassel v. Consolidated Freightways Corp. of Del.*, 450 U.S. 662 (1981); *Raymond Transportation v. Rice*, 434 U.S. 429 (1979); *Morgan v. Commonwealth of Virginia*, 328 U.S. 373 (1946); *Mississippi Railroad Comm'n v. Illinois Cent. Railroad Co.*, 203 U.S. 335 (1906); *Hall v. DeCuir*, 95 U.S. 485 (1877).

Without question, cruise lines are engaged in the transportation of persons and, as such, are both an instrumentality of commerce and the branches that comprise the arteries of commerce. The transportation of persons by water has long been recognized as a form of commerce. *Gibbons v. Ogden*, 22 U.S. 1 (1824). This form of commerce begins at the point of departure and "is not completed until the passenger is disembarked at the pier" at the destination. *Henderson v. Mayor of City of New York*, 92 US. 259, 271 (1875); *see also Isham v. Pacific Far East Line, Inc.*, 476 F.2d 835, 836 (9th Cir. 1973) ("the duty is the long-established rule that embarking and disembarking are part of the voyage which the shipowner agrees to provide.").

Similarly, Mr. Sidman's reliance on the "ferry line" of Supreme Court cases avails him nothing. Indeed, these cases actually support Plaintiffs' arguments. For example, in *Port Richmond & Bergen Point Ferry Co. v. Board of Chosen Freeholders*, the Supreme Court observed, "[i]t is manifest…that the transportation of persons and property from one state to another is none the less interstate commerce because conducted by ferry." 234 U.S. 317, 326 (1914). From this point, the *Port Richmond Court* went on to say, "[i]t necessarily follows that whatever may be properly regarded as a direct burden upon interstate commerce, as conducted by ferries operating between states, it is beyond the competency of the state to impose." *Id.* As authority for this principle, *Port Richmond* cited *Gloucester Ferry Co. v. Pennsylvania,* 114 US. 196 (1885).

29

*Gloucester Ferry*, also cited and relied on by Mr. Sidman, made it clear that, while ferries may occupy a distinctive niche for some purposes in Supreme Court case law, when it comes to commerce, it is part of the broader whole comprising the movement of goods and persons. As the Court explained, "[i]t matters not that the transportation be made in ferry-boats, which pass between state every hour of the day. The means of transportation of persons and freight does not change with the character of the business as one of commerce, nor does the time within which the distance between the states may be traversed." 114 U.S. at 203.

The trial record testimony has established that cruise lines are a particular kind of waterborne transportation business involving not one, but several destinations. PPF 159; *see also Doe v. Celebrity Cruise Lines, Inc.*, 394 F.3d 891, 901 (11th Cir. 2004). The trial record established that a cruise ship visit is not complete unless, at each destination, every passenger has the option to disembark. PPF 284, *Pls Br.* at 34-35. No cruise ship itinerary including Bar Harbor could fulfill its purpose unless every passenger were afforded that option. PX 211-214.

The very act of disembarkation is forbidden under the Ordinance to putatively "excess unauthorized persons", including passengers. Once the connection between disembarkation and the fundamental purpose of the cruise ship commerce are understood, it becomes apparent that the Ordinance does not merely "burden" such commerce, it eliminates the most fundamental premise on which it is based.

*Exxon, National Pork*, and the "arteries of commerce" line of decisions squarely apply to the Ordinance. Otherwise, *National Pork*'s footnote 2 would have to be read: "Ships are not trucks or trains"; an assertion which, for Commerce Clause purposes, would be incomprehensible. To posit the issue somewhat differently—if instead of targeting cruise ships, the Ordinance had

selected coach buses and provided that, although they could come to Bar Harbor and park there, no more than 20 persons could disembark without penalty. The burden on commerce is manifest.

Indeed, in *Buck v. Kuykendall*, the Supreme Court struck down a Washinton State law requiring common carriers to obtain a certificate of public convenience and necessity before they could include Washington State in their interstate routes. 67 U.S. 307, 314 (1925). In striking the statute down, the *Buck* Court commented that "[i]t determines not the manner of use, but persons by whom the highways may be used.  It prohibits such use to some persons, while permitting it for others for the same purpose and in the same manner." *Id.* at 326; *see also Truesdell v. Friedlander*, 80 F.4th 762, 777 (6th Cir. 2023) (citing Buck as current authority). If one were to replace the word "highways" with "any property located within the Town of Bar Harbor", one could not have a more apt description of the Ordinance at issue here.

