**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, | ) ) ) | |
| *Plaintiff-Intervenor*, | ) ) | |
| v. | ) ) | Case No. 1:22-cv-416-LEW |
| TOWN OF BAR HARBOR, | ) ) | |
| *Defendant*, | ) ) | |
| CHARLES SIDMAN, | ) ) | |
| *Defendant-Intervenor*. | ) ) | |

**PLAINTIFF-INTERVENOR**
**PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S**
**POST-TRIAL REPLY BRIEF**

## TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Argument .................................................................................................................... 3

I.   The Ordinance's Probable Effects, Not Its Form or Its Label, Control the Court's Preemption and Commerce Clause Analyses ................................................... 3

II.   The Ordinance Is Preempted ........................................................................ 4

    A.   The Ordinance Is Not Comparable to Local Laws Affecting Maritime Legal Remedies, Procedures, Compensation Structures, and Environmental Damage Assessments or Penalties ................................................................ 4

    B.   The Ordinance Is Not Comparable to Constitutionally Permissible Local Laws That Regulate "Inherently Local" Transportation, Like Ferries ................ 7

    C.   The Town's Convenient, *Post Hoc* Interpretation of the Ordinance Does Not Save the Ordinance from Constitutional Invalidity ................................. 12

    D.   The Ordinance Imposes Municipal Conditions of Entry into Bar Harbor That Conflict with Federal Authority ................................................................ 15

    E.   The Ordinance, Its Enforcement Mechanisms, and Its Effects on Vessel Operations in Federal Anchorage Grounds Are Unlawful Assertions of Municipal Authority Over Federal Subject Matters ................................. 17

III.   The Ordinance Violates the Commerce Clause ............................................. 20

    A.   The Ordinance Obstructs the Flow of Interstate Commerce As Did the Train Car Limits in *Southern Pacific* and the Mudflap Requirements in *Bibb* ............ 21

    B.   Even Absent Discrimination, the Ordinance Unduly Burdens Interstate Commerce ........................................................................................... 26

    C.   The Ordinance Does Not Leave "All Comers with Equal Access" to Bar Harbor ................................................................................................ 27

    D.   The Ordinance Cannot be Sustained in the Absence of Evidence That the Ordinance Will Advance the Asserted Local Benefits ................................ 31

IV.   The Ordinance Violates the Maine Constitution .......................................... 32

Conclusion ............................................................................................................... 34

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- i -

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Dredging Co. v. Miller*,
510 U.S. 443 (1994) ................................................................................4, 5

*Amalgamated Sugar Co. LLC v. Vilsack*,
563 F.3d 822 (9th Cir. 2009) ................................................................13

*Askew v. Am. Waterways Operators, Inc.*,
411 U.S. 325 (1973) ................................................................................4, 5, 6

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984) ................................................................................31

*Baldwin v. G.A.F. Seelig, Inc.*,
294 U.S. 511 (1935) ................................................................................22

*Ballard Shipping Co. v. Beach Shellfish*,
32 F.3d 623 (1st Cir. 1994) ................................................................4, 5

*Barber v. State of Hawai'i*,
42 F.3d 1185 (9th Cir. 1994) ................................................................18

*Bay Ferries, Ltd. v. Bd. of Comm'rs for the Port of Portland*,
No. AP-17-48 (Me. Super. Jun. 1, 2018) (Walker, J.) ........................7, 34

*Bayley's Campground, Inc. v. Mills*,
No. 20-1559, 2021 WL 164973 (1st Cir. Jan. 19, 2021) ........................15

*Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987) ................................................................................13

*Bibb v. Navajo Freight Lines, Inc.*,
359 U.S. 520 (1959) ................................................................................21, 22, 23

*Buck v. Kuykendall*,
267 U.S. 307 (1925) ................................................................................25, 26

*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*,
511 U.S. 383 (1994) ................................................................................28

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*,
520 U.S. 564 (1997) ................................................................................3

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- ii -

*Canadian Pac. Ry. Co. v. United States*,
1934 WL 60036 (9th Cir. Nov. 13, 1934)................................................................8

*Cincinnati, P., B.S. & P. Packet Co. v. Catlettsburg*,
105 U.S. 559 (1881)................................................................10

*City of Charleston, S.C. v. A Fisherman's Best, Inc.*,
310 F.3d 155 (4th Cir. 2002) ................................................................7

*City of Sault Ste. Marie v. Int'l Transit Co.*,
234 U.S. 333 (1914)................................................................20

*Clyde Mallory Lines v. State of Alabama ex rel. State Docks Comm'n*,
296 U.S. 261 (1935)................................................................11, 12

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) ................................................................13

*Conway v. Taylor's Executor*,
66 U.S. 603 (1861)................................................................7, 9, 10

*Cumberland Farms, Inc. v. LaFaver*,
33 F.3d 1 (1st Cir. 1994)................................................................29

*Dep't of Revenue of Ky. v. Davis*,
553 U.S. 328 (2008)................................................................4

*Exxon Corp. v. Governor of Maryland*,
437 U.S. 117 (1978)................................................................2, 29, 30

*Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*,
703 F.3d 1230 (11th Cir. 2012) ................................................................28

*Gloucester Ferry Co. v. Pennsylvania*,
114 U.S. 196 (1885)................................................................10

*Grove City Coll. v. Bell*,
465 U.S. 555 (1984)................................................................14

*H.P. Hood & Sons, Inc. v. Du Mond*,
336 U.S. 525 (1949)................................................................26

*Hughes v. Oklahoma*,
441 U.S. 322 (1979)................................................................3

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- iii -

*Island Silver & Spice, Inc. v. Islamorada, Vill. of Islands*,
   475 F. Supp. 2d 1281 (S.D. Fla. 2007), *aff'd sub nom. Island Silver & Spice,*
   *Inc. v. Islamorada*, 542 F.3d 844 (11th Cir. 2008) ..................................................31

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
   567 U.S. 298 (2012)..................................................................................................15

*Lewis v. BT Inv. Managers, Inc.*,
   447 U.S. 27 (1980)......................................................................................................4

*Lil' Man in the Boat, Inc. v. City & Cnty. of San Francisco*,
   5 F.4th 952 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 900 (2022)............................12

*United States v. Locke*,
   529 U.S. 89 (2000)...................................................................................................6, 7

*Maher Terminals, LLC v. Port Auth. of New York & New Jersey*,
   805 F.3d 98 (3d Cir. 2015).......................................................................................11

*Maine Forest Prod. Council v. Cormier*,
   586 F. Supp. 3d 22 (D. Me.), *aff'd*, 51 F.4th 1 (1st Cir. 2022) ...............................16

*Massachusetts Delivery Ass'n v. Coakley*,
   769 F.3d 11 (1st Cir. 2014)........................................................................................4

*McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*,
   226 F.3d 429 (6th Cir. 2000) ...................................................................................23

*State of R.I. v. Narragansett Indian Tribe*,
   19 F.3d 685 (1st Cir. 1994).......................................................................................14

*National Pork Producers Council v. Ross*,
   598 U.S. 356 (2023).......................................................................................... *passim*

*New Energy Co. of Indiana v. Limbach*,
   486 U.S. 269 (1988)..................................................................................................29

*Commonwealth of Mass. v. New England Transp. Co.*,
   282 Mass. 429 (Mass. 1933) ..............................................................................26, 27

*Polar Tankers, Inc. v. City of Valdez, Alaska*,
   557 U.S. 1 (2009)......................................................................................................11

*Port Richmond & Bergen Point Ferry Co. v. Bd. of Chosen Freeholders of*
   *Hudson Cnty.*,
   234 U.S. 317 (1914).......................................................................................7, 8, 9, 10

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- iv -

*Portland Pipe Line Corp. v. City of South Portland*,
288 F. Supp. 3d 321 (D. Me. 2017) ...................................................................2, 7

*Portland Pipe Line Corp. v. City of South Portland*,
332 F. Supp. 3d 264 (D. Me. 2018) .......................................................................2

*Raymond Motor Transp., Inc. v. Rice*,
434 U.S. 429 (1978) ............................................................................................24

*Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*,
199 F.3d 26 (1st Cir. 1999) ................................................................................13

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ..............................................................................................7

*Romero v. Int'l Terminal Operating Co.*,
358 U.S. 354 (1959) ..............................................................................................4

*S. Covington & C. St. R. Co. v. City of Covington*,
235 U.S. 537 (1915) ............................................................................................22

*Sawyer Env't Recovery Facilities, Inc. v. Town of Hampden*,
760 A.2d 257 (Me. 2000) ....................................................................................33

*Sherlock v. Alling*,
93 U.S. 99 (1876) ................................................................................................21

*Smith v. Town of Pittston*,
820 A.2d 1200 (Me. 2003) ..................................................................................33

*Snead v. Cent. of Georgia Ry. Co.*,
151 F. 608 (C.C.S.D. Ga. 1907) .........................................................................27

*Southern Pacific Co. v. Arizona ex rel. Sullivan*,
325 U.S. 761 (1945) ................................................................................21, 22, 23

*Southern Pacific Co. v. Jensen*,
244 U.S. 205 (1917) ......................................................................................2, 4, 5

*Stephen D. DeVito, Jr. Trucking, Inc. v. Rhode Island Solid Waste Mgmt. Corp.*,
770 F. Supp. 775 (D.R.I.), *aff'd sub nom. DeVito v. Rhode Island Solid Waste
Mgmt. Corp.*, 947 F.2d 1004 (1st Cir. 1991) .................................................31, 32

*United States v. Stevens*,
559 U.S. 460 (2010) ............................................................................................13

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- v -

*Truesdell v. Friedlander*,
  80 F.4th 762 (6th Cir. 2023) ................................................................25, 26, 27

*Ullis v. Inhabitants of Town of Boothbay Harbor*,
  459 A.2d 153 (Me. 1983)...................................................................................33

*Util. Contractors Ass'n of New England, Inc. v. City of Fall River*,
  No. CIV. A. 10-10994-RWZ, 2011 WL 4710875 (D. Mass. Oct. 4, 2011) ...........15

*W. Virginia v. Env't Prot. Agency*,
  142 S. Ct. 2587 (2022)......................................................................................15

*Walgreen Co. v. Rullan*,
  405 F.3d 50 (1st Cir. 2005)................................................................................30

*Wilmington Transp. Co. v. R.R. Comm'n of California*,
  236 U.S. 151 (1915)......................................................................................8, 10

**Statutes**

33 U.S.C. § 5 .........................................................................................................12

33 U.S.C. § 471 .....................................................................................................18

B.H. Code § 125-108(A) .......................................................................................13

B.H. Code § 125-109 ............................................................................................13

Maine Harbor Masters Act.....................................................................................33

Maine Pilotage Act................................................................................................20

Me. Rev. Stat. tit. 38, § 97 ...................................................................................20

Rivers and Harbors Appropriation Act ..................................................................12

**Constitutional Provisions**

U.S. CONST. art. I, § 10, cl. 3 ...............................................................................11

U.S. CONST. art. 3, § 2 ...........................................................................................4

**Rules**

33 C.F.R. parts 104 ...............................................................................................12

33 C.F.R. part 105 .................................................................................................12

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- vi -

33 C.F.R. part 110 ................................................................................................................. 18, 19

Anchorage Grounds; Frenchman Bay, Bar Harbor, ME, 67 Fed. Reg. 68517 (Nov. 12, 2002) (amending 33 C.F.R. part 100) .............................................................. 19

**Other Authorities**

Erik M. Jensen, *Quirky Constitutional Provisions Matter: The Tonnage Clause, Polar Tankers, and State Taxation of Commerce*, 18 GEO. MASON L. REV. 669 (2011) ........................................................................................................................ 11

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- vii -

## Introduction

In November 2022, Bar Harbor residents voted in favor of an Ordinance that limits cruise ship disembarkations to 1,000 persons per day. The Ordinance, arising from what a Town official described as "angst" and "feeling,"[1] purports to address downtown pedestrian congestion but has as its direct, intended result the virtual elimination of long-standing cruise vessel operations in Bar Harbor and at nearby federal anchorage grounds. The Ordinance erects substantial obstacles to interstate and international maritime commerce and the movement of persons within that commerce. It is constitutionally incompatible with the federal government's authority over immigration, customs, vessel conduct and operations, anchorage grounds, and foreign relations. It arbitrarily discriminates against cruise vessels as instrumentalities of interstate transportation and as competitors in the Bar Harbor vacation market. It undermines Maine's interests in a sustainable pilotage system and in statewide efforts to support and grow the tourism industry. Its purported local benefits do not justify its burdens on commerce.

