UNITED STATES DISTRICT COURT

DISCTRICT OF MAINE

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492 LLC, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| | ) | No. 1:22-cv-00416-LEW |
| PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, | ) ) ) | |
| Intervenor-Plaintiffs, | ) ) | |
| v. | ) ) | |
| TOWN OF BAR HARBOR, | ) ) | |
| Defendant, | ) ) ) | |
| CHARLES SIDMAN, | ) ) | |
| Intervenor-Defendant | ) | |

## DECISION AND ORDER

In this action, a group of Bar Harbor businesses and business owners who seek to preserve commercial relationships with cruise lines and their passengers challenge a local exercise of popular sovereignty by the people of Bar Harbor who seek to curtail cruise ship visitation to maintain a certain quality of local life. The resulting controversy is of constitutional dimension and tenders a host of questions, but chiefly asks whether a

municipality with privately owned port facilities can restrain interstate cruise ship commerce for local welfare ends or must make way and permit whatever level of commerce the local market can support.

The matter proceeded to a bench trial following the Court's issuance of an expedited schedule and Plaintiff's withdrawal of a motion for preliminary injunction. The Town of Bar Harbor has agreed not to enforce the challenged land use ordinance pending the outcome of litigation. Following a three-day trial in July 2023, the parties submitted closing arguments in writing. Based on my consideration of the evidentiary record, the arguments of counsel, and the law, judgment will enter in favor of the Defendant Town of Bar Harbor on every count but one, and even as to that one count, judgment will enter partially for the Town, as only limited declaratory relief is awarded in recognition of a partial preemption problem, without affording Plaintiffs and Plaintiff-Intervenor the relief they are seeking.

## FINDINGS

### The Parties

The Plaintiffs in this action are the Association to Preserve and Protect Local Livelihoods ("APPLL"); B.H. Piers, L.L.C.; Golden Anchor, L.C., doing business as Harborside Hotel; BHWW LLC, doing business as Bar Harbor Whale Watch; Delray Explorer Hull 495 LLC; Delray Explorer Hull 493 LLC; and Acadia Explorer 492, LLC.

APPLL is a business league comprised of members who own or operate businesses in Bar Harbor and seek to capitalize on the economic opportunities associated with the

provision of goods and services to cruise ship passengers.  APPLL members include owners and employees of local restaurants, retail stores, and tour-related businesses.

The Delray Explorer Hulls and the Acadia Explorer are tender vessels owned by similarly named limited liability companies.  The vessels carry cruise ship passengers from cruise ships anchored in Frenchman Bay to Bar Harbor.  B.H. Piers and Golden Anchor own piers in Bar Harbor where the tender vessels disembark and embark cruise ship passengers.  BH Piers operates the pier located at 1 West Street, known as Harbor Place.  Golden Anchor operates the pier located at 55 West Street.  The pier owners have received approval from the Coast Guard for the use of the piers for this purpose.

BHWW is a limited liability company doing business as Bar Harbor Whale Watch Company.  BHWW coordinates whale watching tours to cater to the cruise lines' passengers.

The Penobscot Bay and River Pilots Association appears in this matter as Intervenor-Plaintiff.  The Pilots Association is a private corporation that provides pilotage services in a region that extends 75 miles from Boothbay Harbor to Frenchman Bay and 75 miles from the west pilot station on Penobscot Bay to the Penobscot River Port of Brewer.  By law, foreign-flagged and certain domestic cruise ships must be piloted within Frenchman Bay by a local pilot who is familiar with the Bay and its channels.  Pilots board cruise ships (and other large vessels) eight to twelve miles offshore and direct navigation to anchorage grounds in Frenchman Bay (or to other destinations in Penobscot Bay).  The anchorage grounds in Frenchman Bay are roughly two miles from the Bar Harbor waterfront and piers.  The Pilots Association's pilotage operations are regulated by the

Maine Pilotage Commission.  In response to the expansion of cruise vessel traffic, the Pilots Association has invested in vessels and has expanded its employment of pilots.  In particular, the Pilots Association now has a dedicated crew and purpose-built vessel to handle the piloting demands associated with cruise vessel traffic in Frenchman Bay.  Fees for piloting services are established by law and are a function of the size of the vessel.  Ex. 39.  The larger the ship, the greater the fee.

The Defendant is the Town of Bar Harbor.  Bar Harbor is, among other things, a Class A port of entry for foreign-flagged cruise vessels reentering the United States and a popular port-of-call on North Atlantic cruise ship itineraries.  Bar Harbor is governed by a Town Council.  The Bar Harbor Town Council has sponsored a cruise ship committee for more than a dozen years, but recently disbanded the committee.  The Town of Bar Harbor has a year-round population of roughly 5,500 persons, a number comparable to the lower berth capacity (a rough measure of passenger capacity) of a solitary large cruise ship.

One of the residents of Bar Harbor is Charles Sidman, Intervenor Defendant.  Mr. Sidman owns an art gallery in town.  Mr. Sidman was a primary proponent and co-author of the initiative that resulted in the land use ordinance challenged in this case.

<u>Non-Parties of Note</u>

Among the cruise lines that visit Bar Harbor are several lines owning foreign-flagged cruise vessels.  When they call, these vessels typically spend about nine hours at anchorage, enough time for passengers to clear customs and participate in a shore visit of reasonable duration.

The State of Maine has two other Class A ports of entry, Eastport and Portland. Neither is as proximate to Acadia National Park as Bar Harbor. If a cruise ship called in Eastport or Portland, travel by motor coach to reach and return from Acadia National Park would consume much of the day.

The Maine Office of Tourism is a marketing agency for the State of Maine. CruiseMaine, part of the Maine Office of Tourism, promotes cruise communities in Maine and Maine-based cruise ship tourism in general. CruiseMaine engages with cruise lines and the cruise industry trade association and sometimes functions as a municipality-to-cruise-line liaison. The Maine Office of Tourism and CruiseMaine perceive cruise travel as a positive type of tourism for Maine because it introduces many first-time visitors to Maine from a broader geographical region as compared to visitors who travel by land, most of whom are from east coast states and Canada. CruiseMaine maintains a software platform called the PortCall system, https://maine.portcall.com. Through the PortCall system, CruiseMaine posts real-time data related to vessel movements and port operations. State funding supports CruiseMaine.

Carnival, Royal Caribbean, and Norwegian are among the cruise line companies that are active in New England and market cruise itineraries that feature Bar Harbor as a marquee port. These three cruise lines are noted because they operate foreign-flagged vessels and operate some of the largest cruise vessels that call in Bar Harbor and elsewhere

along the Maine coast.[1]  The foreign-flagged lines see Bar Harbor as the most convenient and desirable port of entry when coming from foreign waters (such as Canadian waters).

<u>Background Facts</u>

The Town of Bar Harbor lies on the shores of Frenchman Bay in the North Atlantic on the eastern side of Mount Desert Island.  The Town is nestled in an area of great scenic beauty abutting Acadia National Park, a national asset that the Park Service refers to as the Crown Jewel of the North Atlantic Coast.  Given Bar Harbor and Acadia National Park's placement and prominence among other North Atlantic attractions accessible by sea, the cruise ship industry regards Bar Harbor as a marquee destination, the kind which appeals to customers and around which an appealing cruise itinerary can be built.

Although Bar Harbor had long experienced healthy tourist seasons, in the 2000s there was room for growth.  Additionally, the season was limited to the period between Memorial Day and Labor Day.  Local businesses and their representatives on the Town Council hoped to expand the tourist season and saw cruise tourism as one means of doing so.

In 2006, the Maine Department of Transportation, the Maine Port Authority, and the Town of Bar Harbor joined in a task force to commission a cruise tourism destination management plan for Bar Harbor.  The authors of the management plan proposed architectural and engineering improvements to develop the Town to facilitate expanded

---

[1] MSC Cruises is a fourth cruise line that fits the description.  The executive director of CruiseMaine characterized the domestic cruise lines as "smaller."  In addition to Bar Harbor, Eastport, Portland, and Rockland have ports suited to larger foreign vessels.  Only Bar Harbor and Portland have significant traffic involving foreign cruise vessels seeking a Class A port of entry, with Bar Harbor and Portland having roughly 60% and 40%, respectively.

cruise ship passenger access, chiefly by means of improved pier facilities.  Ex. 260.  In 2008, the Town accepted a recommendation from the task force to embody a cruise ship committee and establish a policy of daily cruise passenger caps of 3,500 passengers for the peak-tourism, summer months of July and August, and 5,500 passengers for the shoulder-season months of May, June, September, October, and November.  The cruise ship lines were receptive to the invitation and amenable to the passenger caps, and cruise ships began to call in Frenchman Bay in ever-increasing numbers.  Local enterprise and investment gradually expanded to meet the increased demand for passenger tendering and other local services.

The Town established its daily passenger caps largely by reference to the lower berth capacities of existing cruise vessels.  The caps were understood to be "voluntary" in that they were mutually acceptable to the then-existing Council and the cruise lines.  The Council and the cruise line industry were able to agree that cruise line passengers generally would not be well served in Bar Harbor if two or more cruise ships each with an especially large lower berth capacity were to disembark on the same day, even during the quieter shoulder season.  They also recognized that it was sensible to lower the cap during Bar Harbor's peak summer season, given the competing demand for local services generated by peak, land-based tourism.  The progenitors of Bar Harbor's cruise ship management plan also understood that cruise ship visitations impose certain municipal burdens,[2]

---

[2] Bar Harbor maintains a per-passenger fee structure for cruise ship visits. Ex. 29.  The Town has used the fees generated in this manner (roughly $1 million per year) to fund town salaries and enlarge its police force, among other things.  The increase in personnel, particularly law enforcement, is itself indicative of the localized impacts of increased traffic.

including congestion, that can detract from the character of the Town and reduce the quality of life for residents. To manage the cap, the Town instituted a reservation system overseen by its harbormaster. When the new reservation system was first instituted, cruise ship visits were not yet a daily phenomenon, despite the reference to "daily" caps.

Over the past 15 years, Bar Harbor has experienced a steady growth in its tourist season, due chiefly to its proximity to Acadia National Park. In 2021, Acadia National Park attracted roughly four million visitors. For many of these visitors, a trip to Acadia includes a visit to downtown Bar Harbor. Meanwhile, more and larger cruise ships anchored in Frenchman Bay and cruise ship passenger visitation levels started to approach or meet the established daily caps on an ever-increasing and consistent basis. Although cruise ship passengers account for a limited portion of the total number of annual visitors to greater Bar Harbor and Mount Desert Island, they arrive at a destination that is already blessed and burdened by land-based tourism and at a waterfront of rather limited area. Cruise ship passenger traffic also has a pronounced impact on and near the waterfront, including the eastern portion of West Street and the northern portion of Main Street.

Over the same period of years, the process of tendering passengers to shore has become a more efficient operation. In the early years, the Tender Parties (i.e., the pier owners, tender-vessel LLCs, and BHWW) would augment the cruise lines' tender operations so that passengers came ashore in a variety of ships, including whale watch ships. In 2017, the Tender Parties designed and built three vessels dedicated to tendering cruise ship passengers. They also invested in barges to facilitate the movement of passengers from the cruise ships to the tender vessels. While these developments are

8

commendable from the standpoint of market efficiency, part of the transactional cost is that the demand for tender operations means that cruise ship tenders have become the dominant harbor traffic during the expanded cruising season.[3]

For some, the expansion of tourism resulted in a return on planning and investment. For others, it resulted in a growing disaffection with municipal life. Increasingly, town leaders heard from constituents who were experiencing this disaffection.[4] Then came COVID. During the visitation-hiatus brought about by COVID quarantine orders—which restrictions impacted both land and sea visitation to Bar Harbor and Acadia National Park—some residents of Bar Harbor were reminded that there are measures of a municipality's success other than its volume of business.

