UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492 LLC,<br><br>Plaintiffs,<br><br><br>PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>TOWN OF BAR HARBOR,<br><br>Defendant,<br><br><br>CHARLES SIDMAN,<br><br>Defendant-Intervenor | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:22-cv-00416-LEW |

**POST-REMAND DECISION AND ORDER**

This case returns following a remand from the First Circuit that directs me to resolve a "mismatch" in my findings, make additional findings in previously unaddressed areas, "acknowledge" a certain burden on interstate commerce, and delve more deeply into the *Pike* discussion contained in my March 1, 2024, Amended Decision and Order (ECF No.

206).  *See Ass'n to Preserve and Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 66-72 (1st Cir. 2025) (discussing the elements of a Dormant Commerce Clause claim governed by *Pike v. Bruce Church*, *Inc.*, 397 U.S. 137 (1970)); *see also Ass'n to Preserve & Protect Local Livelihoods v. Town of Bar Harbor*, 721 F. Supp. 3d 56, 66 (D. Me. 2024), *aff'd in part, vacated in part, remanded sub nom. Ass'n To Preserve & Protect Local Livelihoods v. Sidman*, 147 F.4th 40 (1st Cir. 2025).  With the benefit of the First Circuit's opinion, supplemental briefing by the parties, oral argument, and a guided reexamination of the trial record, this Order clarifies and enhances the findings made in my prior ruling and modifies my prior ruling on the merits.

## FINDINGS

The findings that follow are drawn from and modeled after the findings contained in the Amended Decision and Order.  The findings are refined and supplemented where appropriate to carry out the objectives of the remand.  Some findings from the Amended Decision and Order have been shortened or removed to keep the focus on the *Pike* portion of the Dormant Commerce Clause claim.

### The Parties

The Plaintiffs in this action are the Association to Preserve and Protect Local Livelihoods ("APPLL"); B.H. Piers, L.L.C.; Golden Anchor, L.C., doing business as Harborside Hotel; BHWW LLC, doing business as Bar Harbor Whale Watch; Delray Explorer Hull 495 LLC; Delray Explorer Hull 493 LLC; and Acadia Explorer 492, LLC.

2

APPLL is a business league comprised of members who own or operate businesses in Bar Harbor and seek to capitalize on the economic opportunities associated with the provision of goods and services to cruise ship passengers.  APPLL members include owners and employees of local restaurants, retail stores, and tour-related businesses.

The Delray Explorer Hulls and the Acadia Explorer are tender vessels owned by similarly named limited liability companies.  The vessels carry cruise ship passengers from cruise ships anchored in Frenchman Bay to Bar Harbor.  B.H. Piers and Golden Anchor own piers in Bar Harbor where the tender vessels disembark and embark cruise ship passengers.  BH Piers operates the pier located at 1 West Street, known as Harbor Place. Golden Anchor operates the pier located at 55 West Street.

BHWW is a limited liability company doing business as Bar Harbor Whale Watch Company.  BHWW coordinates whale watching tours to cater to the cruise lines' passengers.

For ease of reference, all of the foregoing parties will be addressed as "Plaintiffs" unless their individual circumstances are addressed.

The Penobscot Bay and River Pilots Association appears in this matter as Intervenor-Plaintiff.  The Pilots Association is a private corporation that provides pilotage services in a region that extends 75 miles from Boothbay Harbor to Frenchman Bay and 75 miles from the west pilot station on Penobscot Bay to the Penobscot River Port of Brewer.  By law, foreign-flagged and certain domestic cruise ships must be piloted within Frenchman Bay by a local pilot who is familiar with the Bay and its channels.  Pilots board cruise ships (and other large vessels) eight to twelve miles offshore and direct navigation

3

to anchorage grounds in Frenchman Bay (or to other destinations in Penobscot Bay). The anchorage grounds in Frenchman Bay are roughly two miles from the Bar Harbor waterfront and piers. In response to the expansion of cruise vessel traffic, the Pilots Association has invested in vessels and has expanded its employment of pilots. In particular, the Pilots Association now has a dedicated crew and purpose-built vessel to handle the piloting demands associated with cruise vessel traffic in Frenchman Bay. Fees for piloting services are established by law and are a function of the size of the vessel. Ex. 39. The larger the ship, the greater the fee.

The Defendant is the Town of Bar Harbor. Bar Harbor is, among other things, a Class A port of entry for foreign-flagged cruise vessels reentering the United States and a popular port-of-call on North Atlantic cruise ship itineraries. Bar Harbor is governed by a Town Council. The Town of Bar Harbor has a year-round population of somewhat fewer than 5,500 persons.

One of the residents of Bar Harbor is Charles Sidman, Intervenor-Defendant. Mr. Sidman was a primary proponent and co-author of the initiative that resulted in the land use ordinance challenged in this case.

### Non-Parties of Note

Among the cruise lines that visit Bar Harbor are several lines owning foreign-flagged cruise vessels. When they call, these vessels typically spend about nine hours at anchorage, enough time for passengers to clear customs and participate in a shore visit of reasonable duration.

4

The State of Maine has two other Class A ports of entry, Eastport and Portland. Neither is as proximate to Acadia National Park as Bar Harbor.  If a cruise ship called in Eastport or Portland, travel by motor coach to reach and return from Acadia National Park would consume much of the day.

CruiseMaine, part of the Maine Office of Tourism, promotes cruise communities in Maine and Maine-based cruise ship tourism in general.

<u>Background Facts</u>

The Town of Bar Harbor lies on the shores of Frenchman Bay in the North Atlantic on the eastern side of Mount Desert Island.  The Town is nestled in an area of great scenic beauty abutting Acadia National Park, a national asset that the Park Service refers to as the Crown Jewel of the North Atlantic Coast.  Given Bar Harbor and Acadia National Park's placement and prominence among other North Atlantic attractions accessible by sea, the cruise ship industry considers Bar Harbor to be a marquee destination, the kind which appeals to customers and around which an appealing cruise itinerary can be built.

Although Bar Harbor had long experienced healthy tourist seasons, in the 2000s local businesses and their representatives on the Town Council desired to expand this commerce, both in terms of intensity and duration.  At the time, and specifically as to cruise ship tourism, the tourism season ran from Memorial Day to Labor Day and cruise ship visitation was occasional and irregular.  Local businesses and their representatives on the Town Council saw cruise tourism as one means of increasing the intensity and extending the duration of the tourism season.