**The Ordinance Violates Commerce Clause Right to Travel.** Mr. Sidman objects to Plaintiffs' claim that the Ordinance violates the right to travel under the Commerce Clause. *Sidman Br.* at 32.  He argues that Plaintiffs failed to plead this claim. *Id.*  Mr. Sidman misunderstands the nature of Plaintiffs' Commerce Clause claims.  At this point, the record is clear that Plaintiffs are not directly affected by the Ordinance's effective ban on cruise ships.  But they are nonetheless harmed by the Ordinance's impact on the cruise ship lines. Therefore, they have Article III standing to maintain this claim.[14]

Because the Ordinance also would impede the rights of third persons to travel to Bar Harbor via large cruise ship, a right guaranteed them under the Commerce Clause, and as Plaintiffs would be harmed by the restriction that the Ordinance imposes on such persons, Plaintiffs may

---

[14]     Like the Ordinance which proposes to penalize the Pier Owners rather than the disembarking persons, the statute in *Edwards* operated by indirection. It did not bar indigent persons from coming to California, but penalized those who would assist them. *Edwards v. People of California*, 314 U.S. 160, 165-166 (1941).

raise this claim, too. Although the Supreme Court has, at times, found a right to travel in the Privileges and Immunities Clause and the Due Process Clause, it has also clearly grounded it in the Commerce Clause.[15] *Edwards v. People of California*, 314 U.S. 160, 173-174 (1941). This Court has recognized the Commerce Clause as the basis for the *Edwards* decision. *Bayley's Campground, Inc. v. Mills*, 463 F.Supp.3d 22, 34 (D. Me. 2020); *see also Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 159-160 (1st Cir. Jan. 19, 2021).

Of the millions of persons who visit Bar Harbor every year, the Ordinance has singled out only those who choose to travel to Bar Harbor by cruise ship. It has imposed numerical and temporal limitations on them, which apply every day of the year, and which bar them from entering any part of the Town. In imposing these limitations on this discrete group of travelers, the Ordinance has impaired their right to travel in violation of the Commerce Clause.

**The Local Interest Served must be Legitimate.** The Supreme Court has also held that, "…once a state law has been shown to discriminate against interstate commerce 'either on its face or in practical effect,' the burden falls on the state to demonstrate both that the statute 'serves a legitimate local purpose' and that this purpose could not be served as well by available nondiscriminatory means." *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979); *see also Washington State Apple Advertising Commission v. Hunt*, 432 U.S. 333, 353 (1977); *Dean Milk Co. v. Madison*, 340 U.S. 349, 354 (1951); *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970).[16] This test requires—as all Commerce Clause tests

---

[15] As noted in Plaintiffs' initial Post-Trial Brief, Plaintiffs base their right to travel claim solely on the Commerce Clause and take no position on whether they would have standing to bring such a claim under the Privileges and Immunity Clause or the Due Process Clause.

[16] The Town asserts that *Pike* is on "life support". Town Br. at 36. This is not a readily recognizable category of precedent and would come as a surprise to Justice Kavanaugh who concluded "six justices of this Court affirmatively retain the longstanding *Pike* test for analyzing dormant Commerce Clause challenges to state economic regulations." *National Pork*, 143 S. Ct. at 1172.

require—that the state or local interest served must be "legitimate." In their review of the Ordinance's terms in their initial brief, above, and in their discussion of Due Process, below, Plaintiffs have demonstrated that the Ordinance serves no legitimate local interest.

### C. The Ordinance Violates Due Process Standards

Mr. Sidman mounts a lengthy and vigorous defense to Plaintiffs' Due Process challenge. *Sidman Br.* at 35-40. However, he fails to engage with the crux of Plaintiffs' claim and instead argues several decisions concern zoning or some form of land use management defeat Plaintiffs' claims. *Id.* This is not surprising, as it is in keeping with the fiction that the Ordinance is simply another land use measure which, Plaintiffs' prior arguments has made clear, it is not.

Defendants insist that the Ordinance is based on the Town's police power. The exercise of municipal power for zoning and land use is well-recognized and requires no citation. One case on which Mr. Sidman places especial reliance, *Corn v City of Lauderdale Lakes*, 997 F.3d 1369 (11th Cir. 1993), is in many ways typical of such cases. It involved a challenge to zoning changes adopted by the City Council that frustrated a developer's aspirations. *Id.* at 1371. The *Corn* Court noted that, "certain interests will provide a rational basis for governmental action restricting land use" and that these interests included "family values, youth values, and the blessings of quiet seclusion." *Id*. at 1375 (quoting *Village of Belle Terre v. Boraas,* 416 U.S. 1, 9 (1974)).