The Ordinance, by intent and effect, severely restricts the disembarkation of passengers from cruise vessels that meet an extensive array of federal regulatory requirements for interstate and international operation while those vessels are lying in federal anchorage grounds proximate to the Town. The Ordinance's express language subjects maritime facility owners to fines of at least $100 per excess person entering the Town, if disembarkations exceed the 1,000-person daily limit, despite those persons having been cleared for entry by federal authorities and despite the maritime facilities having met federal requirements to receive passengers.

The Town and Mr. Sidman defend the Ordinance with largely overlapping justifications

---

[1] Tr. 13-Jul. at 113:2-3.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 1 -

based upon wishfully dismissive descriptions of the Ordinance's purposes and effects. They argue that the Ordinance is a valid exercise of local police powers—a neutral, non-discriminatory regulation that applies to land activities and thus impinges trivially and incidentally on interstate commerce.[2] Its adverse effects on international maritime transport, they contend, are largely caused by the cruise industry's "chosen business model" and are outweighed by the asserted local interest in reducing downtown pedestrian congestion.[3] Further, the Town asserts that the Ordinance's disembarkation restriction, despite its plain language, is applicable only to "passengers" (it says "persons") because the Town plans to interpret "authoritatively" an intentionally-chosen, unambiguous term so as to immunize the Ordinance from invalidation due to its clear conflict with federal regulations. Defendants invite the Court to join in speculative scenarios that minimize the Ordinance's impacts and effects on existing patterns of international maritime commerce but do not identify any evidence in the record to contradict extensive, knowledgeable testimony unequivocally establishing that the 1,000-person per day limit is, was intended to be, and will be an effective prohibition of cruise operations in Bar Harbor for virtually all cruise activity as it has been conducted in recent years.

Defendants posit a unique interpretation of the U.S. Constitution and its protections of interstate and maritime commerce.[4] Their approach renders ineffectual constitutional barriers to local interference with national commerce. The Ordinance, and its underlying justifications, level guardrails that historically have deterred local impulses, regardless of motivation, from

---

[2] Town of Bar Harbor Post-Trial Brief, ECF No. 196 ("T. Br.") at 18-44; Sidman Post-Trial Memorandum, ECF No. 197 ("S. Mem.") at 17-35.

[3] T. Br. at 34-35; S. Mem. at 21 n.8.

[4] Defendants principally rely on distinguishable cases: *Portland Pipe Line Corp. v. City of South Portland*, 288 F. Supp. 3d 321 (D. Me. 2017); *Portland Pipe Line Corp. v. City of South Portland*, 332 F. Supp. 3d 264 (D. Me. 2018); *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023); *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978); and *Southern Pacific Co. v. Jensen*, 244 U.S. 205 (1917).

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 2 -

restricting commercial operations in a United States port so severely as to make trade impracticable.[5] Following Defendants' rationalizations to their logical conclusion, they would have this Court accept that the Town, or any similarly situated locality, may effectively barricade itself against interstate commerce by legislatively limiting the discharge of cargoes to a fraction of a vessel's (or a truck's, or an airplane's) capacity without hindrance from the Constitution. Their reasoning, applied here or to any other transport mode deemed to cause local annoyance or inconvenience, most certainly leads to the kind of "balkanization" of commerce that the Framers sought to prevent. *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979). To accept Defendants' position is to agree that a municipality may arrogate unto itself the authority to obstruct interstate and maritime commerce so long as it selects a mechanism that forces local interests to close the gates, as opposed to regulating the conveyances themselves. Defendants' novel take on the Ordinance's validity has no place in a constitutional system deliberately constructed to prevent local obstructions to interstate commerce.

## Argument

### I. The Ordinance's Probable Effects, Not Its Form or Its Label, Control the Court's Preemption and Commerce Clause Analyses

The Town and Mr. Sidman, throughout their briefs, label the Ordinance a local land use measure and reject the Pilots' position that the Ordinance can, as a land use measure, have constitutionally cognizable impacts on vessels and interstate and international maritime activities.[6] This stage-setting is no more than Defendants' thinly-veiled attempt to elevate form over substance and thereby "avoid the strictures" of the Constitution. *Camps*

---

[5] The Town's guide to voters represented that the impact of the Ordinance would be to reduce cruise tourists by 95 percent. DX 471.
[6] *See, e.g.*, T. Br. at 12, 13, 14 n.6, 22 n.9, 54; S. Mem. at 11, 16-17, 35 n.20.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 3 -

*Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 575 (1997) (state cannot "avoid the strictures of the dormant Commerce Clause by the simple device of labeling its discriminatory tax a levy on real estate"). Defendants' efforts are in vain. The Court's inquiry focuses on the probable effects of the Ordinance, not the labels given to it.[7]

## II.  The Ordinance Is Preempted

### A.  The Ordinance Is Not Comparable to Local Laws Affecting Maritime Legal Remedies, Procedures, Compensation Structures, and Environmental Damage Assessments or Penalties

The Ordinance regulates primary conduct of vessels operating in interstate and international commerce. In so doing, it threatens *operational* uniformity in maritime commerce and is preempted as inconsistent with, or a usurpation of, federal authority over and protection of maritime commerce. *See* Pilots Post-Trial Brief, ECF No. 190 ("Pilot Br.") at 9-18. Defendants resist this conclusion by analogizing this case to a cluster of cases in which state remedies, procedures, and damage measures implicating the Admiralty Clause of the Constitution[8] were challenged unsuccessfully as preempted by general federal maritime law.[9] This category of cases is of limited utility here because it relates to a type of maritime preemption that applies to the assertion of judicial power and application of legal remedies, as opposed to the operation of vessels and the conduct of trade. In this area, the weight of authority has been to apply *Southern Pacific Co. v. Jensen* narrowly when determining whether state law "works material prejudice to

---

[7] *See Massachusetts Delivery Ass'n v. Coakley*, 769 F.3d 11, 20 (1st Cir. 2014) ("The court must engage with the real and logical effects of the state statute, rather than simply assigning it a label."); *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 366 (2008) ("That a law has the police power label—as all laws do—does not exempt it from Commerce Clause analysis."); *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 37 (1980) ("The principal focus of inquiry must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects.").

[8] "The judicial Power shall extend … to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. 3, § 2.

[9] *S. Pac. Co. v. Jensen*, 244 U.S. 205 (1917); *Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325 (1973); *Am. Dredging Co. v. Miller*, 510 U.S. 443 (1994); *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354 (1959); and *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623 (1st Cir. 1994).

the **characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law** in its international and interstate relations." 244 U.S. 205, 216 (1917) (emphasis added). The Town says that the "relevant inquiry" for disposition here is "'harmony and uniformity' of maritime law." T. Br. at 9 & n.4. However, this misapprehension confuses preemption tests in Admiralty Clause cases (not pled or now argued by the Pilots) with the Supremacy and Commerce Clause analyses applicable to the Pilot's claims.

The brace of remedies cases is relevant only for the distinction made by the majority opinion in *American Dredging* and by the Circuit in *Ballard Shipping* between the inclination of reviewing courts to find zones of coexistence between state or common law remedies in damages, penalties, or forum selection contexts when they are challenged as affronts to federal Admiralty Clause jurisdiction and the quite different analysis that applies when state or local measures act on the "primary conduct" of vessels. *See, e.g., American Dredging Co. v. Miller*, 510 U.S. 443, 454 (1994); *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 629 (1st Cir. 1994); *see also* Pilot Br. at 11. This distinction between state-level remedies and damages challenged as inconsistent with the federal judiciary's Admiralty Clause ambit, on the one hand, and, on the other, the non-federal regulation of "primary conduct" of vessels—*i.e.,* their operations, their business undertakings, their carriage of the nation's commerce—was emphasized by the Supreme Court in upholding challenged state procedures, penalties, compensation, and damage measures in *Askew* and *American Dredging*.[10]

---

[10] It is for this reason that the Pilots cited *American Dredging* in their opening brief, Pilot Br. at 11, but did not cite *Jensen*. And although the Town's *passim*-level attention to *Jensen* might suggest otherwise, the Pilots do not rely on *Jensen* for their arguments here. It may well be, as the Town observes, that *Jensen* has moved beyond its shelf life into a realm of borrowed time. However, even if *Jensen* were to be definitively rusticated by some future Admiralty Clause decision of the Supreme Court, its passing would not affect the validity of the Pilots' claims here, which do not contest state-imposed measures of damages, environmental fines, or compensation for maritime-related injuries.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 5 -

The Pilots, both in the context of Supremacy Clause and Commerce Clause contentions, rely on maritime "uniformity" concerns as reflected in cases addressing vessel operations, regulation of vessel conduct, and the preservation of free trade. In such cases, federal courts look to see if the challenged local measure is justified by conditions unique to a particular port or waterway, is of limited extraterritorial effect, and does not require a vessel "to modify its *primary conduct* outside the specific body of water purported to justify the local rule." *United States v. Locke,* 529 U.S. 89, 91 (2000) (emphasis added) (citing *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 159-60, 171 (1978)). As the Court observed in *Locke,*[11] federal regulatory schemes governing vessels are beholden to an "international regime [that] depends upon the principle of reciprocity." *Locke,* 529 U.S. at 102. That is to say, the certification of a vessel by the government of its own flag nation warrants that the ship has complied with international standards, and vessels with those certificates may enter ports of the signatory nations. "The existence of the treaties and agreements on standards of shipping is of relevance, of course, for these agreements give force to the longstanding rule that the enactment of a *uniform federal scheme displaces state law, and the treaties indicate Congress will have demanded national uniformity regarding maritime commerce*." *Id*. at 103 (emphasis added). Under such a regime, States have sea room to impose liability for pollution events, as had been found in *Askew,* but it would upset "the settled division of authority" to allow States (and, certainly, by extension, municipalities within States) "to impose additional unique substantive regulation on the at-sea conduct of vessels." *Id*. at 106. Where challenged state (or, by extension, municipal) laws "bear upon the national and international maritime commerce," there is "no beginning assumption that