In January of 2021, Bar Harbor commissioned a marketing research firm to perform a quantitative study and write a report concerning local opinions.[5] Ex. 323. The survey

---

[3] Each of the three tender vessels is licensed to hold 149 passengers and they steadily rotate into and out of the harbor in roughly 30-minute intervals, primarily disembarking passengers onto the piers mid-morning and embarking them again in the afternoon, though passengers move back and forth throughout the day. Consequently, there are times of day that involve more intense movement of people in either direction, not unlike the tide, albeit more regular in terms of timing. Foreign-flagged vessels, for example, arrive mid-morning and spend on average nine hours at anchorage. Their passengers spend on average six to seven hours on land in various locations, including downtown Bar Harbor. In the morning, passengers congregate near the piers and waterfront, including at motor coach staging areas, while some passengers walk into the Town. Passengers may be in any number of locations during the day, such as on a whale watch tour or an Acadia bus tour, or at a local restaurant or business. In the afternoon, passengers (and their assorted conveyances) again congregate near the piers to obtain passage back to their cruise ship.

[4] Town Council Chair Valerie Peacock testified that in 2020 and continuing residents of Bar Harbor have expressed strong feelings of angst over the perceived negative impact of the cruise ship industry, but also concern over the expansion of tourism in general. July 13 Tr. at 112–13, 121–25.

[5] Pan Atlantic Research's study surveyed year-round and seasonal residents, property owners, and business owners of Bar Harbor to examine what they thought about sea-based tourism. *See generally* Ex. 323. Overcrowding, too many ships/tourists, and environmental concerns ranked among the most popular answers to Bar Harbor's greatest challenges in managing cruise ship tourism. Ex. 323 at 29; *see also* July 13 Tr. at 212:14–214:9 (describing the increased street traffic and congestion at the waterfront when cruise ships arrive).

had a healthy response rate.  Many respondents voiced concern for the congestion[6] caused by cruise ship visits and ranked cruise ship tourism a net negative for the Town.  The growing concern over popular sentiment was also acknowledged by the cruise industry.  In July of 2021, the president of the Cruise Lines International Association proposed new passenger caps as part of a "negotiation" with the Town.  The proposal, accepted by the Town Council, involved a daily passenger reduction for the shoulder season[7] and a new monthly cap of 65,000 visitors specifically to address concerns of capacity.  Although public pressure was growing, the Bar Harbor Town Council, ultimately, was not then constituted to provide the pressure relief that many citizens hoped for.[8]

On February 15, 2022, the Council approved the formation and membership of a new working group to explore the modification of the daily passenger limits for the 2023 and 2024 cruise seasons.[9]  On August 16, 2022, the Town Council accepted the task force's recommendation to enter into a memorandum of agreement ("MOA") with each cruise line

---

[6] Congestion is not exclusively a matter of pedestrian congestion on sidewalks.  Congestion includes vehicular congestion and overcrowding of stores, parks, and other public spaces.

[7] By 2019, it was a misnomer to describe the months of September and October as a "shoulder season" when describing the volume of cruise ship passengers coming ashore in Bar Harbor.  In fact, over 60 percent of Bar Harbor's annual cruise ship passenger visits occur in September and October.  September and October are also the months that see the most visitation by the very largest vessels (>3,500 passengers).  *See*, *e.g.*, Ex. 165.  According to CruiseMaine's director, the number of cruise visitors entering Bar Harbor in September and October is roughly equivalent to the number of tourists on town streets in June and July.

[8] At trial, counsel for Plaintiffs worried that testimony concerning public disaffection and council activities (much of Chair Peacock's testimony) was an attempt to construct a false legislative history in support of the Ordinance.  I have not interpreted the testimony in that fashion.  Rather, the testimony related some of the contemporaneous local history that set the stage for the success of the Initiative.

[9] Separately, the Bar Harbor Cruise Ship Committee was already corresponding with the Cruise Lines International Association to explore ways of reducing cruise visitation.  Ex. 214.

and directed the preparation of a form MOA for circulation.[10]  The resulting MOA withdrew the months of April and November from the Town's reservation system, lowered daily passenger caps from 5,500 to 3,800 for the months of May, June, September, and October (with a +200-passenger leeway), and instituted a new monthly cap of 65,000.  In September and October of 2022, the Town entered into MOAs with American Cruise Lines, Disney Cruise Lines, Holland America Line, Hurtigruten Expeditions, Norwegian Cruise Line, Pearl Seas Cruises, Princess Cruises, Rogay Caribbean Cruises, Seabourn Cruise Line, Viking Cruises, and Windstar Cruises Marshall Islands.

While the Town Council publicly pursued its voluntary measures, a group of local residents formed a petitioning committee to advance a citizens' initiative that would achieve more significant reductions by mandatory means.  Their initiative proposed amending the Bar Harbor Code to require a permit to disembark cruise ship passengers "on, over, or across any property located within the Town of Bar Harbor."  Ex. 243A.  It also specified that "no more than 1,000 passengers, in the aggregate, may disembark on a single calendar day."  *Id.*  The Initiative called for a $100 minimum penalty per excess unauthorized disembarkation, which would be assessed against the property owners (the Pier Operators).  The Initiative states that the harbormaster shall develop rules and regulations to establish a reservation system for disembarkation, a mechanism for counting and tracking disembarkations, a procedure for reporting violations, and "any other

---

[10] Two weeks prior, on August 2, 2022, the Town Council went into executive session to discuss the citizens' petition that would become the Ordinance but was, at that time, still in need of voter approval.  Exs. 207–210.  The Town Council also conducted a workshop on that date to discuss the future of cruise tourism in Bar Harbor.  Among other matters under consideration were cautionary litigation warnings from the Cruise Lines International Association.  Ex. 211.

provisions" deemed necessary.  *Id.*  By the time the Initiative went to vote, the citizens'

group had revised it by substituting the word "persons" for "passengers."  Ex. 243B.  They

did this based on a group member's observation that cruise ships carry a great many

crewmembers as well as passengers.  The group decided it would be best to use the term

persons to capture both passengers and crew.  Ex. 230.

The Initiative included a lengthy statement of purpose focusing on quality of life,

but also expressing concern for public safety and the commercial interests of businesses

other than those seeking the patronage of cruise ship passengers.

Concerning quality of life, the Initiative's sponsors wrote:

> Underlying this proposed amendment is the fact that, in recent years, the
> Town has been a popular port of call for cruise ships of varying sizes, from
> which passengers disembark via tender boats that offload passengers directly
> into the downtown area. The large numbers of passengers have overwhelmed
> the downtown area, resulting in excessive congestion and traffic on public
> streets and sidewalks, frequent overcrowding of parks and other public
> spaces, and inundating local amenities and attractions, all of which result in
> a diminished quality of life for Town residents.

Ex. 243A.  Concerning public safety and other business interests, the sponsors wrote:

> The unchecked and continued influx of disembarking cruise ship passengers
> in the downtown area jeopardizes the Town's ability to deliver municipal
> services to Town residents and visitors (for example, cruise ship passengers),
> including the provision of public safety services (police and fire), emergency
> medical services (EMS), in-patient and out-patient services at local hospitals,
> pandemic control measures, and public sanitation services, and also impacts
> the ability of local shops, restaurants, and other businesses to attract and
> serve customers.

*Id.*  The sponsors then summarized:

> A town-wide survey was conducted in 2021, showing that a majority of
> respondents believe that the volume of disembarking cruise ship passengers
> is too high and has a negative impact on the Town and the health, safety and
> welfare of its residents.

*Id.*

The Initiative was listed as an article on the warrant for Bar Harbor's November 8, 2022, special town meeting.  A majority of the registered voters who voted supported the article.  Bar Harbor now has a land use ordinance that establishes a disembarkation cap of 1,000 persons per day.

During trial, Mr. Sidman testified that the 1,000-person cap was not the product of "a rigorously defensible finding or study or calculation."  July 13 Tr. at 312:20–21.  The group proposed various caps, some higher, but ultimately arrived at 1,000 persons.  In communication with other members of his group, Mr. Sidman expressed a preference for smaller cruise ships because the passengers on smaller cruise ships tend to be more well-to-do.  He also expressed a dislike of "the biggies," meaning the larger cruise ships.

<u>Subsequent Rulemaking</u>

A variety of details remain for purposes of sorting out the best approach to implementing the Ordinance.  These include proposed rulemaking to exclude crew from the 1,000-person limit (for reasons that will be explained shortly), determining how best to monitor passenger volume, and determining how to proceed in the event the limit is disregarded by the Pier Owners.  *See*, *e.g.*, Exs. 66, 204.  However, at present implementation and rulemaking are suspended pending this immediate facial challenge to the Ordinance.

<u>Findings Concerning the Initiative's Stated Purposes</u>

To the extent the Initiative expresses concern for public safety due to congestion located anywhere other than the waterfront, West Street and lower Main Street, there is no

empirical data to enable a fact finder to allocate responsibility for a degradation in overall municipal public safety between cruise and land-based tourism.  But at the waterfront, the press of cruise ship passengers is sufficient to raise safety concerns.  Indeed, the initiative sponsors' stated concern for public safety is echoed by the cruise industry.  Ex. 32 §§ 5.3, 5.4.  However, at least to date there does not appear to be an incident illustrating any past failure in the delivery of public services occasioned by passenger congestion at the waterfront.

Where the stated purposes have greater significance is in regard to congestion and all that congestion entails, such as overtaxed public facilities, long lines, crowded sidewalks and businesses, slowed traffic, and the like.  To be fair, some days with pronounced congestion in Bar Harbor may occur when a cruise ship is not at anchorage.  Nighttime congestion may be particularly bad on some evenings, despite the absence of cruise ship passengers.  But the idea proposed by Plaintiffs and Plaintiff-Intervenor that cruise ship traffic has a negligible impact on local conditions is disingenuous.  What video evidence was presented by Plaintiffs or Plaintiff-Intervenor was more in the nature of pro-cruise marketing material that was not representative of the daily impact of cruise-related visitation and, instead, depicted quieter moments on quieter days.

It is not the fault of cruise ship passengers that the area is congested; it simply is the reality of conditions existing on the ground.  Cruise ship passengers come ashore in an area of limited space nestled between the Public Pier and Harborside Hotel.  One of the piers over which cruise ship passengers travel sits at the east end the harbor, adjacent to the Public Pier, near the juncture of Main Street and West Street.  The other pier sits at the

west end of the harbor. Between them is a short stretch of commercialized waterfront along West Street. The passengers' impact on the relatively confined waterfront area is marked,[11] though their spillover impact on the Town more widely is best described as cumulative. But even further up Main Street and in public areas the impact is real and tangible to locals who visit the downtown.

As attested to by witnesses Dr. Bill Horner, Nathan Young, and Seth Libby, the press of people in the downtown intensifies on cruise ship days. Dr. Horner described it as a dramatic growth in the press of people with a tremendous amount of traffic, particularly in the waterfront area. Mr. Young described sidewalks busy enough that he prefers to walk in the street when he has to go downtown on a cruise ship day. Mr. Libby described the scene similarly, stating that cruise ship visits produce greater crowding. The witnesses also testified that they avoid the downtown on cruise ship days due to the extent of the congestion. Horner, Libby, and Young all testified that they voted in favor of the initiative because they felt that elected officials had failed to act in a timely or meaningful manner to curtail the impact of cruise ship visits. I find that these witnesses provided a fair and accurate assessment of the impact of cruise ship visits in terms of both the intensification of congestion and the undesirability of a trip downtown for many residents on "cruise ship days," which increasingly means most days of the cruise ship season.[12]

---

[11] *See*, *e.g.*, Ex. 32 § 5.3. Congestion is bad enough that the Cruise Line Industry Association has proposed that Bar Harbor give over to cruise passenger traffic most of the public pier as well. *Id.* at §§ 5.3, 5.8. This would effectively give over the vast majority of Bar Harbor's waterfront to the primary function of facilitating cruise ship passenger arrival and departure during the cruising season.