In 2006, the Maine Department of Transportation, the Maine Port Authority, and the Town of Bar Harbor joined in a task force to commission a cruise tourism destination management plan for Bar Harbor.  The authors of the plan proposed architectural and engineering improvements to develop the Town to facilitate expanded cruise ship passenger access, chiefly by means of improved pier facilities. Ex. 260.  In 2008, the Town accepted a recommendation from the task force to embody a cruise ship committee and establish a policy of daily cruise passenger caps of 3,500 passengers for the peak-tourism, summer months of July and August, and 5,500 passengers for the shoulder-season months of May, June, September, October, and November.  The cruise ship lines were receptive to the invitation and amenable to the passenger caps, and cruise ships began to call in Frenchman Bay in ever-increasing numbers.  Local enterprise and investment gradually expanded to meet the increased demand for passenger tendering and other local services.

Historically, the Town established its daily passenger caps largely by reference to the lower berth capacities of existing cruise vessels.  The caps were understood to be "voluntary" in that they were mutually acceptable to the then-existing Council and the cruise lines.  The Council and the cruise line industry were able to agree that cruise line passengers generally would not be well served in Bar Harbor if two or more cruise ships each with an especially large lower-berth capacity were to disembark on the same day, even during the shoulder season.  They also recognized that it was sensible to lower the cap during Bar Harbor's peak summer season, given the competing demand for local services and the resulting local burden and congestion generated by peak, land-based tourism.  The progenitors of Bar Harbor's cruise ship management plan understood that

cruise ship visitation imposes certain municipal burdens,[1] including congestion, that can detract from the character of the Town and reduce the quality of life for residents. In other words, even the supporters of the growth in cruise traffic appreciated that, given the realities on the ground in Bar Harbor in 2008, limits are appropriate and serve the interests of both the cruising public and local residents.

Since then, Bar Harbor has experienced a steady growth in tourism, due chiefly to its proximity to Acadia National Park. In 2021, Acadia National Park attracted roughly four million visitors. For many of these visitors, a trip to Acadia includes a visit to downtown Bar Harbor. Meanwhile, more and larger cruise ships anchored in Frenchman Bay and cruise ship passenger visitation levels started to approach the established daily caps on an ever-increasing and consistent basis. Although cruise ship passengers account for a limited portion of the total number of annual visitors to Bar Harbor, they arrive at a destination that is already heavily burdened (and also blessed) by land-based tourism and at a waterfront of limited area and carrying capacity.[2]

Over the years, the process of tendering passengers to shore has become an increasingly efficient operation. In 2017, the Delray Explorer Hulls and the Acadia

---

[1] To manage the voluntary cap system, the Town instituted a reservation system overseen by its harbormaster. Bar Harbor also maintains a per-passenger fee structure for cruise ship visits. Ex. 29. The Town has used the fees generated in this manner (roughly $1 million per year) to fund town salaries and enlarge its police force, among other things. This significant increase in personnel, particularly law enforcement, is itself evidence of the localized impacts of increased traffic.

[2] There is evidence that on an annualized basis, the total number of cruise ship passengers who come to Bar Harbor is less that 10 percent (closer to 7 percent) of the total of all tourists who come to Bar Harbor for purposes of tourism. The percentage is not static, however, and on a day-to-day basis will rise and fall according to the size of the ship in the Bay, the season, and the intensity of land-based tourism. The percentage would typically be higher in the shoulder season when land-based tourism is less intense and cruise ship tourism is increased.

Explorer were constructed and dedicated to tendering cruise ship passengers. Their owners also invested in barges to facilitate the movement of passengers from the cruise ships to the tender vessels. Each of the three tender vessels is licensed to hold 149 passengers and together they steadily rotate into and out of the harbor in roughly 30-minute intervals, primarily disembarking passengers onto the piers mid-morning and embarking them again in the afternoon, though passengers move back and forth throughout the day. Consequently, there are times of day that involve more intense movement of people in either direction. Foreign-flagged vessels, for example, arrive mid-morning and spend on average nine hours at anchorage. Their passengers spend on average six to seven hours on land. In the morning, passengers congregate near the piers and waterfront, including at motor coach staging areas, while others walk into the Town. Passengers may be in any number of locations during the day, such as on a whale watch tour or an Acadia bus tour, or at a local restaurant or business. In the afternoon, passengers (and their assorted conveyances) again congregate near the piers to obtain passage back to their cruise ship. During these periods, law enforcement presence is enhanced and helps to facilitate the flow of traffic associated with the comings and goings of cruise ship passengers. Parking spaces on West Street are restricted to buses and other conveyances as well to help keep things moving. The duration of these surges is in part a function of the total number of cruise ship passengers who come ashore in a given day.

While these efforts to steadily move cruise ship passengers are commendable, they by no means render inconsequential the supplemental press of people into the downtown. At trial, Plaintiffs' witnesses sought to portray these operations as tidy and well managed.

However, more persuasive to me was the witness testimony of locals who described both the waterfront and the downtown as undesirable destinations to visit when large cruise ships are at anchor.

In summary, the expansion of cruise tourism in Bar Harbor has taken place alongside the burgeoning growth of tourism of all stripes. For some, the expansion has resulted in a return on planning and investment. But for the majority of local voters, the expansion has resulted in a growing disaffection with the quality of municipal life. Increasingly, town leaders were hearing from constituents who expressed their disaffection.[3] In January of 2021, Bar Harbor commissioned a marketing research firm to perform a quantitative study and write a report concerning local opinions.[4] Ex. 323. The survey had a healthy response rate. Many respondents voiced concern for the congestion caused by cruise ship visits and ranked cruise ship tourism a net negative for the Town. Even the cruise industry has acknowledged this growing disaffection. In July of 2021, the president of the Cruise Lines International Association proposed new passenger caps as part of a negotiation with the Town. The proposal, accepted by the Town Council, involved

---

[3] Town Council Chair Valerie Peacock testified that in 2020 and continuing residents of Bar Harbor have expressed strong feelings of angst over the perceived negative impact of the cruise ship industry but also concern over the expansion of tourism in general. July 13 Tr. at 112–13, 121–25.