But none of the land use and zoning cases Mr. Sidman has cited involved attempts, as the Ordinance proposes to do, to impose a sanction on private parties owning publicly accessible properties if they fail to bar a specific category of *persons* from entering *anywhere* within the limits of an entire municipality. As has been discussed above, the Town's invocation of the police power to bar these "excess unauthorized persons" from setting foot upon "any property located in the Town of Bar Harbor", can only succeed as an exercise of the police power of those excluded

persons carry some demonstrable noxious quality justifying the Town's invocation of the police power and that category of persons as the legitimate object of the Town's exercise of that power.

But nowhere does Mr. Sidman acknowledge that, perhaps, persons disembarking from cruise ships are not so inherently toxic that the validity of invoking the Town's police power to exclude them (or to heavily penalize a private third party for admitting them) may simply be assumed. For example, without explaining himself, Mr. Sidman simply assumes that, for police power purposes, persons arriving by cruise ship are indistinguishable from the petroleum products at issue in *Portland Pipeline II*.  *Sidman Br*. at 42 n. 20.[17]

It should be self-evident that persons arriving in Bar Harbor by cruise ship are *not,* for that reason alone, inherently noxious or that the Town may act on that assumption. Therefore, under the Due Process clause, the Town lacks the power to exclude such persons or to impose a punitive regime for their admission without a demonstrated nexus between the presence of such persons within the limits of Bar Harbor and some particular risk that such persons pose to the community.

Plaintiffs contend further that in doing so, the Town must also demonstrate a rational nexus between the risk (or risks) that this particular Ordinance-designated category of persons pose and the specific restrictions that set forth in the Ordinance including: 1) limiting the entry of the disfavored class of persons to 1,000 and no more; 2) allowing no more than 1,000 members of the disfavored class of persons to enter onto "any property" in Bar Harbor in each 24 hour period; and 3) applying this limitation on the disfavored class of persons every day of the year without exception—even on days on which, historically, no cruise ships have ever come to Bar Harbor.

---

[17]    Mr. Sidman's easy endorsement of the equivalence between cruise ship disembarkers and petroleum products shows that he has come a long way from the point where he "hesitat[ed] to compare people to fish." ECF 74 at 8 (discussing *Tart v.  Commonwealth*, 949 F.2d 490 (1ˢᵗ Cir. 1991) (where raw fish, not people, were the subject of the law in questions. *Id.* at 493)).

As has been discussed above, if the rational basis evaluation for the Ordinance is limited to the text of the Ordinance, it would fail entirely. Nothing in the Ordinance either explains or provides a rational basis for inferring why cruise ship disembarkers, above the number 1,000, have been singled out for this focused exercise of the Town's police powers. Neither does the text of the Ordinance reveal a rational basis for why this disfavored category of human beings is only allowed limited access to any part of Bar Harbor for reach 24 hour period; that is, the text reveals no reason why, once a group of 1,000 persons has left on a given day, another 1,000 might enter.  Finally, the text reveals no reason what is it about persons disembarking cruise ships that creates such a risk to public health, safety, and welfare that their entry into Bar Harbor must be limited to no more than 1,000 every single day of the year.

Mr. Sidman raises the Purpose section of the Initiative, which he wrote. Athough the Purpose section recites a dire list of risks to municipal and hospital services that cruise ship disembarkers pose to the community at large, Mr. Sidman admitted that he consulted no Town officials in drafting these assertions. Based on Mr. Sidman's own testimony, the Purpose section is no more than a Sidman *ipse dixit.*  As Plaintiffs noted earlier, the bar for establishing a rational nexus for Due Process purposes is low, but it is not nonexistent. The Ordinance lacks a rational nexus for its exercise of the Town's police power against persons disembarking from cruise ships. Its singling out this disfavored group over all others; its numerical limitation of 1,000 admittees in each calendar day, every day of the year; and its denial to those persons of access to any part of Bar Harbor are arbitrary, discriminatory, and irrelevant to any legitimate legislative goal.  *Vaqueria Tres Monjitos, Inc. v. Irizarry*, 587 F.3d 464, 583 (1st Cir. 2009) (citing *Tenneco Oil Co. v. Dep't of Consumer Affairs*, 876 F.2d 1013, 1021 (1st Cir. 1989)); *see also Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988). Dated this 27th day of October, 2023.

Respectfully submitted,

*/s/ Timothy C. Woodcock*

Timothy C. Woodcock, Bar #1663
P. Andrew Hamilton, Bar # 2933
Patrick W. Lyons, Bar #5600
Janna L. Gau, Bar #6043

**EATON PEABODY**
80 Exchange Street
Bangor, ME 04402-1210
(207) 947-0111
twoodcock@eatonpeabody.com
ahamilton@eatonpeabody.com
plyons@eatonpeabody.com
jgau@eatonpeabody.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of October, 2023, I caused the foregoing document to

be served upon all counsel of record via email.

/s/Timothy C. Woodcock

36