---

[11] In *Locke,* the vessels at issues were oil tankers, but a similar scheme applies to cruise vessels, the large majority of which are registered in other countries.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 6 -

concurrent regulation by the State is a valid exercise of its police powers. Rather, the Court must ask whether the local laws in question are consistent with the federal statutory structure, which has as one of its objectives *a uniformity of regulation for maritime commerce*."[12] *Id.* at 108 (emphasis added).[13]

### B. The Ordinance Is Not Comparable to Constitutionally Permissible Local Laws That Regulate "Inherently Local" Transportation, Like Ferries

For his part, Mr. Sidman argues that federal maritime law cannot possibly preempt the Ordinance because federal law has not "supplant[ed]" local regulation of "interstate transportation of people to and from its own shore."[14] S. Mem. at 8. He supports this broad statement with selective quotes from three cases discussing state regulatory and ratemaking authority over *ferries* in the Commerce Clause context.[15] Ferries are a "means of transit from shore to shore" and necessarily imply "transportation for a short distance, almost invariably between two points only, and unrelated to other transportation."[16] *Port Richmond & Bergen*

---

[12] The Town suggests that a contrary assumption should apply here and relies on *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947), a non-maritime case, as quoted in *Portland Pipe Line*, for the unremarkable proposition that when Congress legislates in a field traditionally occupied by the States, reviewing courts should assume the "police powers of the States [are] not to be superseded by [the federal legislation] unless that was the clear and manifest purpose of Congress." *Portland Pipe Line*, 288 F. Supp. 3d at 428; T. Br. at 8. Because the Ordinance in effect operates upon maritime commerce (a field of general federal occupation), *Locke*'s starting position applies here.

[13] It is significant for review of the Ordinance that the Court in *Locke* also addressed, not in a Commerce Clause context such as was discussed in *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), but in its Supremacy Clause review of Washington State tanker regulations, the criterion of "limited extraterritorial effect," saying that a regulation within a State's residual powers must not require a tanker "to modify its primary conduct outside the specific body of water purported to justify the local rule" and further must "not impose a substantial burden on the vessel's operation within the local jurisdiction itself." *Locke*, 529 U.S. at 112. Here, the Pilots have shown that the Ordinance has a prohibitory effect on the operation of large cruise vessels in waters near the Town and will affect business decisions and itinerary planning for routes along the northeastern seaboard of the United States and between the U.S. and Canada. Pilot Br. at 30-33; PX 193 at 4; *see also* Tr. 12-Jul. at 181:23-182:10.

[14] Preemption of local law can occur even in the absence of a federal law that explicitly prohibits the exact conduct sought to be regulated locally. *City of Charleston, S.C. v. A Fisherman's Best, Inc.*, 310 F.3d 155 (4th Cir. 2002).

[15] Mr. Sidman mischaracterizes the holding in *Conway v. Taylor's Executor*. S. Mem. at 8 (quoting *Conway v. Taylor's Ex'r*, 66 U.S. 603, 620 (1861)). He offers the argument of Mr. Stevenson, counsel for the appellees, not the opinion of Justice Swayne, which begins just before page 623 of the reported decision.

[16] Because of these characteristics, the Supreme Court consistently has considered ferries "essentially local, requiring regulation according to local conditions." *Port Richmond*, 234 U.S. at 332.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 7 -

*Point Ferry Co. v. Bd. of Chosen Freeholders of Hudson Cnty.*, 234 U.S. 317, 331-32 (1914).

Additionally, ferries are often a franchise right bestowed by state or local legislative grant.[17] *Id*.

at 321. Cruise vessels are not ferries, nor do they share a ferry's defining characteristics. Cruise

vessels transport passengers over long distances between multiple ports of call in multiple state

and international jurisdictions. Cruise transportation connects to other interstate transportation

(*e.g.*, cruise passengers typically fly or drive to their embarkation ports). Neither Plaintiffs nor

the Pilots base their claims on an exclusive state law right to transport passengers by cruise

vessel. Thus, these ferry cases, given their unique context, are not particularly helpful, and their

teachings do not lead to Mr. Sidman's proposition that localities may regulate the "shoreside

aspects" of interstate transportation without fear of constitutional conflict.[18] S. Mem. at 28-29.

    In two of the cases, the Supreme Court considered a state's ability to set rates for ferriage

originating within the regulating state. *Port Richmond*, 234 U.S. at 321-22 (considering whether

Hudson County could set rates for ferriage from New York to New Jersey); *Wilmington Transp.*

*Co. v. R.R. Comm'n of California*, 236 U.S. 151 (1915) (considering whether California railroad

commission could set rates for water transportation by common carrier between the mainland

and an island, both in California). Only *Port Richmond* concerned *interstate* transportation,[19] and

---

[17] A ferry is "a place of transit across a river or arm of the sea; but in law it is treated as a franchise, and defined as the exclusive right to carry passengers across a river, or arm of the sea, from one vill to another …." *Canadian Pac. Ry. Co. v. United States*, 1934 WL 60036, at *2 (9th Cir. Nov. 13, 1934) (quoting BOUVIER'S *Law Dictionary* (1928)). "In the United States ferries are established by the legislative authority of the states, which is exercised either directly by a special act of the legislature, or through some inferior body to which power has been delegated under the provisions of a general law." *Id*. at *2. A ferry franchise "may be made exclusive as to ferrying from [a state's own] shore, but it cannot be made to exclude ferries operating under franchises granted by the state on the opposite shore." *Id.* at *3 (internal citations and quotations omitted).

[18] The Pilots continue to dispute Mr. Sidman's characterization of the Ordinance as regulating the land, not the water, and by adopting Mr. Sidman's characterization for purposes of argument here, the Pilots do not concede that the Ordinance regulates only land-based conduct. Further, as the Pilots have previously argued and now renew here, shoreside impingements on the landing and receiving of passengers are not exempt from constitutional scrutiny.

[19] The Supreme Court's determination in *Wilmington Transportation* that a state may set reasonable rates for common carriage conducted solely within that state's borders has no bearing on the constitutional constraints applicable to state impositions on *interstate* transportation.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 8 -

the holding has no applicability here. The Court upheld New York's imposition of "reasonable charges" for interstate ferriage originating in New York, not because New York had *carte blanche* authority to regulate interstate transportation at its shoreline, but because the charges were not "prohibitory or discriminatory requirements, or burdensome exactions … which may be said to interfere with the guaranteed freedom of interstate intercourse, or with constitutional rights of property."[20] *Port Richmond*, 234 U.S. at 331-32.

In *Conway v. Taylor's Executor*, the Supreme Court reviewed a state court injunction preventing a vessel from operating a ferry to or from Kentucky in violation of the ferry franchise rights granted by the state to one of its citizens. 66 U.S. 603 (1861).[21] The Court upheld the injunction, not because the state enjoyed uninhibited power over its shoreline, but because the injunction prevented incursion into a state-granted ferry franchise (property) right. *Id*. at 631-32. The Court, however, would have "without hesitation, reverse[d]" the injunction if it were intended to prevent the transportation of persons or property under any or all circumstances. *Id*. at 632. The state, by ferry franchise, could not "exclude or restrain" all persons from "prosecuting the business of commerce in good faith, without the regularity or purposes of ferry trips," from the Kentucky shore.[22] *Id*. at 632.

---

[20] Ferries maintained for the purpose of interstate commerce are "subject to the regulating power of Congress. It necessarily follows that whatever may properly be regarded as a direct burden upon interstate commerce, as conducted by ferries operating between states, it is beyond the competency of the states to impose." *Port Richmond*, 234 U.S. at 326.

[21] Mr. Sidman suggests that the Ordinance closely resembles the Kentucky statute at issue in *Conway* because the Kentucky statute imposed a sixteen dollar fine for any ferry transportation from the Kentucky shoreline that violated the rights of the nearest Kentucky citizen who owned an exclusive ferry franchise. That fine is nothing like the Ordinance's $100 per person penalty. The *Conway* court made clear that the state, fine or no fine, could not "exclude or restrain" all persons from "prosecuting the business of commerce in good faith, without the regularity or purposes of ferry trips," from the Kentucky shore. 66 U.S. at 632.

[22] To be clear, while the Pilots do not dispute that Maine or the Town have some degree of police power authority to enforce reasonable local laws affecting public order, health, and behavior within Town limits, the Town does not have the authority under the U.S. Constitution, and by extension under the Maine Constitution or any Maine law, to exclude or restrain all cruise vessels from prosecuting the business of commerce in good faith to and from Bar

---

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 9 -

The Ordinance does not impose a "reasonable charge" on cruise vessels for use of port infrastructure or limit the use of privately-owned dock facilities in order to protect an infringed-upon property right.[23] Instead, the Ordinance obstructs the transportation of passengers into Bar Harbor under any circumstance where more than 1,000 people might disembark collectively from a single or multiple cruise vessels on a given day. Thus, *Port Richmond*, *Wilmington Transportation*, and *Conway* do not provide a basis for upholding the Ordinance.