[12] Plaintiffs and Plaintiff-Intervenor offered the testimony of Professor Todd Gabe, Ph.D., of the University of Maine, who studied congestion in Bar Harbor's tourist district. One study occurred at the tail end of August and essentially concluded that allowing 680 *additional* cruise ship passengers (i.e., more than the

Congestion in downtown Bar Harbor is a seasonal fact of life, but it is empirically exacerbated by the regular morning and afternoon pulse of cruise ship passengers and the tour buses and other vehicles[13] that arrive to cater to them. In addition, fall congestion is largely a function of cruise ship visitation, resulting in an undeniable change to the annual rhythm of municipal life. Cruise ship passenger visitations may well be viewed by rational voters as indulgent and burdensome surplusage in an already taxed ecosystem. In this sense, the initiative sponsors' stated concern for generalized welfare and qualify-of-life considerations is neither unsubstantiated nor unrelated to the unique congestion problem associated with high-berth cruise tourism, let alone arbitrary and irrational.[14]

<u>Findings Concerning the Ordinance's Impacts</u>

Most of the cruise lines that schedule visits to Bar Harbor plan visits in cruise ships having a lower berth capacity in excess of 1,000. Only 27 of the 134 ships scheduled to make calls in the 2023 season would be able to disembark their entire complement of passengers without exceeding the cap. It appears unlikely that a cruise line will schedule

---

daily 3,500 passenger cap for August) would result in only a negligible *further* experience of congestion in a town already impacted by land-based tourism and the baseline 3,500 cruise ship passengers. Ex. 319 at 2. Professor Gabe also spent a number of days walking about Bar Harbor and recording his subjective experience at various times and locations. About half of the walks he took were "at times early in the morning, during months outside the peak tourism seasons and in inclement weather, or at places located on the outskirts of the tourism district." Ex. 319 at 6. I did not find Professor Gabe's testimony or reports to be helpful in terms of achieving whatever finding Plaintiffs and Plaintiff-Intervenor intended me to draw.

[13] *See, e.g.*, Ex 12A; Ex. 32 § 4.2. In addition to tour buses, there are vans, minibuses, motor coaches, taxis, and bike tours. While the pulses of congestion are most keen in the mid-morning and afternoon, there is a greater mid-day press as well, which the restaurateur members of APPLL seek to capitalize on.

[14] Plaintiffs insist that the Town of Bar Harbor must prove that the Ordinance can be based on a finding that the one-thousand-and-first passenger disembarked and every passenger who follows is somehow a "noxious" or "toxic" threat to the well-being of the Town. *See, e.g.*, Pls.' Reply Br. at 6, 16, 20, 34. I do not believe that is the test. The Ordinance is obviously designed to draw a line between levels of impact occasioned by the berth capacities of cruise ships, not the relative innocuousness or noxiousness of individuals.

a port call for purposes of a shore visit if it cannot disembark its ship's entire complement of passengers on a single day.  Consequently, in terms of the volume of visitors disembarking from cruise ships, the likely avoidance of the large vessels will reduce passenger visitation volume by a significant percentage, likely north of 80 and possibly as high as 90 percent (in the short term) compared with the peak numbers experienced in 2022 and 2023.

Cruise lines with large ships will, necessarily, adjust their itineraries and reroute high-berth ships to other ports.  Plaintiffs would likely feel a financial impact occasioned by reduced cruise passenger patronage.  The pier and tender boat operators will likely lose fees, the APPLL members will likely experience a reduction in business and will perhaps close during the shoulder season or retain fewer employees in those months, and the Pilots Association will have decisions to make related to maintaining personnel, vessels, and equipment without the revenue generated by regular piloting of the largest cruise ships into and out of Frenchman Bay.

Because no ecosystem is static, presumably some cruise lines will adjust practices to maximize utilization of the new caps.  However, the record does not contain evidence that would allow for a reliable calculation on that score, nor would I expect it to.[15]  There is no evidence to suggest, for example, that the cruise lines with the smaller ships have

---

[15] The cruise industry stated in 2019 that it "is poised to continue its overall expansion, adding new ships faster than retiring them."  Ex. 32 § 6.  "The demographics of the passengers seeking cruises in a given area will largely dictate that seize and amenities of vessels.  Vessels should be considered moveable high-value assets for generating shareholder profits.  To this end, cruise companies will evaluate the yield achievable by a ship assignment in a given market."  *Id.*  Conceivably, if, as the cruise lines evidently fear, more municipalities impose capacity restrictions, then certain cruise lines will reconsider their decision to focus on maximization of economies of scale in cruise ship design.

either a sufficient number of ships or that their cruises are in sufficient demand to approach the caps on a regular daily basis.  Even if visitation is eventually maximized under the Ordinance, the overall number of cruise ship passenger visits would be significantly less than the level of visitation experienced in 2022 and 2023 and less than a third of the level authorized under the recent MOAs.

**DISCUSSION**

Plaintiffs allege in their Complaint (ECF No. 1) that Bar Harbor's new Ordinance is preempted by operation of the United States Constitution's Supremacy Clause (Count 1), violates the Commerce Clause (Count 2), and offends "substantive due process" (Count 3).  Plaintiff-Intervenors similarly allege in their Complaint-in-Intervention (ECF No. 43) that the ordinance violates the Supremacy Clause (Count 1) and the Commerce Clause (Count 2), but additionally allege that the ordinance is preempted under the Maine Constitution based on alleged conflict with Maine's statutory pilotage system (Count 3) and its statutory economic and community development program (Count 4).

I address the Maine Constitution first before turning to the federal claims.

**A.     The Maine Constitution**

The Maine Constitution affords municipalities home rule authority.  "The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character.  The Legislature shall prescribe the procedure by which the municipality may so act."  Me. Const. art. VIII, pt. 2, § 1.  Home rule authority has been conferred on Maine municipalities by the Maine Legislature to the maximum extent of the Legislature's power

to grant it, excepting only home rule authority that is elsewhere denied expressly or by clear implication in Maine law, *see* 30-A M.R.S. § 3001, or where "the municipal ordinance in question would frustrate the purpose of any state law," *id.* § 3001(3). When the exercise of home rule is challenged, the municipal power authorized under Maine law is to be "liberally construed to effect its purposes" and courts must apply a "rebuttable presumption that any ordinance . . . is a valid exercise of a municipality's home rule authority." *Id.* § 3001(1), (2).

The Maine Constitution also extends to each Maine municipality the authority to provide for their electors to exercise "the direct initiative . . . in regard to its municipal affairs." Me. Const. art IV, pt. 3, § 21. The authority of municipal electors (i.e., voters) to legislate by means of a direct initiative is coextensive with the authority of the municipality to exert its home rule authority. *Portland Reg'l Chamber of Commerce v. City of Portland*, 253 A.3d 586, 592–93 (Me. 2021). It was thus an exercise of home rule authority when the petition committee circulated the initiative that resulted in Bar Harbor's challenged Ordinance.

Plaintiff-Intervenor does not contend that the petition process and resulting initiative exceeded any state or municipal law or rule insofar as the Ordinance's enactment is concerned. Nor does it contend that the initiative is not an exercise of home rule authority involving municipal affairs. Instead, Plaintiff-Intervenor contends that the Ordinance prevents the accomplishment of state priorities articulated in state laws respecting the establishment of a system of pilotage and a program of economic and community development. Challenges involving the "implied" prohibition "must be evaluated on a

19

case-by-case basis by examining the language of the ordinance and any statutes enacted by the Legislature." *Id.* at 593.

In Maine Revised Statutes Title 38 the Maine Legislature has declared a policy and purpose "to provide for a system of state pilotage in order to provide maximum safety from the dangers of navigation," "to maintain a state pilotage system devoted to the preservation and protection of lives, property, the environment and vessels," and "to insure the availability of pilots" 38 M.R.S. § 85. The pilotage statute then goes on to define terms, outline jurisdiction, specify the vessels that must take pilots, prohibit piloting without a license, establish a pilotage commission and outline its duties, and set up a system of licensure for pilots. None of these statutory provisions prohibits a municipality from enacting an ordinance that restricts local passage from private piers onto municipal property. Nor does the Ordinance conflict with the objective of the Legislature when it comes to pilotage. Pilots remain free to conduct their profession and to pilot vessels within the region, including by piloting them to Frenchman Bay anchorages. Nothing in the pilotage statute can reasonably be construed as a legislative intention, express or implied, to divest municipalities of home rule authority over local, land-based, police power concerns whenever the exercise of that authority could foreseeably impact the volume of business available to pilots. The establishment of a pilotage system is not an implicit statutory surrogate for compulsory, maximal municipal participation in cruise tourism.

Plaintiff-Intervenor also argues that Maine's statutory intention of "formulat[ing] and implement[ing] economic development policies and programs" that are coordinated among the State's several agencies and various "municipal and regional economic efforts,"

20

5 M.R.S. § 13052, will not tolerate an exercise in municipal home rule that curtails cruise tourism.  With the statute in question, the Maine Legislature organized a Department of Economic and Community Development.  *Id.* §§ 13054, 13055.  The Department is empowered to, among other things, implement policies and programs, work with other organization including municipalities, conduct planning and research, communicate with the private sector, prepare and distribute publications, and implement programs assigned to it by the Governor or Legislature.  *Id.* § 13056.  The Department's Office of Tourism is empowered to engage in promotional and informational activities, encourage development, review and comment activities, and similar activities.  *Id.* §§ 13090-C, 13090-E.  However, it has no power to compel or even regulate municipal engagement with cruise line tourism.

While the Department and the Office have rule-making authority, Plaintiff-Intervenor does not rely on any rules to support its preemption claim.  Instead, Plaintiff-Intervenor argues that any municipal action inconsistent with greater economic development necessarily prevents coordination as well as economic and community development.  The argument is essentially that through declaration of an economic and community development goal and creation of a related department and tourism office, the Maine Legislature has imposed a duty on every municipality and political subdivision to act in the best interest of the Chamber of Commerce.  Of course, if the maximization of commerce were compulsory, a vast body of zoning and land use regulation would not be worth the paper it is written on.  To be certain, most municipalities yearn for the types of burdens of fortune that Bar Harbor experiences.  The broad and undifferentiated aspiration toward commercial health made manifest by the Legislature's creation of the Office of

Tourism and CruiseMaine is sensible and one supposes is in league with the desires of most municipalities most of the time. However, the picture of commercial development is not painted in primary colors alone but rather exists in a pastiche of other municipal considerations. A municipality that rationally exercises its home rule authority in a manner which is modestly in tension with the highest marginal commercial harvest, the type which is the sine qua non of the tourism office, is not an outlaw.

The fact is that the Legislature has not empowered these instrumentalities to override municipal home rule authority. The Legislature has not even empowered these instrumentalities to wield the interstitial power of a special master or an ombudsman in matters of municipal and cruise line conflict. If it had, then some manner of administrative process would have preceded before or alongside this litigation. Yes, CruiseMaine may support, educate, promote, and play the part of a sales broker when it comes to cruise tourism, but decidedly missing from the enumerated powers is the power to trump home rule authority to dictate acceptable levels of municipal participation in cruise tourism.

Nor can the mere existence of the Department or its tourism-focused instrumentalities be regarded as an implied prohibition against a local municipal determination to reduce engagement with the cruise line industry. Public bodies may exercise only the powers conferred upon them by law. The conferral of powers must be found "in the enabling statute either expressly or by necessary inference as an incidence essential to the full exercise of powers specifically granted." *Hallissey v. Sch. Admin. Dist. No. 77*, 755 A.2d 1068, 1072 (Me. 2000). The derogation of home rule authority must rest on something more immediate and direct than the Legislature's pro-commerce

proclamations and the institution of a body tasked with broadly supporting and promoting, but not regulating, tourism.  If home rule authority is to be overcome it ought to be based on something with a little more starch, such as the text of the law.  As is so often the case, when textual (i.e., legal) support for a challenge to home rule authority is lacking, an invitation is made to the court to begin at the intellectual equivalent of divining legislative intent from high upon the pillars, which is to say, an appeal toward sophistry.  To be certain, for some there is an intoxicating appeal to wielding such authority, acting as a sort of judicial "God of the gaps" and the line is long of those only too eager to cast their light upon the unwashed masses to shepherd us through the darkness left by the democratic process.  For ease of analysis, this case does not present a close call of implied prohibition of home rule.  Any argument of implied prohibition of municipal home rule authority must be attended by a particularly muscular example of how the purpose of the enabling legislation is at cross purposes with the home rule.  The analysis cannot be one of contingencies or at least if it is, must ultimately be tethered to the noncontingent; a prime mover example in the law that demonstrates how home rule errs.