[4] Pan Atlantic Research's study surveyed year-round and seasonal residents, property owners, and business owners of Bar Harbor to examine what they thought about sea-based tourism. *See generally* Ex. 323. Overcrowding, too many ships/tourists, and environmental concerns ranked among the most popular answers to Bar Harbor's greatest challenges in managing cruise ship tourism. Ex. 323 at 29; *see also* July 13 Tr. at 212:14–214:9 (describing the increased street traffic and congestion at the waterfront when cruise ships arrive).

a daily passenger reduction for the shoulder season[5] and a new monthly cap of 65,000 visitors.

Although public pressure was growing, the Bar Harbor Town Council, ultimately, was not then constituted to provide the pressure relief that many citizens hoped for, though the Council did work to reduce cruise ship passenger traffic.[6]  On February 15, 2022, the Council approved the formation and membership of a new working group to explore the modification of the daily passenger limits for the 2023 and 2024 cruise seasons.[7]   On August 16, 2022, the Town Council accepted the task force's recommendation to enter into a memorandum of agreement ("MOA") with each cruise line and directed the preparation of a form MOA for circulation.[8]  The resulting MOA withdrew the months of April and November from the Town's reservation system, lowered daily passenger caps from 5,500 to 3,800 for the months of May, June, September, and October (with a +200-passenger leeway), and instituted a new monthly cap of 65,000.  In September and October of 2022,

---

[5] By 2019, it was a misnomer to describe the months of September and October as a "shoulder season" when describing the volume of cruise ship passengers coming ashore in Bar Harbor.  In fact, over 60 percent of Bar Harbor's annual cruise ship passenger visits occur in September and October.  September and October are also the months that see the most visitation by the very largest vessels (>3,500 passengers).  *See*, *e.g.*, Ex. 165.

[6] At trial, counsel for Plaintiffs worried that testimony concerning public disaffection and council activities (much of Chair Peacock's testimony) was an attempt to construct a false legislative history in support of the Ordinance.  I have not interpreted the testimony in that fashion.  Rather, the testimony related some of the contemporaneous local history that set the stage for the success of the Initiative.

[7] Separately, the Bar Harbor Cruise Ship Committee was already corresponding with the Cruise Lines International Association to explore ways of reducing cruise visitation.  Ex. 214.

[8] Two weeks prior, on August 2, 2022, the Town Council went into executive session to discuss the citizens' petition that would become the Ordinance but was, at that time, still in need of voter approval.  Exs. 207–210.  The Town Council also conducted a workshop on that date to discuss the future of cruise tourism in Bar Harbor.  Among other matters under consideration were cautionary litigation warnings from the Cruise Lines International Association.  Ex. 211.

the Town entered into MOAs with American Cruise Lines, Disney Cruise Lines, Holland America Line, Hurtigruten Expeditions, Norwegian Cruise Line, Pearl Seas Cruises, Princess Cruises, Rogay Caribbean Cruises, Seabourn Cruise Line, Viking Cruises, and Windstar Cruises Marshall Islands.

While the Town Council publicly pursued its voluntary measures, a group of local residents formed a petitioning committee to advance a citizens' initiative that would achieve more significant reductions. Their initiative proposed amending the Bar Harbor Code to require a permit to disembark cruise ship passengers "on, over, or across any property located within the Town of Bar Harbor." Ex. 243A. It also specified that "no more than 1,000 passengers, in the aggregate, may disembark on a single calendar day." *Id.* The Initiative states that the harbormaster shall develop rules and regulations to establish a reservation system for disembarkation. (Historically, application of the voluntary caps also relied on a reservation system.)

The initiative included a statement of purpose focusing on quality of life but also expressing concern for public safety and the commercial interests of businesses other than those seeking the patronage of cruise ship passengers. Concerning quality of life, the initiative's sponsors wrote:

> Underlying this proposed amendment is the fact that, in recent years, the Town has been a popular port of call for cruise ships of varying sizes, from which passengers disembark via tender boats that offload passengers directly into the downtown area. The large numbers of passengers have overwhelmed the downtown area, resulting in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other public spaces, and inundating local amenities and attractions, all of which result in a diminished quality of life for Town residents.

11

Ex. 243A. Concerning public safety and other business interests, the sponsors wrote:

> The unchecked and continued influx of disembarking cruise ship passengers in the downtown area jeopardizes the Town's ability to deliver municipal services to Town residents and visitors (for example, cruise ship passengers), including the provision of public safety services (police and fire), emergency medical services (EMS), in-patient and out-patient services at local hospitals, pandemic control measures, and public sanitation services, and also impacts the ability of local shops, restaurants, and other businesses to attract and serve customers.

*Id.* The sponsors then summarized:

> A town-wide survey was conducted in 2021, showing that a majority of respondents believe that the volume of disembarking cruise ship passengers is too high and has a negative impact on the Town and the health, safety and welfare of its residents.

*Id.*

The initiative was listed as an article on the warrant for Bar Harbor's November 8, 2022, special town meeting. A majority of the registered voters who voted supported the article. Bar Harbor now has a land use ordinance that establishes a disembarkation cap of 1,000 persons per day throughout the entire cruising season.

During trial, Mr. Sidman testified that the 1,000-person cap was not the product of "a rigorously defensible finding or study or calculation." July 13 Tr. at 312:20–21 (ECF No. 185). The group proposed various caps, some higher, but ultimately arrived at 1,000 persons. According to Sidman, "We just didn't want to get into various limits at different times of the year." *Id.* at 313:24-25.

<u>Findings Concerning the Ordinance's Burdens on Commerce</u>

Most of the cruise lines that have historically scheduled visits to Bar Harbor plan visits with cruise ships having a lower berth capacity in excess of 1,000 passengers. Only

12

27 of the 134 ships scheduled to make calls in the 2023 season could disembark their entire complement of passengers in one day without exceeding the 1,000-passenger cap. It appears unlikely that a cruise line will schedule a port call for purposes of a shore visit if it cannot disembark its ship's entire complement of passengers in a single day.[9] Consequently, the likely impact of the Ordinance on the number of cruise ships weighing anchor in Frenchman Bay is substantial. And in terms of the number of disembarking passengers, the reduction is likely to be north of 80 and possibly as high as a 90 percent reduction based on existing vessel traffic that served the region when the Ordinance passed.