The more useful ferry case when applied to the situation at bar is *Gloucester Ferry Co. v. Pennsylvania*, where the Supreme Court confirmed that States can, by a variety of means not directly focused on conduct on the water, unconstitutionally interfere with interstate maritime commerce. 114 U.S. 196 (1885). When it comes to the transportation of passengers,[24] permissible state interference with the landing and receiving of such passengers is "confined to such measures as will prevent confusion among the vessels, and collision between them, insure their safety and convenience, and facilitate the discharge or receipt of their passengers … which fall under the general head of port regulations." *Id*. at 206 (cited with approval in *Port Richmond*, 234 U.S. at 327).[25] Conversely, restraints on the landing and receiving of passengers, in the form of taxes upon such transportation as in *Gloucester Ferry Co.* or upon acts "necessary to its completion, are so many invasions of the exclusive power of [C]ongress to regulate that portion of commerce between the states." *Id*. at 213-14. The Ordinance does not regulate rates, prevent

---

Harbor's shoreline. *See Cincinnati, P., B.S. & P. Packet Co. v. Catlettsburg*, 105 U.S. 559, 563-64 (1881) (discussing oppressive and arbitrary exercise of local authority with regard to provision of vessel landing facilities).
[23] The Town separately assesses passenger and port fees. The constitutionality of these fees is questionable, at best.
[24] "Receiving and landing passengers and freight is incident to their transportation. Without both there could be no such thing as their transportation across the river …. The transportation, as to passengers, is not completed until … they are disembarked at the pier of the city to which they are carried …." *Gloucester Ferry Co*., 114 U.S. at 213-14.
[25] At the time *Gloucester Ferry Co.* was decided, direct federal regulation of vessel operations was not nearly as pervasive as is the case today. Even *Gloucester Ferry Co.*'s limited acknowledgement of some permissible local measures is anachronistic given the substantial federal presence in vessel safety and operational constraints.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 10 -

confusion among or collisions between vessels, ensure the safety and convenience of vessels, or facilitate the discharge and receipt of passengers. PX 237 at 2. Rather, the Ordinance penalizes the discharge of passengers and crew, core activities of vessels engaged in interstate and international maritime transportation and commerce. It is an unconstitutional invasion of Congress's exclusive power over interstate and maritime commerce.[26]

Mr. Sidman also argues that the Ordinance is not preempted by federal law because Congress has not "expressly curb[ed]" local restrictions on "water carrier transportation," as it has for bus and air transportation, citing in support federal laws that regulate head taxes on air and bus travel. S. Mem. at 9 (internal citations, quotations omitted). This argument is glaringly misinformed. The federal government has a unique and pervasive interest in preventing local restrictions on water transportation, expressed in the Constitution and federal law. The Tonnage Clause[27] forbids state taxation of vessels, absent congressional approval, solely "for the privilege of entering, trading in, or lying in a port."[28] *Clyde Mallory Lines v. State of Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 265-66 (1935) (quoted with approval in *Polar Tankers, Inc. v. City of Valdez, Alaska*, 557 U.S. 1, 6-7 (2009)). It and the Import-Export Clause "serve as backstops to the 'negative implications' of the Commerce Clause." Erik M. Jensen, *Quirky Constitutional Provisions Matter: The Tonnage Clause, Polar Tankers, and State Taxation of Commerce*, 18 GEO. MASON L. REV. 669, 669-70 (2011) (noting that if tonnage "duties could be

---

[26] Mr. Sidman appears to adopt the Town's defense against the Ordinance's obstruction of instrumentalities of interstate commerce. S. Mem. at 29 n.18; *see* T. Br. at 29-30 (arguing that Ordinance, as a land use ordinance, neither regulates cruise ships nor prohibits cruise ships from continuing to operate "as they so choose"). The Pilots' arguments herein in response to the Town are equally applicable to any similar arguments raised by Mr. Sidman, by incorporation or otherwise.

[27] U.S. CONST. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress, lay any Duty of Tonnage….").

[28] The "Tonnage Clause's prohibition 'embrace[s] all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port.'" *Maher Terminals, LLC v. Port Auth. of New York & New Jersey*, 805 F.3d 98, 107 (3d Cir. 2015) (quoting *Clyde Mallory Lines*, 296 U.S. at 265-66).

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 11 -

levied, friction among the states might increase, and national unity might be strained"); *see Clyde Mallory Lines*, 296 U.S. at 265 ("[D]uties of tonnage and duties on imports were known to commerce as levies upon the privilege of access by vessels or goods to the ports or to the territorial limits of a state[.]"). Similarly, Congress's 2002 amendments to the Rivers and Harbors Appropriation Act (the "RHAA") seek to protect the federal interest in open ports free of local burdens.[29] Section 5(b) of the RHAA expressly prohibits "non-Federal" interests from levying or collecting fees from vessels, or their passengers or crew, ***unless*** the fee is "reasonable," "charged on a fair and equitable basis," "used solely to pay for the cost of a service to the vessel," enhances the "safety and efficiency of interstate and foreign commerce," ***and*** does "not impose more than a small burden on interstate or foreign commerce." 33 U.S.C. § 5(b) (emphasis added). The Ordinance is directly contrary to federal interests.[30]

### C.  The Town's Convenient, *Post Hoc* Interpretation of the Ordinance Does Not Save the Ordinance from Constitutional Invalidity

The Ordinance presents a direct conflict with federal regulations controlling both the private piers at which persons disembark from tender vessels into the Town and the cruise vessels calling at Bar Harbor. *See* Pilot Br. at 8-18; S. Mem. at 9 (acknowledging that conflict with 33 C.F.R. part 105 is a "plausible preemption argument"). The Town invites the Court to ignore this constitutional conflict by advancing a "limiting construction" of the Ordinance (*i.e.*, "persons" means "passengers").[31] *See* T. Br. at 13-15. There are many reasons this Court should

---

[29] 33 U.S.C. § 5 "codified Commerce Clause and Tonnage Clause common law." *See, e.g.*, *Lil' Man in the Boat, Inc. v. City & Cnty. of San Francisco*, 5 F.4th 952, 957 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 900 (2022).

[30] A prohibition on disembarking more than 1,000 persons per day, enforced by the threat of a minimum $100 per person fine, does not enhance the safety or efficiency of interstate or foreign commerce.

[31] Neither the Town nor Mr. Sidman argue that the Ordinance does not conflict with 33 C.F.R. parts 104 and/or 105 when the term "persons" is afforded its ordinary and plain meaning, given the meaning ascribed to "persons" in the Bar Harbor Code, or read to mean exactly what Mr. Sidman and his Petitioning Committee intended for it to mean – cruise passengers and anyone else disembarking from cruise vessels, including crew and pilots. The Town and Mr. Sidman appear to acknowledge that the Ordinance is preempted as written. *See* PX 204.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 12 -

not do so.

First, the Town's proffered limiting construction of the Ordinance must be plausible to be authoritative. The term "person" is unambiguous. An unambiguous statute is not "readily susceptible to a narrowing construction." *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 35 (1st Cir. 1999). The Bar Harbor Code defines "person" as "[a]n individual, corporation, governmental agency, municipality, trust, estate, partnership, association, two or more individuals having a joint or common interest, or other legal entity." B.H. Code § 125-109. The Code explicitly forecloses any other definition. B.H. Code § 125-108(A) (providing that words *not defined* in the chapter should have "meaning implied by their context in the chapter or their ordinarily accepted meanings as found in the current edition of Webster's Collegiate Dictionary"). The Court need go no further. *See Amalgamated Sugar Co. LLC v. Vilsack*, 563 F.3d 822, 829 (9th Cir. 2009) ("The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there.") (internal citation omitted). Because the Town's interpretation requires rewriting the Ordinance, not merely interpreting it in a limited way, this Court need not give it any weight. *United States v. Stevens*, 559 U.S. 460, 481 (2010) (holding that accepting the government's stated intention only to prosecute "extreme" cases "requires rewriting [the statute], not just reinterpretation"); *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987) (refusing to adopt limiting construction where "the words of the resolution simply leave no room for a narrowing construction"); *see Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 946 (9th Cir. 2011) ("Although we must consider the City's limiting construction of the Ordinance, we are not required to insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance.") (internal citation

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 13 -

omitted). The Town's construction cannot avert the Ordinance's preemption-induced demise.

Defendants' effort to retreat from the Ordinance's facial language is particularly ironic given that the *only* record evidence addressing the meaning of the word "persons" in the Ordinance establishes that "persons" was chosen deliberately to ensure that the Ordinance did in fact count crew, as well as anyone else disembarking from a cruise ship into the Town. Joint Proposed Findings of Fact ("PFF"), ECF No. 192, ¶¶ 198, 245-46. As Mr. Sidman explained:

> Until now, the limitations were based on a subset … of the passenger capacity of each ship. Crew on these ships is often about half of the passenger capacity. … I know to certain knowledge that many crew are allowed off at each port of call. Net:net, the total numbers of disembarking persons could be wildly different from (and likely higher than) the ostensible passenger capacities. … Eddie's astute catch is why we modified the petition to limit "disembarking persons" rather than "passengers". (sic)

PX 230. Distancing itself from Mr. Sidman's pre-enactment statements, the Town invokes the assistance of a general rule that statements by individuals need not be given controlling effect.[32] T. Br. at 32-33. However, this rule does not require the Court to disregard statements of individuals claiming authorial credit for statutes under review. Rather, such statements are entitled to respect "to the extent that they 'are consistent with the statutory language,'" *State of R.I. v. Narragansett Indian Tribe*, 19 F.3d 685, 699 (1st Cir. 1994) (quoting *Brock v. Pierce Cnty.*, 476 U.S. 253, 263 (1986)), and the remarks of a sponsor of legislation may be taken as "*authoritative*" to the extent they are consistent with plain language, *Grove City Coll. v. Bell*,

---

[32] This application of the rule makes sense because "as a practical matter, most members of the enacting [body] will be familiar only with the bill as it stands when the vote occurs." *State of R.I. v. Narragansett Indian Tribe*, 19 F.3d 685, 699 (1st Cir. 1994). Here, the Town residents voted for a local law that would restrict cruise ship disembarkations to 1,000 *people* per day, not 1,000 passengers per day. The Town is bound by the "will of the people" in this regard. This is also why courts generally disregard, as controlling, limiting language in earlier versions of proposed legislation that does not make it into the final, voted-upon bill. The "standard presumption" is that the legislature intended the law to operate without the rejected limitation. *Id*. at 700. "Deletion, without more, suggests that [the legislators] simply had a change of heart." *Id*. Here, the Petitioning Committee intentionally deleted the term "passengers" and elected to use the term "persons" instead. PX 230. Their deliberate "change of heart" precludes the Town's contrary interpretation.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 14 -

465 U.S. 555, 567 (1984) (emphasis added) (internal citation omitted).[33] Mr. Sidman's

explanation of the Ordinance's use of the term "persons" to include crew as well as passengers is

consistent with the plain language of the Ordinance, and therefore is as "authoritative" as

anything in the record on this subject.[34]

### D.   The Ordinance Imposes Municipal Conditions of Entry into Bar Harbor That Conflict with Federal Authority

Defendants also assert that the Ordinance does not "impose another condition of entry"

and therefore does not conflict with federal immigration/customs procedures and authority. *See*

T. Br. at 16; S. Mem. at 12. They argue that the Ordinance's disembarkation limit does not

prevent U.S. Customs and Border Protection ("CBP") from boarding cruise vessels in

Frenchman Bay and clearing passengers and crew for entry into the United States on the vessel.

*See* S. Mem. at 11; T. Br. at 17. Defendants misconstrue the Pilots' argument. The Ordinance

raises "preemption flags" not because it physically restricts CBP inspection and clearance

activities, but because it modifies CBP's plenary authority to determine who may and may not

gain entry into the United States. *See* Pilot Br. at 15. The Ordinance alters the result of the CPB

clearance process. Under federal law, passengers (and crew) cannot disembark unless they have

cleared customs/immigration inspection. PX 032.015. However, under the Ordinance, these same

passengers and crew cannot go ashore unless they happen to be within the first 1,000 people to

---

[33] For these same reasons, the Court may disregard another of Defendants' arguments—that no discriminatory purpose may be gleaned from "certain statements" of Mr. Sidman, the self-proclaimed drafter of the citizen's Initiative, since Mr. Sidman's statements are akin to the voice of one "legislator" in a cacophony of many and therefore of "little probative value." T. Br. at 32-33; *see* S. Mem. at 38 n.23. No "cacophony" of competing statements exists. Mr. Sidman's voice is the only contemporaneous voice on the subject.