The Legislature should not be viewed as having impliedly prohibited the exercise of municipal home rule authority in an area that the Legislature has not even attempted to regulate in any direct manner.  Even in areas that the Legislature has regulated directly, municipal home rule authority is not so easily preempted.  *See*, *e.g.*, *Portland Reg'l Chamber*, 253 A.3d at 591 (upholding Portland's minimum wage ordinance despite existence of state minimum wage statute); *Portland Pipe Line Corp. v. City of S. Portland*, 240 A.3d 364, 368 (Me. 2020) (holding that Maine Coastal Conveyance Act, which

involved the State's exercise of police power in matters of oil transfers, did not preempt a local ordinance that prohibited an activity even though the Maine Department of Environmental Protection ("DEP") had issued an approval that allowed for but did not require the activity in question); *E. Perry Iron & Metal Co.*, *Inc. v. City of Portland*, 941 A.2d 457, 463 (Me. 2008) (upholding municipal regulation of junkyard in absence of evidence that it frustrated the purposes of Maine's Solid Waste Act); *Smith v. Town of Pittston*, 820 A.2d 1200, 1201 (Me. 2003) (4-3) (upholding municipal ordinance banning the spread of septage in the Town of Pittston despite existence of DEP rules establishing minimal performance criteria for such spreading, DEP's award of permit application to conduct such spreading, and legislative intent to encourage development of affordable, environmentally suitable waste disposal sites). When it comes to the growth of tourism in Maine there simply is no state-sanctioned regulatory scheme to frustrate, only a broadly worded aspirational objective of regional economic coordination and an associated initiative of the Office of Tourism to support, educate, and promote cruise communities.

Plaintiff-Intervenor's claims of preemption under the Maine Constitution (Complaint in Intervention Counts 3 and 4) fail.

## B.   The United States Constitution

Plaintiffs and Plaintiff-Intervenor mount challenges to Bar Harbor's Ordinance based on the Supremacy Clause and the Commerce Clause. Pls.' Compl. Counts 1–2; Compl. in Intervention Counts 1–2. Plaintiffs add a claim under the Due Process Clause. Pls.' Compl. Count 3. I begin my review with the Supremacy Clause, move on to the Due Process Clause, and finish with the Commerce Clause.

24

### 1.     The Supremacy Clause

The Supremacy Clause provides that "the Laws of the United States . . . and all Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Due to the Supremacy Clause, when Congress enacts a statute, state law is preempted to the extent of any conflict with the federal statute.  *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023).  Sometimes a federal statute will expressly preempt state law, but preemption also can arise "by virtue of restrictions or rights that are inferred from statutory law." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020).  Preemption can result, for example, based on the inference that Congress has effectively occupied the field in a certain area of regulation even though Congress has not announced a preemptive intention.  *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973).  Preemption can also result based on the existence of competing commands, allowances, or standards in federal and state law.  "If federal law 'imposes restrictions or confers rights on private actors' and 'a state law confers rights or imposes restrictions that conflict with the federal law,' 'the federal law takes precedence and the state law is preempted.'"  *Garcia*, 140 S. Ct. at 801 (quoting *Murphy v. National Collegiate Athletic Assn*., 138 S. Ct. 1461, 1480 (2018)). However, "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law."  *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019).

"'[T]he basic question involved in [Supremacy Clause] cases . . . is never one of

interpretation of the Federal Constitution but inevitably one of comparing two statutes." *Swift & Co. v. Wickham*, 382 U.S. 111, 120 (1965). "[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough Cnty*., *Fla. v. Automated Med. Laboratories*, *Inc*., 471 U.S. 707, 713 (1985).

a.   Federal regulation of maritime matters

Plaintiffs point to the many ways in which federal law applies to vessels, seafarers, and ports or "maritime terminal facilities" to argue that there is no room for a municipality to restrict shore access via port facilities. The cited federal law, rules, and regulations, however, do nothing to legislate in the area of cruise tourism (or even—with one exception—landward passage). Plaintiffs cite the Federal Maritime Transportation Security Act, 46 U.S.C. §§ 70101-70132, which governs "port security," and the entire Coast Guard Authorization Act, Pub. L. 111-281, 124 Stat. 2905 (Oct. 15, 2010), which as the title suggests authorizes appropriations for the Coast Guard. Bar Harbor's Ordinance clearly does not compete with federal law in the area of port security or Coast Guard operations.[16]

Plaintiff-Intervenor advances similar preemption arguments to those pressed by Plaintiffs but shifts the focus slightly to contemplate the regulatory burdens imposed on

---

[16] In Plaintiffs' rundown of federal law touching on vessels and maritime facilities, they cite 33 C.F.R. § 105.105(a)(2) for the proposition that Coast Guard regulations under the Maritime Transportation Security Act are intended to be preemptive. Pls.' Br. at 20. The reference is perplexing because it merely states that the requirements of maritime security for facilities apply to the owner or operator of a facility that receives vessels certified to carry more than 150 passengers, yet Plaintiffs have elsewhere informed the Court that the tender vessels are licensed to hold 149 passengers. In any event, clearly the Bar Harbor Ordinance was not drawn to impose competing security standards for maritime facilities.

cruise lines and pilots.  The Pilots Association argues that because "[t]he federal presence in the area of navigation, safety, and environmental protection is extensive, pervasive, demanding, and complex," and "follows a vessel from its design phase through its ultimate scrapping," and "link[s with] a series of international agreements dependent upon the predictability of access to ports," and involves oversight by the Coast Guard, Customs and Border Protection, the Centers for Disease Control and Prevention, the Environmental Protection Agency, and the Federal Maritime Commission, "[l]ocal restrictions on vessel operations . . . pose a direct threat to the necessary uniformity of federal oversight and the efficient operation of cruise . . . vessels."  Pl.-Int.'s Br. at 9–10 (ECF No. 190).  This language checks off the lawyerly rhetoric box but fails to tease out any actual conflict.  The Ordinance simply does not purport to regulate vessel requirements or make the operation or navigation of cruise vessels any less safe, environmentally sound, or efficient.  Nor does it interfere in any way with the performance of cruise line oversight by the Coast Guard, CBP, CDC, EPA, or the FMC.  Nor can it be said that any one of the identified agencies has attempted to occupy the regulatory field when it comes to balancing competing interests related to a municipality's participation in cruise tourism.  Federal regulation in this arena is not even extant, let alone pervasive.  *City of Burbank v. Lockheed Air Terminal Inc*., 411 U.S. 624, 633 (1973) ("It is the pervasive nature of the scheme of federal regulation of aircraft noise that leads us to conclude that there is pre-emption.").

Plaintiffs and Plaintiff-Intervenor's invocation of all the many ways that federal law touches upon maritime traffic is precisely the kind of "brooding federal interest" mentioned in *Hillsborough*, 471 U.S. at 713.  As such, it does not suffice to support the preemption of

Bar Harbor's disembarkation restriction.[17]

> ### b.   Seafarer shore access

When Plaintiffs and Plaintiff-Intervenors do dive down into the maritime regulations to retrieve something specific, the palatable[18] oyster they surface with is a preemptive maritime security regulation that requires the owners or operators of maritime facilities (such as Plaintiff Pier Owners) to ensure shore access for seafarers who wish to transit from a vessel through or over regulated facilities.  33 C.F.R. § 105.237.[19]

> (a) Access required.  Each facility owner or operator must implement a system . . . for providing access through the facility that enables individuals to transit to and from a vessel moored at the facility and the facility gate in accordance with the requirements in this section.  The system must provide timely access as described in paragraph (c) of this section and incorporate the access methods described in paragraph (d) of this section at no cost to the individuals covered.
>
> (b) Individuals covered.  The individuals to whom the facility owner or operator must provide the access described in this section include—

---

[17] Plaintiffs muse in their post-trial brief that the Ordinance is unenforceable because the Pier Owners lack the authority to stop or turn back cruise ship passengers who arrive at the pier.  Pls.' Br. at 31 n.27 (also noting that this point is "not part of this legal challenge").  The idea that the Pier Owners cannot lawfully comply ignores the reality that cruise ship passengers (and crew) arrive at the piers pursuant to a prearranged reservation system and have long done so with the understanding that a free-for-all would result in chaos and passenger dissatisfaction with the shoreside experience.  Besides, compliance should present no difficulty as we are assured by Plaintiff and Plaintiff-Intervenor that oversized cruise ships will no longer call at Bar Harbor.

[18] Plaintiff-Intervenor also cites 33 U.S.C. § 5, which prohibits the levying of tolls "or any other impositions whatever," upon vessels, water craft, or their passengers or crew, by "any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States."  Pl.-Int.'s Reply Br. at 12.  This oyster has spoiled.  The argument is waived for purposes of this litigation since it was first raised in a reply brief.  But in any event, the Ordinance is designed to prevent excessive disembarkations from cruise ships, subject to a fine imposed against the pier owner to ensure compliance. It is not a toll, fee, or other imposition directed toward cruise ships or their passengers and crew associated with their use or enjoyment of navigable waters.

[19] The regulations provide that part 105 has preemptive effect "insofar as a State or local law or regulation applicable to the facilities . . . would conflict with the regulations in part 105, either by actually conflicting or by frustrating an overriding Federal need for uniformity."  33 C.F.R. § 101.112(b).

(1) Seafarers assigned to a vessel at that facility;

(2) Pilots; and

(3) Representatives of seafarers' welfare and labor organizations.

*Id.* § 105.237.  Cruise ship passengers are not seafarers.  Seafarers are persons "assigned to a vessel" (i.e., crew) or "pilots" or "[r]epresentatives of seafarers' welfare and labor organizations."  *Id.* § 105.237(b); *see also id.* § 96.250(f)(4) (providing that safety management systems include personnel procedures ensuring that "[e]ach vessel is properly crewed with qualified, certificated and medically fit seafarers").

Because the Bar Harbor Ordinance is drawn as a restriction on the numbers of "persons" and not just "passengers" who may be disembarked on or over municipal land, Plaintiffs and Plaintiff-Intervenor proclaim a victory.  I agree with Plaintiffs and Plaintiff-Intervenor (and evidently with Defendant and Defendant-Intervenor) that the Ordinance cannot stand as a barrier to seafarers' shore access when a seafarer is assigned to a vessel moored at either pier facility owned by the Plaintiff Pier Owners.  To the extent the Ordinance might be read to require a different conclusion, it cannot be enforced.  However, it does not follow that the entire Ordinance is invalidated or that any meaningful relief is to be awarded in this litigation as a result of the limited (and hypothetical) preemption occasioned by the seafarers' access regulation.

The scope of preemption "is guided by the rule that the purpose of Congress is the ultimate touchstone in every pre-emption case." *Altria Group*, *Inc. v. Good*, 555 U.S. 70, 76 (2008) (cleaned up).  "That approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." *Medtronic*, *Inc. v.*

*Lohr*, 518 U.S. 470, 485 (1996); *see also Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 12 (1st Cir. 2022) (remanding for district court to analyze the scope of a federal law's preemptive impact), *cert. denied*, 143 S. Ct. 777 (2023).  Here, the purpose of the federal regulation is to assure seafarer access to shore when seafarers are aboard and assigned to a vessel moored at the regulated facility.  Consequently, the preemptive reach of the federal seafarers' access regulation extends no farther than to a controversy involving an attempt by Bar Harbor to deny shore access to a seafarer on a vessel moored at either facility.

This case does not present any actual controversy of that (or any other actual) kind. Moreover, even if the conflict preemption associated with the seafarers' access regulation is appropriately resolved in the context of this litigation, it would not achieve the result that Plaintiffs and Plaintiff-Intervenor seek, which is total invalidation of the Ordinance.  A limited invalidation of the Ordinance for purposes of seafarers' access would not render the Ordinance an ineffective instrument to impose a disembarkation cap against cruise ship passengers, since passengers are not seafarers.