The likely impact for Plaintiffs and the Pilots Association varies. The pier and tender boat operators will no longer generate fees for the lost passenger traffic and will experience a significant drop in revenue, though I do not recall evidence concerning their fee structure. The Pilots will likewise experience a significant reduction in revenue, as their fee structure takes into consideration vessel size. Under the Ordinance, the large cruise ships will no longer seek the Pilots' services for purposes of accessing an anchorage in Frenchman Bay. Both these Plaintiffs and the Pilots Association will fail to realize anticipated returns on their investments. The impact on BHWW is less certain on this

---

[9] It is certainly understandable that every passenger on board would wish to come ashore at a port of call, and that cruise lines need to fulfill that reasonable expectation. Less understandable is the supposition that cruise lines could not anchor a ship for more than one day to enable everyone to go ashore under a cap that is lower than the ship's lower-berth capacity. Plaintiffs did not offer any evidence to demonstrate that remaining at anchor for longer than a day would be anathema to the cruising public, but there is the suggestion that this is an externality of their business model that port communities are expected to absorb. *See* Def. Brief on Remand at 13 (citing *Cruise Connections Charter Mgmt. 1, LP v. Atty. Gen. of Canada*, 967 F. Supp. 2d 115, 131 (D.D.C. 2013)); *see also Ass'n to Preserve & Protect Local Livelihoods*, 721 F. Supp. 3d at 94-95 & n.36.

record.  I do not recall evidence concerning their business model or how much it depends on cruise ship passengers, but there was testimony that whale watch cruises are reserved by members of the cruising public.  The APPLL members, most of whom operate land-based retail establishments, will likely experience a reduction in the volume of business, particularly in the shoulder seasons, and will perhaps close during either or both shoulder seasons.

In addition to these localized burdens, there is also a burden on interstate commerce associated with the cruise line industry and its itineraries, and on the traveling public who wish to visit Bar Harbor and Acadia by cruise ship.  The reduction in the number of passengers who may disembark will mean there are fewer passengers who make it to Bar Harbor via cruise ship.  Accessing Acadia National Park will involve far fewer vessel options, though cruise ship options and many alternative means of visiting Bar Harbor (and Acadia) remain.

I do not recall any evidence concerning the lost revenue of cruise lines.  What was made manifest is that Bar Harbor is a marquee cruise ship destination, and there will always be cruise lines willing to build cruise tours around Bar Harbor and Acadia to the extent they are able.  The difficulty for cruise lines is that they cannot enjoy the same economies of scale and associated profits that their larger cruise ships enable if they intend to design a cruise itinerary that includes a one-day Bar Harbor visit with a 1,000-passenger cap.

Finally, there has been some effort by the parties to address on remand the First Circuit's expectation that I make a finding concerning the impact the Ordinance may have on "other coastal towns."  *See APPLL*, 147 F.4th at 72.  I find that the record does not

14

provide the means to do so.  What can be said is that Bar Harbor will be on fewer itineraries, but not that other coastal towns that cater to cruise tourism will suffer a loss in visitation.  The opposite may even be true.  The record simply is too conjectural.  Even Plaintiffs and the Pilots Association speak in terms of suppositions, suggesting that the Ordinance "can impact U.S. commerce beyond Bar Harbor."  Pls. & Pl. Int. Joint Brief ("Joint Brief," ECF No. 246) at 18.  I agree with Defendant that Plaintiffs and the Pilots Association have not demonstrated this harm.  Def. Brief on Remand at 11-15; *see also Ass'n to Preserve & Protect Local Livelihoods*, 721 F. Supp. 3d at 89 n.26.

<u>Findings Concerning the Initiative's Stated Purposes</u>

To the extent the initiative expressed concern for public safety due to congestion located anywhere other than the waterfront, West Street and northern Main Street, there is no empirical data to enable a fact finder to mathematically allocate responsibility for a degradation in overall municipal public safety between cruise and land-based tourism.  But this observation is of no moment.  The weight of the evidence convinces me that cruise tourism imposes a real and substantial burden in terms of congestion not only at the waterfront but also more widely in the rest of downtown, and that this added burden has real and substantial negative implications for residents' experiences in terms of their quality of life.  Moreover, the waterfront is an integral part of downtown Bar Harbor that members of the local public wish to enjoy.  It is overwhelmingly apparent that this area, including its public spaces and ocean views, has greatly diminished appeal to local residents when cruise tourism is coupled with peak-season, land-based tourism.  Furthermore, conditions at the waterfront are problematic enough to generate non-

15

speculative concerns for public safety.  Indeed, the initiative sponsors' stated concern for public safety has been echoed by the cruise industry.  *See*, *e.g.*, Ex. 32 §§ 5.3, 5.4.  However, at least to date there does not appear to be an incident illustrating any past failure in the delivery of public services occasioned by passenger congestion at the waterfront or elsewhere downtown.  This is not a finding that a reasonable person would regard the press of persons in the downtown area (in and beyond the waterfront) as insignificant or inconsequential to safety.  To the contrary, based on findings related herein, a reasonable person could view the level of congestion in Bar Harbor during peak tourism as a legitimate police power concern, even beyond the waterfront.

To provide some geographic perspective, cruise ship passengers come ashore in Bar Harbor in an area of limited space nestled between the Public Pier and Harborside Hotel.  One of the tender boat piers over which cruise ship passengers travel sits at the east end the harbor, just west of the Public Pier, near the juncture of Main Street and West Street.  The other pier sits a few hundred feet to the west of that, less than a city block from the same intersection.  Between them is a short stretch of commercialized waterfront.  Both West Street, running east-west, and Main Street, running north-south, are two-way roadways of no special width, with on street parking.[10]  These roads provide access to the waterfront, which comprises the north end of the downtown.  As Defendant protests, Def. Brief on Remand at 17-19, the waterfront is an integral part of downtown Bar Harbor.  It is inaccurate to think of the Bar Harbor waterfront as a separate area merely adjacent to the

---

[10] The parking spaces on West Street are set aside for buses and other conveyances when cruise ships are in the Bay.

downtown.  The waterfront area is an integral component of downtown Bar Harbor.  Also, as a waterfront, this area of the downtown includes the primary public land—including Agamont Park and the municipal pier—from which to look out on the harbor or visit Bar Harbor's shore path, which begins (or ends) just to the east of BH Piers' 1 West Street pier and the whale watch staging area.