[34] The Town's representations as to how it intends to enforce the Ordinance do not moot the Pilots' preemption challenge. *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2606-07 (2022); *see Util. Contractors Ass'n of New England, Inc. v. City of Fall River*, No. CIV. A. 10-10994-RWZ, 2011 WL 4710875, at *2 (D. Mass. Oct. 4, 2011); *see also Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012); *Bayley's Campground, Inc. v. Mills*, No. 20-1559, 2021 WL 164973, at *157-58 (1st Cir. Jan. 19, 2021).

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 15 -

disembark from a cruise ship that day. The unfortunates (person 1,001 and later) are effectively denied entrance to the United States at Bar Harbor, despite having completed CBP clearance procedures. *See Maine Forest Prod. Council v. Cormier*, 586 F. Supp. 3d 22, 41-50 (D. Me.) (explaining that a Maine law imposing requirements beyond those already contained in the Immigration and Naturalization Act should be preempted), *aff'd*, 51 F.4th 1 (1st Cir. 2022).

This leads to the determinedly more wishful assertion by Defendants that, notwithstanding the disembarkation limits, anyone who has been screened and cleared by CBP may disembark at Bar Harbor. T. Br. at 17; S. Mem. at 11-12. This argument is akin to Defendants' equally unrealistic assertion that cruise vessels can and possibly will continue to call at Bar Harbor without discharging passengers or crew. T. Br. at 30; S. Mem. at 11. To sustain this position, Defendants have to suggest that the penalties imposed on receiving piers are more in the nature of admission fees for arriving international passengers. A locality charging admission raises its own constitutional vexations, but there can be no question on the face of the Ordinance or on the record of this proceeding that the Ordinance is not about charging admission. It imposes a penalty with potentially enormous financial implications for violators. It is by design and effect a prohibition on entry for all cruise visitors beyond the first 1,000 to arrive. PFF ¶¶ 274-75, 281-82, 361. The Ordinance does not have to identify, *in haec verba,* its disembarkation limit as a "condition of entry" for it to operate as such. In *Maine Forest Products Council*, a state law excluded H-2A visa holders from the definition of employees eligible to serve as point-to-point logging trucks drivers and therefore effectively gave Maine "final say" over the United States' prior grant of H-2A visas, which were dependent upon the holders' employment as logging truck drivers. 586 F. Supp. 3d at 47-49. Here, the Ordinance denies a right of entry to every person who is or will be the 1,001st or greater person to disembark at Bar

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 16 -

Harbor, even though such person has been granted a right of entry by CBP. Just as the H2-A visa process was rendered meaningless by Maine's exclusion of H2-A visa holders from eligibility for employment as logging truck drivers, the Ordinance renders meaningless CBP's grant of admission at Bar Harbor (as a port of entry). Therefore, the Ordinance operates as an additional condition of entry and conflicts with federal immigration authority and CBP's clearance of persons subject to exclusion under the Ordinance.

### E. The Ordinance, Its Enforcement Mechanisms, and Its Effects on Vessel Operations in Federal Anchorage Grounds Are Unlawful Assertions of Municipal Authority Over Federal Subject Matters

The Town also asserts that the Ordinance does not conflict with the U.S. Coast Guard's designation of anchorage grounds in Frenchman Bay because federal regulations do not "require" vessels to come to Bar Harbor and do not "displace[ ] local laws." T. Br. at 17. In the Town's view, the federal anchorage ground designations acknowledge the Town's purported authority to assert regulatory jurisdiction over the anchorage grounds.

The Town also states that the U.S. Coast Guard's express allowance of "coordination of the local Harbormaster" with respect to federally designated *anchorage grounds* (Anchorages A and B) in Frenchman Bay is of a piece with the Coast Guard's suggestion to mariners using *special anchorage areas* in other parts of Maine to contact local authorities, like the local harbormaster, to ensure compliance with any additional applicable local laws. T. Br. at 18. This is a specious and dangerous comparison that bespeaks ignorance of federal authority over the navigable waters of the United States. The Town apparently has no limiting sense of its role in these areas, both in the context of this litigation and in recent proposed actions to further intrude into federally-sanctioned activities in the Frenchman Bay anchorage grounds.

The Coast Guard establishes *anchorage grounds* for vessels, like those in Frenchman

---

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 17 -

Bay, pursuant to statutory authority, empowerment, and direction from Congress to "establish anchorage grounds for vessels in all harbors, rivers, bays, and other navigable waters of the United States whenever it is manifest … that the maritime or commercial interests of the United States require such anchorage grounds for safe navigation." 33 U.S.C. § 471; 33 C.F.R. § 110.1(b) (anchorage grounds are described in Subpart B of 33 C.F.R. § 110). The Coast Guard is expressly authorized by statute to adopt rules and regulations for designated anchorage grounds. 33 U.S.C. § 471; *see, e.g.,* 33 C.F.R. § 110.130(b) (establishing regulations for anchorage grounds in Frenchman Bay). Violations of the Coast Guard's rules and regulations carry a stiff federal penalty (up to $10,000 per day). 33 U.S.C. § 471.

In contrast, the Coast Guard designates *special anchorage areas*, like those in Penobscot Bay, to implement specific rules relating to lighting and sound signals in restricted visibility. 33 C.F.R. § 110.1(a). Coast Guard activity in special anchorage areas is decidedly less extensive than its authority over anchorage grounds. *See Barber v. State of Hawai'i*, 42 F.3d 1185, 1191 (9th Cir. 1994) ("Subpart B [describing anchorage grounds] regulates anchoring and mooring more extensively."). Typically, in *special anchorage areas*, one expects to find moored pleasure vessels and smaller commercial *craft*. For the special anchorage areas in Penobscot Bay (the Town's comparator), the Coast Guard has acknowledged the potential applicability of state or local ordinances. 33 C.F.R. § 110.3 note 1 ("Those planning to use these special anchorage areas [in the First Coast Guard District, identified in ***33 C.F.R. §§ 110.4 through 110.60***] are advised that state ordinances, local ordinances, or both, may apply. The local harbormaster is often the best source of information about any such ordinances.") (emphasis added). This acknowledgement ***does not apply*** to the federal anchorage grounds (Anchorages A and B) in Frenchman Bay used by cruise vessels when calling at Bar Harbor.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 18 -

The Coast Guard exercised its statutory authority to establish federal anchorage grounds, not special anchorage areas, in Frenchman Bay. 33 C.F.R. §§ 110.1(b), 110.130. It promulgated regulations for the Frenchman Bay anchorages, 33 C.F.R. § 110.130(b), which are subject to federal enforcement. The regulations anticipate that passenger vessels, small commercial vessels, and pleasure craft may use the anchorages but do not restrict entry into or use of the anchorages. 33 C.F.R. § 110.130(b); *see* Anchorage Grounds; Frenchman Bay, Bar Harbor, ME, 67 Fed. Reg. 68517 (Nov. 12, 2002) (amending 33 C.F.R. part 110). They provide only that the "anchoring of vessels is under the coordination" of the local harbormaster. 33 C.F.R. § 110.130(b).

The Coast Guard limited local authority to "coordination" of the anchoring of vessels, which does not permit local regulation of the anchorage grounds under any rational construction.[35] The Town cannot claim the authority to regulate the Frenchman Bay anchorage grounds under the guise of "coordination."[36] Yet the Town wields "coordination" like a paint roller, not a fine brush. In the Ordinance, and (more blatantly) in a recent attempt to insulate further its cruise ship programs from constitutional invalidation, the Town asserts a municipal "regulatory authority" over the Frenchman Bay anchorage grounds that it simply does not have.[37] The Town has no authority to condition vessel access and operations in the federal anchorage

---

[35] The Coast Guard's grant of limited "coordination" authority effectuated one of the purposes of a 1999 Maine Department of Transportation cruise ship traffic demand management study—to "develop a scheduling and reservation system for arriving cruise ships." Anchorage Grounds; Frenchman Bay, Bar Harbor, ME, 67 Fed. Reg. 68517, 68517 (Nov. 12, 2002) (amending 33 C.F.R. part 110). It accommodated the mechanics of the reservation procedures used by the Town to implement voluntary agreements with cruise lines; it was not a grant of organic regulatory authority to the Town.

[36] The harbormaster acknowledged his limited authority with respect to the federal anchorages. PX 066 ("The Harbormaster has limited authority under federal law to 'coordinate' activity of ships anchoring in the anchorages. We do not have the ability to tell a ship ['no'] unless there is a serious and legitimate safety concern involved. This decision is made by the Pilots and not the Harbormaster."). He also questioned his ability legally to "tell a ship not to anchor" or "block any boat from accessing the harbor." PX 019.

[37] Anchorage Grounds; Frenchman Bay, Bar Harbor, ME, 67 Fed. Reg. 68517, 68517-68519 (Nov. 12, 2002) (amending 33 C.F.R. part 110) (Coast Guard determined no regulatory review was necessary because "there are no fees, permits, or specialized requirements for the maritime industry to utilize these anchorage areas. The regulation is solely for the purpose of advancing safety of maritime commerce").

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 19 -

grounds by requiring reservations with the local harbormaster.[38] Nor can the local harbormaster in any way abridge or countermand a state pilot's statutory authority and discretion to direct the navigation of vessels within the federal anchorage grounds or to determine where, within an anchorage ground, a vessel is placed.[39] The Town has no authority to prohibit cruise vessels from navigating, anchoring or disembarking passengers or crew from the anchorages without a permit or to prohibit state pilots from using the anchorage grounds as they, in their judgment, see fit. *See, e.g.*, *City of Sault Ste. Marie v. Int'l Transit Co.*, 234 U.S. 333, 341 (1914) ( "[O]ne otherwise enjoying full capacity for the purpose cannot be compelled to take out a local license for the mere privilege of carrying on interstate or foreign commerce[.]").

And the Town certainly does not have the authority to subject cruise vessels (through their owners or masters) to monetary penalties for anchoring in federally-designated anchorage grounds contrary to any Town ordinance, rule or regulation. Any assertion of such authority by the Town would be in direct conflict with federal authority over the Frenchman Bay anchorage grounds and with the Maine Pilotage Act.[40]

### III. The Ordinance Violates the Commerce Clause

The Ordinance effectively obstructs the flow of interstate commerce by prohibiting the

---

[38] The October 17, 2023, Town Council Agenda contains a proposed "Cruise Ship Disembarkation Ordinance" and proposed amendments to Chapter 153 of the Bar Harbor Port and Harbor Code. The full agenda is attached hereto as **Exhibit 1**. The portions of the agenda containing the proposed new ordinance and amendments may be found at pages 33 to 46. The agenda is publicly available at https://www.barharbormaine.gov/AgendaCenter/ViewFile/Agenda/_10172023-3299 (last visited Oct. 25, 2023). Although this ambitious new incursion by the Town into a zone of federal authority is at the proposal stage, if enacted in its current state, it creates additional legal concerns for the Pilots and vessel owners. This context makes clear the importance of obtaining unambiguous guidance from the Court on the appropriate bounds of municipal action in this area.