Plaintiffs and Plaintiff-Intervenor insist nonetheless that invalidation of the Ordinance based on its use of the word "persons" instead of "passengers" should be total. I digress to address this assertion, though it is unavailing.  The genesis of the digression is the fact that Bar Harbor has indicated that it will author a rule that limits the Ordinance by recognizing an exception for shore access for seafarers.  When a state, municipality or local agency interprets or enforces a law in a manner that avoids a conflict with federal law, ordinarily mere facial constitutional challenges are effectively deflected.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 456 (2008); *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 795–96 (1989); *McGuire v. Reilly*, 386 F.3d 45, 58 (1st Cir. 2004). However, here the Ordinance's use of "persons" unambiguously extends to seafarers, so it is "not readily susceptible to a narrowing construction." *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 35 (1st Cir. 1999).

Plaintiffs also cite Maine Supreme Judicial Court opinions that they say preclude efforts by a municipality to confine the reach of a citizen initiative by means of a rulemaking process.  They contend that the only available fix requires an initiative and election do-over.  The cases Plaintiffs cite do not support the proposition. *See Wawenock, LLC v. Dep't of Transp.*, 187 A.3d 609, 618 (Me. 2018) (discussing methods of interpreting the "will of the people" when construing citizen initiatives); *Davis v. SBA Towers II, LLC*, 979 A.2d 86, 92–93 (Me. 2008) ("Although Gridcom argues that the Planning Board's decision to redefine the term was also procedurally improper, we need not address this claim.").  And while Plaintiffs correctly observe that Maine law requires that an ordinance be revised "only by following the procedure required for its original enactment," 30-A M.R.S. § 3004(4), it does not compel that an ordinance be invalidated *in toto* based on a limited conflict with federal law.  The default rule of constitutional jurisprudence is to the contrary, and here it takes little imagination to appreciate that the voters of Bar Harbor intended and would prefer that the Ordinance remain operative as to passengers rather than be invalidated as to passengers. *See Town of Windham v. LaPointe*, 308 A.2d 286, 292 (Me. 1973); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329–30 (2006).

In summary, yes, the Ordinance has the potential to conflict with the preemptive

seafarers' access regulation and requires that Bar Harbor avoid any application of the Ordinance that would run afoul of 33 C.F.R. § 105.237.  However, the limited conceptual conflict does not achieve the result that Plaintiffs and Plaintiff-Intervenor are after, which is total invalidation of the Ordinance.[20]

### c.  Customs and immigration

Plaintiff-Intervenor also argues that the Ordinance "obstructs customs and immigration screening of entrants to the United States." Pl.-Int.'s Br. at 14.  The idea is that cruise itineraries in the North Atlantic often include calls in Canadian ports before returning to U.S. waters, so if the first port of call in the U.S. chosen by the cruise ship's captain is Bar Harbor, then Bar Harbor must permit unrestricted disembarkation from the cruise ship as a logical consequence of any immigration and customs inspection that transpires aboard the ship while it is anchored in Frenchman Bay.

The conflict is imagined, not real.  The Ordinance does not prohibit or otherwise prevent entry to the United States.  Anyone admitted to the United States by CPB through a process that transpires aboard ship in Frenchman Bay may enter the United States, including in Bar Harbor.  The Ordinance does not impose an additional condition for admission or otherwise purport to supply a basis for exclusion from the United States, it

---

[20] Plaintiffs and Plaintiff-Intervenor fail to articulate a set of circumstances in which an as-applied challenge by a seafarer necessarily would arise and hypothetical notions about what might transpire do not suffice since "litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987), and discussing the exception for overbroad restraints on free speech)).  Assuming reservations are booked and tendering arrangements are made such that a combined total of more than 1,000 passengers and seafarers would be disembarked on a given day, further constitutional litigation based on the preemptive force of 33 C.F.R. § 105.237 is susceptible to avoidance when the Court is assured that the handling of any such scenario will be addressed in advance by the Town's rulemaking process in recognition of the partial preemption of the Ordinance.  The facial challenge presented in this litigation should not prevent that process from unfolding.

imposes only a limitation on local disembarkations and a fine for excessive disembarkations, regardless of the admission status of persons disembarked.[21] Nevertheless, Plaintiff-Intervenor likens this case to *Takashi v. Fish & Game Commission*, 334 U.S. 410 (1948), and *Maine Forest Products Council v. Cormier*, 586 F. Supp. 3d 22 (D. Me. 2022). Pl.-Int.'s Br. at 14–16. This case is unlike either.

In *Takashi*, the Supreme Court invalidated, on a variety of grounds, a discriminatory California law that banned lawful residents ineligible for citizenship from engaging in commercial fishing. 334 U.S. at 413–415, 422. Plaintiff-Intervenor says the Ordinance similarly discriminates. The discrimination argument relies on the fact that the largest cruise ships are all foreign-flagged vessels and the fact that all cruise ships customarily carry passengers who are foreign nationals. However, the Ordinance is not drawn in discriminatory language and nothing that transpired at trial betrayed a discriminatory purpose to exclude foreign-flagged vessels or the citizens of other nations. The Ordinance is drawn with the passenger capacity of ships in mind, not the nationality of the ships' owners or passengers.

In *Cormier*, Judge Woodcock issued a preliminary injunction enjoining enforcement of a protectionist state statute designed to prevent foreign workers from

---

[21] It bears repeating that cruise ships with passenger capacities in excess of 1,000 will likely not have Bar Harbor on their itineraries. Visitation at a port is arranged many months in advance, with local, daily passenger caps in mind. Consequently, the imagined conflict between an admission decision and a refusal to allow disembarkation (or imposition of a fine on the Pier Owners for excessive disembarkations) is entirely at odds with the actual practices long observed in Bar Harbor in relation to pre-scheduled port calls. Plaintiff-Intervenor also neglected to call an expert witness to substantiate its hypothetical customs scenario of a cruise ship returning from foreign waters intent on making an appointment with CPB in Frenchman Bay as a means of forcing an unreserved port call in Bar Harbor (assuming CBP would even condone such a maneuver).

engaging in the intrastate transportation of forest products.  There, the federal regulatory regime for alien work visas resulted in the issuance of work visas for the performance of specific jobs identified as part of a certification process and based on the Department of Labor's specific findings that domestic workers were not available in sufficient numbers and employment of the aliens would not negatively impact local wages and work conditions.  *Id.* at 39–41 & n.12.  In that context, the federal government's occupation of the field of foreign worker authorization was manifest, as was the conflict between the Maine act and federal law.  *Id.* at 46.  That is not the situation in this case.  There is no evidence in this case or cited law demonstrating that cruise lines obtain advance federal authorization to disembark their entire complement of passengers specifically in Bar Harbor.  Cruise lines present their passengers for inspection when they arrive at the Class A port designated on their own itineraries.  Cruise lines are not required by federal law to apply for preauthorization to call at a particular port, let alone to disembark every passenger upon arrival.  Nor does CPB make specific findings based on any federal law or regulation that cruise line passengers may disembark in any particular location in any particular numbers based on the cruise ship's passenger capacity and local conditions.

Plaintiff-Intervenor's customs- and immigration-based arguments for preemption fail to make way.

### d.  Anchorages

Finally, Plaintiff-Intervenor argues that because the Secretary of Homeland Security has established federal anchorages in Frenchman Bay for purposes of safe navigation, *see* 46 U.S.C. § 70006; 33 C.F.R. § 110.130, the Ordinance's regulation of onshore

disembarkation is preempted since large cruise ships with North Atlantic itineraries will otherwise have rare occasion to use the anchorages.  Pl.-Int.'s Br. at 17–18.  This final Supremacy Clause challenge is like the others.  It fails to support an inference of federal field preemption expansive enough to blockade local regulation in matters of cruise line passenger shore access.  It also fails to expose any actual conflict between federal and state law as the Ordinance imposes no restriction whatsoever on Frenchman Bay anchorage access.  Cruise ships of whatever size are free to anchor in Frenchman Bay.  If cruise lines chose not to anchor in Frenchman Bay because of the Ordinance, that is a function of the cruise lines' own cost and benefit calculations.  By the mere act of establishing anchorages the Secretary of Homeland Security has not conferred a charter of privileges on cruise lines to disembark their entire complement of passengers in any municipality in which there are pier operators who would welcome them.   Like the other shots fired in Plaintiff-Intervenor's Supremacy Clause fusillade, the final shot fails to sink the Ordinance.

### 2.   *The Due Process Clause*

Plaintiffs, but not Plaintiff-Intervenor, claim that the Ordinance offends the Due Process Clause.  The Fourteenth Amendment prohibits the States from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  Around the dawn of the Twentieth Century—an era sometimes described as the "*Lochner* era" by Supreme Court historians—the Supreme Court instilled in the Due Process Clause substantive overtones based on a natural-law preoccupation with the freedom to contract.  Essentially, if two parties were willing to engage in a commercial relationship, an expression of their individual liberty, what should stand in their way or interfere with their

decisions about how to structure the relationship?  According to the Court, not the majority of their peers acting through their elected representatives.  *See*, *e.g.*, *Allgeyer v. Louisiana*, 165 U.S. 578 (1897) (invalidating a law regulating marine insurance); *Lochner v. New York*, 198 U.S. 45 (1905) (invalidating a labor law designed to limit the hours worked by bakers); *Adkins v. Children's Hosp. of the D.C.*, 261 U.S. 525 (1923) (invalidating a law establishing a board and an investigative and consultative process to establish minimum wages for women).

When we speak of the *Lochner* Era's substantive due process jurisprudence today, it is mostly to express bewilderment that the Court engaged in such a freehanded practice of judicial policymaking in favor of those having commercial advantage in the marketplace, or else to extol the noteworthy dissents of the era, such as the work of Justice Oliver Wendel Holmes in *Lochner* and the work of Justice Holmes and Chief Justice William Howard Taft in *Adkins*.  It reminds us, and is worthy of perennial reminding, that judicial policymaking is an insidious, antidemocratic, and narcissistic instinct still very much alive that must be resisted.  Lessons from the *Lochner*-era season of judicial mischief making that are worthy of mention include the observance that "[t]he 14th Amendment does not enact Mr. Herbert Spencer's Social Statics," *Lochner*, 198 U.S. at 75; that a court should avoid "pricking out a line in successive cases" when the process is akin to legislative policymaking, *Adkins*, 261 U.S. at 562 (Taft, C.J., dissenting); that the substantive "contours" of the Due Process Clause are decidedly "vague" in relation to the freedom to contract, *id.* at 568 (Holmes, J., dissenting); that when it comes to liberty "pretty much all law consists in forbidding men to do some things that they want to do," *id.*; and that

deciding whether a law's benefits are worth its costs is a matter assigned to the legislative rather than the judicial branch of government, *id.* at 571.

When the Supreme Court finally abandoned using the freedom to contract as an antidemocratic talisman, it reaffirmed what a great many of its other decisions had long established, summing up the concern over individual liberty as follows:

> [F]reedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one will or to contract as one chooses. The guarantee of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to the government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulation and prohibitions imposed in the interest of the community.

*W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 392 (1937).

And so it comes as something of a surprise that I now consider a due process challenge to the Bar Harbor Ordinance that pits the Plaintiffs' freedom to contract[22] against restrictions imposed in the interest of the community. But to their credit, Plaintiffs do not come right out and say it. Instead, they adopt the language of modern due process standards, contending that there is no "rational nexus" between the Ordinance's "purpose and standards and the processes . . . employe[ed] to achieve [them]." Pls.' Br. at 52 (ECF No. 191) (citing *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988) (upholding municipal rent control ordinance over a due process challenge)).

When it comes to the evaluation of the existence of a rational nexus, "courts should

---

[22] Plaintiffs have also asserted that the Ordinance unlawfully restrains the non-party cruise lines' and their passengers' right to travel. Presumably the freedom to travel is no more sacrosanct than the freedom to contract. I can see no reasons why natural law would elevate one over the other. Plaintiffs did not assert that the Ordinance violates individuals' right to travel in their complaint; instead, they raised this issue for the first time in their post-trial brief in a perfunctory fashion. Consequently, I do not consider the freedom to travel in this Decision and Order.

refrain from substituting their regulatory wisdom for that of the legislature. *Vaqueria Tres Monjitas*, *Inc. v. Irizarry*, 587 F.3d 464, 483 (1st Cir. 2009). "[A] court's Due Process inquiry should be satisfied '[i]f the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory.'" *Id.* (quoting *Nebbia v. New York*, 291 U.S. 502, 537 (1934)). "This inquiry should focus on whether a program's procedures are inadequate or whether, overall, a program is arbitrary, discriminatory or irrelevant to a legitimate legislative goal." *Id.* (internal quotation marks omitted).