Bar Harbor's downtown is no urban landscape.  In terms of city blocks, there are roughly four blocks in a two-by-two orientation that comprise Bar Harbor's downtown.  Outside of those boundaries are, primarily, residences.[11]  As for Bar Harbor's downtown roadways, they are not wide thoroughfares of the kind you expect to see near, say, San Francisco's Pier 27, Boston's Flynn Cruiseport, or even Portland's Cruise Terminal.  Anyone who imagines the Port of Bar Harbor and conjures up a picture looking anything like these other port facilities utterly misapprehends the lay of the land in Bar Harbor. [12]

Congestion in downtown Bar Harbor is a seasonal fact of life, but it is exacerbated by the regular morning and afternoon pulse of cruise ship passengers and the tour buses and other vehicles that arrive to cater to them.  In addition, fall congestion is largely a

---

[11] Plaintiffs and the Pilots Association assert that the impact of cruise ship passengers on congestion is effectively nil "just 1,400 feet from" the waterfront.  Joint Brief at 24.  As I understand the record, the initiative authors' apprehension for congestion in the downtown concerns the area inside of this boundary.  One might say that the area outside of this boundary is "downtown" as well, speaking casually, but the character of the Town from the perspective of pedestrian downtown tourism changes dramatically and almost immediately from predominantly services catering to tourists to predominantly residential outside of this core or inner downtown area.  This appears to be entirely consistent with the understanding of Plaintiffs and the Pilots Association, who characterize the downtown as "the heart of Bar Harbor's business district," or "the community focal point for cultural, business and service activities."  Joint Brief at 30.

[12] And yet, Bar Harbor's cruise passenger traffic under voluntary limitations has exceeded that of Portland and Boston, and perhaps has even rivaled that of San Francisco.

function of cruise ship visitation, resulting in an undeniable change to the annual rhythm of municipal life.    In this environment, cruise ship passenger visitations may well be viewed by rational voters as indulgent and burdensome surplusage in an already taxed ecosystem of extremely modest geographical proportions.  In other words, the initiative sponsors' stated concern for generalized welfare and quality-of-life considerations is neither unsubstantiated nor unrelated to the unique congestion problem associated with a small coastal town's capacity to accommodate cruise ships with increasingly high lower-berth capacities, that choose to anchor for less than a day.

When tourism is in full swing and when cruise ships come to call, cruise ship passengers and those who seek to serve them effectively bottleneck the juncture between Main Street and West Street and dominate an integral portion of the downtown that the wider public also wants to access.  This intensive localized impact wanes the further one moves away from it, but it has real negative implications for the flow of vehicular and pedestrian traffic in other areas of the downtown as well.  The duration of this impact is in part a function of the total number of passengers who disembark from a particular cruise ship.

Congestion produces significant disaffection with municipal life, overtaxed public facilities, long lines, crowded streets and sidewalks and businesses, slowed traffic, and the like.  The initiative in support of the Ordinance fairly described these negative impacts as quality-of-life concerns.  The idea proposed by Plaintiffs and the Pilots Association that cruise ship traffic has a negligible impact on local conditions is disingenuous, unpersuasive and flatly contradicted by the record.  The video evidence that was presented by Plaintiffs

and/or the Pilots Association was more in the nature of pro-cruise marketing material that was not representative of the daily impact of cruise-related visitation and, instead, depicted quieter moments on quieter days. Plaintiffs and the Pilots Associations observe that, "[e]ven so, the videos and the Court's treatment of them demonstrate that even 'cruise ship days' can be quiet days in Bar Harbor when pedestrian congestion is minimal or absent." Joint Brief at 26. They find fault with the fact that "[t]he Ordinance does not account for the relative and varying contribution of cruise passengers to pedestrians from other sources at all." *Id.* However, Plaintiffs and the Pilots Associations did not attempt to present a case for fluctuating passenger caps based on, say, the day of the week. Nor did they offer any predictive model to advocate for greater cruise ship tolerance during particular parts of the week, or particular weeks in the month, to support the idea that larger vessels can be accommodated on a predictive, periodic basis through the reservation system even during peak congestion. Plaintiffs and the Pilots Association's theory of the case and their evidentiary presentation steered clear of acknowledging the existence of any worst-case scenarios and instead advanced the notion that there is really nothing to worry about on any given day.

Alternatively, Plaintiffs and the Pilots Association posit that "[i]f there is indeed a 'flood' of congestion-creating visitors to Bar Harbor," there is no point in restricting cruise ship visitation because they are a small percentage contributor to the larger problem. Pilots Ass'n Reply at 16 (ECF No. 250). In effect, the Plaintiffs and the Pilots Association's only concessions are that congestion is a legitimate factor upon which to restrict the number of disembarkations, a willingness to abide by an MOA that reduces July and August

19

disembarkations relative to the shoulder seasons, and the most recent voluntary reduction in visitation levels for the entire shoulder season. *See, e.g.*, Pilots Ass'n Reply at 22 ("The new [MOA] passenger caps aligned cruise visitation with the Town's ability to accommodate that visitation."); Pls. Reply at 24 (ECF No. 251) (similar).