[39] As Captain Gelinas testified, only the United States Coast Guard Captain of the Port has authority to overturn a pilot's judgment concerning use of these anchorages. Tr. 11-Jul. at 47-48. For this reason, among others, the Town's most recent claim of purported authority to restrict disembarkations from cruise vessels lying in the federal anchorage grounds is especially alarming.

[40] The Maine Pilotage Act provides: "A pilot licensed under this subchapter may pilot any vessel required to take a state pilot anywhere upon the pilotage area for which the pilot is licensed." Me. Rev. Stat. tit. 38, § 97.

PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 20 -

disembarkation of passengers and crew traveling in interstate commerce except in very limited circumstances. The record is clear and not controverted that the embarkation, transport and disembarkation of passengers are core functions of modern cruise vessels. The Ordinance discriminates, both in purpose and effect, against cruise vessels by constraining their access to a valued natural resource (Acadia National Park), effectively eliminating the cruise industry as a competitor in the Bar Harbor vacation market. The record provides no evidence that the Ordinance will fulfill its putative goal to diminish pedestrian congestion along the streets of Bar Harbor at the times when the streets are most congested—the evening when land-based tourists are returning to Bar Harbor and cruise tourists are nowhere to be found.

### A.  The Ordinance Obstructs the Flow of Interstate Commerce As Did the Train Car Limits in *Southern Pacific* and the Mudflap Requirements in *Bibb*

The individual States and, by extension, municipalities and local governments within those States, may not obstruct the flow of interstate commerce by imposing "a tax upon some instrument or subject of commerce," or exacting a "license fee from parties engaged in commercial pursuits," or prescribing the "conditions in accordance with which commerce in particular articles or between particular places [is] required to be conducted." *Sherlock v. Alling*, 93 U.S. 99, 102 (1876). Neither may a State, consistent with the Constitution, create impediments to free interstate navigation or the operation of the instrumentalities on which interstate commerce travels. *Id.*; *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 396 (2023) (distinguishing laws governing interstate transportation from laws that may have collateral effects of impeding interstate commerce) (Roberts, C.J., concurring in part).

Obstructing the free flow of commerce and the operation of instrumentalities of interstate transportation is exactly what the Ordinance does here. It obstructs the operation of

---

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 21 -

instrumentalities of interstate transportation by prohibiting the disembarkation of persons

(primary conduct of cruise vessels) in every instance in which a vessel, either singly or in

combination with other vessels, brings to Bar Harbor more than 1,000 persons in a single day.

*See S. Covington & C. St. R. Co. v. City of Covington*, 235 U.S. 537, 547-48 (1915).

The Town argues that the Ordinance does not run afoul of the Constitution's prohibition

against obstructing instrumentalities of interstate commerce because the Ordinance, as a land use

ordinance, neither regulates cruise ships nor prohibits cruise ships from continuing to operate "as

they so choose." T. Br. at 29-30. The Commerce Clause, however, does not tolerate state and

local burdens on interstate commerce "in any form or under any guise." *Baldwin v. G.A.F.*

*Seelig, Inc.*, 294 U.S. 511, 522 (1935) (internal citations omitted). For this reason, the Ordinance

is not insulated from Commerce Clause scrutiny simply because it resides in the Land Use Code

and its enforcement mechanisms "bite" the permit holders of the landside piers, therefore

outsourcing responsibility for enforcement of the limits to private actors, who, in turn, on pain of

penalty, must enforce the limits against instrumentalities of commerce. *See* Section I.

The Town also attempts to distinguish the restrictive impacts of the Ordinance from

burdens on commerce occasioned by state regulation of trucks and trains in *Bibb v. Navajo*

*Freight Lines, Inc.*, 359 U.S. 520 (1959), and *Southern Pacific Co. v. Arizona ex rel. Sullivan*,

325 U.S. 761 (1945). T. Br. at 29-30. According to the Town, the Ordinance is not like the laws

in *Bibb* and *Southern Pacific* because the Ordinance does not "act on cruise ships at all." T. Br.

at 30. In the Town's view, the Ordinance does not "dictate how cruise ships are to be

constructed, equipped, or operated" or "compel them to change their configuration or reduce the

number of passengers they are carrying." T. Br. at 30. Rather, the Town asserts that cruise lines

are "free to continue to operate as they so choose," *i.e.*, they can call at Bar Harbor so long as

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 22 -

they do not collectively disembark more than 1,000 persons, or they can call elsewhere.[41]

The Town's efforts to minimize the Ordinance's impact on cruise ships starkly conflict with the evidence in the record. The Ordinance dictates how cruise ships must be operated in order to visit Bar Harbor. They cannot have a design capacity of more than 1,000 persons (in the aggregate, passengers and crew, as between all vessels calling at Bar Harbor on a particular day), or, if they do and carry more than 1,000 persons, they must deny disembarkation to persons onboard who would cause more than 1,000 persons to touch the shore (based on the aggregate of all ships on a given day) to avoid denial of entry at the pier in Bar Harbor. *See* PX 191 at 7-9, 12; PX 192 at 13-14; PX 193 at 4. This reality will compel them to change their operations, change their configurations, or reduce the number of persons they carry, if they call at Bar Harbor. Or, as the Town suggests, they can call elsewhere—fulfilling Mr. Sidman's vision to keep out "the biggies" as well as everyone else. DX 357; *see* PFF ¶¶ 240, 258-75, 277-82.

The state laws in *Bibb* and *Southern Pacific* were found invalid under the Commerce Clause because they obstructed the efficient operation of instrumentalities of interstate transportation. *See* Pilot Br. at 28-29. The challenged local laws required conduct that materially impeded, delayed, and obstructed the flow of interstate commerce. *Bibb*, 359 U.S. at 527 (compliance with law mandating certain mudguard flaps for operation in the state would require interchanging mudguards, "causing a significant delay in an operation where prompt movement may be of the essence"); *Southern Pacific*, 325 U.S. at 772-73 (compliance with law limiting

---

[41] The Town boldly suggests that cruise vessels can just stop calling at Bar Harbor. If such an argument obviated a state law's burden on interstate commerce, it would save from invalidation the majority of state laws that seek to eliminate an out-of-state market participant. That an entity can just "stop doing business" in a particular state or locality cannot justify a state or local law's burden on interstate commerce. *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 442 (6th Cir. 2000) (finding state license law violated dormant Commerce Clause for its discriminatory effect where out-of-state entities, unlike in-state entities, "must either start purchasing chassis from in-state dealers, or else stop doing business in Ohio"). It is the "stop doing business" part that leads to Commerce Clause litigation, including this matter now before the Court.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 23 -

number of train cars within state required more locomotives, more manpower, and more delays, ultimately increasing costs and decreasing efficiency, which "materially impede[d] the movement" of interstate trains and imposed a "serious burden" on the commerce conducted by Southern Pacific); *see Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 445 & n.21 (1978) (compliance with law limiting the length and configuration of trucks within the state required carriers to haul double-trailer units separately, use single units, or avoid the state altogether, which substantially burdened commerce by increasing the costs and slowing the movement of goods). There is no reason to conclude that these cases would have been decided differently if the state restrictions had been engineered to have enforcement effect by placing penalties for rail or motor carrier violations on some local gatekeeper private entity who had choke-point control, as do the pier operators in Bar Harbor, as opposed to the trucks and trains themselves.

The Ordinance is no different. Cruise line witnesses testified unequivocally that cruise lines will not call at Bar Harbor and that they will not be placed in a position where they must pick "winners and losers" among their guests as a condition of being let ashore. PX 191 at 7-9, 12; PX 192 at 13-14; PX 193 at 4; PX 211; PX 212; PX 213. Mr. Goldstein, a 32-year employee of Royal Caribbean Cruises, Ltd., former Vice Chairman of Royal Caribbean Cruises, Ltd., and former President of Royal Caribbean International, stated that no cruise line would ever call at a port under such conditions. *See* Tr. 12-Jul. at 181:23-182:21. His testimony is supported by deposition testimony of executives of Norwegian Cruise Lines and Holland America Lines.[42] PX

---

[42] Mr. Sidman calls into question the testimony of these cruise line executives. S. Mem. at 33. He argues that their testimony is "undermined" by testimony that the lines call at international ports that "impose similar restrictions." *Id*. He compares the Ordinance's disembarkation limit to Bergen, Norway, which since June 2022 has had an 8,000 passengers per day limit. With a limit as high as 8,000 passengers per day, it is no wonder that cruise lines could call there without concern of being barred from disembarking their full complement of passengers. (And, of course, one must acknowledge that Bergen, Norway is an awkward comparator for another reason—as a Norwegian port, it is not subject to the same constitutional limits that invalidate the Ordinance here.)

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 24 -

191 at 7-9, 12; PX 192 at 13-14; PX 193 at 4. The Ordinance's effect is to bar interstate transportation by cruise vessel into Bar Harbor.

Mr. Sidman argues that the Ordinance is not constitutionally problematic because local governments can regulate the "to and from" shoreline aspects of interstate transportation. S. Mem. at 28-29. This argument is easily dismissed for the same reasons articulated in Section II.B. The Ordinance bars cruise lines from offering cruise itineraries that include Bar Harbor unless their vessels, cumulatively, disembark 1,000 persons or less each day. The Ordinance bars the Pier Owners from providing disembarkation services to cruise vessels traveling in interstate commerce, unless either the Pier Owners or the cruise vessels or both ensure that no more than 1,000 persons, cumulatively, disembark in Bar Harbor each day. The Ordinance limits, to the point of exclusion, cruise traffic in Bar Harbor because Mr. Sidman, the Petitioning Committee, or the Town decided that the Town had "too many cruise ships."[43] This suggests that the Town has come to view its relationship to the cruise industry as an unstated "public convenience and necessity" permitting system in which the Town controls the valve to adjust cruise visitation and decides when "enough is enough." But the Town cannot, consistent with the Commerce Clause, prohibit interstate cruise transportation on the ground that the Town has enough interstate cruise transportation. *Buck v. Kuykendall*, 267 U.S. 307, 316 (1925) (states may not bar new entrants from supplying interstate transportation on the ground that an adequate supply already exists); *Truesdell v. Friedlander*, 80 F.4th 762, 777-82 (6th Cir. 2023) (Kentucky law that barred out-of-

---

[43] DX 323 at 13, 15, 29 (survey respondents citing "too many ships"); DX 256 at 59 (referring to a "feeling among some town residents that there are too many tourists visiting the town on an annual basis when combining both land- and sea-based visitors"); PX 197 at 82 (describing how survey indicated that people felt there was too much cruise traffic); Tr. 13-Jul. at 113:1-7 ("So there is a lot of angst and feeling of too much cruise tourism in town."); Tr. 13-Jul. at 271:19-25 (Mr. Sidman testifying that 2021 survey indicated that there was a broad consensus that there was too much cruise tourism); *see also* Tr. 13-Jul. at 121:8-122:11 (Peacock explaining that draft Comprehensive Plan (DX 256) reflects the fact that over-tourism is an issue in Bar Harbor).