Plaintiffs argue that the Ordinance defies the rational nexus requirement because it imposes a strict limit of 1,000 persons per day "for every single day of the year," without accounting for seasonal variation in the congestion experienced in Bar Harbor as the result of tourism. Pls.' Br. at 53. In support of their position, Plaintiffs emphasize that Mr. Sidman testified that the fixed restriction to 1,000 persons daily was not the product of "a rigorously defensible finding or study or calculation," July 13 Tr. at 312:20–21, and that his group "just didn't want to get into various limits at different times of the year." *Id.* at 313:24–25.

Plaintiffs' argument is that because Bar Harbor long employed different summer-season and shoulder-season caps it is now irrational for Bar Harbor to do otherwise. I am not convinced that adopting this rationale would be any different than imposing by judicial fiat the rule that a fixed cap is unwise policy and therefore unconstitutional because it fails to maximize tourism—because, in effect, it is my opinion or another judge's opinion that the Ordinance's local benefits are not worth their costs. That might as well be said about

fixing a minimum wage or imposing rent control.  It is of course rational to propose that passenger caps rise and fall inversely to land-based tourism, but it does not follow that a fixed cap is therefore irrational.[23]  The Constitution "is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, and even shocking, ought not to conclude our judgment upon the question." *Lochner*, 198 U.S. at 75–76 (1905) (Holmes, J., dissenting).  The Due Process Clause does not compel Bar Harbor to eliminate visitation lulls during the shoulder season by means of increased cruise ship visitation.  Nor, to my knowledge, does the Due Process Clause forbid municipalities from enacting ordinances that have the effect of preserving seasonal fluctuations in the blessings and burdens of tourism.  Though Plaintiffs evidently see it as their constitutional right to maximize the burden that their commercial activity imposes on the commons, at least up to a level that approaches their capacity to serve, they have not cited any authority for that proposition.

The Ordinance's 1,000-person daily cap reduces the profit that can be achieved from commercial engagement with cruise lines and cruise ship passengers, but it also preserves that engagement to a degree.  Is it irrational for the citizens of Bar Harbor to desire a passenger cap that enhances their own relative enjoyment of their community during the summer and shoulder seasons while maintaining a measure of cruise tourism commerce?  I cannot say that it is.  If I were to conclude otherwise, I would simply be ratifying the

---

[23] I am not concerned here with the alleged irrationality of a "year-round" cap because this case does not involve year-round cruise ship traffic.  When the Ordinance came into being, the MOAs between the Town and the cruise lines involved a season beginning in May and ending in October.  The cruise lines have voluntarily passed on visitation between November 1 and April 30.

Plaintiffs' policy preference as being in league with my own, not because the Ordinance is discordant with the Due Process Clause. I adhere to an antiquated notion that judges should not allow robes to suffocate a sense of judicial humility by steering wildly outside their lane into the role delegated to elected representatives. Whether the Ordinance is the wisest expression of democratic will is a question for which the Constitution does not hold the answer. What may seem like a sensible policy today may strike voters as needing some renovation down the road. This is merely a *Schoolhouse Rock*-level civics lesson that nevertheless bears repeating in constitutional challenges that more appear to challenge the marginal wisdom of the law than satisfy the more capacious test of whether it offends the Constitution. Even if I were equipped to play the role of the Oracle of Delphi to answer the question of whether the Ordinance is sensible, which I am not, that is not the role assigned to me by the Constitution, contemporary trends notwithstanding.

Plaintiffs argue that it is discriminatory that the amelioration of congestion falls exclusively on them, without imposing restrictions on other accommodations or tourists who contribute to the problem. Based on my review of the record, I am not persuaded that the Ordinance discriminates in an irrational manner. Congestion in Bar Harbor is real and is experienced throughout the summer and fall months. When the Pier Owners and Tender LLCs disembark several thousand persons on a daily basis, they substantially burden Bar Harbor's waterfront and intensify the experience of congestion more widely.

Cruise line passenger traffic stands out as worthy of special consideration for a variety of reasons. For purposes of this context, among these reasons are the industry's own longstanding selective and voluntary approach to municipal engagement and its

acknowledged need for management by means of a reservation system that employs caps. Land-based tourism is not equally amenable to management and Plaintiffs have not suggested any ready means of stemming that particular stream of visitation. Cruise-based tourism is also unlike land-based tourism in that cruise ships carry passengers in numbers quite unlike any land-based conveyance. While cruise lines evidently consider local conditions in terms of the capacity of the area to provide their passengers with goods and services, they are not deterred by local "no vacancy" conditions that would deter land-based visitors. Upon arrival, cruise line passengers congregate in volume, in relatively intense morning and afternoon waves, though they also enhance congestion throughout the day. When they arrive, they are joined by a caravan of the vehicles that cater to them, congesting the waterfront area with buses, minibuses, vans, motor coaches, and taxis. Their arrival demands significant attention by municipal authorities, mostly law enforcement personnel hired to manage the press of people and conveyances. Cruise lines also have the relatively unique ability to transform the shoulder season, calling in Bar Harbor on a near daily basis in especially large cruise ships. These are distinct features of cruise tourism in Bar Harbor that make differential treatment rational.

Ultimately, the costs and benefits of the various features of cruise tourism and the 1000-person daily passenger cap do not boil down to a neat finding of arbitrariness, irrationality, irrelevance, or discrimination. A rational voter could take these features into consideration and conclude that a 1,000-passenger cap is an appropriate means of recalibrating the Town's approach to this very local concern.

### 3.      *The Commerce Clause*

Among the powers the Constitution vests in Congress is the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art I, § 8.  The conferral upon Congress of the power to regulate commerce clearly authorizes Congress to override competing regulations adopted by the states, but it also acts as a bulwark against state and local regulations that would, if permitted to stand, either discriminate against foreign and interstate commerce for local protectionist purposes or produce a Balkanized system in which commerce among the states and with other nations is overburdened by a need to satisfy multifarious regulations imposed by different states on the very same commercial activity.  *Camps Newfound/Owatonna*, *Inc. v. Town of Harrison*, *Me.*, 520 U.S. 564, 571, 576–77 (1997) (concerning discriminatory regulation); *Bibb v. Navajo Freight Lines*, *Inc.*, 359 U.S. 520, 523–530 (1959) (concerning regulation inimical to the orderly movement of good across state lines).  The bulwark against pernicious regulation is varyingly described as the "dormant" Commerce Clause or the "negative command" of the Commerce Clause.  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023).  Judicial decisions discussing the dormant Commerce Clause are legion and not all of the precedent fits neatly into the categories outlined above.

Plaintiff-Intervenor breaks its argument into three overarching assertions with subparts.  Pl.-Int.'s Br. at 18–44.  The first contention is that the Bar Harbor Ordinance is protectionist and discriminatory.  *Id.* at 22–38.  The second contention is that the burdens of the Ordinance far exceed the local benefits.  *Id.* at 38–43.  The third is that the Ordinance violates the Foreign Commerce Clause.  *Id.* at 43–44.  Plaintiffs, on the other hand, advance

their position under twelve headings, three of which are prefatory.  Pls.' Br. at 22–52.  The resulting nine arguments cover a similar range of subjects and bounce back and forth thematically.  I address Plaintiff-Intervenor's and Plaintiffs' arguments together but impose my own outline.

### a.   Discrimination against foreign commerce

"'[T]he' Commerce Clause is really three distinct Clauses rolled into one: a Foreign Commerce Clause, an Interstate Commerce Clause, and an Indian Commerce Clause." *Haaland v. Brackeen*, 599 U.S. 255, 320 (2023) (Gorsuch, J., concurring).  Each clause is construed to effectuate its purposes, resulting in differing applications.  *Id.*  Here, the contention is that the Ordinance discriminates against foreign commerce because cruise lines conduct an international operation, some utilizing exclusively foreign-flagged vessels, and their vessels frequently call in the ports of two or more nations during a solitary tour.  Plaintiffs assert that cruise lines have the right to call on any Class A port that is convenient, such as the Port of Bar Harbor, and, consequently, the Ordinance disrupts the flow of foreign commerce.  Pls.' Br. at 51.  Plaintiff-Intervenor agrees, arguing that the Ordinance overwhelmingly burdens foreign commerce because the largest ships are foreign-flagged, and it is essential that there be uniformity in regulation.  Pl.-Int.'s Br. at 43.

These assertions lack persuasive force.  The Ordinance does not discriminate on the basis of a "foreign" attribute.  The Ordinance is indifferent to whether passengers arrive on foreign-flagged vessels or are themselves citizens of foreign states.  The Ordinance also is silent on the subject of foreign navigation.  The Ordinance imposes a capacity limitation

on the disembarkation of passengers regardless of the origin of the vessel carrying them or the itinerary that informs the vessel's movements.  The imposition of a restriction on local daily disembarkations into a small town does not meddle in an area of commerce that must of necessity be ironed out between nations.[24]

There is no cause to think that the ability of municipalities to govern the extent of their participation in cruise tourism for local welfare reasons will undermine the cruise tourism industry or result in cruise lines having to modify their vessels, crews, passenger capacities or anything else in order to continue plying the seas to visit whatever nations, states, and municipalities remain on their itineraries, of which there are, evidently, a great many.  If anything, permitting municipalities to establish terms and conditions on local participation in cruise tourism may encourage more municipalities to consider participation, knowing that they will not thereby be compelled to accommodate whatever level of traffic the cruise lines and their local partners wish to impose.  That more ports may be open to smaller vessels is to be expected rather than condemned on "constitutional" grounds.

The record fails to justify the notion that there is a need for uniformity[25] in the terms and conditions of municipal partnering with the cruise tourism industry, let alone that

---

[24] This case is unlike *Henderson v. Mayor of the City of New York*, in which the Supreme Court struck down a state statute that imposed certain financial obligations on ship owners whose ships carried foreign subjects migrating to the United States, explaining that the terms of our Nation's immigration policy, 92 U.S. 259, 270 (1875), "require exclusive legislation by Congress," as the subject "in an eminent degree . . . concerns our international relations."  *Id.* at 273.

[25] Plaintiffs assert: "No other significant port physically capable of disembarking passengers from similar-sized vessels restricts disembarkation in the same manner as the Ordinance."  Pls.' Br. at 30.  The statement not only admits that other ports impose restrictions, but also is so laden with qualifiers that its meaning is uncertain.  No party introduced the kind of evidence that would enable me to unpack this assertion, let alone give it any weight in my analysis.

uniformity is necessary to foreign (or interstate) commerce.  Congress has not seen fit to
regulate the terms and conditions of municipality and cruise line engagement and it is not
at all apparent or even probable that allowing municipalities the ability to regulate their
level of engagement will undermine the ability of any of the several coastal states to
participate fully in cruise tourism involving every size cruise ship imaginable and bearing
whatever flag.  What this case really involves is the contention that cruise lines are able to
compel local accommodation of their private assessment of the ideal economies of scale
for cruise tourism.  *See* Pl.-Int.'s Br. at 30–31; Pls.' Br. at 26.  The Foreign Commerce
Clause does not demand such a result.[26]

### b.   Discrimination-qua-protectionism

At the "very core" of the Supreme Court's Commerce Clause jurisprudence lies an
"anti-discrimination principle."  *Nat'l Pork Producers Council*, 598 U.S. at 369.  The anti-
discrimination principle "prohibits the enforcement of state laws driven by economic
protectionism."  *Id.* (cleaned up).  Protectionist state and local laws are those that impose
restrictions or grant benefits that favor in-state or local economic interests and disadvantage
their out-of-state competitors.  *Id.*  Such measures are barred by the negative command of
the dormant Commerce Clause because the alternative would result in the existence of
state-by-state protectionist initiatives and reprisals that would prevent the operation of a

---

[26] Cases cited in support of the "foreign commerce" argument are distinguishable.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) (holding that state law boycotting companies that do business with Burma violated Supremacy Clause); *United States v. Locke*, 529 U.S. 89 (2000) (holding Washington law regulating oil tankers was preempted in part by comprehensive federal regulatory regime and remanding for further consideration of certain state regulations); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue and Fin.*, 505 U.S. 71 (1992) (invalidating state corporate tax law that gave preferential tax treatment to dividend-income received from domestic subsidiaries versus dividends from foreign subsidiaries).

national, cohesive and competitive marketplace.    *Id.* at 371–73 (discussing cases illustrating this core concern).  Thus:

> We have understood this construction to serve the Commerce Clause's purpose of preventing a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.  The provision thus "'reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'"

*Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179–80 (1995); *see also H.P. Hood & Sons*, *Inc. v. Du Mond*, 336 U.S. 525, 539 (1949); *Baldwin v. G.A.F. Seelig*, *Inc*., 294 U.S. 511, 522 (1935).  The Framers feared interstate commercial strife, not impartial regulations enacted for local welfare ends, with which they were no doubt familiar.