The fact is that the negative implications of cruise tourism are intensified and prolonged as the number of cruise ship passenger disembarkations increases. These implications include the bottleneck of two of fewer than a handful of roads into and out of the downtown, a tide of pedestrian traffic that dramatically undermines public enjoyment of the waterfront and other nearby portions of the downtown, and excessive pedestrian crowding throughout the downtown. In all, the combined impact of cruise ship passengers and those motor carriers who aim to serve them is very substantial when it comes to the waterfront. As the morning progresses, and in the afternoon, the impact of this bottleneck gradually works its way, arterially, up West Street and Main Street, with consequential impacts to adjacent traffic tributaries. Although I stated in my Amended Decision and Order that the effect beyond the waterfront was "cumulative" of preexisting congestions, what that meant is that it produces an accumulation of persons on top of what is often an already significant, and sometimes an already excessive, degree of congestion.[13] If the

---

[13] Plaintiffs and Pilots Association acknowledge that there is already significant congestion when cruise ship passengers arrive. They observe that the "sources of downtown congestion are manifold, and include: hotels, short-term rentals, seasonal homes, and campsites. (PX 14.) They also include commuting employees, seasonal workers, and day trippers. (PX 14.)" Pls. & Pl.-Int. Brief on Remand at 27. The Pilots Association observes:

> On any given day, particularly during tourism season, Bar Harbor's population can swell to approximately 24,000 people, *excluding* day trippers and cruise ship passengers. (PX 14.) Visitors stay in Bar Harbor's approximately 3,000 hotel rooms, 620 short-term rentals,

First Circuit discerned that I rejected any such impact, that was an inaccurate reading of that Order.  In fact, local witnesses testified to the impact in matter-of-fact ways that conveyed their experience of excessive congestion beyond the waterfront in a tangible and relatable fashion.  To the extent Plaintiffs sought to dispute these contentions, ostensibly in an empirical fashion, the soundings they took through their expert witness lacked persuasive force and were, in the end, unrelatable.[14]  Considering that Plaintiffs bear the burden of proof on their claim, this is not favorable to their cause.  As a matter of fact, cruise ship days have a qualitative and quantitative impact that is more than marginal to the experience of congestion in the downtown beyond the limited confines of the waterfront.

---

726 seasonal homes, and 970 campsites. (PX 14). Roughly 750 seasonal workers contribute to Bar Harbor's increased tourist-season numbers, meaning that, at its peak, Bar Harbor hosts nearly 16,000 non-residents overnight—nearly three times the local year-round population. Add to that day trippers, who visit Bar Harbor in unknown numbers, and nearly 3,000 employees, who commute into Bar Harbor daily. (PX 14.)

Pilots Ass'n Reply at 16.  Of course, they offer this only as a springboard to say that cruise tourism is a negligible drop in a sea of congestion, all the while acting as though they are suspending disbelief for the sake of argument.  *Id.* ("If there is indeed a 'flood' of congestion . . . .").  Reasoning by analogy, if an artery is already clogged, it would be irrational to describe as of only marginal significance a diet that only serves to exacerbate the blockage.

[14] Plaintiffs and Pilots Association offered the testimony of Professor Todd Gabe, Ph.D., of the University of Maine, who studied congestion in Bar Harbor's tourist district.  One study occurred at the tail end of August and essentially concluded that allowing 680 *additional* cruise ship passengers (i.e., more than the daily 3,500 passenger cap for August) would result in only a negligible *further* experience of congestion in a town already impacted by land-based tourism and the baseline 3,500 cruise ship passengers.  Ex. 319 at 2.  Professor Gabe also spent a number of days walking about Bar Harbor and recording his subjective experience at various times and locations.  About half of the walks he took were "at times early in the morning, during months outside the peak tourism seasons and in inclement weather, or at places located on the outskirts of the tourism district."  Ex. 319 at 6.  I did not find Professor Gabe's testimony or reports to be helpful in terms of achieving whatever finding Plaintiffs and Pilots Association intended me to draw.  In addition to these critiques, Intervenor-Defendant has supplied several additional critical observations concerning Professor Gabe's soundings that I find persuasive on the subject.  Sidman Brief on Remand at 23-24.

As attested to by witnesses Dr. Bill Horner, Nathan Young, and Seth Libby, the press of people in the downtown intensifies on cruise ship days. Dr. Horner described it as a dramatic growth in the press of people with a tremendous amount of traffic, particularly in the waterfront area. Mr. Young described sidewalks busy enough that he prefers to walk in the street when he has to go downtown on a cruise ship day. Mr. Libby described the scene similarly, stating that cruise ship visits produce greater crowding. The witnesses also testified that they avoid the downtown on cruise ship days due to the extent of the congestion. Horner, Libby, and Young all testified that they voted in favor of the initiative because they felt that elected officials had failed to act in a timely or meaningful manner to curtail the impact of cruise ship visits. I find that these witnesses provided a fair and accurate assessment of the impact of cruise ship visits in terms of both the intensification of congestion and the undesirability of a trip downtown on "cruise ship days," which increasingly has come to mean most days of the cruise ship season.

Vehicular and pedestrian access to the waterfront is by way of either Main Street or West Street. During peak tourism, accessing the waterfront by either street or either means (by vehicle or by foot) is a tiresome affair. Not a single local witness suggested an inclination to drive to the downtown. Driving into the area is disconcerting, in part, because pedestrians are overflowing into the street. Traffic is also problematic at these times because all manner of commercial conveyances crowd West Street to take on passengers

22

as they come ashore.[15]  As for walking to the waterfront, particularly via Main Street, all local witnesses testified that they did not care to walk in the area when cruise ships are at anchor due to excessive sidewalk congestion.  These conditions exist despite considerable effort to smooth the passage of cruise ship passengers at the waterfront.

In addition to witness testimony, there is circumstantial evidence from which I find that the general public's interest in accessing the downtown and the interest of cruise ship passengers in doing the same are at loggerheads.  Congestion is severe enough that the Cruise Lines International Association and the Town previously explored the idea that Bar Harbor give over to cruise passenger traffic most of the public pier to improve the movement of vehicles and pedestrians.  *See* Ex. 32 §§ 5.3, 5.8.  This would effectively box out more of Bar Harbor's public waterfront for the primary function of facilitating cruise ship passenger arrival and departure during the cruising season.

## DISCUSSION

The assignment on remand is to return to one component of the Dormant Commerce Clause claim.  Before doing so, I pause to address a supposed knock-out punch thrown by Plaintiffs in their briefs and at oral argument.  Specifically, Plaintiffs assert that this case should be decided based on Supreme Court precedent from 1915 associated with the local regulation of street cars.

---

[15] *See*, *e.g.*, Ex 12A; Ex. 32 § 4.2.  In addition to tour buses, there are vans, minibuses, motor coaches, taxis, and bike tours.  While the pulses of congestion are most keen in the mid-morning and afternoon, there is a greater mid-day press as well, which the restaurateur members of APPLL seek to capitalize on.