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 25 -

state provider from transporting people from Kentucky to Ohio by ambulance violated Commerce Clause);[44] *Commonwealth of Mass. v. New England Transp. Co*., 282 Mass. 429 (Mass. 1933) (local law requiring certificate of public convenience and necessity would unconstitutionally encroach upon interstate commerce if applied to interstate transportation of passengers).[45] Yet that is exactly what the Town is doing here. It has decided that Bar Harbor has too many cruise ships (or cruise ship visitors) and so has sought to eliminate that "oversupply" by imposing severe restrictions on the disembarkation activities of vessels in Bar Harbor. In so doing, the Town has encroached upon interstate commerce, which it cannot do consistent with the Constitution.

### B. Even Absent Discrimination, the Ordinance Unduly Burdens Interstate Commerce[46]

Relying heavily on the Supreme Court's recent opinion in *National Pork Producers*, the Town asserts that the Pilots and Plaintiffs cannot show a substantial burden on interstate commerce because cruise lines retain equal access to Bar Harbor, have no in-state competitors, and can choose to comply with the Ordinance or go elsewhere. T. Br. at 24, 37-38. In other words, only discrimination begets undue burden.

The Town's argument fails for two reasons. First, the Ordinance does discriminate against interstate commerce in effect. Pilot Br. at 22, 34-37; Section III.C. Second, discrimination is not required to establish a Commerce Clause violation when the state law in question obstructs interstate transportation. *Buck*, 267 U.S. at 313 (decision did not turn on a

---

[44] The "question whether there are 'adequate facilities for conducting interstate commerce' belongs 'peculiarly' to the federal government." *Truesdell*, 80 F.4th at 778 (quoting *Buck*, 267 U.S. at 316).
[45] These cases are not unique. *See H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525 (1949) (state law controlling the volume of interstate commerce in order to subsidize local economic interests violated Commerce Clause).
[46] The Pilots maintain that the Ordinance discriminates against cruise vessels as competitors in the Bar Harbor vacation market. Pilot Br. at 34-37; Section III.C.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 26 -

finding that the Washington law discriminated against out-of-state bus lines in favor of in-state bus lines or even that it benefited in-state interests); *see Truesdell*, 80 F.4th 762, 777-81; *New England Transp. Co.*, 282 Mass. 429. Thus, the Town's rigid reliance on *National Pork Producers* is misplaced. Cruise ships are not pigs; neither are cruise passengers. *Cf. Nat'l Pork Prod.*, 598 U.S. at 380 n.2 (stating that the Court did not "face a law that impedes the flow of commerce" because "[p]igs are not trucks or trains"). Cruise ships fall unequivocally into the "trucks and trains" category, not the ethical livestock breeding category. This dispute is about instrumentalities of interstate transportation and a local law that burdens, to the point of obstruction, those instrumentalities.[47]

### C.  The Ordinance Does Not Leave "All Comers with Equal Access" to Bar Harbor

In addition to obstructing instrumentalities of interstate transportation in violation of the Commerce Clause, the Ordinance discriminates against interstate commerce in its effects by imposing a disadvantage on interstate competitors in the Bar Harbor vacation market.[48]

Cruise lines, hotels, and other lodging providers compete for tourists' discretionary vacation dollars in vacation markets globally and as relevant here, in the Bar Harbor vacation market. The Ordinance will halt the majority of cruise vessel traffic in Bar Harbor. PFF ¶¶ 281-85, 290.[49] No tourist who wants to visit Bar Harbor and/or Acadia National Park will choose a

---

[47] To distinguish this case further from *National Pork Producers*, the Pilots themselves are instrumentalities of interstate commerce. *Snead v. Cent. of Georgia Ry. Co.*, 151 F. 608, 613 (C.C.S.D. Ga. 1907) ("persons who are concerned or affected by commerce [include] … persons who are the instrumentalities of commerce, such as pilots").

[48] The Town, along with Mr. Sidman, asserts that the Ordinance does not facially discriminate against interstate commerce. T. Br. at 22-23; S. Mem. at 33. The Pilots have not argued that the Ordinance bears the typical hallmarks of a facially discriminatory local law.

[49] At various intervals, the Town and Mr. Sidman assert that the elimination of cruise ship traffic in Bar Harbor as a result of the Ordinance is a "theory." T. Br. at 30; S. Mem. at 11 (stating that there is nothing in the record that ships will refuse to anchor in Frenchman Bay). The record clearly contradicts this position. The cruise lines have testified that they will not call at Bar Harbor if the Ordinance is implemented. PFF ¶¶ 281-82. Even now, the Ordinance is

---

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 27 -

cruise itinerary does not include a call at Bar Harbor. *See* PFF ¶¶ 281-82. Nor will such tourist

choose a cruise vacation if the cruise itinerary calls at Bar Harbor, but the tourist cannot get off

the ship. Tourists require a place to stay; as a result of the Ordinance, a tourist's Bar Harbor

vacation options thus become primarily in-state options (local hotels and other accommodation

providers), *i.e.*, options that afford the tourist the opportunity to visit Bar Harbor and/or Acadia

National Park. The Ordinance hoards a local resource—Bar Harbor, its close proximity to

Acadia National Park, and the demand to visit Bar Harbor and Acadia National Park—for the

advantage of local hotels that provide tourists necessary lodging, and those local hotels will

surely benefit from increased non-cruise tourism. *See C & A Carbone, Inc. v. Town of

Clarkstown, N.Y.*, 511 U.S. 383, 390-92 (1994) (ordinance "hoard[ed] solid waste, and the

demand to get rid of it, for the benefit of the preferred processing facility"). The Ordinance

burdens the Bar Harbor vacation market as a whole by depriving travelers of the choice to visit

Bar Harbor and/or Acadia National Park by cruise ship (a choice that may, for some, have cost,

convenience, or other advantages that are negated by the Town's restrictions). Even if the

Ordinance operates "equally on all cruise ship disembarkations," as the Town asserts, it does not

leave interstate cruise lines with "equal access" to Bar Harbor or Acadia National Park. *Cf.* T. Br.

at 23. Thus, the Ordinance discriminates in effect against interstate commerce. *See Fla. Transp.

Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1244 (11th Cir. 2012) ("law discriminates by

restricting market participation or curtailing the movement of articles of interstate commerce

---

having its intended effect. A review of Holland America's published itineraries for 2025 in the Canada/New
England trade shows 17 separate itineraries in 2025 in the region, only four of which will run more than once. **None
include Bar Harbor**. Holland America's 2025 itineraries for the Canada/New England market, as they appear on
the company's website, are attached hereto as **Exhibit 2**. *Cf.* PFF ¶¶ 267 (25 scheduled calls to Bar Harbor for
Holland America in 2023). Norwegian Cruise Lines' published itineraries for the region for 2025 do not include any
calls in Bar Harbor. **Nor do they include any calls in Maine**. Norwegian Cruise Lines' 2025 itineraries for the
Canada/New England market, as they appear on the company's website, are attached hereto as **Exhibit 3**. *Cf.* PFF ¶
267 (36 scheduled calls to Bar Harbor for Norwegian Cruise Lines in 2023).

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 28 -

based on whether a market participant or article of commerce is in-state versus out-of-state")
("law is no less discriminatory because it applies 'alike to the people of all the States, including
the people of the [enacting] State'") (internal citations omitted).

The lack of Maine cruise lines does not eliminate the Ordinance's discriminatory effects.
*Cf.* T. Br. at 23. Nor are its effects rendered less constitutionally relevant because they cause
collateral damage to local entities, like the Pilots and the Pier Owners. *Cumberland Farms, Inc.
v. LaFaver*, 33 F.3d 1, 1-2 (1st Cir. 1994) (rejecting "quantitative distinctions" between in-state
and out-of-state impacts for Commerce Clause analysis); *see New Energy Co. of Indiana v.
Limbach*, 486 U.S. 269, 276-77 (1988) ("Varying the strength of the bar against economic
protectionism according to the size and number of in-state and out-of-state firms affected
[serves] no purpose ...."). *Cf.* T. Br. at 24.

Defendants dismiss the Pilots' and Plaintiffs' claims as demonstrating mere "harm to the
profits of cruise lines or their local partners," having an effect only upon a "national or
international market," and disadvantaging a preferred business model, but not harming
commerce. T. Br. at 24-25; S. Mem. at 21 n.8. Defendants rely on generalized pronouncements
pulled from *Exxon* and *National Pork Producers*. Neither case controls here.

In *Exxon*, the Supreme Court upheld a Maryland law that prohibited producers or refiners
of petroleum products from operating retail gas stations in Maryland because the state restriction
did not impact the flow of interstate goods—the Court reasoned that if the law caused some
refiners to withdraw entirely from the market, their share of the entire supply would be promptly
replaced by other interstate refiners. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127
(1978). The Ordinance does not fit the *Exxon* mold. It directly impacts and obstructs the flow of
historic and present-day interstate commerce. *See* Section III.A. If the majority of cruise lines

PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 29 -

stop calling at Bar Harbor, no other cruise lines can promptly replace that activity. PFF ¶¶ 274-76. The Ordinance interferes with the movement of people in interstate commerce; it is unconstitutional. *Cf.* T. Br. at 38.[50]

The Ordinance's discriminatory effects also impose more than a burden on a particular business model, interstate firm, or method of operation, thus distinguishing it from both *Exxon* and *National Pork Producers*. *Cf.* T. Br. at 24-25; S. Mem. at 6, 33. While the Ordinance more directly affects cruise lines operating larger vessels, it restricts virtually all vessels. Every cruise ship, no matter its capacity, faces the real possibility of running afoul of the Ordinance's disembarkation limit because the disembarkation limit applies to daily disembarkations *in toto*, not per vessel. Even a smaller cruise vessel may find that its disembarkations violate the Ordinance if other cruise vessels have already disembarked 1,000 persons. The Ordinance does not just inhibit cruise lines with "mega-ships" from calling at Bar Harbor; it inhibits every cruise line seeking to disembark persons at Bar Harbor.[51] *See Walgreen Co. v. Rullan*, 405 F.3d 50, 59 (1st Cir. 2005) (rejecting comparison to *Exxon* where local law perpetuated dominance of local pharmacies in the market at the expense of every pharmacy seeking to open in an area already occupied by an established pharmacy). This deterrent effect is magnified by the cruise lines' complex itinerary planning process and the inability of individual cruise line planners to know for any given day how many disembarkations a vessel might be allowed.

Finally, Defendants assert that cruise lines and local hotels are not "direct" competitors,

---

[50] The Ordinance's direct impact on primary conduct of cruise vessels (*i.e.*, impacting business decisions about when and where to deploy vessels, itinerary planning, etc.) does not change this result. *Cf.* T. Br. at 25.