State and local regulations that are not protectionist in purpose or effect are not prohibited by the negative command of the Commerce Clause simply because they impact an out-of-state economic interest associated with commerce.    *Nat'l Pork Producers Council*, 598 U.S. at 374.  After all, "[i]n our interconnected national marketplace, many (maybe most) state laws have the practical effect of controlling extraterritorial behavior," *id.* (internal quotation marks omitted), including "an immense mass of inspection laws, quarantine laws, and health laws of every description that have a considerable influence of commerce outside their borders."  *Id.* at 375 (cleaned up, quotation marks omitted);[27] *see*

---

[27] In *National Pork Producers Council v. Ross*, the Supreme Court rejected a challenge to a California law requiring that all pork sold in California derived from breeding pigs or their offspring be raised according

*also Camps Newfound/Owatonna*, 520 U.S. at 596 ("In our zeal to advance [open markets] we must take care not to overstep our mandate, for the Commerce Clause was not intended 'to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.'" (Scalia, J., dissenting) (quoting *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443–444 (1960)).

Plaintiffs argue that Bar Harbor's Ordinance is facially and per se discriminatory and protectionist because it impacts only travelers arriving by sea, without attempting to regulate the congestive impact of land-based travelers. Pls.' Br. at 28 (citing *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 344 n.6 (1992) (explaining that a per se rule of invalidity applies "not only to laws motivated solely by a desire to protect local industries from out-of-state competition, but also to laws that respond to legitimate local concerns by discriminating arbitrarily against interstate trade"). In *Hunt*, the Supreme Court struck down an Alabama law that imposed fees on the deposit of out-of-state hazardous waste (but not in-state hazardous waste) in an in-state commercial landfill, classifying the law as a facial violation of the Commerce Clause. 504 U.S. at 336–37. *See Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98–99 (1994) (invalidating protectionist surcharge imposed on solid waste trucked from out of state destined for in-state landfill). However, unlike these protectionist circumstances, the circumstances here

---

to certain standards. 598 U.S. at 365. The law did not discriminate based on the state or country of origin of the pork, but the impact of the law was felt predominantly by producers operating outside of California, most if not all of whom want to access California's enormous marketplace. *Id.* at 367. The Supreme Court affirmed the dismissal of the case at the pleading stage for lack of any plausible inference of a discriminatory/protectionist purpose or effect. *Id.* at 368, 391.

involve a neutral regulation that applies regardless of the state of origin of those passengers arriving after exhaustion of the 1,000-person limitation. Additionally, the supposed preference afforded to land-based travelers is not one that is conditioned on the state or national citizenship of land-based travelers.[28]

The burdens and benefits of Bar Harbor's Ordinance do not discriminate based on the interstate or international character of those persons seeking to participate in the local economy. The burden is not imposed because of the interstate nature of the traffic but rather because of various features of that traffic, already discussed, that hamper the experience of local welfare. Like Californians' decision to prohibit traffic in certain food products produced under locally disfavored conditions, *Nat'l Pork Producers Council*, 598 U.S. at 363, Bar Harbor's voters have decided to regulate traffic in persons based on that traffic's distinctive contribution to locally disfavored conditions. Doing so, they have not advanced any discernable local commercial interest. In fact, a primary consequence of the Ordinance is to frustrate local commercial interests.

Nor have the voters of Bar Harbor engaged in a parochial or isolationist exercise. They have, instead, engaged in the exercise of imposing a restriction based on their first-hand experience of the relative deleterious impact of high-volume disembarkations at the waterfront while remaining open to the entire world's visitation. In both purpose and effect, they have acted only to limit the extent to which Bar Harbor must be victim to its

---

[28] Another oft-cited precedent under the discrimination heading is *Hughes v. Oklahoma*, 441 U.S. 322 (1979), in which the Supreme Court invalidated a state law that prohibited the out-of-state sale of locally grown minnows, effectively hoarding them for local purchase. *Id.* at 336–37. This case is unlike *Hughes*. Bar Harbor is not hoarding local resources for local consumption. Bar Harbor is open to global traffic.

own success, while continuing to welcome travelers from every corner of the world.  These on-the-ground realities are quite unlike the isolationist and protectionist circumstances discussed in the expansive corpus of dormant Commerce Clause jurisprudence.

Plaintiffs and Plaintiff-Intervenor persist by arguing that the Ordinance is discriminatory and protectionist because it has the effect of favoring hotels and other land-based overnight accommodations.  They explain that cruise lines are in competition with land-based accommodations because they are competing for the patronage of travelers seeking to visit a particular destination.  Pl.-Int.'s Br. at 35–36; Pls.' Br. at 28, Pl.-Int.'s Reply Br. at 27–28 (ECF No. 199).  However, the Ordinance is not drawn to effectuate an advantage for local hoteliers, and I do not find that the Ordinance in fact produces such a result.[29]  I have no evidence from which to draw the conclusion other than the testimony of former or current cruise line executives who stated that cruise lines compete in the hospitality sector against land-based accommodations for the consumer's discretionary travel dollar.  As interesting as the testimony was, it was reductionist in the extreme.  The same comparison might be drawn between two non-Californian producers of pork products seeking to place their products in California stores, where one complies with California law and the other does not.  Or we might compare a non-Californian producer of pork products with a Californian producer of beef products.  In either example, the producers compete for dollars directed toward meat consumption, yet that obvious point did not

---

[29] Plaintiff-Intervenor also argues that the Ordinance is protectionist because reduced waterfront traffic will enable the Town to collect more paid parking revenue and because Mr. Sidman stated that he preferred smaller ships with their more well-to-do passengers.  Pl.-Int.'s Br. at 26.  The paid parking contention is a straw grasp and as such does not warrant serious consideration.  As for Mr. Sidman's personal opinion about passengers arriving on smaller ships, there is no evidence to support a finding that his opinion informed the public's assessment of the Ordinance's merits or that his opinion is "protectionist" in nature.

inform the Supreme Court's evaluation of the merits in *National Pork Producers Council*.

I can see no reason why it should control here.  Reducing the constitutional inquiry so that

discrimination is found and heightened standards are imposed whenever one product or

service is impacted by a regulation but a competing product or service is not is a recipe for

widescale elimination of state and local regulations impacting the provision of goods and

services.[30]

### c.  Arteries of Commerce

Finally, the negative command of the Commerce Clause means that state and local

governments have restricted power to issue legislation or regulations that serve to slow or

obstruct the flow of commerce.  *South Dakota v. Wayfair*, *Inc*., 138 S. Ct. 2080, 2089–90

(2018).  Obstructions that are protectionist in nature are routinely struck down, as discussed

in the preceding section.  Like the concern over protectionist measures that stack the deck

in favor of in-state economic interests, the concern for the health of the Nation's arteries

ensures that the Nation avoids economic Balkanization, meaning the isolation of

neighboring states into separate economic units.  *Id.* at 2089.  Unlike discriminatory

scenarios, classic "free-flow" commerce cases are cases in which a state enacts a law

evenhandedly to regulate in-state economic activity (*e.g.*, trucking), but does so in a manner

that prevents operation of the enterprise within the enacting state according to a standard

observed in neighboring or surrounding states, effectively halting interstate transportation

---

[30] The argument also disregards the fact that travelers staying in hotels are dispersed throughout the Town and Mount Desert Island.  They do not impact the waterfront the same way that cruise lines and their passengers do.  Many land-based tourists intent upon visiting Acadia National Park may well avoid Bar Harbor's waterfront (and its downtown) for the same reason that local citizens do.

through that state.  *See Kassel v. Consolidated Freightways Corporation of Delaware*, 450 U.S. 662, 671 (1981) (invalidating Iowa law barring trucks longer than 60 feet); *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761 (1945) (invalidating state law that prohibited the operation of interstate trains having more than a certain number of railroad cars).  Less common, but similarly concerning cases arise out of a state's creation of a monopolistic enterprise that prohibits competition.  *See*, *e.g.*, *Buck v. Kuykendall*, 267 U.S. 307, 315–16 (1925) (invalidating state law prohibiting common carriers from using highways to carry persons between Seattle, Washington and Portland, Oregon without first obtaining a certificate of public convenience and necessity from the State of Washington, where issuance of a certificate to one carrier for purposes of a given route precluded issuance of a certificate to another carrier for the same route).  The Ordinance does not fit into either category.

Plaintiffs argue that the Ordinance clogs "the arteries of commerce" by impeding "the ability of large cruise ships to move persons from port to port according to itineraries that are interstate and frequently international."  Pls.' Br. at 26.  They emphasize that cruise lines are engaged in the transportation of persons free to travel as they see fit.  *Id.* at 26–27.  Plaintiff-Intervenors observe that the Commerce Clause exists in part to ensure open access to the facilities of interstate traffic and the free flow of persons and property without undue restraint.  Pl.-Int.'s Br. at 19–23.

The record in this case demonstrates that the Ordinance does indeed stem the flow of interstate commercial activity by reducing the daily volume of persons disembarked into Bar Harbor from cruise ships.  However, the mere fact that a state or local law impedes the

free flow of commerce does not result in an automatic finding of invalidity. "State laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Wayfair*, 138 S. Ct. at 2091 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). The burden-benefit calculus recognizes that, "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *S. Pac. Co.*, 325 U.S. at 767.[31] When considering whether local regulation comes within the residuum of state power, courts may consider factors such as whether the matter regulated is a localized concern, the extent to which the regulation interferes with national commerce, and the incentive at the national level to attempt to regulate what would amount to multifarious and diverse local concerns. *Id.*; *Duckworth v. Arkansas*, 314 U.S. 390, 394 (1941); *see also Sproles v. Binford*, 286 U.S. 374, 390 (1932) (recognizing "the established principle that in matters admitting of diversity of treatment, according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act."). "But ever since *Gibbons v. Ogden*, [22 U.S. (9 Wheat.) 1 (1824)], the states have

---

[31] *See National Pork Producers Council*, 598 U.S. at 375 (recognizing "the usual legislative power of a State to act upon persons and property within the limits of its own territory, a feature of our constitutional order that allows different communities to live with different local standards" (internal quotation marks and citation omitted)); *Maine v. Taylor*, 477 U.S. 131, 151 (1986) ("The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values. As long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources." (internal quotation marks omitted)).

not been deemed to have authority to impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." *S. Pac. Co.*, 325 U.S. at 767.[32]

I reject the contention that the question of a local municipality's relative tolerance of cruise tourism based on local conditions is an aspect of the national commerce that requires the national uniformity that only Congress can provide. There are a great many varieties of port facilities and communities that house them. Cruise tourism, based on the record before me, is a function of cruise line and local community collaboration.[33] *See*, *e.g.*, Exs. 32 & 161. It has always proceeded on that basis in Bar Harbor. *See*, *e.g.*, Ex. 260 at 1 (Bar Harbor Cruise Tourism Destination Management Plan, "prepared for the use of the Town of Bar Harbor residents, stakeholders, municipal agencies and cruise industry partners"). I have no reason to conclude that it does not proceed on a similar basis elsewhere. The parties are agreed that different municipalities impose a variety of constraints, such as caps and limited cruise ship days, though no party has attempted to canvas the variety of measures employed by domestic municipalities for purposes of this litigation.[34] In any event, this case illustrates that the impact of cruise tourism on local

---

[32] *Gibbons v. Ogden* is a formative Commerce Clause decision that struck down a New York enactment that granted one company the exclusive right to navigate coastal waters in vessels powered by steam, which enactment was in direct conflict with the federal government's grant of coasting licenses to other steamboat owners. 22 U.S. at 221.