A.     *South Covington*

In *South Covington & Cincinnati Street Railway Company v. City of Covington*, 235 U.S. 537 (1915), the City of Covington, Kentucky, enacted an ordinance to regulate the operation of street cars based on health and safety concerns.  Because the streetcars in question operated over the Ohio River and transported persons between Kentucky and Ohio, the Supreme Court held that certain of the ordinance's requirements but not others violated the Commerce Clause since they would require the authorities in Cincinnati, Ohio to comply with the requirements imposed by authorities in Covington, Kentucky, and, in turn, Cincinnati could impose its own ordinance, which might be inconsistent with Covington's, such that "interstate business might be impeded by conflicting and varying regulations . . . with which it might be impossible to comply." *Id.* at 547–48.

The non-offending regulations involved design requirements including safety rails to prevent passengers from falling from the back or front of the streetcars and a requirement that the cars be kept clean, well ventilated, and fumigated. *Id.* at 548.  The offending requirements consisted of a limit on the number of persons who could ride on the streetcars at one time and the number of streetcars that the railway company had to keep in service. *Id.* at 549.  It was held that toleration of the disallowed regulations would only lead to "embarassments," whereas toleration of the allowed regulations involved only incidental impacts on commerce. *Id.*  That was the long and the short of it.

I do not find *South Covington* to be controlling, though I recognize why it has appeal to Plaintiffs and the Pilots Association as one in "a line of cases" that are concerned with interstate transportation, as highlighted in *National Pork Producers Council*, 598 U.S. at

24

379 n.2. *See also id.* at 399 (Roberts, C.J., concurring op.) ("The *Pike* balance may well come out differently when it comes to interstate transportation, an area presenting a strong interest in 'national uniformity.'" (quoting *General Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997)).  The interstate transportation aspect of this case undoubtedly calls for application of the *Pike* balancing analysis.  This is clearly not a scenario in which a court would summarily dismiss the *Pike* claim as occurred in *National Pork Producers Council* for lack of a significant or substantial burden on interstate commerce.  *See Triumph Foods, LLC v. Campbell*, 156 F.4th 29, 48-50 (1st Cir. 2025) (describing the dismissal that occurred in *National Pork Producers Council*).

As for the idea that *South Covington* summarily knocks out Bar Harbor's Ordinance based on the embarrassment of competing regulations, "the language of an opinion is not always to be parsed as though we were dealing with language of a statute."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979).  "Instead, [Supreme Court] opinions dispose of discrete cases and controversies and they must be read with a careful eye to context."  *Nat'l Pork Producers Council*, 598 U.S. at 373–74.  Cruise ships are not tethered by necessity to separate task masters with inimical regulations.  Cruise ships are not locked on a rail line or interstate highway system.  Based on local conditions, municipalities either welcome the cruising public or they do not.  When they do, some municipalities rationally wish to cater only to cruising operations of a preferred magnitude, based on local conditions.  These desires grow out of local concerns not readily susceptible to a one-size-fits-all approach.  Cruise companies can fashion itineraries accordingly, assigning vessels to the ports that welcome them.  By imposing local limitations, no municipality presupposes that it has

25

thereby dictated the size or shape or number of cruise ships that cruise lines wish to construct or to which other ports they might direct them on the open ocean. Moreover, to the extent a cruise line's business model runs up against a local regulation, it is most likely the result of the incompatibility of the cruise line's business model (particularly in the form of vessel size and lower-berth capacity) with local conditions.

There simply is no *South Covington* "embarrassment" in this picture. Plaintiffs and the Pilots Association have all along advised the Court that municipal participation in the cruise industry trade is a voluntary affair between partners. They have indicated that they are sensitive to the local congestion impact of their business model and as evidence of their understanding, they have fastidiously avoided unworkable scenarios. Yet with this new advocacy based on *South Covington* Plaintiffs lay bare the stark contention that any municipal restriction that does not accommodate their largest vessels is categorically unconstitutional and, greater still, an embarrassment to commerce. In my prior Decision and Order I concluded that it is proper for municipalities to regulate the extent to which they can accommodate cruise ships with increasingly high lower-berth capacities, explaining that "this case illustrates that the impact of cruise tourism on local living conditions is a hyperlocal concern that is not well suited to a one-size-fits-all regulatory approach at the federal level." Am. Dec. & Order at 53-54. The First Circuit affirmed that determination. Accordingly, what I have now said on this issue is likely beside the point.

26

The *South Covington* argument is outside the bounds of the remand objective and has received much more treatment than it deserves.[16]

**B.      *Pike* Balancing**

The Constitution vests Congress with the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. art I, § 8.  The Commerce Clause not only confers on Congress the supreme authority to regulate commerce but imposes a variety of constraints on state and local government efforts to do the same in the absence of congressional action.  Among these constraints is one applicable to nondiscriminatory regulations that impose incidental burdens on interstate commerce.  This constraint on state and local regulation arises from the premise "that the Commerce Clause not only vests Congress with the power to regulate interstate trade [but also] 'contain[s] a further, negative command,' one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'"  *Nat'l Pork Producers Council*, 598 U.S. at 368 (quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)).  The judicial inquiry that attends the application of this restraint is commonly referred to as the *Pike*

---

[16] In response to the First Circuit's direction to evaluate the burden on commerce on other coastal towns, *APPLL*, 147 F.4th at 72, Plaintiffs and Pilots Association contend that the Ordinance, if tolerated, will impose "a reductive constraint on maritime cruise commerce" and lead to a "nightmare" of "numerically disparate restrictions at other ports, reducing . . . commerce to the lowest common denominator."  Joint Brief at 18 & n.24.  I conclude that this observation is adequately answered by my rejection of the *South Covington* argument.  It stands to reason that as cruise ships grow in size with ever-increasing lower-berth capacities, the number of ports that are suited to accommodate them will decrease in number, since cruise lines are unwilling to make a shore visit unless a ship's entire complement of passengers is able to come ashore, typically in a single day.

balancing analysis, or "*Pike* balancing," in reference to *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Pike* balancing looks to judges to decide whether a particular state or local regulation imposes burdens on commerce that are "excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. Here, the burden of proving excessiveness falls on Plaintiffs and the Pilots Association. *Ass'n to Preserve. & Protect Local Livelihoods*, 147 F.4th at 65.[17]

This is hazardous as well as presumptuous work. *See Nat'l Pork Producers Council*, 598 U.S. at 381-82. "Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Id.* at 390 (quoting *Conway v. Taylor's Executor*, 66 U.S. (1 Black) 603 (1862)). In my prior Amended Decision and Order, I concluded that the voters of Bar Harbor had acted wisely enough for *Pike* purposes, based on a trial record that, in my view, displayed the Town Council's historic tendency toward excessive deference to the cruise line industry, a misleading effort by Plaintiffs and the Pilots Association when it came to depicting peak tourism conditions in Bar Harbor, and an industry business model that favors economies of scale without special concern for local community impacts. Ultimately, that assessment was held to be insufficiently founded, and so the question of the proper balance returns to me to resolve based on my own findings and conclusions without affording deference to the Bar harbor

---

[17] Plaintiffs and the Pilots Association argue that the burden falls on Defendant to demonstrate that the Ordinance produces its intended benefits. Joint Brief at 21-22. My findings concerning peak congestion and the benefits of the Ordinance are based on the entire trial record and I would make these findings regardless of where the burden falls. The same is true of my ultimate assessment concerning *Pike* balancing.

voting public or penalizing Plaintiffs' efforts to downplay the significance of peak congestion.

As related in my findings, the Ordinance yields both substantial burdens on interstate commerce and substantial local benefits of the kinds that the initiative's authors sought to achieve. Comparing the two interests is in some ways like inquiring "whether a particular line is longer than a particular rock is heavy." *Nat'l Pork Producers Council*, 598 U.S. at 381 (quoting *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in judgment)). Still, that is the task. When I reflect on the problem of articulating what the proper balance is, the one background circumstance that most readily provides a workable pivot point is the divide between peak and shoulder seasons. It has been an abiding personal impression, rational in my view, that what may be fair and balanced for the peak season may not be fair and balanced for the shoulder season. The record powerfully conveys the notion that Bar Harbor's peak season is not as suited to high lower-berth-capacity cruise ships, whereas the shoulder season most likely is. In fact, the distinction between seasons is a major consideration when one is assessing what an appropriate passenger disembarkation cap should be. If a 1,000-passenger cap can be accommodated in the peak season, even a somewhat higher cap is one readily available example of a "less burdensome means" that would serve in the shoulder season. *Ass'n To Preserve & Protect Local Livelihoods*, 147 F.4th at 72.

When I consider the burdens and benefits described above in my findings, I am not persuaded by Plaintiffs and Intervenor-Plaintiff's that the burden imposed on their trade is clearly excessive in relation to the putative local benefits during the peak summer season.

29

In the peak summer season tourism imposes substantial burdens on the Bar Harbor downtown, burdens that are felt in a variety of meaningful and substantial negative ways by local residents, mostly in relation to congestion, and always in relation to the quality of municipal life.  As applied during the peak season, the Ordinance is designed to and does in fact achieve that amount of breathing room that makes an intolerable situation tolerable. If one is up to one's eyeballs in water, lowering the water beneath one's nostrils is a substantial benefit, indeed, an emergent need, even if the volume of water is not thereby dramatically reduced.[18]  The Ordinance is in my view measured and reasonable for the peak summer season, not clearly excessive in relation to the local benefits, because peak season congestion has all but exhausted the voting public's patience and tolerance, and that exhaustion is the product of much more than mere marginal impacts.  Plaintiff and the Pilots Association's less burdensome, "voluntary" alternative fails to account for the fact that there is no predictive model to plan for a low-intensity tourism day and, given this fact, I find it appropriately balanced for the Defendant to impose the 1,000-passenger cap across the entire peak summer season.

As for the shoulder season, I find that Plaintiffs and Intervenor-Plaintiff's protests are much more sensible and that Defendant and Intervenor-Defendant's opposition lacks persuasive force.  That is not to say that I believe that the residents of Bar Harbor should be required to endure a level of cruise traffic during the shoulder season that ensures they have no respite from the press of the peak summer tourism season; only to say that the

---

[18] Plaintiffs and the Pilots Association calculate the cruise passenger contribution to congestion as approximately seven percent.  Joint Brief at 25.

1,000-passenger limitation, applied to every day of every week in the shoulder season is really quite parsimonious from an objective standpoint. This hard limitation is difficult to defend on a principled basis. The distinction between peak and shoulder seasons is longstanding and self-evident. The Initiative authors' failure to recognize and account for the significant intensity fluctuation between the shoulder seasons and the summer season appears more an act of indifference than a fair-minded effort to balance competing interests. It is to be expected that the authors of this kind of initiative would have performed their own *Pike* balancing long before I ever needed to. Yet I cannot see or infer that they ever did. Instead, they presented the voters with one disembarkation limitation born out of peak frustration. Under *Pike*, "the extent of the burden that will be tolerated will . . . depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142; *see also APPLL*, 147 F.4th at 67-68 (flagging a need to consider the possible effectiveness of less onerous restrictions). In Bar Harbor, in the shoulder seasons, public disaffection with the local burdens of cruise tourism could be managed as effectively by, for instance, periodic accommodation of cruise ships with lower-berth capacities in excess of 1,000 passengers.[19]

That is my judicial calculus concerning the *Pike* balancing test and the Ordinance's 1,000-passenger cap on daily disembarkations regardless of season. Needless to say, problems of this kind are best addressed in a legislative venue. But popular initiatives are

---

[19] Alternatively, Bar Harbor might significantly increase the passenger cap in the shoulder season but decrease the number of cruise ship days, achieving thereby a measured increase in the total volume of cruise ship tourism above what is permitted during the peak season.

the last resort of majorities who find no safe harbor by their representatives and litigation is the last resort of losers in the democratic arena, leading inexorably to this act of judicial rearrangement.

## CONCLUSION

Based on my findings of fact I conclude that the Ordinance's 1,000-passenger cap is not clearly excessive in relation to its local benefits during the peak summer tourism season but is clearly excessive in relation to the shoulder seasons.  Accordingly, I declare the Ordinance unconstitutional and unenforceable in all months other than July and August.

SO ORDERED.

Dated this 15th day of May, 2026

/s/ Lance E. Walker
Chief U.S. District Judge

32