[51] Mr. Sidman argues that the Ordinance's impact on cruise line efficiencies proves that the Ordinance burdens a business model, not interstate commerce. S. Mem. at 21 n.8; *see* T. Br. at 41. To the contrary, the facts demonstrate that the Ordinance renders any cruise line participation in the Bar Harbor vacation market an untenable business proposition. No matter how a cruise line chooses to operate its business, it will never be able to disembark more than 1,000 persons per day into Bar Harbor. Thus, the Ordinance's burdens fall on interstate commerce.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 30 -

even though Mr. Goldstein testified that cruise lines compete with hotels, PFF ¶ 147, and multiple cruise line executives said the same, PFF ¶¶ 146-49. Defendants claim that cruise lines and hotels do not compete in the same market because cruise lines do not sell one-night cruises to Bar Harbor. T. Br. at 26-27; S. Mem. at 22-23. But the Court need not define the market so narrowly.[52] At the very least, cruise lines and hotels compete for multiday vacation customers. That is enough. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984) (as long as there is some competition between local and interstate entities, there is discriminatory effect).

### D. The Ordinance Cannot be Sustained in the Absence of Evidence That the Ordinance Will Advance the Asserted Local Benefits

Unsupported and illusory local benefits cannot justify the imposition of burdens on interstate commerce. Here, the Town asserts that the Ordinance "has a number of clear local benefits" but does not direct the Court to evidence in the record establishing that the Ordinance will, in fact, advance those local benefits. T. Br. at 39. Instead, the Town offers a rote account of its "concerns" with cruise ship visitation in the hope that this Court will be satisfied with a "mere recitation" of the Ordinance's purported legitimate purpose. This Court's inquiry, however, is not so superficial. *Stephen D. DeVito, Jr. Trucking, Inc. v. Rhode Island Solid Waste Mgmt. Corp.*, 770 F. Supp. 775, 783 (D.R.I.), *aff'd sub nom. DeVito v. Rhode Island Solid Waste Mgmt. Corp.*, 947 F.2d 1004 (1st Cir. 1991) (court must determine whether local law in fact advances local purpose because "mere recitation of a legitimate purpose" is "not conclusive"); *see Island Silver & Spice, Inc. v. Islamorada, Vill. of Islands*, 475 F. Supp. 2d 1281, 1292-93 (S.D. Fla. 2007), *aff'd sub nom. Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844 (11th Cir. 2008)

---

[52] Defendants' argument fails by simple analogy. If cruise lines and local hotels are not competitors because one does not offer a one-night stay, then neither are hotels that do and do not require a minimum night stay. In such a narrowly-drawn market, one would need to look long and hard to find "direct" competitors. The dormant Commerce Clause does not require such austerity.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 31 -

(village did not establish that challenged ordinance "actually encouraged" asserted local interest).

Here, the Court can only conclude that the Ordinance does not deliver the asserted local benefits. Defendants cannot establish that the Ordinance would reduce sidewalk congestion at the times when sidewalk congestion is at its peak—in the afternoon and evening hours when land-based tourists are in Bar Harbor. PFF ¶ 293. In fact, the Ordinance could have the reverse effect of increasing sidewalk congestion in the afternoon and evening hours.[53] Defendants also cannot establish that the Ordinance would conserve municipal resources, particularly those associated with police, fire, and EMS activities. PFF ¶¶ 223, 227, 236.

Even assuming the local benefits are legitimate (which the Court cannot do on the record before it), the Town's method for achieving those benefits must be evaluated in light of the "availability of less burdensome alternatives." *Stephen D. DeVito, Jr. Trucking, Inc.*, 770 F. Supp. at 785 (mere fact that asserted local benefits may be legitimate "does not mean that any method of achieving" those benefits "is therefore legitimate"). Here, the Town does not argue that the Ordinance is a legitimate, or even a rational, means to achieve any of the asserted local benefits and does not address the existence of the many less burdensome alternatives available to it.[54] The Town's silence is acquiescence. The Ordinance is not a legitimate method for managing downtown pedestrian congestion.[55]

## IV. The Ordinance Violates the Maine Constitution

Local action that frustrates the purpose, or prevents the efficient accomplishment of, a

---

[53] The Town points to the Pilots' recognition of probable congestion reduction at or in very near proximity to the piers (*i.e.*, the cruise disembarkation points) as proof that the Ordinance actually will deliver its touted local benefits. *See* T. Br. at 39. The Town ignores the incongruency between a reduction in congestion at the piers and a reduction in congestion on downtown sidewalks (which is the Ordinance's focus), particularly at the times when cruise ships are not in port and congestion is at its highest. This incongruency is fatal to the Town's position.

[54] There are many less burdensome alternatives at the Town's disposal. Pilot Br. at 42.

[55] Mr. Sidman does not contribute anything of substance on this point but instead echoes the Town's cursory handling of the efficacy of the Ordinance. S. Mem. at 27-28.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 32 -

defined state purpose is an invalid exercise of home rule authority and preempted by the Maine Constitution. *Smith v. Town of Pittston*, 820 A.2d 1200 (Me. 2003); *Sawyer Env't Recovery Facilities, Inc. v. Town of Hampden*, 760 A.2d 257 (Me. 2000). The Ordinance is just such a local action. It frustrates the provision of critical and necessary state pilotage services by both constraining the Pilots' statutory authority to pilot vessels in their pilotage area and obstructing the Pilots' ability to maintain a safe and efficient system of pilotage. It also works at cross-purposes to the State's interests in growing the Maine tourism industry. *See* Pilot Br. at 44-49.

Defendants contend that home rule authority and the Maine Harbor Masters Act ("HMA") entitle the Town to regulate all activities within the Town's "local waters," intimating that the Ordinance is a valid exercise of authority pursuant to the HMA. T. Br. at 47-48; S. Mem. at 40. The HMA cannot save the Ordinance. Because the Ordinance frustrates the purpose of Maine's pilotage and tourism statutes, the Town may not enact and enforce ordinances that conflict with those statutes under the guise of exercising any authority reserved to it by the HMA. *See Ullis v. Inhabitants of Town of Boothbay Harbor*, 459 A.2d 153, 160 (Me. 1983) ("Where the state legislature has preempted a field, a municipality may not invade that field in the guise of regulating a field still open to that municipality.") (internal citations omitted).

The Town also hypothesizes that the Ordinance will make Maine waters safer by reducing ship traffic and the Pilots can offset revenue losses by increasing their rates. T. Br. at 50-51. The wishful logic of the Town's position ignores the realities of the world in which the Pilots operate. A safe and efficient system of pilotage is an expensive and capital-intensive endeavor. PFF ¶¶ 306, 314. Its fixed costs do not diminish in proportion to reductions in the vessel traffic that the system supports. Thus, eliminating revenue-contributing traffic does not increase safety; it deprives the system of resources that enable safe and efficient pilotage services

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 33 -

for all other vessel traffic in the pilotage area. The Town also assumes that if obstacles to commerce, like the Ordinance, significantly reduce maritime trade, the Maine Pilotage Commission can simply require the remaining traffic to bear an increasingly greater proportionate share of the system's fixed costs in the form of increased rates.[56] Pilotage is a state-created monopoly, and the Commission must be cognizant that it can control rates, but not demand, for pilotage services. If rates are too high and spread over declining vessel moves, demand will fall. Obviously, the Town is willing to risk Maine pricing itself out of the maritime commerce market. *See* Tr. 11-Jul. at 60:3-6; *see also Bay Ferries, Ltd. v. Bd. of Comm'rs for the Port of Portland*, No. AP-17-48, *7 (Me. Super. Jun. 1, 2018) (Walker, J.).

Finally, Defendants assert that the Ordinance does not frustrate the purpose of Maine's tourism statutes because those statutes do not require municipalities to maximize tourism nor do they give the State "hegemonic rule" over municipalities. T. Br. at 52-53; S. Mem. at 42-43. These statutes do not need to impose ubiquitous, inflexible directives to be preemptive. The Ordinance disconnects one of the most sought-after destinations in the State from a historically plentiful resource of first-time visitors to Maine. PFF ¶ 41. The Ordinance will hamper the State's ability to grow tourism and attract new visitors, thereby frustrating State objectives.

## Conclusion

The Town concludes by attributing to Pilots and Plaintiffs an interpretation of the Constitution that leaves States without recourse to address the sometimes inconvenient or unwelcome by-products of the Nation's commerce. T. Br. at 54. The Town protests too much.

---

[56] The Town suggests the situation is not so dire because the Pilots will be providing pilotage to the CAT ferry, which very recently returned to Bar Harbor. T. Br. at 52. Endorsed rates for the CAT ferry are significantly less than those charged to cruise vessels. PX 039. Pilotage rates for the CAT and all other vessels would have to increase substantially in order to bear the costs of the pilotage system, so much so that it likely would make pilotage services too expensive for the market to bear, even if the Pilots implemented "expected responses" to the lower demand.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 34 -

**This Ordinance**, as written and designed, poses the constitutional quandary. It regulates primary conduct of vessels and limits disembarkations to a number so low that it renders impracticable vessel calls for virtually all vessels now calling at Bar Harbor. It negates federal customs and immigration clearances. It frustrates U.S. obligations under international treaties. It undermines Congress's authority "to regulate interstate navigation, without embarrassment from intervention of the separate States and resulting difficulties with foreign nations [that] was … one of the reasons for adopting the Constitution." *Locke,* 529 U.S. at 99 (internal citation omitted).

The Town has considerable authority to exercise its police powers in a host of constitutionally appropriate ways to mitigate the effects of Bar Harbor's popularity with tourists. *See* Pilot Br. at 2. It can control local pedestrian congestion through establishment of traffic patterns, limitations on motor vehicles on crowded streets, and restrictions on the placement of obstacles, like life-size lobsters, on downtown sidewalks. It can set standards for and make physical improvements to existing pedestrian areas to enhance traffic flow. And it can continue to reach, as it has in the past, voluntary agreements with cruise lines to fashion non-coercive, mutually acceptable limits on cruise visitation. Against this array of options, the Town instead chose to erect a barricade against cruise visitors in a manner and at a level so extreme that disruption of interstate and maritime commerce was all but preordained.

The Pilots ask the Court to protect the history-rooted, vital national interest in avoidance of local obstacles to the free flow of commerce, and in so doing, leave the Town where it started, with a range of options available to address local impacts of tourism, whatever the origin.

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 35 -

Respectfully submitted,

/s/ Kathleen E. Kraft

Twain Braden                              C. Jonathan Benner (*pro hac vice*)
Archipelago LLC                           Kathleen E. Kraft (*pro hac vice*)
One Dana Street, 4th Floor                Thompson Coburn LLP
Portland, ME 04101                        1909 K Street N.W., Suite 600
(207) 558-0102                            Washington, D.C. 20006
tbraden@archipelagona.com                 (202) 585-6900 (main)
                                          (202) 585-6969 (fax)
                                          kkraft@thompsoncoburn.com

                                          John S. Kingston (*pro hac vice*)
                                          Thompson Coburn LLP
                                          One U.S. Bank Plaza
                                          St. Louis, MO 63101
                                          (314) 552-6000 (main)
                                          (314) 552-7000 (fax)
                                          jkingston@thompsoncoburn.com

                                          *Attorneys for Plaintiff-Intervenor Penobscot Bay*
                                          *and River Pilots Association*

Date: October 27, 2023


## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of October, 2023, I caused the foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

/s/ Kathleen E. Kraft

**PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S REPLY BRIEF**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 36 -