[33] For example, Rockland has "a very limited number of slots that it allows for ships over a lower berth capacity of 500." Ex. 195 at 56. Rockland permits only "six bookings per year per season unless" it "authorize[s] a waiver to add any ships beyond that." *Id.*

[34] This phenomenon may well suggest a nationwide interest among cruise tourism communities to impose restrictions. *Cf. Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128 (1978) ("The evil that appellants

living conditions is a hyperlocal concern that is not well suited to a one-size-fits-all regulatory approach at the federal level.

Furthermore, Bar Harbor is regulating a "matter[ ] of local concern" in both "character and effect." *S. Pac. Co.*, 325 U.S. at 767. The history of cruise tourism at Bar Harbor demonstrates the unique challenges that cruise tourism imposes on Bar Harbor. These challenges gave rise to a democratic effort, where the voters weighed the relevant local commercial and noncommercial interests and ultimately adopted the Ordinance. Modern-day, board-directed cruise practices (particularly those of foreign-flagged cruise lines[35]) do not allow much room for smaller municipalities to manage their local experiences based on daily limits on the number of passengers coming ashore. Cruise lines are utilizing ever larger vessels to achieve unprecedented economies of scale, principally for shareholder profit. At the same time, cruise lines will not call at a port unless the entire complement of passengers is permitted to come ashore.[36] These characteristics of cruise tourism make it unworthy of overly solicitous judicial action that would negate an exercise in democratic self-determination that is better informed of existing, localized conditions. Nothing in the Constitution dictates municipal obeisance to the economies of scale of cruise tourism. Nor, as far as I can tell, does the dormant Commerce Clause legislate adherence

---

perceive in this litigation is not that the several States will enact differing regulations, but rather that they will all conclude that divestiture provisions are warranted.").

[35] The representative voices of cruise tourism offered at trial, like Plaintiffs' and Plaintiff-Intervenor's briefing, did not speak to a need for moderation but rather have thematically favored catering to the interests of the cruise lines with the very largest capacity vessels. Those cruise lines happen to conduct their trade with foreign-flagged vessels.

[36] *But see* Ex. 193 at 8–9. Chris Martin, Director of Port Operations for Holland America, testified at his deposition that Holland America stops at ports that limit the number of passenger disembarkations, such as in Bergen, Norway. *Id.*

to neoclassical liberalism any more than the Due Process Clause compels observation of Mr. Herbert Spencer's Social Statics.

In the absence of federal or state law dictating the outcome, reasonable citizens at the municipal level will come to different conclusions about the proper balance between unabated cruise tourism and relative calm, and the outcome of their democratic process is the best measure of the polity's tolerance in light of local conditions. For this reason, I conclude that non-discriminatory and non-monopolistic state laws and local regulations that have the impact of restraining outsize cruise tourism do not deserve per se invalidation or a heightened standard of review through which judges rather than citizens become the final arbiters of the terms by which cruise tourism will be conducted in every port in the Nation. In other words, "[c]ompelling reasons justify treating these laws differently from laws favoring particular private businesses over their competitors." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007) (relying, in part, on *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" (internal quotation marks omitted))).

### d.  Burdens versus benefits

Although the Bar Harbor Ordinance "regulates even-handedly to effectuate a legitimate local public interest" while imposing "incidental" effects on commerce, it remains necessary to determine whether "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. Under this

standard, "the extent of the burden that will be tolerated will . . . depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.* But even so, "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Nat'l Pork Producers Council*, 598 U.S. at 390 (quoting *Conway v. Taylor's Executor*, 66 U.S. (1 Black) 603 (1862)).

The parties disagree as to whether the Ordinance's burdens on commerce are clearly excessive in comparison to the local benefits. Plaintiffs and Plaintiff-Intervenor view the Ordinance's benefits as purely speculative and Bar Harbor's interest in reducing cruise tourism as illegitimate. On the other hand, Bar Harbor and Mr. Sidman characterize the Ordinance as imposing a burden on the cruise industry's business model rather than on interstate commerce. To the extent that the Ordinance does affect commerce, they argue that its burdens are not clearly excessive in relation to the local benefits.

I first consider the Ordinance's burdens on commerce. There is no doubt that the Ordinance will have some effect on commerce since almost 80% of the cruise ships that presently visit Bar Harbor have a lower berth capacity in excess of 1,000 and are thus unlikely to call at Bar Harbor.[37] But it is impossible to predict the Ordinance's precise consequences. The Ordinance continues to permit the daily disembarkation of persons traveling by cruise ship in large numbers, even if those numbers are inadequate to

_____

[37] As of December 2022, 107 of the 134 cruise vessel calls for the 2023 cruise season were scheduled for vessels that have a lower birth capacity in excess of 1,000. Ex. 8.

accommodate most of the cruise ships plying the Atlantic seaboard these days.  Milton Friedman and the Chicago school would recoil at the claim made by business interests that the free market economy of private actors cannot adapt to the limitation at the Bar Harbor waterfront, and who instead seek snug harbor behind a constitutional challenge that strikes me as not well fitted to the facts on the ground.  Given the attractiveness of the port of Bar Harbor, it is to be expected that cruise enthusiasts intent of reaching Bar Harbor will find a cruise line to carry them there.  Some cruise lines already offer suitable vessels with Bar Harbor itineraries.  Other cruise lines no doubt will adjust to serve the emerging market charted by municipalities interested in following Bar Harbor's example by accommodating cruise tourism subject to more constituency-pleasing passenger caps (something that is unlikely to develop so long as cruise lines and their proxies threaten constitutional litigation over limited access).  *See id.* at 385 (plurality opinion) ("But from all anyone can tell, *other* out-of-state competitors seeking to enhance their own profits may choose to modify their existing operations or create new ones to fill the void.").

Insofar as the Ordinance causes visitors to travel to Bar Harbor through other means, like smaller cruise ships, the Ordinance is best described as burdening the cruise line industry's business model, rather than interstate commerce.  *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978) (reasoning that Maryland's law prohibiting petroleum producers from operating retail gas stations in-state did not unduly burden commerce because "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another" when "there [was] no reason to assume that their share of

the entire supply [would] not be promptly replaced" by other companies).  Unfortunately for Plaintiffs and Plaintiff-Intervenor, the Commerce Clause does not protect the cruise line industry's "particular structure [and] methods of operation."  *Id.*  While the Ordinance will likely cause visitation to Bar Harbor to decrease, thereby affecting interstate commerce, it is impossible to know exactly how many fewer visitors will travel to Bar Harbor.  Thus, I conclude that the Ordinance will impose an uncertain burden on interstate commerce.

I next consider the Ordinance's local benefits.  I reject Plaintiffs and Plaintiff-Intervenor's arguments that Bar Harbor's proffered interests in lessening congestion and conserving municipal resources are illegitimate.[38]  Courts have held that similar local interests are legitimate in a variety of contexts.  *See*, *e.g.*, *Maine v. Taylor*, 477 U.S. 131, 151 (1986) ("The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values" [because] States "retain[ ] broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources."); *Memphis v. Greene*, 451 U.S. 100, 126–27 (1981) (describing a city's "decision to reduce the flow of traffic" as "legitimate" and the "residential interest in comparative tranquility" as "unquestionably legitimate" in analyzing a claim under the Thirteenth Amendment);[39]

---

[38] On this point, they rely on *Young v. Coloma-Agaran*, No. 1:00-CV-00774-HG-BMK, 2001 WL 1677259, at *11 (D. Haw. Dec. 27, 2001) (stating that "[e]liminating the presence of tourists from the Bay is not a proper reason for the Ban as it directly contradicts the very purpose of the Commerce Clause"), *aff'd*, 340 F.3d 1053 (9th Cir. 2003).  The district court cited no authority for this proposition, and while the Ninth Circuit affirmed the district court, the Ninth Circuit decided the case on alternative grounds and thus did not opine on the Commerce Clause.

*Tart v. Massachusetts*, 949 F.2d 490, 501 (1st Cir. 1991) (discussing the legitimate local interest in promoting public health).  Insofar as the Ordinance reduces the number of persons who visit Bar Harbor by cruise ship, the Ordinance commensurably advances Bar Harbor's local interest in lessening congestion—particularly at the waterfront, over which the cruise industry will otherwise domineer.  This noneconomic benefit, while not precisely measurable, is both real and reasonably well calibrated to ameliorate the particularized excesses of modern cruise tourism and how it interfaces with Bar Harbor's waterfront.

In short, the Ordinance imposes some burden on the "free flow" of commerce, but that burden is impossible to quantify.  The 1,000-person limitation is a significant downshift from the passenger caps previously observed in Bar Harbor.  But that downshift also promotes noneconomic interests.[40]  Bar Harbor with the MOA passenger limits and Bar Harbor with the 1,000 daily passenger limit are significantly different places.  The voters of Bar Harbor "weigh[ed] the relevant 'political and economic' costs and benefits for themselves," and the voters evidently decided that the noneconomic benefits of the Ordinance favored adopting it.  *Nat'l Pork Producers Council*, 598 U.S. at 382 (plurality opinion) (quoting *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 279 (1978)).  Considering the

---

[39] The circumstances in *Greene* gave rise to a lively dissent based on the observation that the interest in comparative tranquility can be a pretext for walling off white communities from communities of color. *Greene*, 451 U.S. at 136 (Marshall, J., dissenting).  Unlike *Greene*, this case has no undertones of invidious discrimination.

[40] Plaintiff and Plaintiff-Intervenor see the impact on the movement of vessels and persons as burdens so weighty as to compel per se invalidation of the Ordinance.  Obviously, I have not viewed it the same way. The lead authority they cite is *Edwards v. California*, 314 U.S. 160 (1941), in which California attempted to minimize the extent to which it would bear the burden of indigent migration secondary to the Dust Bowl—a "grave and perplexing social and economic dislocation" (i.e., the greatest natural disaster of our Nation's history), *id.* at 173.  The analogy between Dust Bowl migration and cruise tourism is strained, to say the least.

intimate "nature of the local interest[s]" involved in Bar Harbor's decision to limit cruise tourism, I cannot say that the Ordinance imposes a burden on commerce that "is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.[41]

**CONCLUSION**

For the reasons set forth above, I conclude as follows:

The challenged Bar Harbor Ordinance, Bar Harbor Code Chapter 125, Article VII, Section 125-77, is a lawful exercise of home rule authority under the Maine Constitution and is not preempted by state law.

The Ordinance does not violate the Due Process Clause or the Commerce Clause of the United States Constitution.

The Ordinance is in part conflict preempted under the Supremacy Clause. Specifically, the 1,000-person cap is conflict preempted insofar as seafarer shore access is concerned. But insofar as cruise ship passengers are concerned, the 1,000-person cap survives challenge under the Supremacy Clause.

Based on these legal conclusions, judgment will enter for the Town of Bar Harbor on Counts II and III of Plaintiffs' Complaint and on Counts II, III, and IV of Plaintiff-Intervenor's Complaint in Intervention. As for the Supremacy Clause claims stated in the first counts of the Plaintiffs' Complaint and the Plaintiff-Intervenor's Complaint in Intervention, judgment will enter IN PART for the Town of Bar Harbor, as Plaintiff and

---

[41] *Cf. Nat'l Pork Producers Council*, 598 U.S. at 382 (plurality opinion) (describing that weighing out-of-state producers' costs of compliance against the moral and health interests of California's residents as "a task no court is equipped to undertake" and stating that in "a functioning democracy, policy choices like these usually belong to the people and their elected representatives").

Plaintiff-Intervenor fail to demonstrate cause to invalidate the Ordinance insofar as it operates as a restriction on passenger disembarkations, and IN PART for Plaintiff and Plaintiff-Intervenor, as they have demonstrated that the Ordinance is partially preempted in relation to seafarer shore access, although it is by no means self-evident that any material alteration of the legal relationship of the parties has thereby been achieved.

**SO ORDERED.**

Dated this 29th day of February, 2024.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE